## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| AMBER WOOD, ASHLEY SCHUCHART, KAREN BURKE, and DANIELLE COATES, | Case No. |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| FCA US LLC, a Delaware limited liability corporation, | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................1

II.    JURISDICTION AND VENUE ...................................................3

III.   THE PARTIES .............................................................................4

     A.    Plaintiffs .............................................................................4

          1.    Plaintiff Amber Wood...............................................4

          2.    Plaintiff Ashley Schuchart .......................................7

          3.    Plaintiff Karen Burke .............................................10

          4.    Plaintiff Danielle Coates ........................................13

     B.    Defendant .........................................................................15

IV.   FACTUAL ALLEGATIONS......................................................16

     A.    FCA's 2.4L Tigershark MultiAir II Engine .....................16

     B.    The Defects in the Class Vehicles....................................17

          1.    The Oil Consumption defect creates a safety
               hazard for class members............................................17

          2.    The Oil Indicator defect creates a safety hazard for
               class members. ........................................................23

     C.    FCA's national advertising campaign misrepresents the
          safety of the Class Vehicles. .............................................28

     D.    FCA has known of the dangerous defects present in the
          Class Vehicles for years. ..................................................33

          1.    Pre-release design, manufacturing, and testing
               data—as well as post-release monitoring—alerted
               FCA to the defects. .................................................34

010902-11/1259753 V1

2.     Dealership repair records and warranty claims data also support FCA's knowledge of the defects. .........................35

3.     By issuing its 2015 TSB, FCA implicitly acknowledged reports of abnormal oil consumption by 2015. ................................................36

4.     Complaints made to NHTSA and on internet forums also support FCA's knowledge of the defects. ...................................................................37

5.     Acknowledgements of the pervasiveness of the defects by dealerships also supports that FCA would have known early on about them. ...................39

E.     FCA has exclusive knowledge of the defects. ....................................41

F.     FCA has actively concealed the defects. ............................................43

G.     The statute of limitations should be tolled. .........................................45

V.     CLASS ACTION ALLEGATIONS ................................................................46

COUNT I  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND  DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A) ......................................................50

COUNT II  FRAUDULENT CONCEALMENT (BASED ON ILLINOIS LAW) .........................................................................................55

COUNT III  VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*) .....................56

COUNT IV  FRAUDULENT CONCEALMENT (BASED ON OHIO LAW) ................................................................................................62

COUNT V  VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET SEQ.*) ...................................................................64

COUNT VI  FRAUDULENT CONCEALMENT (BASED ON PENNSYLVANIA LAW) ...............................................................................69

- ii -

COUNT VII  VIOLATIONS OF STATE CONSUMER
     PROTECTION ACTS ................................................................70

COUNT VIII  FRAUDULENT CONCEALMENT UNDER
     COMMON LAW OF EACH STATE ...........................................75

RELIEF REQUESTED.........................................................................77

DEMAND FOR JURY TRIAL .............................................................78

010902-11/1259753 V1

Plaintiffs Amber Wood, Ashley Schuchart, Karen Burke, and Danielle Coates (Plaintiffs) bring this action on behalf of themselves and all those similarly situated who purchased or leased any vehicle equipped with a 2.4L Tigershark MultiAir II Engine (Class Vehicles) manufactured and sold by FCA US LLC, formerly known as Chrysler Group LLC (FCA or Defendant).  All allegations made in this Complaint are based on investigation of counsel, except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## I.   INTRODUCTION

1.     Car manufacturers have a responsibility to ensure that the vehicles they sell to consumers are safe.  A car manufacturer violates this duty when it sells vehicles that, unbeknownst to drivers: (a) consume excessive engine oil so that oil pressure drops too low before recommended oil changes; and (b) to avoid engine damage when oil pressure drops too low, shut off during operation without warning.  This is incredibly dangerous.  But this is exactly what happens with the Class Vehicles.  And FCA fails to disclose it to consumers.

2.     The Class Vehicles contain a significant design and/or manufacturing defect in their engines that causes them to improperly burn off and/or consume abnormally high amounts of oil.  As a result of this "Oil Consumption" defect, Class Vehicles can shut down during the course of their normal operation—placing the occupants and surrounding vehicles at an increased risk of serious injury and

death.  Indeed, FCA has expressly acknowledged in other unrelated safety recalls that "an engine stall could cause a crash without prior warning."

3.      Moreover, the sudden shut offs caused by the Oil Consumption defect could be avoided if FCA's oil indicator system alerted drivers of the Class Vehicles that their engine oil was running low.  But it does not.  And this "Oil Indicator" defect means that drivers of the Class Vehicles only become aware of a dangerously low engine-oil level after it causes an engine stall or shut-down, putting their lives at risk.  Indeed, Class Vehicles shut down without warning *when FCA's oil change indicator does not yet recommend an oil change*.

4.      FCA has long known about the Oil Consumption and Oil Indicator defects, as hundreds of Class Vehicle owners and lessees have reported instances of their vehicles shutting down without warning due to low oil levels and/or pressure.  Yet rather than being honest about these problems, FCA has engaged in efforts to conceal them by describing the defects as "normal" in a technical service bulletin.

5.      By characterizing the excessive oil consumption rate as "normal," FCA has avoided the economic fallout that would inevitably result from recalling the millions of Class Vehicles.  As a result, Class Vehicle owners must fend for themselves, attempting to have the defect diagnosed and repaired on their own or

- 2 -

otherwise drive unsafe vehicles that could suffer from mechanical breakdown at any time, even while the car is travelling at full speed.

6.     The Oil Consumption and Oil Indicator defects pose a material safety risk to the operators and passengers of all Class Vehicles.  The dangers of excessive and/or abnormal oil consumption include increased mechanical breakdown and a resulting increase in the risk of injury or death.  Plaintiffs and many other class members have experienced the Oil Consumption and Oil Indicator defects, and FCA continues to put owners and lessees of the Class Vehicles at risk by refusing to replace them.

7.     The alleged defects not only threaten every passenger in a Class Vehicle, they also materially reduce the Class Vehicles' value as well.  Consumers who purchased Class Vehicles have been harmed by purchases they would not have made or paid as much for had they known the truth.  FCA should be required to compensate consumers for its deceptive conduct and remedy these defects.  So Plaintiffs bring claims on behalf of themselves and all those similarly situated for FCA's violation of the consumer protection laws of each of the fifty states.

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant; the proposed Class consists of 100 or more

members; and the amount in controversy exceeds $5,000,000, exclusive of costs and interest..

9.      Venue is proper in this District under 28 U.S.C. § 1391 because FCA is headquartered in this District; FCA has marketed, advertised, sold, and leased the Class Vehicles within this District; and many of the acts and transactions giving rise to this action occurred in this District, including FCA's design, manufacturing, promotion, marketing, distribution, and sale of Class Vehicles. Further, a significant number of the Class Vehicles are registered in this District and thousands of Class Vehicles are in operation in this District.

### III.    THE PARTIES

**A.    Plaintiffs**

**1.    Plaintiff Amber Wood**

10.     Plaintiff Amber Wood is a resident of Aurora, Illinois.  On or about November 18, 2018, Plaintiff purchased a 2018 Jeep Compass VIN# 3C4NJDBBXJT480397 (for purposes of this section, the Affected Vehicle) from Bettenhausen Chrysler Dodge Jeep RAM in Tinley Park, Illinois.  Plaintiff purchased and still owns this vehicle.

11.     Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L Tigershark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design.  FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling,

- 4 -

and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator

defects has caused out-of-pocket loss, future attempted repairs, and diminished

value of the Affected Vehicle.

12.     Plaintiff uses the Affected Vehicle for personal, family, and/or

household uses.  Prior to purchasing the Affected Vehicle, Plaintiff reviewed the

Munroney Label FCA placed on the window.  The window sticker advertised the

Affected Vehicle's various features (such as price, specifications, gas mileage,

equipment and warranty details, and crash test ratings) and Plaintiff relied on the

advertisements contained within the window sticker when deciding to purchase the

Affected Vehicle.  The Munroney sticker did not disclose that the Affected Vehicle

possessed any defects.

13.     Plaintiff has followed the FCA-issued Owner's Manual for her

Affected vehicle and taken the Affected Vehicle in for regular oil changes when

the indicator light has come on.  However, since purchasing the Affected Vehicle,

Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite

adhering to FCA's suggested maintenance schedule for oil changes.  In fact, only a

few weeks after purchasing the vehicle, Plaintiff was driving the Affected Vehicle

to work and while she was making a left turn, it shut off and would not move.

Plaintiff called her dad because he is a mechanic and he told her to keep trying to

turn it back on.  Plaintiff was finally able to get the Affected Vehicle to start and

drove it to her nearby home.  Once she was home, Plaintiff called the dealership.

They told her if she did not feel safe enough to drive it to the dealership, which

was 35 minutes away, to have it towed in for diagnosis and repair.  The FCA

technician said they were not sure what happened.  They kept the vehicle for a

couple of days then told her the Affected Vehicle was sucking down oil and

needed a new motor.  The engine was replaced.  Recently, the oil change indicator

light came on even though it was only 2000 miles since the last oil change.

14.    FCA never told Plaintiff about the Oil Consumption or Oil Indicator

defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but

mistaken, belief that her Affected Vehicle would be reliable and safe and would

retain all of its operating characteristics throughout its useful life.  Plaintiff

specifically shopped for an FCA vehicle because she believed FCA's broad

advertising messaging that its vehicles were safe and reliable.  None of the

advertisements reviewed or representations received by Plaintiff contained any

disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator

defect or the fact that FCA would refuse to repair the defects.  Had FCA disclosed

the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket

costs, including repair costs, Plaintiff would have received these disclosures, and

she would not have purchased the Affected Vehicle or would have paid less for it.

- 6 -

### 2.    Plaintiff Ashley Schuchart

15.    Plaintiff Ashley Schuchart is a resident of Shorewood, Illinois. On or about November 19, 2017, Plaintiff purchased a 2017 Jeep Cherokee VIN#1C4PJMCB0HW570671 (for purposes of this section, the Affected Vehicle) from Zeigler Chrysler Dodge Jeep RAM of Downers Grove in Downers Grove, Illinois.  Plaintiff purchased and still owns this vehicle.

16.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L Tigershark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design.  FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

17.    Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Munroney Label FCA placed on the window.  The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the

- 7 -

Affected Vehicle.  The Munroney sticker did not disclose that the Affected Vehicle possessed any defects.

18.     Plaintiff has followed the FCA-issued Owner's Manual for her Affected vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on.  However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption defect, despite adhering to FCA's suggested maintenance schedule for oil changes.  Plaintiff's vehicle has shut down several times without warning as she was driving on busy roads.

19.     When she brought the Affected Vehicle in for an oil change at 32,886 miles, she complained to her authorized FCA dealership about it shutting off on her.  The FCA technician inspected the Affected Vehicle and told her the car was fine but said the oil was half-way down the safe zone.  As a result, the dealership had Plaintiff begin oil consumption testing at 33,335 miles.  At roughly 35,681 miles, Plaintiff brought the Affected Vehicle in to the dealership due to an issue with the shifter lights.  They checked the oil and the vehicle was 2 quarts low, so they filled it up.  At 37,777 miles Plaintiff brought the Affected Vehicle in for another oil consumption test and it was 1.25 quarts low.  At 40,919 miles, the Affected Vehicle was a quarter of an inch below the hash marks on the dip stick.  At 45,029 miles, the Affected Vehicle was one and a half quarts low.  Plaintiff has brought the vehicle in several times for oil consumption testing.

- 8 -

20.     At 47,109 miles, the Affected Vehicle shut off while Plaintiff was driving it again.  The car driving behind Plaintiff almost hit her.  Plaintiff called Tyson Motors in Shorewood, Illinois to tell them what happened and they said, "I know what that is, means it's time for an oil change."  Plaintiff's dad came to get her and added 3 quarts of oil.  Plaintiff brought the Affected Vehicle to Tyson Motors two days later and the vehicle was four quarts low.  Tyson Motors told Plaintiff she needed to restart the oil consumption testing so she did.  Plaintiff's vehicle continues to consume oil at an abnormally high pace.

21.     At 71,813 miles, the Affected Vehicle stalled while Plaintiff was driving and would not restart. Plaintiff added one quart of oil and drove it to the FCA dealership.  Plaintiff tweeted a video of the car stalling on Jeep Cares and was contacted by FCA customer care.  The case manager told Plaintiff she needed to continue oil consumption testing.  At 72,895 miles, the Affected Vehicle was a half quart low.  At 73,709 miles the engine failed.  Plaintiff was driving on the expressway when the entire vehicle started to violently shake and it would not accelerate. Plaintiff was able to limp it off the expressway.  The Affected Vehicle then died at a light, but Plaintiff restarted it and was able to coast into a gas station parking lot.  From there, the Affected Vehicle was towed to the dealership where the engine was replaced.  Plaintiff's vehicle continues to have issues with oil consumption.

- 9 -

22. FCA never told Plaintiff about the Oil Consumption or Oil Indication defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indication defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

### 3. Plaintiff Karen Burke

23. Plaintiff Karen Burke is a resident of Johnstown, Pennsylvania. On or about June 13, 2018, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, the Affected Vehicle) from Laurel Chrysler Didge Jeep Ram in Johnstown, Pennsylvania. Plaintiff purchased and still owns this vehicle.

24. Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design. FCA's unfair,

- 10 -

unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

25.     Plaintiff uses the Affected Vehicle for personal, family, and/or household uses.  Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Munroney Label FCA placed on the window.  The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle.  The Munroney sticker did not disclose that the Affected Vehicle possessed any defects.

26.     Plaintiff has followed the FCA-issued Owner's Manual for her Affected vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on.  However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes.  In October 2019, the Affected Vehicle completely shut down when Plaintiff was merging onto a highway.  There was a huge truck behind Plaintiff at the time who almost hit the Affected Vehicle and had to swerve around to miss hitting her.  Plaintiff brought

- 11 -

the Affected Vehicle to her FCA dealership and the technician said, "You could use a little oil. Just make sure you check your oil more often." However, the low oil indicator light had not come on to alert her.

27.    Plaintiff delivered her vehicle to an authorized FCA dealership for diagnosis and repair. The FCA technician diagnosed the vehicle with low oil. When Plaintiff asked the dealership personnel about the cause of the oil consumption problem, the dealership said told her to check the oil every few days herself. Plaintiff's Affected Vehicle continues to consume oil at an abnormally high pace.

28.    FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket

- 12 -

costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

### 4.    Plaintiff Danielle Coates

29.    Plaintiff Danielle Coates is a resident of Cincinnati, Ohio.  On or about February 23, 2019, Plaintiff purchased a used 2016 Jeep Cherokee VIN# 1C4PJLCB5GW176866 (for purposes of this section, the Affected Vehicle) from Jeff Wyler Ft. Thomas Chrysler Ram Jeep in Ft. Thomas, Kentucky.  Plaintiff purchased and still owns this vehicle.

30.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L Tigershark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design.  FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

31.    Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Munroney Label FCA placed on the window.  The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the

- 13 -

advertisements contained within the window sticker when deciding to purchase the Affected Vehicle.  The Munroney sticker did not disclose that the Affected Vehicle possessed any defects.

32.    Plaintiff has followed the FCA-issued Owner's Manual for her Affected vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on.  However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes.  For example, in August 2019, while driving her Affected Vehicle down a busy street, it sputtered and stalled while turning left into a mall parking lot.  This was a very dangerous situation because the vehicle stalled as Plaintiff was turning left and crossing lanes of traffic flowing in the opposite direction.  Because the vehicle stalled, Plaintiff was unable to accelerate the vehicle through the turn, and was forced to coast, barely making it into the parking lot.  Plaintiff, with the assistance of a woman who worked at a nearby restaurant, pushed the Affected Vehicle into a safer location. Plaintiff called her family members for assistance.  After her family members arrived, they checked the vehicle's oil level and determined that the oil level was bone dry.  Prior to and even after stalling, there was no check oil level warning from the vehicle.  Plaintiff's family then drove her to a nearby Advanced Auto store where Plaintiff purchased a 5-qt container of oil and funnel, spending $32.22.

- 14 -

After adding approximately 4 quarts of oil to the vehicle, the vehicle started and was operational.

33.     FCA never told Plaintiff about the Oil Consumption or Oil Indication defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad advertising messaging that its vehicles were safe and reliable.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indication defect or the fact that FCA would refuse to repair the defects.  Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

## B.     Defendant

34.     Defendant FCA US LLC is a limited liability corporation organized and in existence under the laws of the State of Delaware. FCA's corporate headquarters are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. At all relevant times, Defendant was and is engaged in the business of designing,

- 15 -

manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components throughout the United States.

## IV.    FACTUAL ALLEGATIONS

### A.    FCA's 2.4L Tigershark MultiAir II Engine

35.    Prior to 2013, consumers had complained that some of the Class Vehicles were underpowered, so the larger 2.4L Tigershark MultiAir II Engine 2.4L supplanted the World Gas Engine used previously by Chrysler and was a near top-down overhaul.

36.    This advertisement depicts the new engine:



37.    The Class Vehicles equipped with this engine include the following:

- 2015 – 2016 Chrysler 200;

- 2013 – 2016 Dodge Dart;

- 2016 – 2020 Fiat 500X;

- 2017 – 2020 Fiat Toro;

- 16 -

- 2014 – 2020 Jeep Cherokee;

- 2017 – 2020 Jeep Compass;

- 2015 – 2020 Jeep Renegade; and

- 2015 – 2020 Ram ProMaster City.

38.    The 2.4L Tigershark engine employs an electro-hydraulic "MultiAir" technology proprietary to FCA.  MultiAir is supposed to offer more controllable flow of air during the engine combustion cycle when compared to mechanical variable valve timing systems.  According to FCA, the MultiAir technology is supposed to increase engine power and torque, reduce fuel consumption, and reduce emissions.  Based on information and belief, FCA's MultiAir hydraulic system requires strict maintenance of oil volume to function properly.

**B.    The Defects in the Class Vehicles**

**1.    The Oil Consumption defect creates a safety hazard for class members.**

39.    Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing within the combustion chamber, and to cool the engine by carrying heat away from the moving parts.  If there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts, inadequate performance, and catastrophic engine failure.

- 17 -

40.     As explained by FCA in a July 31, 2015, Technical Service Bulletin, "Engines require oil to lubricate and protect the load bearing and internal moving parts from wear including cylinder walls, pistons and piston rings."

41.     But according to FCA dealerships there is a problem with the pistons and/or rings causing the Oil Consumption defect.  A March 29, 2019, National Highway Traffic Safety Administration (NHTSA) complaint regarding a 2015 Jeep Cherokee, indicates that the "dealership says this is an oil consumption issue" having "to do with the pistons."  And a November 22, 2019, NHTSA complaint regarding a 2016 Jeep Cherokee says that an "engine piston [was] blown" due to a "faulty engine with excessive oil consumption."  And a 2020 complaint regarding a 2019 Jeep Cherokee says that the driver required a new engine because "the piston rings in the engine broke and scored the cylinder leaving the engine to consume too much oil."

42.     In a Technical Service Bulletin, dated July 31, 2015, FCA addresses oil consumption in its vehicles but hides the precise cause of the defect.  Instead of describing the cause and the fix in the bulletin, FCA instead directs the dealership "to the detailed diagnostic procedures available in DealerCONNECT> TechCONNECT."

43.     On information and belief, and based on the description of the defect in another case involving similar allegations, the top sidewall of each engine piston

- 18 -

contains piston rings that prevent engine oil from entering the combustion chamber, as well as optimizing compression.  But the oil control strategy in the Class Vehicles does not work as intended, allowing engine oil to escape past the oil control piston ring and into the combustion area.  This is the result of oil control piston rings that do not integrate properly with the cylinders in which they operate. Although piston rings do not require maintenance, and are purportedly lifetime parts, the rings in Class Vehicles wear down, whereby the oil control piston ring is worn flush with the piston wall, allowing engine oil to be consumed during the compression cycle.

44.     And if there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts and catastrophic engine failure.

45.     To avoid such catastrophic engine failure, FCA employs what it calls a "safety feature"—the Class Vehicles upon detecting low oil pressure simply shut down.  As repeatedly remarked upon in NHTSA complaints regarding the Jeep Cherokee, the "dealership says it is a safety feature to shut engine off in the middle of the freeway" and "the car shutting off while in motion was referred to as a safety feature by the dealership."  But consumers say it is "an unsafe safety feature and downright dangerous" and "a safety feature to save engine but apparently not

human lives." And one consumer called it not a "safety feature" but a "danger switch."

46.    The Oil Consumption defect unreasonably threatens the safety of drivers and passengers using the Class Vehicles. Because of the Oil Consumption defect, the Class Vehicles are prone to sudden and unexpected shut down, creating unsafe driving conditions when the vehicle stalls or shuts off without warning, as indicated in these NHTSA complaints:

- I PURCHASED A 2019 JEEP CHEROKEE AND IN LESS THAN 3,000 MILES THE CAR BROKE DOWN. IT GAVE NO INDICATION, JUST COMPLETELY SHUT OFF WHILE I WAS DRIVING IN THE MIDDLE LANE OF A FAST-PACED HIGHWAY AND ALMOST KILLED ME. THE DEALERSHIP TOLD ME IT WAS LOW ON OIL. June 12, 2019, complaint regarding 2019 Jeep Cherokee.

- VEHICLE, WHILE IN MOTION, STALLS AND ENGINE SHUTS OFF AT ANY SPEED. BEING TOLD OIL BURNS TOO QUICKLY IN THESE VEHICLES AND THIS IS A SAFETY FEATURE THE CAR HAS ALTHOUGH IT HAS ALMOST COST ME MULTIPLE SERIOUS/POTENTILLY FATAL COLLISIONS WITH MY INFANT CHILDREN IN THE VEHICLE. NO OIL INDICATOR HAS EVER TURNED ON INDICATING OIL LEVEL IS LOW. HAD SAME ISSUE WITH THIS CAR AT 15,000 MILES IN WHICH ENGINE WAS COMPLETELY REPLACED BUT NOW IS DOING THE SAME THING AS BEFORE. THIS IS A WELL DOCUMENTED ISSUE AMONGST JEEPS - WHY HAS THERE NOT BEEN A RECALL? THIS IS A MAJOR SAFETY CONCERN AND OUR LIVES AND THE LIVES OF OUR CHILDREN ARE AT RISK AS I ALMOST WAS T-BONED TODAY AS MY ENGINE STALLED IN A BUSY INTERSECTION. I WAS ATTEMPTING TO TURN BUT HAD NOT YET MANEUVERED AND WAS LEFT STALLED IN THE MIDDLE BLOCKING ONCOMING TRAFFIC ON A BUSY CITY STREET BUT HAD HAD THIS SAME PROBLEM HAPPEN ON A HIGHWAY. August 6, 2019, complaint regarding a 2016 Jeep Cherokee.

- CAR JUST RANDOMLY SHUT OFF IN MIDDLE OF A 50 MPH HIGHWAY, ALMOST CAUSED ACCIDENT. IT DID IT A COUPLE MORE TIMES BEFORE I GOT IT LOOKED AT. DEALER SAID IT WAS SO LOW ON OIL IT SHUT OFF.  January 5, 2017, complaint regarding a 2015 Jeep Cherokee.

- THE DEALER EXPLAINED WHEN THE DIPSTICK DOES NOT "FEEL" OIL THE ENTIRE CAR ESSENTIALLY SHUTS DOWN AND LOCKS UP IN ORDER TO "PROTECT THE ENGINE" CAUSING THE DRIVER TO LOSE ALL ABILITY TO CONTROL IT. THEY MIGHT BE PROTECTING THE ENGINE FROM BURNING OIL, BUT TO LOSE FUNCTIONALITY PUTS MY LIFE AND FAMILY IN DANGER. JEEP/CHRYSLER HAVE HAD THIS REPORTED BEFORE AS I FOUND NUMEROUS CASES OF THE SAME STORY. HOWEVER NO RECALL HAVE BEEN ISSUED. I COULD HAVE BEEN IN A VERY SERIOUS ACCIDENT. I WAS NOT TOLD ANY OF THIS INFORMATION WHEN I PURCHASED THE CAR.  May 21, 2019, complaint regarding 2016 Jeep Cherokee.

- WHEN CAR STALLS OUT IT IS WHILE YOU ARE DRIVING AND HAPPENS WITHOUT WARNING, I WAS IN THE MIDDLE OF AN INTERSECTION THE FIRST TIME IT HAPPENED TO ME. I COULD HAVE BEEN KILLED TO "SAVE THEIR ENGINE."  January 8, 2019, complaint regarding 2016 Jeep Cherokee.

- WHILE DRIVING THE ENGINE CUT OUT. I DRIFTED TO THE SIDE OF THE ROAD, PUT IT IN PARK AND RESTARTED IT. THERE WASN'T ANY MESSAGE THERE WAS A PROBLEM. IT WAS FINE FOR A COUPLE OF DAYS AND THEN WHILE DRIVING TO WORK THE SAME THING HAPPEN AGAIN. I WAS ABLE TO GET TO THE SIDE WITHOUT BEING HIT. ON CHECKING THE INTERNET IT SHOWED OTHERS HAD THE SAME PROBLEM AND WAS RELATED TO OIL. . CHECKED OIL AND IT WAS LOW. I TOOK IT TO THE DEALERSHIP AND THEY CONFIRMED THE 2.4 CUTS OFF EVEN IF THE VEHICLE IS IN MOTION WITH NO WARNING WHEN OIL IS LOW. NO ONE EVER TOLD ME THIS. HAD I BEEN ON A BUSIER MULTI LANE ROAD I MAY HAVE BEEN INVOLVED IN AN ACCIDENT. I HAVE NEVER NEEDED TO CHECK MY OIL BETWEEN SERVICE ON A NEWER CAR BEFORE THIS IS AN UNSAFE DEFAULT TO LOW OIL. IT PUTS THE DRIVER AND PUBLIC IN DANGER. HAD I BEEN TOLD THE VEHICLE MAY SHUT OFF WHILE I WAS DRIVING I WOULD NEVER HAVE BOUGHT THE CAR. I CANT BELIEVE

- 21 -

THAT THEY ARE ALLOWED TO HAVE THIS AS A FEATURE WITH NO WARNING.  April 28, 2018, complaint regarding 2016 Jeep Cherokee.

- WHILE DRIVING MY CAR, THE ENGINE SHUT OFF IN MID DRIVE, IN MOTION, IN A PARKING STRUCTURE GETTING READY TO GET ON THE FREEWAY. I COMPLAINED TO THE DEALER AND THEY SAID IT WAS BECAUSE I NEEDED AN OIL CHANGE AND I WASN'T OVER MILEAGE BY THAT MUCH, HE SAID HE HAS HEARD THIS HAPPEN BEFORE TO A CUSTOMER. I WAS SO TERRIFIED BECAUSE I COULD HAVE BEEN ON THE FREEWAY AND COULD HAVE GOTTEN INTO AN ACCIDENT AND INJURED AND UNTIL THIS DAY I AM VERY DISTURBED AND WORRY IF IT WILL TURN OFF WHILE DRIVING AND EVEN MORE TERRIFIED IF I AM ON THE FREEWAY! I JUST WANT TO REPORT THIS BECAUSE THE DEALERSHIP'S RESPONSE DIDN'T SIT WELL WITH ME AND I THINK IT IS VERY VERY DANGEROUS FOR THE CAR TO TURN OFF JUST BECAUSE YOU NEED AN OIL CHANGE, IS THERE A DEFECT IN MY CAR?  August 20, 2018, complaint regarding 2018 Jeep Cherokee.

- CAR IS BURNING OIL AND SHUTTING OFF ON THE ROAD, WHICH I OR MY CHILDREN, CAN EASILY GET HURT OR KILLED. HAVE TRIED TO HAVE RESOLVED NUMEROUS TIMES WITH UNSATISFACTORY RESULTS FROM THE CAR LOT. AS ADVISED FROM THE SERVICE MANAGER THIS IS NORMAL UNDER CHRYSLER STANDARDS.  February 23, 2018, complaint regarding 2015 Jeep Cherokee.

42.    The Oil Consumption Defect also increases the expected cost of

ownership and maintenance of the Class Vehicles.  In order to prevent their

vehicles from stalling, Plaintiffs and class members have needed to replenish the

oil of their vehicles at excessive abnormal rates.  Additionally, the Oil

Consumption defect has the consequential effect of shortening the expected

lifespan of other mechanical components of the Class Vehicles.  Because of this,

Plaintiffs and class members have and will be forced to replace these components

- 22 -

at a much higher rate than they reasonably expected when purchasing the vehicles, thereby increasing their overall cost of ownership.

**2.     The Oil Indicator defect creates a safety hazard for class members.**

47.     The dangers of the Oil Consumption defect are worsened by the Class Vehicles' inability and/or failure to alert drivers to dangerously low oil levels and/or oil pressure.

48.     FCA has equipped the Class Vehicles with an oil change indicator system.  This is a software based, algorithm-driven device that purportedly takes into account various engine operating conditions to determine when the oil needs changing, such as ambient temperature and typical trip length.  It then alerts the driver of the need for an oil change.  As FCA states in the Owner's Manual:

> Your vehicle is equipped with an automatic oil change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance.
>
> Based on engine operation conditions, the oil change indicator message will illuminate. This means that service is required for your vehicle. Operating conditions such as frequent short-trips, trailer tow, extremely hot or cold ambient temperatures will influence when the "Change Oil" or "Oil Change Required" message is displayed.

49.     FCA also explains in its Owner's Manuals that "Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles

- 23 -

(5,600 km) since last reset.  Have your vehicle serviced as soon as possible, within the next 500 miles (805 km)."

50.     And it further explains that oil should be changed "at 4,000 miles (6,500 km) or 350 hours of engine run time if the vehicle is operated in a dusty and off road environment or is operated predominately at idle or only very low engine RPM's," as that "type of vehicle use is considered Severe Duty."

51.     Otherwise, the oil change intervals should not exceed "10,000 miles (16,000 km), twelve months or 350 hours of engine run time, whichever comes first. The 350 hours of engine run or idle time is generally only a concern for fleet customers."

52.     So a reasonable consumer driving under normal, as opposed to severe duty, driving conditions is instructed to change their oil either when prompted to do so by the oil change indicator or by 10,000 miles or twelve months.

53.     Remarkably, FCA's oil change indicator does *not* take into account actual, as opposed to predicted, oil levels.  So it does not alert drivers of the Class Vehicles to low oil levels or oil loss, even when oil levels are critically, dangerously low.  Indeed, consumers routinely report not having yet received a change oil message at the time their vehicles stalled or shut off.  Put another way, the Class Vehicles regularly experience such severe shortages of oil that they automatically shut down to protect the engine *before FCA's indicator system tells*

- 24 -

*them they are due for an oil change*.  This represents a complete failure of the oil change indicator system to monitor and provide meaningful information regarding the real world status of the Class Vehicle's oil levels.

52.   FCA also misrepresents that the Class Vehicles are equipped with a separate Oil Pressure Warning Light designed to illuminate when "low engine oil pressure" is detected.  This messaging appears in the Owner's Manual as follows:

Oil Pressure Warning Light

| Red Telltale Light | What It Means |
| --- | --- |
| 🛢 | **Oil Pressure Warning Light**<br>This light indicates low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on.<br>Do not operate the vehicle until the cause is corrected. This light does not indicate how much oil is in the engine. The engine oil level must be checked under the hood. |

52.   According to FCA, a "Red Telltale Light" will illuminate and a chime will sound to alert the driver to "stop the vehicle and shut off the engine as soon as possible."  FCA further instructs owners not to operate the vehicle until the cause is corrected.  But this system also fails to alert drivers of the Class Vehicles *in advance* of the vehicle spontaneously shutting off as a result of low levels.

54.   As a result of the Oil Indicator defect, consumers are not warned in time to avert sudden shut off of their vehicles, creating unsafe driving conditions, as indicated in these NHTSA complaints:

- THE VEHICLE IS BURNING OIL BETWEEN CHANGES, IT SHUTS OFF IN THE MIDDLE OF DRIVING ON A ROAD BECAUSE IT HAS NO OIL. NO WARNING MESSAGES OR LIGHTS POP UP. I HAVE ALMOST BEEN HIT BY OTHER CARS TWICE (WITH A CHILD IN THE BACKSEAT) BECAUSE THE

- 25 -

CAR SHUTS DOWN AND THERE IS NO OIL IN THE CAR. MY
SCREEN SAYS I HAVE OVER 50% REMAINING UNTIL THE
NEXT OIL CHANGE! I WAS DRIVING DOWN THE ROAD, AND
THE VEHICLE SHUT OFF AND I WAS ALMOST HIT BY
OTHER CARS!  January 29, 2019, complaint regarding 2016 Jeep
Cherokee.

- THE CAR WILL SHUT DOWN WITH ABSOLUTELY NO
WARNING, DOESN'T MATTER HOW FAST YOU ARE GOING.
THIS HAS HAPPENED ON BOTH HIGHWAY AND BACK
STREETS. I'M TOLD BY DEALER THAT THE ISSUE IS
THE OIL WAS TOO LOW AND THAT SOME SENSOR SHUTS
DOWN THE ENGINE. NO WARNING LIGHT, NOTHING. JUST
HAPPENS. CAN'T BELIEVE THIS FLAW HAS NOT BEEN
RECALLED OR CAUSED FATALITIES.  November 1, 2017,
complaint regarding 2014 Jeep Cherokee.

- WHILE DRIVING, THE JEEP WILL TURN OFF
AUTOMATICALLY DUE TO THE ENGINE BURING TOO
MUCH OIL. IT CAUSES A SAFETY CONCERN WHEN THE CAR
AUTOMATICALLY STOPS AND CAUSES OTHER CARS TO
SWIRVE OR TO HIT THE CAR. I HAVE ALMOST BEEN HIT
MULTIPLE TIMES BECAUSE OF THIS. THERE IS NO
WARNING TO IT AND NO OIL LIGHT TO TELL ME THE
ENGINE IS LOW OF OIL. December 31, 2019, complaint regarding
2015 Jeep Cherokee.

- MY 2015 JEEP CHEROKEE LATITUDE HAS STALL OUT 3
TIMES ON ME WHILE DRIVING ON BUSY HIGHWAYS. I
TOOK THE VEHICLE IN FOR REPAIR AND WAS TOLD THIS
PARTICULAR ENGINE CONSUMES OIL AT A FAST RATE
AND WITHOUT ANY WARNING, WHEN LOW, WILL STALL
UNEXPECTEDLY. NO WARNING, NO OIL PRESSURE GAUGE
ALERTS, CAR SIMPLE STALLS. I AM AFRAID THE VEHICLE
WILL STALL AND ME AND ANY OCCUPANT WILL BE
KILLED OR SERIOUSLY INJURED.  November 7, 2019, complaint
regarding 2015 Jeep Cherokee.

- WHILE DRIVING ON SUNDAY MY JEEP SUDDENLY
WITHOUT NOTICE OR WARNING SHUT OFF AND WOULD
NOT RESTART, I WAS STRANDED IN MIDDLE OF THE ROAD
SINCE THERE WAS NO WARNING I HAD NO TIME TO PULL
TO SIDE. AAA TOWED TO CLARK CHRYSLER/JEEP WHERE
IT WAS BOUGHT AND UNDER EXTENDED WARRANTY. ALL
PM'S HAVE BEEN DONE THERE AND DONE TIMELY. WHAT
THEY FOUND WAS JEEP WAS DOWN 3 QTS OF OIL, I ASKED

- 26 -

HOW THAT COULD BE AND WHY WOULD ENGINE SHUT OFF SO ABRUPTLY THEY CLAIM THE 2.4 ENGINES USE 1QT PER 1,000 MILES, THAT NO INDICATOR OR WARNING COMES ON AND ENGINE WILL SHUT OFF TO PROTECT IT. NO WHERE IS IT LISTED IN OWNERS MANUAL.  November 15, 2017, complaint regarding 2015 Jeep Cherokee.

- THE ENGINE BURNS THROUGH ALL OF THE OIL IN ABOUT 1500 MILES OF DRIVING. OIL HAS TO BE FILLED IN BETWEEN OIL CHANGES OR ENGINE WILL STOP WITH NO WARNING OR OIL LIGHT... ENGINE STOPS WHILE MOVING. February 24, 2020, complaint regarding 2018 Jeep Cherokee.

- THE 2018 JEEP CHEROKEE LATITUDE CONSUMES OIL AND HAS A MECHANISM WHERE IF THE CAR IS LOW ON OIL IT WILL JUST SHUT OFF WHEN DRIVING. THIS IS A SERIOUS SAFETY HAZARD AS THE CAR GIVES NO WARNING IT IS LOW ON OIL. SOMEONE IS GOING TO GET KILLED ONE DAY WHEN THESE CARS JUST SHUT OFF IN THE MIDDLE OF DRIVING.  December 9, 2019, complaint regarding 2018 Jeep Cherokee.

- VEHICLE SHUTS OFF WHILE DRIVING, CAUSING ME TO HAVE TO PUT IT IN PARK AND RE-START THE ENGINE. TWO TIMES WHEN IT HAPPENED, I WASN'T GOING FAST ENOUGH TO COAST TO THE SHOULDER, SO HAD TO START THE VEHICLE IN THE MIDDLE OF THE STREET. VEHICLE HAS A HARD TIME STARTING ONCE STALLED. SERVICE DEPARTMENT AT DEALERSHIP INFORMED ME OIL WAS LOW, VEHICLE WASN'T DUE FOR AN OIL CHANGE YET. NO WARNINGS OR INDICATOR LIGHTS THAT OIL LEVEL WAS LOW. SERVICE TECHNICIAN SAID TO CHECK OIL EVERY 1000 MILES, ON A BRAND NEW VEHICLE. SAID THIS ENGINE USES A LOT OF OIL. I'M CONCERNED AT PULLING ONTO A BUSY ROAD OR INTO TRAFFIC AND HAVING VEHICLE DIE ON ME AND GETTING HIT.  October 12, 2018, complaint re 2019 Jeep Cherokee.

55.    Consumers reasonably relied on FCA's representations in the Owner's Manuals regarding the oil indicator system and its ability to give notice of the need for an oil change.  Those material misrepresentations are false and have

- 27 -

unreasonably placed Plaintiffs and class members at an increased risk of injury or death.

## C.   FCA's national advertising campaign misrepresents the safety of the Class Vehicles.

56.    The following are examples of Jeep Cherokee advertisements concerning the Class Vehicles that touted their safety and reliability while failing to disclose the Oil Consumption and Oil Indicator defects:



- 28 -





57.     These advertisements state: "Whatever the destination, the 2020

Jeep® Cherokee can help keep you and your passengers safe and secure on all your

journeys. Over 80 standard and available safety and security features work together

to help you stay protected on all your travels."  They also state: "The 2020 Jeep

Grand Cherokee is always ready. Even when you're not. With over 70 Standard

and available safety and security features, plus new standard and available ProTech

Packages, the Grand Cherokee may help keep you and your loved ones out of

harm's way."  And they state: "Courageous by nature. The 2020 Jeep® Cherokee

- 29 -

offers over 80 standard and available safety and security features designed to step in and help protect you from the unexpected."  But these representations are not in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

58.    The following are examples of Jeep Compass advertisements concerning the Class Vehicles that touted their safety while failing to disclose the Oil Consumption and Oil Indicator defects:







59.    These advertisements state: "Equipped with over 70 standard and available safety and security features, the 2020 Jeep® Compass is engineered to inspire confidence with its every innovation."  And they also state: "Intuitive and always thinking ahead. The 2020 Jeep® Compass offers innovative standard and available safety and security technology designed to help protect you from the

- 31 -

unexpected and anticipate the things you don't."  But these representations are not

in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

60.    The following are examples of Jeep Renegade advertisements

concerning the Class Vehicles that touted their safety while failing to disclose the

Oil Consumption and Oil Indicator defects:



010902-11/1259753 V1



61.     These advertisements state: "Wherever you go, over 70 standard and available safety and security technologies can go with you in the 2020 Jeep® Renegade—an ideal balance of excitement and peace of mind."  And these advertisements state: While you're on the lookout for thrills and adventure, the 2020 Renegade offers over 70 standard and available safety and security features looking out for you and your crew."  But these representations are not in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

**D.     FCA has known of the dangerous defects present in the Class Vehicles for years.**

62.     Upon information and belief, FCA has known about the dangerous defects present in the class vehicles since at least 2015 and acquired such knowledge through pre-release testing; post-release monitoring; dealership repair records; warranty and post-warranty claims; complaints made to NHTSA; complaints made on internet forums; and complaints made to FCA itself.  Moreover, the defects themselves are pervasive, increasing the likelihood of FCA's early knowledge.

- 33 -

### 1. Pre-release design, manufacturing, and testing data—as well as post-release monitoring—alerted FCA to the defects.

63.     It is standard practice for automobile manufacturers to engage in extensive pre-launch testing of its vehicles.  FCA did so here and it would have been particularly robust given the switch to the new Tigershark MultiAir II Engine.  This design, engineering, and testing data is unavailable to Plaintiffs without discovery, but upon information and belief, analysis of this data would have revealed the defects.  Moreover, vehicle manufacturers such as FCA have significant and dedicated departments that monitor many public and subscription sites to ensure awareness of emerging safety-related issues, among others.  Emerging problems such as the Oil Consumption and Oil Indicator defects would be tracked by FCA.  Relevant information would be condensed and pushed to design, development, testing, service and quality departments for follow up.

64.     FCA routinely monitors the internet for consumer complaints.  Its customer relations department routinely monitors the internet for customer complaints, and it retains the services of third parties to do the same.  FCA's customer relations division regularly receives and responds to customer calls concerning product defects.  FCA's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed

- 34 -

vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

65.     FCA knew about the defects because its customer relations department, which interacts with FCA-authorized service technicians in order to identify potentially widespread vehicle problems and assist in diagnosing vehicle issues, has received numerous reports that the Oil Consumption and Oil Indicator defects can cause mechanical breakdown and stall a moving vehicle without any warnings from the oil indicator system.

### 2.     Dealership repair records and warranty claims data also support FCA's knowledge of the defects.

66.     Upon information and belief, FCA regularly compiles and analyzes detailed warranty service information regarding repairs performed under warranty at its network of dealerships.  Indeed, FCA requires dealers to maintain detailed and meticulous records for any warranty repairs performed and routinely refuses to pay for warranty repairs made where the nature and cause of the malfunction is insufficiently described.

67.     Moreover, owners of Class Vehicles have indicated that they made complaints directly to the dealerships as well as to FCA as early as 2015.  For example:

> I WAS DRIVING AND ALL OF A SUDDEN THE
> VEHICLE ENGINE TURNED OFF. THANK GOODNESS
> THERE WAS NO TRAFFIC AS I WAS ONLY BLOCKS
> FROM THE JEEP DEALER. I WAITED

APPROXIMATELY 30 SECONDS AND PUSHED THE
START BUTTON AND LUCKILY THE VEHICLE
STARTED BUT WOULD ONLY PUTT PUTT TO THE
DEALER. THE DEALER HAD DIFFICULTY GETTING
THE VEHICLE TO THE WORK STATION. WHEN
THEY CALLED ME TO TELL ME THEY FIXED IT
THEY TOLD ME THE REASON IT STOP WAS
BECAUSE IT WAS 2 QUARTS LOW OF OIL AND
THAT WAS THE CAUSE. THIS WAS VERY STRANGE
AS I REMINDED THEM TO LOOK AT MY SERVICE
RECORD AT WHICH I HAD THE OIL SERVICE
RECENTLY DONE AT THEIR FACILITY. THEY DID
NOT KNOW HOW TO RESPOND.

SUBSEQUENT I CONTACTED JEEP HEADQUARTERS
(RESOLUTION DEPT.) AND EXPLAINED WHAT
HAPPENED. May 11, 2015, NHTSA complaint.

**3. By issuing its 2015 TSB, FCA implicitly acknowledged reports of abnormal oil consumption by 2015.**

68. Technical Service Bulletins (TSBs) document recommended procedures for repairing vehicles and are issued by a vehicle manufacturer when there are repeat occurrences of a reported problem.

69. On July 31, 2015, FCA issued an "Engine Oil Consumption Guideline," TSB No. 09-007-15, to dealerships, providing guidance on what was an "acceptable rate of oil consumption" for all 2013-2016 vehicles equipped with gasoline engines, stating in relevant part:

The accepted rate of oil consumption for engines used in the vehicles listed above is 1 quart (0.946 liter) in 2,000 miles (3,200 km) for the 1st 50,000 miles (80,467 km). For vehicles with more then [sic] 50,000 miles the acceptable oil consumption for engines is 1 quart (0.946 liter) in 750 miles (1,207 km).

- 36 -

70.     Of course, these guidelines are inconsistent with its oil change indicator and Owner's Manual, as discussed above, and represent FCA's attempt to "normalize" the excessive oil consumption of the Class Vehicles.  But more to the point here: they demonstrate that FCA was aware in 2015 that consumers were contacting FCA and dealers with oil consumptions issues necessitating the issuance of the TSB to address them.

**4.      Complaints made to NHTSA and on internet forums also support FCA's knowledge of the defects.**

71.     In addition to the sampling of NHTSA complaints included throughout this complaint, there are hundreds of additional NHTSA complaints regarding the Oil Consumption and/or Oil Indication defects as to Jeep Cherokee alone, including dozens as to each of the 2014, 2015, 2016, 2017, 2018, and 2019 models.  The following is a sampling of NHTSA complaints from 2015:

- ON 12/19/14 WHILE DRIVING, MY VEH STALLED WITHOUT WARNING. THERE WAS NO WARNING LIGHTS ILLUMINATED BEFORE, DURING/AFTER ITS FAILURE. I HAD TO HAVE THE CAR TOWED. AFTER INSPECTION, I WAS TOLD THAT THE ENGINE OF MY NEW JEEP WAS BURNING OIL. THE JEEP RECENTLY HAD BEEN IN FOR AN OIL CHANGE & RTD WITH THE MULTI POINT INSPECTION PAPERWORK INDICATING EVERYTHING WAS OK. HERB CHAMBERS, ALTHOUGH DIAGNOSISING THE JEEP TO BE "BURNING OIL" INSISTED, AT THE DIRECTION OF CHRYSLER PROTOCOL, THAT I DRIVE IT 5,000 MILES AND RETURN IT FOR FURTHER INSPECT. ONLY AFTER MY HUSBAND GOT INVOLVED DID THEY KEEP THE CAR, DRIVE IT, AND EVENTUALLY INSTALL A NEW ENGINE. June 15, 2015, NHTSA complaint.

- NEXT MORNING DROVE 1/4 MILE DOWN ROAD AND IT HAD LOST ALL POWER AGAIN. CALLED DEALERSHIP TO LET THEM KNOW I WAS BRINGING IT BACK, JEEP WOULD NOT GO PAST 3RD GEAR, ALMOST HIT MULTIPLE TIMES TRYING TO GET OFF THE ROAD. GOT TO DEALERSHIP, THEY TOLD ME IT IS UN-DRIVEABLE AFTER DRIVING OVER AN HOUR TO GET THERE, THEY HAD JEEP ALMOST 3 WEEKS. MILEAGE WAS AROUND 18,000. WOULD NEED TO REPLACE TRANSMISSION, WHEN THEY FINALLY CALLED TO SAY IT WAS READY, I WAS TOLD IT WAS BC IT NEEDED AN OIL CHANGE...WITH ONLY 3500 MILES ON THIS CHANGE(FEB2015-MARCH2015).  October 13, 2015, NHTSA complaint.

- 2 TIMES ALREADY I HAVE HAD TO TAKE MY CAR INTO THE DEALERSHIP BECAUSE IT WOULD SHUT OFF RANDOMLY WHILE DRIVING. THIS HAS HAPPENED WHILE ON THE HIGHWAY AND ALSO WHILE ON BUSY STREETS. SO FAR I HAVE BEEN ABLE TO DRIFT TO THE SIDE OF THE ROAD, PUT THE CAR IN PARK AND THEN TURN THE CAR OFF AND BACK ON. THE CAR SPUTTERS WHEN RESTARTING AND ON MULTIPLE OCCASIONS WILL STALL AGAIN. BOTH TIMES THEY TRIED TO BLAME IT ON THE OIL CHANGE BEING OVERDUE. THE 2ND TIME I HAD TO HAVE THE CAR TOWED TO THE DEALERSHIP AND THEY STATED THERE WAS NO OIL IN THE CAR. HOW A CAR LOSES OIL IF THERE ISN'T A LEAK, I'M NOT SURE. THIS IS NOW THE THIRD TIME IT IS HAPPENING AND BASED ON THE CAR'S COMPUTER I STILL HAVE 30% TO GO BEFORE NEEDING AN OIL CHANGE AND THE CAR IS SHUTTING OFF ON ME AGAIN RANDOMLY. I WAS AT THE DEALERSHIP FOR THE 2ND TIME LESS THAN 3 MONTHS AGO. I DRIVE IN MIAMI AND HAVE BEEN LUCKY THAT MY SON WAS NOT IN THE CAR WITH ME.  November 17, 2015, NHTSA complaint.

- @3:30PM 12 /5 /15 CHEROKEE STOP IN THE MIDDLE OF THE INTERSECTION OF 13 MILE & UTICA. I HAD MY 7YR OLD IN THE CAR AND AVOIDED TRAFFIC ACCIDENT PULLED OVER AND IT SUDDENLY STOPPED AGAIN. FORTUNATELY WAS ABLE TO GET HOME WAS ONLY FIVE MINUTES AWAY. PLACED COMPLAINT TO CHRYSLER THEY TOWED THE VEHICLE 12/7/15. HOWEVER YESTERDAY 12/7/15 @6PM ROSEVILLE CHRYSLER JEEP DEALERSHIP SERVICE:(888)409-5930 CALLED TO TELL ME IT WAS MY ERROR THAT JEEP CHEROKEE STOP WORKING BECAUSE IT WAS "DUE AN OIL CHANGE IN OCTOBER". I TOLD REPAIR

- 38 -

SHOP MY HUSBAND AND I NEED TO SPEAK TO A MANAGER
BECAUSE 1ST I RECEIVED NO LIGHT SIGNAL OR
NOTIFICATION FROM THIS DIGITAL DISPLAY STATING I
NEEDED AN OIL CHANGE WHICH IS PROVIDED BY 2014
JEEP CHEROKEE SECOND THERE IS NO WAY THE VEHICLE
SHOULD HAVE BEEN DRY OUT OF OIL UNLESS THERE IS
LEAK OR SOMETHING CAUSED OIL TO DRY UP.  December 8,
2015, NHTSA complaint.

72.    And there are also scores of complaints posted on various consumer

forums, such as www.cargurus.com, www.carcomplaints.com,

www.myjeepcompass.com, and www.carproblemzoo.com.  All of these complaints

support FCA's knowledge of the defects.

**5.    Acknowledgements of the pervasiveness of the defects by
dealerships also supports that FCA would have known early on
about them.**

73.    FCA's knowledge of the defects is also shown by the fact that FCA

dealers and technicians have admitted to Class Vehicle owners that the Oil

Consumption and Oil Indicator defects are common problems with the Vehicles.

For example:

- THE VEHICLE SHUT OFF ON MY WIFE AND CHILD WHILE
SHE WAS DRIVING IT ON THE HIGHWAY, AND WE TOOK IT
TO THE DEALERSHIP AND THEY SAID IT WAS LOW
ON OIL AND THEY DID AN OIL CONSUMPTION TEST AND
CLEARED THE VEHICLE AND SAID IT WAS A COMMON
PROBLEM AND THEY HAVE TO DO OIL CONSUMPTION
TEST BEFORE CHRYSLER WILL ISSUE A REPLACEMENT
MOTOR, AFTER 2 MONTHS OF THE TEST THEY CONCLUDED
THAT IT WAS OK AND SAFE TO DRIVE. THE ISSUE
HAPPEND AGAIN WITH MY WIFE AND CHILD IN THE CAR
AND DRIVING DOWN THE ROAD, SHE MADE IT BACK HOME
AND THE MOTOR WAS OUT OF OIL 3,000 MILES BEFORE
HER NEXT OIL CHANGE. I GOT IT TO THE DEALER AND

- 39 -

THEY SAID THEY HAVE TO DO THE OIL CONSUMPTION TEST PROCESS AGAIN.  May 16, 2018, NHTSA complaint.

- STARTING AT 25K MILES, THE VEHICLE STARTED TO BURN THROUGH OIL EVEN BEFORE THE NEXT OIL CHANGE. THE MANUAL STATES TO GO OFF THE OIL SYSTEM LIGHT, DEALERS SAY DIFFERENT. OIL HAD 14% LEFT, BUT THE CAR KEPT SHUTTING OFF WHILE DRIVING ON THE HIGHWAY. WENT TO DEALER, CAR BURNED THROUGH ALL THE OIL. THEY REFUSED TO CHECK FOR ENGINE DAMAGE AND FORCE ME TO PAY FOR A FULL OIL CHANGE. STATED BY THE DEALER, ITS A KNOWN ISSUE WITH JEEP  October 9, 2019, NHTSA complaint.

- THE VEHICLE SHUTS OFF WHEN APPROACHING 3500 MILES. THIS HAPPENS WHEN THE VEHICLE IS IN MOTION REGARDLESS OF SPEED RENDERING THE VEHICLE EXTREMELY DIFFICULT TO MANEUVER. THE JEEP WAS TAKEN TO DEALER AND THE MECHANIC ADVISED THAT THIS IS A KNOWN ISSUE WITH SOME OF THE NEW JEEP CHEROKEES CONTAINING CERTAIN FIAT MOTORS. THE VEHICLES NOW HAVE A FIAT MOTOR THAT APPARENTLY BURNS THE ENGINES OIL EVERY 3500 MILES & THE SHUT OFF IS A BUILT IN "SAFETY MECHANISM" TO PREVENT THE MOTOR FROM BURNING OUT DUE TO THE LACK OF OIL. THIS INFORMATION WAS NOT DISCLOSED WHEN THE VEHICLE WAS PURCHASED.  December 29, 2018, NHTSA complaint.

- MY NEW CAR HAS 2,800 MILES DUE FOR AN OIL CHANGE AT 5 MONTHS/5,000 MILES. THE ENGINE FAILED ONCE FOR NO KNOWN CAUSE AFTER 2 WEEKS IN THE REPAIR SHOP. NOW MY CAR DIED WHILE IN MOTION ON BUSY ROADS AND A HIGHWAY RAMP AT SPEEDS BETWEEN 15-40 MPH WITHOUT WARNING OR LIGHTS. THIS IS SLA SAFETY HAZARD AS THE STEERING GOES AND CAR JUST COMES TO A STOP WITHOUT ANY WARNING. I HAD IT TOWED AFTER IT'S 5TH TIME IN 4 DAYS STOPPING WHILE IN MOTION AND SHUTTING DOWN. JEEP TOLD ME IT'S EMPTY ON OIL BUT YET THE OIL LIGHT INDICATOR DOESN'T COME ON. THEY SAID IT IS A KNOWN ISSUE WITHOUT A FIX FOR ALL 2014-2019 JEEP CHEROKEES.  September 26, 2018, NHTSA complaint.

- WHILE DRIVING A VEHICLE WITH ONLY 4200 MILES ON IT, THE JEEP STALED WITHOUT WARNING. JEEP RESTARTED

- 40 -

AND WAS DRIVEN. WHEN I CALLED THE LOCAL DEALERSHIP, I WAS INFORMED TO CHECK MY OIL LEVEL - THAT IT WOULD BE LOW AND TO REFILL. I ASKED HOW THEY KNOW THIS AND THE DEALERSHIP'S SERVICE CENTER INFORMED ME THAT THIS IS A "KNOWN ISSUE" WITH THE 2.4 LITER ENGINE AND IS "COMMON". I CHECKED MY OIL, SURE ENOUGH, IT WAS LOW - I WOULD SAY TWO (2) QUARTS LOW (IN A 5 QUART SYSTEM). NO "CHECK ENGINE LIGHT", NO "SERVICE ISSUE ANNOUNCEMENT" FROM JEEP - NO WARNING AT ALL FOR A "KNOWN ISSUE". THIS IS INEXCUSABLE!  August 9, 2018, NHTSA complaint.

74.    Before dealers would have been referring to the Oil Consumption and Oil Indicator defects as "common" and "known" problems, FCA certainly would have been aware of them.  And the pervasiveness of the defects increases the likelihood of FCA's early knowledge.  For example, a November 30, 2019, NHTSA complaint states that one dealer said it "had 50 customers" with the same problem. And a consumer forum posting on carproblemzoo.com states that the dealer "said its normal to burn oil and fca knows about the issue but will not repair. They say about 70% of the 2. 4 are affected across all models."

**E.    FCA has exclusive knowledge of the defects.**

75.    FCA had superior and exclusive knowledge of the defects and knew or should have known that the defects were not known or reasonably discoverable by Plaintiffs and class members before they purchased or leased the class vehicles.

76.    Before Plaintiffs purchased their Class Vehicle, and since at least 2015, FCA knew about the defects through its exclusive knowledge of non-public, internal data including pre-and post-release internal durability testing and analysis;

- 41 -

early consumer complaints about the defects, including complaints to Defendant's dealers who are its agents for vehicle repairs; records from NHTSA, including early customer complaints made to NHTSA and elsewhere; dealership repair orders; testing conducted in response to those complaints; and other various sources.

77.     The Oil Consumption and Oil Indicator defects were inherent in each Class Vehicle and present at the time of sale.

78.     The existence of the defects is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle. Had Plaintiffs and other class members known that the Class Vehicles were equipped with an engine that causes excessive oil consumption and shuts off without warning, they would not have purchased or leased the Class Vehicles or would have paid less for them.

79.     Reasonable consumers, like Plaintiffs, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety hazard, and is free from defects.  Plaintiffs and class members further reasonably expect that FCA will not sell or lease vehicles with known safety defects, such as the Oil Consumption and Oil Indicator defects, and will disclose any such defects to its consumers when it learns of them.  Plaintiffs and class members did not expect FCA to fail to disclose

- 42 -

the Oil Consumption and Oil Indicator defects to them and to continually deny the defects by refusing to issue a recall.

**F.    FCA has actively concealed the defects.**

80.    While FCA has been fully aware of the defects in the Class Vehicles, it actively concealed the existence and nature of them from Plaintiffs and class members at the time of purchase, lease, or repair and thereafter.

81.    FCA—by and through the statements it made in the Owner's Manuals prepared for distribution with the Class Vehicles—has misrepresented the Oil Consumption defect by recommending oil changes at much higher mileage than warranted by the true oil life cycle of the Class Vehicles, and has misrepresented the Oil Indicator defect by saying that an oil change indicator will let the driver know the appropriate time to change the oil, when Class Vehicles may actually require an oil change much sooner than indicated and receive no warning prior to the Class Vehicle shutting off to avoid engine damage.

82.    According to FCA's representations in the Owner's Manual: "Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles since last reset."  But FCA made far different representations in the TSB Oil Consumption Guidelines issued to its dealers in 2015.

83.    In the 2015 TSB, FCA told dealer service departments that the accepted rate of oil consumption for engines used in its vehicles is one quart/per

- 43 -

2,000 miles driven for the first 50,000 miles. And for vehicles with more than 50,000 miles, the acceptable oil consumption is one quart for every 750 miles.

84.     FCA entirely omits the information contained in its 2015 TSB Oil Consumption Guidelines from the Owner's Manual it distributes with the Class Vehicles.  Moreover, FCA fails to disclose to consumers the information in its 2015 Oil Consumption Guidelines when they purchase the Class Vehicles. Plaintiffs and class members thus only learn that FCA considers the excessive oil consumption of the 2.4L Tigershark engine "normal" when they are told that is the case by FCA's service departments.  Conveniently for FCA, this occurs far after the sale of the Class Vehicles and after experiencing the consequences of the defects.

85.     To the extent that FCA believed that the Oil Consumption defect is "normal," it had a duty to disclose that information to consumers because of the partial representations made in the Owner's Manuals of the Class Vehicles.

86.     Moreover, despite notice of the defect from numerous consumer complaints and dealership repair orders, FCA has not recalled the Class Vehicles to repair the defects, has not offered their customers a suitable repair or replacement free of charge, and has not offered to reimburse the Class Vehicles' owners and leaseholders in full for the costs they incurred in attempting to diagnose and repair the defects.

- 44 -

87.     When consumers present the Class Vehicles to an authorized FCA dealer for stalling, consumers are typically told the excessive oil consumption and frequent "top-offs" of engine oil are a known issue and there is no fix.  On information and belief, whether or not consumers are forced to pay for repairs relating to excessive oil consumption and subsequent engine damage, the same defective part or parts are used to replace the prior defective part or parts.

88.     To this day, FCA still has not notified Plaintiffs and class members that the Class Vehicles suffer from systemic defects that cause excessive oil consumption and premature engine damage and wear.

89.     On information and belief, FCA has caused Plaintiffs and class members to expend money at its dealerships to diagnose, repair, and/or replace the Class Vehicles' engine or related components, despite FCA's knowledge of the defects.

## G.     The statute of limitations should be tolled.

90.     Because the defects in the design or manufacture of the Class Vehicles and their engines and/or related components cannot be detected until the defects manifests themselves, Plaintiffs and class members were not reasonably able to discover the problem until after purchasing or leasing the Class Vehicles, despite their exercise of due diligence.

- 45 -

91.    Plaintiffs and class members had no realistic ability to discern that the engine was defective until it prematurely failed, and would have no reason to believe that problems they encountered were caused by dangerous defects known to FAC.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and class members.

92.    Plaintiffs are informed and believe and based thereon allege that FCA knew of the defects since 2015, if not earlier, and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of their vehicles.

93.    Any applicable statute of limitation has therefore been tolled by FCA's knowledge, active concealment, and denial of the facts alleged herein.  FCA is further estopped from relying on any statute of limitation because of its concealment of the defective nature of the Class Vehicles and their engines.

## V.    CLASS ACTION ALLEGATIONS

94.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Plaintiff Classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

- 46 -

95.   The Classes are defined as:

All individuals in [State] who purchased or leased any
FCA vehicle equipped with the 2.4L Tigershark MultiAir
II engine.

96.   Excluded from the Classes are: (1) Defendant, any entity or division

in which Defendant has a controlling interest, and their legal representatives,

officers, directors, assigns, and successors; (2) the Judge to whom this case is

assigned and the Judge's staff; (3) any Judge sitting in the presiding court system

who may hear an appeal of any judgment entered; and (4) those persons who have

suffered personal injuries as a result of the facts alleged herein.  Plaintiffs reserve

the right to amend the Class definitions if discovery and further investigation

reveal that the Classes should be expanded or otherwise modified.

97.   There is a well-defined community of interest in the litigation and

each subclass is readily ascertainable.

98.   <u>Numerosity:</u> Although the exact number of class members is uncertain

and can only be ascertained through appropriate discovery, the number is great

enough such that joinder is impracticable.  The disposition of class members'

claims in a single action will provide substantial benefits to all parties and to the

Court.  Class members are readily identifiable from information and records in

Defendant's possession, custody, or control, as well as from records kept by the

departments of motor vehicles of the various states.

99.   Typicality: The claims of the representative Plaintiffs are typical of the claims of all class members in that the representative Plaintiffs and class members purchased and/or leased a Class Vehicle designed, manufactured, and distributed by FCA. The representative Plaintiffs, like all class members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of substantial oil additions and engine repairs caused by excessive oil consumption. Furthermore, the factual bases of FCA's misconduct are common to all class members and represent a common thread resulting in injury to all class members.

100.   Commonality and Predominance: There are numerous questions of law and fact common to Plaintiffs and class members that predominate over any question affecting individual class members.  These common legal and factual issues include the following:

(a)   Whether Class Vehicles contain engine defects causing excessive oil consumption and sudden shut off without warning;

(b)   Whether Defendant knew about the defects relating to the Class Vehicles;

(c)   Whether Defendant had a duty to disclose the defects to Plaintiffs and class members;

(d)   Whether Defendant failed to disclose the defects;

(e)   Whether Defendant's omission of the defects was material;

- 48 -

> (f)     Whether Plaintiffs and class members are entitled
> to compensatory and/or equitable relief.

101.   <u>Adequate Representation:</u> Plaintiffs will fairly and adequately protect class members' interests. Plaintiffs have retained attorneys experienced in prosecuting class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

102.   <u>Superiority:</u> Plaintiffs and class members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual class members' claims, it is likely that only a few class members could afford to seek legal redress for Defendant's misconduct.  Absent a class action, class members will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

010902-11/1259753 V1

## COUNT I

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)

103.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

104.    Plaintiffs bring this Count on behalf of the Illinois class members.

105.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

106.    Plaintiffs and class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

107.    The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer.  The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

108.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes

- 50 -

them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety.  Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, *i.e*., the Oil Indicator defect, such that they have no opportunity to avert sudden shut off.  Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards.  Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices.  FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

109.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that

- 51 -

they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles.  Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

110.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading.  As alleged herein, FCA engaged in sophisticated methods of deception.  Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended oil changes.  Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

111.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

112.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

113.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

114.   FCA knew or should have known that its conduct violated the Illinois CFA.

115.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Class Vehicles;

    b.    Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

116.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members.  Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure.  This is a reasonable and objective consumer expectation relating to vehicle engines.  Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off.

- 53 -

This is a reasonable and objective consumer expectation relating to the Class Vehicles.

117.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

118.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

119.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs and class members seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

120.   Plaintiffs also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq*.

- 54 -

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON ILLINOIS LAW)

121.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

122.   Plaintiffs bring this Count on behalf of the Illinois Class.

123.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

124.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

125.   FCA had a duty to disclose this material safety information to Plaintiff and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

126.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

127.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

- 55 -

128.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

129.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

130.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members.  Plaintiff is therefore entitled to an award of punitive damages.

## COUNT III

## VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*)

131.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

132.   Plaintiffs bring this Count behalf of the Ohio class members.

133.   FCA's actions occurred in the conduct of trade or commerce.

134.   Plaintiffs and the other Ohio class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 (Ohio CSPA).

- 56 -

135.   FCA is a "supplier" as defined by the Ohio CSPA.

136.   Plaintiffs' and the other Ohio class members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

137.   The Ohio CSPA, Ohio Rev. Code § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not."  Ohio Rev. Code § 1345.02.  Defendant's conduct as alleged above and below constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code § 1345.02.  By concealing the known defects in the Class Vehicles, FCA participated in unconscionable acts and practices that violated the Ohio CSPA.

138.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety.  Moreover, FCA willfully failed to

- 57 -

disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, *i.e.*, the Oil Indicator defect, such that they have no opportunity to avert sudden shut off.  Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner.  FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression,

- 58 -

or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

139.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles.  Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

140.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading.  As alleged herein, FCA engaged in sophisticated methods of deception.  Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended oil changes.  Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

010902-11/1259753 V1

141.   FCA knew at the time of the consumer transactions that the Plaintiffs and other class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

142.   FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

143.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

144.   FCA knew or should have known that its conduct violated the Ohio CSPA.

145.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

- 60 -

c.     Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

146.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members.  Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure.  This is a reasonable and objective consumer expectation relating to vehicle engines.  Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

147.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

- 61 -

148.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

149.   Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining FCA's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code § 1345.09.

## COUNT IV

### FRAUDULENT CONCEALMENT
### (BASED ON OHIO LAW)

150.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

151.   Plaintiffs bring this Count on behalf of the Ohio Class.

152.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

153.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

154.   FCA had a duty to disclose this material safety information to Plaintiff and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

155.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

156.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

157.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

158.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

159.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiff is therefore entitled to an award of punitive damages.

## COUNT V

## VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1 *ET SEQ.*)

160.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

161.   Plaintiffs bring this Count on behalf of the Pennsylvania class members.

162.   Plaintiffs purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

163.   All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

164.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

165.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety.  Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, *i.e*., the Oil Indicator defect, such that they have no opportunity to avert sudden shut off.  Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards.  Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and

- 65 -

failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner.  FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

166.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles.  Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

167.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading.  As alleged herein, FCA engaged in sophisticated methods of deception.  Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal"

even though it caused Class Vehicles to run low on oil *in between* recommended oil changes.  Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

168.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

169.   FCA knew or should have known that its conduct violated the Pennsylvania CPL.

170.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

171.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members.  Plaintiffs and class members are reasonable consumers who do not

- 67 -

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

172.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

173.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

174.   FCA is liable to Plaintiffs and the Pennsylvania class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Plaintiffs and the Pennsylvania class members are also

- 68 -

entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT VI

## FRAUDULENT CONCEALMENT
## (BASED ON PENNSYLVANIA LAW)

175.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

176.    Plaintiffs bring this Count on behalf of the Pennsylvania Class.

177.    FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

178.    The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

179.    FCA had a duty to disclose this material safety information to Plaintiff and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

- 69 -

180.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

181.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

182.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

183.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

184.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiff is therefore entitled to an award of punitive damages.

## COUNT VII

### VIOLATIONS OF STATE CONSUMER PROTECTION ACTS

185.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 70 -

186.   This Count is brought by Plaintiffs, individually and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:[1]

a.   the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq*.;

b.   the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq*.;

c.   the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq*.;

d.   the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq*. and 17500, *et seq*.;

e.   the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.;

f.   the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101, *et seq*.;

g.   the Connecticut Unfair Trade Practices Act, Conn. Gen Stat. Ann. § 42-110, *et seq*.;

h.   the Delaware Consumer Fraud Act, 6 Del. Code § 2513, *et seq*.;

i.   the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.;

---

[1] Plaintiffs also place Defendant on notice that they intend to amend their complaint to seek recovery for class members under the following statutes: Alabama Code § 8-19-10(e); Alaska Statutes § 45.50.535; California Civil Code § 1782; Georgia Code § 10-1-399; Indiana Code § 24-5-0.5-5(a); Maine Revised Statutes, Title 5 § 50-634(g); Massachusetts General Laws Chapter 93A, § 9(3); Texas Business & Commercial Code § 17.505; West Virginia Code § 46A-6-106(b); and Wyoming Statutes § 40-12-109.

j.      the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

k.      the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.*;

l.      the Hawaii Unfair Competition Law, Haw. Rev. Stat. § 480-2, *et seq.*;

m.      the Idaho Consumer Protection Act, Idaho Code. Ann. § 48-601, *et seq.*;

n.      the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1, *et seq.*;

o.      the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, *et seq.*;

p.      the Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*

q.      the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et seq.*;

r.      the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

s.      the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

t.      the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207, *et seq.*;

u.      the Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301, *et seq.*;

v.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A, *et seq.*;

w.      the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*;

- 72 -

x.     the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, *et seq*.;

y.     the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407, *et seq*.;

z.     the Nebraska Consumer Protection Act, Neb. Rev. St. § 59-1601, *et seq*.;

aa.    the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600, *et seq*.;

bb.    the New Hampshire Regulation of Business Practices For Consumer Protection, N.H. Rev. Stat. § 358-A:1, *et seq*.;

cc.    the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8, *et seq*.;

dd.    the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq*.;

ee.    the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, *et seq*.;

ff.    the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq*.;

gg.    the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15, *et seq*.;

hh.    the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq*.;

ii.    the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15 § 751, *et seq*.;

jj.    the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*.;

kk.    the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*.;

- 73 -

ll.     the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-5.2(B), *et seq*.;

mm.     the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.;

nn.     the South Dakota Deceptive Trade Practices and Consumer Protection, S.D. Codified Laws § 37-24-1, *et seq*.;

oo.     the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq*.;

pp.     the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code Ann., Bus. & Con. § 17.41, *et seq*.;

qq.     the Utah Consumer Sales Practices Act, Utah Code. Ann. § 13-11-175, *et seq*.;

rr.     the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq*.;

ss.     the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199, *et seq*.;

tt.     the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq*.;

uu.     the West Virginia Consumer Credit And Protection Act, W. Va. Code § 46A, *et seq*.;

vv.     the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq*.; and

ww.     the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, *et seq*.

187.     The unfair and deceptive practices engaged in by FCA described above, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

- 74 -

188.   FCA's acts and practices were unfair and created a likelihood of confusion or misunderstanding and misled, deceived, or damaged Plaintiffs and members of the class in connection with the manufacture, marketing, and sale of Class Vehicles without disclosure of either the Oil Consumption or Oil Indicator defects.  FCA's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services, whether or not a person has in fact been misled, deceived, or damaged in violation of each of the above-enumerated statutes.

189.   Plaintiffs, on behalf of themselves and class members, seek restitution, monetary damages, treble damages, and such other and further relief as set forth in each of the above-enumerated statutes.

## COUNT VIII

## FRAUDULENT CONCEALMENT UNDER COMMON LAW OF EACH STATE

190.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 75 -

191.   This Count is brought by Plaintiffs, individually and on behalf of all similarly situated residents of each of the 50 states for breach of the common law of fraudulent concealment in each state.

192.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

193.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

194.   FCA had a duty to disclose this material safety information to Plaintiff and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

195.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

196.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

197.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and

- 76 -

FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

198.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

199.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiff is therefore entitled to an award of punitive damages.

## RELIEF REQUESTED

Plaintiffs and class members request that the Court enter an order or judgment against Defendants including:

A.     Certification of the action as a Class Action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.     Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited;

C.     Pre-judgment and post-judgment interest on such monetary relief;

D.     Other appropriate injunctive relief as permitted by law or equity;

E.     The costs of bringing suit, including reasonable attorney's fees; and

- 77 -

F.      All other relief to which Plaintiffs and members of the class may be

entitled by law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

DATED: April 29, 2020                    Respectfully submitted,

By:  /s/ Steve W. Berman
Steve W. Berman
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA  98101
(206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA  91101
(213) 330-7150
elaine@hbsslaw.com

E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
Miller Building
950 West University Drive, Suite 300
Rochester, MI  48307
(248) 841-2200
epm@miller.law

Jeffrey S. Goldenberg
Todd Naylor
**GOLDENBERG SCHNEIDER, LPA**
One West 4th Street, 18th Floor
Cincinnati, Ohio 45202
(513) 345-8291
jgoldenberg@gs-legal.com
tnaylor@gs-legal.com

*Attorneys for Plaintiffs*

- 78 -