UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AMBER WOOD, GUY WEST, NICK GIZZARELLI, ROBERT & DEBORAH JOHNSTON, MICHELLE SCHMID, KYLE DAVIS, NATHANEAL ROMANCHUK, NICOLETTE WATSON, DESIREE TARRO, THOMAS WEINER, REBEKAH AAREN WRIGHT, CHERYL MILLER, PAMELA ANDERSON, CATHERINE COPPINGER, CAREN CHRISTMAN, KELLY JOHNSON, HOLLY KUNDEL, RYAN HALL, ROBERTO HERNANDEZ, KIMBERLY EAGER, LUIS MUNOZ, SHERRI MCCALL, JOSHUA CAPLES, MIKAELYN MCDOWELL, KRISHAWN DURHAM, KATIE KUCZKOWSKI, DANIELLE COATES, KELSEY WILLIAMS, DANIEL SCOTT, RYAN GRAHAM, DANIEL MCGORREY, KAREN BURKE, ROSALIND BURKS, HOLLY HICKMAN, AMBER PORTUGAL, MICHAEL SANCHEZ, ADAM DYER, ARTEAL JORDAN, VIVIEN NAGY, KATLYN WILLS, and TERA CASTILLO, individually and on behalf of all others similarly situated, | Case No. 5:20-cv-11054-JEL-APP<br><br>District Judge Judith E. Levy<br><br>Magistrate Judge Anthony P. Patti<br><br>**CONSOLIDATED MASTER CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| FCA US LLC, | |
| Defendant. | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................ 1

II.   JURISDICTION ......................................................... 5

III.  VENUE .................................................................. 6

IV.  PARTIES ................................................................. 7

    A.    Plaintiffs ........................................................ 7

        1.    Arizona Plaintiff .................................... 7

        2.    California Plaintiffs ................................ 10

        3.    Florida Plaintiffs .................................. 18

        4.    Idaho Plaintiff ..................................... 27

        5.    Illinois Plaintiffs ................................. 31

        6.    Kansas Plaintiff .................................... 39

        7.    Louisiana Plaintiff ................................. 41

        8.    Maryland Plaintiff .................................. 45

        9.    Massachusetts Plaintiff ............................. 48

        10.  Michigan Plaintiffs ................................. 51

        11.  Minnesota Plaintiff ................................. 57

        12.  Missouri Plaintiffs ................................. 61

        13.  Nevada Plaintiffs .................................. 63

        14.  New Jersey Plaintiffs .............................. 66

        15.  New York Plaintiff ................................. 71

        16.  North Carolina Plaintiffs .......................... 74

        17.  Ohio Plaintiff ..................................... 76

        18.  Oklahoma Plaintiff ................................. 88

19. Oregon Plaintiffs ................................................................. 90

20. Pennsylvania Plaintiff ........................................................ 95

21. South Carolina Plaintiff ....................................................101

22. Tennessee Plaintiff .............................................................104

23. Texas Plaintiffs ...................................................................107

24. Virginia Plaintiff ................................................................113

25. Washington Plaintiff ..........................................................116

26. West Virginia Plaintiff .......................................................119

27. Wisconsin Plaintiff .............................................................122

B. Defendant ....................................................................................124

1. Defendant ...........................................................................124

V. FACTUAL ALLEGATIONS ..................................................................125

A. FCA's 2.4L Tigershark MultiAir II Engine ...............................125

B. The Defects in the Defective Vehicles ........................................127

1. The Oil Consumption defect creates a safety hazard for class members. ...................................................127

2. The Oil Indicator defect creates a safety hazard for class members. ...................................................................133

3. The Oil Consumption defect causes higher emissions. ...........................................................................138

C. FCA's national advertising campaign misrepresents the safety and reliability of the Defective Vehicles. ............................144

D. FCA has known of the dangerous defects present in the Defective Vehicles for years. .......................................................150

1. Pre-release design, manufacturing, and testing data—as well as post-release monitoring—alerted FCA to the defects. ............................151

2.   Dealership repair records and warranty claims data also support FCA's knowledge of the defects. ...........................................152

3.   By issuing its 2015 TSB, FCA implicitly acknowledged reports of abnormal oil consumption by 2015. .......................................153

4.   Complaints made to NHTSA and on internet forums also support FCA's knowledge of the defects. ...........................................155

5.   Acknowledgements of the pervasiveness of the defects by dealerships also supports that FCA would have known early on about them. .............................................................175

   E.   FCA has exclusive knowledge of the defects. ..............................179

   F.   FCA has actively concealed the defects. .....................................181

VI.   TOLLING OF THE STATUTE OF LIMITATIONS .............................183

   A.   Discovery rule tolling ..................................................183

   B.   Fraudulent concealment tolling ....................................184

   C.   Estoppel ........................................................................185

VII.   CLASS DEFINITIONS ........................................................185

VIII.   CLASS ALLEGATIONS ......................................................195

   A.   Claims brought on behalf of the Arizona Subclass .......................195

COUNT 1 VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-1521 *ET SEQ.*) ...............................195

COUNT 2 BREACH OF CONTRACT  (BASED ON ARIZONA LAW) ........200

COUNT 3 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY .........................................................201

COUNT 4 FRAUDULENT CONCEALMENT (BASED ON ARIZONA LAW) ...............................................................203

COUNT 5 ..............................................................................207

NEGLIGENT MISREPRESENTATION...........................................207

COUNT 6 UNJUST ENRICHMENT .............................................208

B.      Claims Brought on Behalf of the California Subclass ...................209

COUNT 7 VIOLATIONS OF THE CALIFORNIA UNFAIR
        COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200
        *ET SEQ.*).................................................................................................209

COUNT 8 VIOLATIONS OF THE CALIFORNIA'S CONSUMERS
        LEGAL REMEDIES ACT (CAL. BUS. & PROF. CODE § 1750
        *ET SEQ.*).................................................................................................213

COUNT 9 VIOLATIONS OF THE CALIFORNIA FALSE
        ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500
        *ET SEQ.*).................................................................................................216

COUNT 10 BREACH OF CONTRACT  (BASED ON CALIFORNIA
        LAW) ........................................................................................................218

COUNT 11 BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY ..........................................................................219

COUNT 12 FRAUDULENT CONCEALMENT (BASED ON
        CALIFORNIA LAW)..............................................................................221

COUNT 13 .......................................................................................................225

NEGLIGENT MISREPRESENTATION...................................................225

COUNT 14 UNJUST ENRICHMENT ...........................................................226

C.      Claims Brought on Behalf of the Florida Subclass ........................227

COUNT 15 VIOLATIONS OF THE FLORIDA UNFAIR AND
        DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201
        *ET SEQ.*).................................................................................................227

COUNT 16 BREACH OF CONTRACT  (BASED ON FLORIDA LAW) .......232

COUNT 17 BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY ..........................................................................233

COUNT 18 FRAUDULENT CONCEALMENT (BASED ON FLORIDA
        LAW) ........................................................................................................235

COUNT 19 .......................................................................................................239

NEGLIGENT MISREPRESENTATION...................................................239

COUNT 20 UNJUST ENRICHMENT ............................................................240

    D.    Claims Brought on Behalf of the Idaho Subclass .........................241

COUNT 21 VIOLATION OF THE IDAHO CONSUMER
PROTECTION ACT (IDAHO CODE ANN. § 48-601 *ET SEQ.*) ...........241

COUNT 22 BREACH OF CONTRACT  (BASED ON IDAHO LAW) ...........246

COUNT 23 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ............................................................247

COUNT 24 FRAUDULENT CONCEALMENT (BASED ON IDAHO
LAW) ................................................................................249

COUNT 25 ..................................................................................254

NEGLIGENT MISREPRESENTATION ............................................254

COUNT 26 UNJUST ENRICHMENT ............................................................254

    E.    Claims Brought on Behalf of the Illinois Subclass ........................255

COUNT 27 VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS
505/1, *ET SEQ.* AND 720 ILCS 295/1A)................................255

COUNT 28 BREACH OF CONTRACT (BASED ON ILLINOIS LAW).........260

COUNT 29 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ............................................................261

COUNT 30 FRAUDULENT CONCEALMENT (BASED ON ILLINOIS
LAW) ................................................................................263

COUNT 31 ..................................................................................268

NEGLIGENT MISREPRESENTATION ............................................268

COUNT 32 UNJUST ENRICHMENT ............................................................268

    F.    Claims brought on behalf of the Kansas Subclass .........................269

COUNT 33 VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*) ..............269

COUNT 34 BREACH OF CONTRACT  (BASED ON KANSAS LAW) ........275

COUNT 35 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................................276

COUNT 36 FRAUDULENT CONCEALMENT (BASED ON KANSAS
LAW) ................................................................................................278

COUNT 37 ....................................................................................................282

NEGLIGENT MISREPRESENTATION ..........................................................282

COUNT 38 UNJUST ENRICHMENT ............................................................283

    G.    Claims Brought on Behalf of the Louisiana Subclass ...................284

COUNT 39 VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW (LA.
REV. STAT. § 51:1401 *ET SEQ.*)............................................................284

COUNT 40 BREACH OF CONTRACT (BASED ON LOUISIANA
LAW) ................................................................................................289

COUNT 41 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................................290

COUNT 42 FRAUDULENT CONCEALMENT (BASED ON
LOUISIANA LAW) ............................................................................292

COUNT 43 ....................................................................................................297

NEGLIGENT MISREPRESENTATION ..........................................................297

COUNT 44 UNJUST ENRICHMENT ............................................................297

    H.    Claims Brought on Behalf of the Maryland Subclass ...................298

COUNT 45 VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101
*ET SEQ.*).............................................................................................298

COUNT 46 BREACH OF CONTRACT  (BASED ON MARYLAND
LAW) ................................................................................................303

COUNT 47 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................................304

COUNT 48 FRAUDULENT CONCEALMENT (BASED ON MARYLAND LAW) .............................................................306

COUNT 49 ...........................................................................311

NEGLIGENT MISREPRESENTATION ..........................................311

COUNT 50 UNJUST ENRICHMENT ...........................................311

    I.    Claims brought on behalf of the Massachusetts Subclass ..............312

COUNT 51 VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*).................................................................312

COUNT 52 BREACH OF CONTRACT  (BASED ON MASSACHUSETTS LAW) ...................................................317

COUNT 53 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ......................................................318

COUNT 54 FRAUDULENT CONCEALMENT (BASED ON MASSACHUSETTS LAW) ...................................................320

COUNT 55 ...........................................................................325

NEGLIGENT MISREPRESENTATION ..........................................325

COUNT 56 UNJUST ENRICHMENT ...........................................326

    J.    Claims Brought on Behalf of the Michigan Subclass ...................327

COUNT 57 VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)........327

COUNT 58 BREACH OF CONTRACT  (BASED ON MICHIGAN LAW) ..............................................................................332

COUNT 59 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ......................................................333

COUNT 60 FRAUDULENT CONCEALMENT (BASED ON MICHIGAN LAW).................................................................335

COUNT 61 ...........................................................................340

NEGLIGENT MISREPRESENTATION ..........................................340

COUNT 62 UNJUST ENRICHMENT .........................................................340

    K.    Claims Brought on Behalf of the Minnesota Subclass..................341

COUNT 63 VIOLATION OF THE MINNESOTA PREVENTION OF
    CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *ET SEQ.*) .........341

COUNT 64 VIOLATION OF THE MINNESOTA DECEPTIVE
    TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48
    *ET SEQ.*).............................................................................................346

COUNT 65 BREACH OF CONTRACT  (BASED ON MINNESOTA
    LAW) ...................................................................................................351

COUNT 66 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .........................................................................352

COUNT 67 FRAUDULENT CONCEALMENT (BASED ON
    MINNESOTA LAW).............................................................................354

COUNT 68 .................................................................................................359

NEGLIGENT MISREPRESENTATION .........................................................359

COUNT 69 UNJUST ENRICHMENT .........................................................359

    L.    Claims Brought on Behalf of the Missouri Subclass ....................360

COUNT 70 VIOLATION OF THE MISSOURI MERCHANDISING
    PRACTICES ACT (MO. REV. STAT. § 407.010, *ET SEQ.*).................360

COUNT 71 BREACH OF CONTRACT  (BASED ON MISSOURI
    LAW) ...................................................................................................366

COUNT 72 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .........................................................................367

COUNT 73 FRAUDULENT CONCEALMENT (BASED ON
    MISSOURI LAW).................................................................................369

COUNT 74 .................................................................................................373

NEGLIGENT MISREPRESENTATION .........................................................373

COUNT 75 UNJUST ENRICHMENT .........................................................374

    M.    Claims Brought on Behalf of the Nevada Subclass ......................375

COUNT 76 VIOLATION OF THE NEVADA DECEPTIVE TRADE
    PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*)...............375

COUNT 77 BREACH OF CONTRACT  (BASED ON NEVADA LAW)........380

COUNT 78 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................381

COUNT 79 FRAUDULENT CONCEALMENT (BASED ON NEVADA
    LAW) ...............................................................................................383

COUNT 80 ....................................................................................................388

NEGLIGENT MISREPRESENTATION..........................................................388

COUNT 81 UNJUST ENRICHMENT ...........................................................388

    N.    Claims Brought on Behalf of the New Jersey Subclass ................389

COUNT 82 VIOLATION OF THE NEW JERSEY CONSUMER
    FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) ............................389

COUNT 83 BREACH OF CONTRACT  (BASED ON NEW JERSEY
    LAW) ...............................................................................................394

COUNT 84 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................396

COUNT 85 FRAUDULENT CONCEALMENT (BASED ON NEW
    JERSEY LAW)....................................................................................397

COUNT 86 ....................................................................................................402

NEGLIGENT MISREPRESENTATION..........................................................402

COUNT 87 UNJUST ENRICHMENT ...........................................................403

    O.    Claims Brought on Behalf of the New York Subclass ..................404

COUNT 88 VIOLATION OF THE NEW YORK GENERAL
    BUSINESS LAW (N.Y. GEN. BUS. LAW § 349) .................................404

COUNT 89 VIOLATION OF THE NEW YORK GENERAL
    BUSINESS LAW (N.Y. GEN. BUS. LAW § 350) .................................406

COUNT 90 BREACH OF CONTRACT  (BASED ON NEW YORK
    LAW) ...............................................................................................408

COUNT 91 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .........................................................................409

COUNT 92 FRAUDULENT CONCEALMENT (BASED ON NEW
    YORK LAW) ...................................................................................411

COUNT 93 .....................................................................................................416

NEGLIGENT MISREPRESENTATION ........................................................416

COUNT 94 UNJUST ENRICHMENT ...........................................................416

    P.    Claims Brought on Behalf of the North Carolina Subclass ............417

COUNT 95 VIOLATION OF THE NORTH CAROLINA UNFAIR
    AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN.
    STAT. § 75-1.1 *ET SEQ.*) ......................................................................417

COUNT 96 BREACH OF CONTRACT  (BASED ON NORTH
    CAROLINA LAW) .........................................................................423

COUNT 97 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .........................................................................424

COUNT 98 FRAUDULENT CONCEALMENT (BASED ON NORTH
    CAROLINA LAW) .........................................................................426

COUNT 99 .....................................................................................................430

NEGLIGENT MISREPRESENTATION ........................................................430

COUNT 100 UNJUST ENRICHMENT ...........................................................431

    Q.    Claims Brought on Behalf of the Ohio Subclass .........................432

COUNT 101 VIOLATION OF THE OHIO CONSUMER SALES
    PRACTICES ACT (OHIO REV. CODE ANN. § 1345.01
    *ET SEQ.*)..............................................................................................432

COUNT 102 BREACH OF CONTRACT (BASED ON OHIO LAW) ............439

COUNT 103 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .........................................................................440

COUNT 104 FRAUDULENT CONCEALMENT (BASED ON OHIO
    LAW) ...................................................................................................442

COUNT 105 ...................................................................................447

NEGLIGENT MISREPRESENTATION..........................................447

COUNT 106 UNJUST ENRICHMENT ...........................................447

 R. Claims Brought on Behalf of the Oklahoma Subclass..................448

COUNT 107 VIOLATION OF THE OKLAHOMA CONSUMER
 PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*) ............448

COUNT 108 BREACH OF CONTRACT  (BASED ON OKLAHOMA
 LAW) ........................................................................................453

COUNT 109 BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY ............................................................455

COUNT 110 FRAUDULENT CONCEALMENT (BASED ON
 OKLAHOMA LAW)................................................................456

COUNT 111 ...................................................................................461

NEGLIGENT MISREPRESENTATION..........................................461

COUNT 112 UNJUST ENRICHMENT ...........................................462

 S. Claims Brought on Behalf of the Oregon Subclass ......................463

COUNT 113 VIOLATION OF THE OREGON UNLAWFUL TRADE
 PRACTICES ACT (OR. REV. STAT. § 646.605 *ET SEQ.*) ..................463

COUNT 114 BREACH OF CONTRACT  (BASED ON OREGON
 LAW) ........................................................................................468

COUNT 115 BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY ............................................................469

COUNT 116 FRAUDULENT CONCEALMENT (BASED ON
 OREGON LAW) .......................................................................471

COUNT 117 ...................................................................................476

NEGLIGENT MISREPRESENTATION..........................................476

COUNT 118 UNJUST ENRICHMENT ...........................................476

 T. Claims Brought on Behalf of the Pennsylvania Subclass .............477

COUNT 119 VIOLATION OF THE PENNSYLVANIA UNFAIR
    TRADE PRACTICES AND CONSUMER PROTECTION LAW
    (73 PA. CONS. STAT. § 201-1 *ET SEQ.*)...............................................477

COUNT 120 BREACH OF CONTRACT  (BASED ON
    PENNSYLVANIA LAW) ...................................................................482

COUNT 121 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................483

COUNT 122 FRAUDULENT CONCEALMENT (BASED ON
    PENNSYLVANIA LAW) ...................................................................485

COUNT 123 .............................................................................................490

NEGLIGENT MISREPRESENTATION .........................................................490

COUNT 124 UNJUST ENRICHMENT ...........................................................490

    U.    Claims Brought on Behalf of the South Carolina Subclass............491

COUNT 125 VIOLATION OF THE SOUTH CAROLINA UNFAIR
    TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10
    *ET SEQ.*)............................................................................................491

COUNT 126 VIOLATION OF THE SOUTH CAROLINA
    REGULATION OF MANUFACTURERS, DISTRIBUTORS,
    AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *ET SEQ.*)...........496

COUNT 127 BREACH OF CONTRACT (BASED ON SOUTH
    CAROLINA LAW) ...........................................................................499

COUNT 128 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................500

COUNT 129 FRAUDULENT CONCEALMENT (BASED ON SOUTH
    CAROLINA LAW) ...........................................................................502

COUNT 130 .............................................................................................506

NEGLIGENT MISREPRESENTATION .........................................................506

COUNT 131 UNJUST ENRICHMENT ...........................................................507

    V.    Claims Brought on Behalf of the Tennessee Subclass ..................508

COUNT 132 VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT (TENN. CODE § 47-18-101, *ET SEQ.*) ...............508

COUNT 133 BREACH OF CONTRACT  (BASED ON TENNESSEE
LAW) ...................................................................................513

COUNT 134 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................514

COUNT 135 FRAUDULENT CONCEALMENT (BASED ON
TENNESSEE LAW)............................................................516

COUNT 136 .................................................................................521

NEGLIGENT MISREPRESENTATION ..........................................521

COUNT 137 UNJUST ENRICHMENT ..........................................521

     W.     Claims Brought on Behalf of the Texas Subclass .........................522

COUNT 138 VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION ACT (TEX.
BUS. & COM. CODE § 17.4 *ET SEQ.*) ...................................522

COUNT 139 BREACH OF CONTRACT  (BASED ON TEXAS LAW)..........528

COUNT 140 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................529

COUNT 141 FRAUDULENT CONCEALMENT (BASED ON TEXAS
LAW) ...................................................................................531

COUNT 142 .................................................................................536

NEGLIGENT MISREPRESENTATION ..........................................536

COUNT 143 UNJUST ENRICHMENT ..........................................536

     X.     Claims Brought on Behalf of the Virginia Subclass .....................537

COUNT 144 VIOLATION OF THE VIRGINIA CONSUMER
PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*) .............537

COUNT 145 BREACH OF CONTRACT  (BASED ON VIRGINIA
LAW) ...................................................................................542

COUNT 146 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ......................................................................543

COUNT 147 FRAUDULENT CONCEALMENT (BASED ON
VIRGINIA LAW)...........................................................................545

COUNT 148 .................................................................................550

NEGLIGENT MISREPRESENTATION ...........................................550

COUNT 149 UNJUST ENRICHMENT ............................................550

     Y.     Claims Brought on Behalf of the Washington Subclass ................551

COUNT 150 VIOLATION OF THE WASHINGTON CONSUMER
PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010
*ET SEQ.*)....................................................................................551

COUNT 151 BREACH OF CONTRACT  (BASED ON WASHINGTON
LAW) ..........................................................................................556

COUNT 152 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ......................................................................557

COUNT 153 FRAUDULENT CONCEALMENT (BASED ON
WASHINGTON LAW) .....................................................................559

COUNT 154 .................................................................................564

NEGLIGENT MISREPRESENTATION ...........................................564

COUNT 155 UNJUST ENRICHMENT ............................................564

     Z.     Claims brought on behalf of the West Virginia Subclass ..............565

COUNT 156 VIOLATION OF THE WEST VIRGINIA CONSUMER
CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101
*ET SEQ.*)....................................................................................565

COUNT 157 BREACH OF CONTRACT  (BASED ON WEST
VIRGINIA LAW)...........................................................................571

COUNT 158 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ......................................................................572

COUNT 159 FRAUDULENT CONCEALMENT (BASED ON WEST
    VIRGINIA LAW)................................................................................574

COUNT 160 .................................................................................................579

NEGLIGENT MISREPRESENTATION ........................................................579

COUNT 161 UNJUST ENRICHMENT .........................................................579

    AA.   Claims Brought on Behalf of the Wisconsin Subclass...................580

COUNT 162 VIOLATION OF THE WISCONSIN DECEPTIVE
    TRADE PRACTICES ACT (WIS. STAT. § 110.18).............................580

COUNT 163 BREACH OF CONTRACT (BASED ON WISCONSIN
    LAW) .................................................................................................585

COUNT 164 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .......................................................................586

COUNT 165 FRAUDULENT CONCEALMENT (BASED ON
    WISCONSIN LAW).............................................................................588

COUNT 166 .................................................................................................593

NEGLIGENT MISREPRESENTATION ........................................................593

COUNT 167 UNJUST ENRICHMENT .........................................................593

    BB.   Claims Brought on Behalf of the Alabama Subclass ....................594

COUNT 168 VIOLATION OF THE ALABAMA DECEPTIVE TRADE
    PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*)............................594

COUNT 169 BREACH OF CONTRACT  (BASED ON ALABAMA
    LAW) .................................................................................................599

COUNT 170 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .......................................................................601

COUNT 171 FRAUDULENT CONCEALMENT (BASED ON
    ALABAMA LAW)................................................................................602

COUNT 172 .................................................................................................607

NEGLIGENT MISREPRESENTATION ........................................................607

COUNT 173 UNJUST ENRICHMENT ........................................................608

    CC.   Claims brought on behalf of the Alaska Subclass.........................609

COUNT 174 VIOLATION OF THE ALASKA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (ALASKA
STAT. ANN. § 45.50.471 *ET SEQ.*) ........................................................609

COUNT 175 BREACH OF CONTRACT (BASED ON ALASKA
LAW) ...............................................................................................614

COUNT 176 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ...........................................................................615

COUNT 177 FRAUDULENT CONCEALMENT (BASED ON
ALASKA LAW)...................................................................................617

COUNT 178 ...............................................................................................621

NEGLIGENT MISREPRESENTATION .........................................................621

COUNT 179 UNJUST ENRICHMENT ........................................................622

    DD.   Claims brought on behalf of the Arkansas Subclass .....................623

COUNT 180 VIOLATION OF THE ARKANSAS DECEPTIVE
TRADE PRACTICES ACT (ARK. CODE ANN. § 4-88-101
*ET SEQ.*)...................................................................................623

COUNT 181 BREACH OF CONTRACT (BASED ON ARKANSAS
LAW) ...............................................................................................628

COUNT 182 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ...........................................................................629

COUNT 183 FRAUDULENT CONCEALMENT (BASED ON
ARKANSAS LAW) ...............................................................................631

COUNT 184 ...............................................................................................635

NEGLIGENT MISREPRESENTATION .........................................................635

COUNT 185 UNJUST ENRICHMENT ........................................................636

    EE.   Claims Brought on Behalf of the Colorado Subclass.....................637

COUNT 186 VIOLATION OF THE COLORADO CONSUMER
PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*) ...........637

COUNT 187 BREACH OF CONTRACT  (BASED ON COLORADO
LAW) .......................................................................................642

COUNT 188 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ..............................................................643

COUNT 189 FRAUDULENT CONCEALMENT (BASED ON
COLORADO LAW)....................................................................645

COUNT 190 ..................................................................................649

NEGLIGENT MISREPRESENTATION ............................................649

COUNT 191 UNJUST ENRICHMENT ...........................................650

FF.    Claims brought on behalf of the Connecticut Subclass.................651

COUNT 192 VIOLATION OF THE CONNECTICUT UNFAIR TRADE
PRACTICES ACT (CONN. GEN. STAT. § 42-110A *ET SEQ.*) ...........651

COUNT 193 BREACH OF CONTRACT  (BASED ON
CONNECTICUT LAW) ...........................................................656

COUNT 194 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ..............................................................657

COUNT 195 FRAUDULENT CONCEALMENT (BASED ON
CONNECTICUT LAW) ...........................................................659

COUNT 196 ..................................................................................663

NEGLIGENT MISREPRESENTATION ............................................663

COUNT 197 UNJUST ENRICHMENT ...........................................664

GG.   Claims brought on behalf of the Delaware Subclass.....................665

COUNT 198 VIOLATION OF THE DELAWARE CONSUMER
FRAUD ACT (DEL. CODE TIT. 6, § 2513 *ET SEQ.*)..........................665

COUNT 199 BREACH OF CONTRACT  (BASED ON DELAWARE
LAW) .......................................................................................670

COUNT 200 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................671

COUNT 201 FRAUDULENT CONCEALMENT (BASED ON
    DELAWARE LAW)............................................................................673

COUNT 202 ..................................................................................................677

NEGLIGENT MISREPRESENTATION ..........................................................677

COUNT 203 UNJUST ENRICHMENT ..........................................................678

    HH.   Claims Brought on Behalf of the Georgia Subclass......................679

COUNT 204 VIOLATION OF THE GEORGIA FAIR BUSINESS
    PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*) ................679

COUNT 205 VIOLATION OF THE GEORGIA UNIFORM
    DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN § 10-
    1-370 *ET SEQ.*)..........................................................................684

COUNT 206 BREACH OF CONTRACT (BASED ON GEORGIA
    LAW) ................................................................................................689

COUNT 207 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................690

COUNT 208 FRAUDULENT CONCEALMENT (BASED ON
    GEORGIA LAW).............................................................................692

COUNT 209 ..................................................................................................696

NEGLIGENT MISREPRESENTATION ..........................................................696

COUNT 210 UNJUST ENRICHMENT ..........................................................697

    II.   Claims brought on behalf of the Hawaii Subclass ........................698

COUNT 211 VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW.
    REV. STAT. § 480 *ET SEQ.*)...................................................................698

COUNT 212 BREACH OF CONTRACT  (BASED ON HAWAII LAW) .......703

COUNT 213 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ........................................................................704

COUNT 214 FRAUDULENT CONCEALMENT (BASED ON HAWAII LAW) ................................................................................706

COUNT 215 ................................................................................710

NEGLIGENT MISREPRESENTATION ........................................710

COUNT 216 UNJUST ENRICHMENT ........................................711

JJ.    Claims brought on behalf of the Indiana Subclass........................712

COUNT 217 VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3) ........................712

COUNT 218 BREACH OF CONTRACT  (BASED ON INDIANA LAW) ................................................................................718

COUNT 219 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................................................................719

COUNT 220 FRAUDULENT CONCEALMENT (BASED ON INDIANA LAW)................................................................721

COUNT 221 ................................................................................725

NEGLIGENT MISREPRESENTATION ........................................725

COUNT 222 UNJUST ENRICHMENT ........................................726

KK.    Claims brought on behalf of the Iowa Subclass............................727

COUNT 223 VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE § 714H.1 *ET SEQ.*) ................................................................727

COUNT 224 BREACH OF CONTRACT  (BASED ON IOWA LAW) ...........732

COUNT 225 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................................................................733

COUNT 226 FRAUDULENT CONCEALMENT (BASED ON IOWA LAW) ................................................................................735

COUNT 227 ................................................................................740

NEGLIGENT MISREPRESENTATION ........................................740

COUNT 228 UNJUST ENRICHMENT ..........................................................740

    LL.   Claims brought on behalf of the Kentucky Subclass ....................741

COUNT 229 VIOLATIONS OF THE KENTUCKY CONSUMER
    PROTECTION ACT (KY. REV. STAT. § 367.110 *ET SEQ.*). ..............741

COUNT 230 BREACH OF CONTRACT  (BASED ON KENTUCKY
    LAW) ........................................................................................746

COUNT 231 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ...............................................................747

COUNT 232 FRAUDULENT CONCEALMENT (BASED ON
    KENTUCKY LAW) ...................................................................749

COUNT 233 .....................................................................................754

NEGLIGENT MISREPRESENTATION ..........................................................754

COUNT 234 UNJUST ENRICHMENT ..........................................................754

    MM.  Claims brought on behalf of the Maine Subclass..........................755

COUNT 235 VIOLATION OF THE MAINE UNFAIR TRADE
    PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A
    *ET SEQ.*).................................................................................755

COUNT 236 BREACH OF CONTRACT  (BASED ON MAINE LAW) .........760

COUNT 237 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ...............................................................761

COUNT 238 FRAUDULENT CONCEALMENT (BASED ON MAINE
    LAW) ........................................................................................763

COUNT 239 .....................................................................................768

NEGLIGENT MISREPRESENTATION ..........................................................768

COUNT 240 UNJUST ENRICHMENT ..........................................................768

    NN.   Claims brought on behalf of the Mississippi Subclass...................769

COUNT 241 VIOLATION OF THE MISSISSIPPI CONSUMER
    PROTECTION ACT (MISS. CODE. ANN. § 75-24-1 *ET SEQ.*) ...........769

COUNT 242 BREACH OF CONTRACT  (BASED ON MISSISSIPPI
    LAW) ....................................................................................774

COUNT 243 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .......................................................775

COUNT 244 FRAUDULENT CONCEALMENT (BASED ON
    MISSISSIPPI LAW).............................................................777

COUNT 245 .............................................................................782

NEGLIGENT MISREPRESENTATION.......................................782

COUNT 246 UNJUST ENRICHMENT .......................................782

    OO.   Claims Brought on Behalf of the Montana Subclass ....................783

COUNT 247 VIOLATION OF THE MONTANA UNFAIR TRADE
    PRACTICES  AND CONSUMER PROTECTION ACT OF 1973
    (MONT. CODE ANN. § 30-14-101 *ET SEQ.*)........................783

COUNT 248 BREACH OF CONTRACT  (BASED ON MONTANA
    LAW) ....................................................................................788

COUNT 249 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .......................................................789

COUNT 250 FRAUDULENT CONCEALMENT (BASED ON
    MONTANA LAW)................................................................791

COUNT 251 .............................................................................796

NEGLIGENT MISREPRESENTATION.......................................796

COUNT 252 UNJUST ENRICHMENT .......................................797

    PP.   Claims Brought on Behalf of the Nebraska Subclass ...................798

COUNT 253 VIOLATION OF THE NEBRASKA CONSUMER
    PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*) .............798

COUNT 254 BREACH OF CONTRACT (BASED ON NEBRASKA
    LAW) ....................................................................................803

COUNT 255 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY .......................................................804

COUNT 256 FRAUDULENT CONCEALMENT (BASED ON
    NEBRASKA LAW) ..................................................................806

COUNT 257 ..........................................................................................810

NEGLIGENT MISREPRESENTATION ..........................................810

COUNT 258 UNJUST ENRICHMENT ...........................................811

    QQ.   Claims brought on behalf of the New Hampshire Subclass ..........812

COUNT 259 VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
    PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1
    *ET SEQ.*)..............................................................................812

COUNT 260 BREACH OF CONTRACT  (BASED ON NEW
    HAMPSHIRE LAW) ...............................................................817

COUNT 261 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ...........................................................818

COUNT 262 FRAUDULENT CONCEALMENT (BASED ON NEW
    HAMPSHIRE LAW) ...............................................................820

COUNT 263 ..........................................................................................825

NEGLIGENT MISREPRESENTATION ..........................................825

COUNT 264 UNJUST ENRICHMENT ...........................................825

    RR.   Claims brought on behalf of the New Mexico Subclass ...............826

COUNT 265 VIOLATION OF THE NEW MEXICO UNFAIR TRADE
    PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*) ................826

COUNT 266 BREACH OF CONTRACT  (BASED ON NEW MEXICO
    LAW) ......................................................................................831

COUNT 267 BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY ...........................................................832

COUNT 268 FRAUDULENT CONCEALMENT (BASED ON NEW
    MEXICO LAW) ......................................................................834

COUNT 269 ..........................................................................................839

NEGLIGENT MISREPRESENTATION ..........................................839

COUNT 270 UNJUST ENRICHMENT ..........................................................839

 SS. Claims brought on behalf of the North Dakota Subclass ..............840

COUNT 271 VIOLATION OF THE NORTH DAKOTA CONSUMER
 FRAUD ACT (N.D. CENT. CODE § 51-15-02)....................................840

COUNT 272 BREACH OF CONTRACT  (BASED ON NORTH
 DAKOTA LAW)....................................................................................845

COUNT 273 BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY ..........................................................................846

COUNT 274 FRAUDULENT CONCEALMENT (BASED ON NORTH
 DAKOTA LAW)....................................................................................848

COUNT 275 ...............................................................................................853

NEGLIGENT MISREPRESENTATION ........................................................853

COUNT 276 UNJUST ENRICHMENT ..........................................................854

 TT. Claims brought on behalf of the Rhode Island Subclass ...............855

COUNT 277 VIOLATION OF THE RHODE ISLAND UNFAIR
 TRADE PRACTICES AND CONSUMER PROTECTION ACT
 (R.I. GEN. LAWS § 6-13.1 *ET SEQ.*)....................................................855

COUNT 278 BREACH OF CONTRACT  (BASED ON RHODE
 ISLAND LAW) .....................................................................................860

COUNT 279 BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY ..........................................................................861

COUNT 280 FRAUDULENT CONCEALMENT (BASED ON RHODE
 ISLAND LAW) .....................................................................................863

COUNT 281 ...............................................................................................867

NEGLIGENT MISREPRESENTATION ........................................................867

COUNT 282 UNJUST ENRICHMENT ..........................................................868

 UU. Claims Brought on Behalf of the South Dakota Subclass ..............869

COUNT 283 VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(S.D. CODIFIED LAWS § 37-24-6)........................................869

COUNT 284 BREACH OF CONTRACT (BASED ON SOUTH
DAKOTA LAW)....................................................................874

COUNT 285 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ..........................................................875

COUNT 286 FRAUDULENT CONCEALMENT (BASED ON SOUTH
DAKOTA LAW)....................................................................877

COUNT 287 ............................................................................881

NEGLIGENT MISREPRESENTATION ........................................881

COUNT 288 UNJUST ENRICHMENT ........................................882

VV.   Claims Brought on Behalf of the Utah Subclass...........................883

COUNT 289 VIOLATION OF THE UTAH CONSUMER SALE
PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)..............883

COUNT 290 BREACH OF CONTRACT  (BASED ON UTAH LAW) ..........888

COUNT 291 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ..........................................................889

COUNT 292 FRAUDULENT CONCEALMENT (BASED ON UTAH
LAW) ..................................................................................891

COUNT 293 ............................................................................896

NEGLIGENT MISREPRESENTATION ........................................896

COUNT 294 UNJUST ENRICHMENT ........................................897

WW. Claims brought on behalf of the Vermont Subclass.......................898

COUNT 295 VIOLATION OF THE VERMONT CONSUMER FRAUD
ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)..................898

COUNT 296 BREACH OF CONTRACT  (BASED ON VERMONT
LAW) ..................................................................................902

COUNT 297 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................904

COUNT 298 FRAUDULENT CONCEALMENT (BASED ON
VERMONT LAW) ..............................................................905

COUNT 299 ............................................................................910

NEGLIGENT MISREPRESENTATION ..........................................910

COUNT 300 UNJUST ENRICHMENT ...........................................911

    XX.   Claims brought on behalf of the Wyoming Subclass .....................912

COUNT 301 VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT (WYO. STAT. § 40-12-105 *ET SEQ.*) .................912

COUNT 302 BREACH OF CONTRACT  (BASED ON WYOMING
LAW) ...................................................................................916

COUNT 303 BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY ........................................................917

COUNT 304 FRAUDULENT CONCEALMENT (BASED ON
WYOMING LAW) ..............................................................919

COUNT 305 ............................................................................924

NEGLIGENT MISREPRESENTATION ..........................................924

COUNT 306 UNJUST ENRICHMENT ...........................................925

    YY.   Claims Brought on Behalf of the Nationwide Class .....................926

COUNT 307 VIOLATION OF THE MAGNUSSON-MOSS
WARRANTY ACT (15 U.S.C. §§ 2301 *ET SEQ.*) .................926

REQUEST FOR RELIEF ...............................................................929

DEMAND FOR JURY TRIAL ........................................................930

Plaintiffs Amber Wood, Guy West, Nick Gizzarelli, Robert & Deborah Johnston, Michelle Schmid, Kyle Davis, Nathaneal Romanchuk, Nicolette Watson, Desiree Tarro, Thomas Weiner, Rebekah Aaren Wright, Cheryl Miller, Catherine Coppinger, Pamela Anderson, Kelly Johnson, Caren Christman, Holly Kundel, Ryan Hall, Joshua Caples, Kimberly Eager, Luis Munoz, Roberto Hernandez, Sherri McCall, Mikaelyn McDowell, Krishawn Durham, Katie Kuczkowski, Danielle Coates, Kelsey Williams, Daniel Scott, Ryan Graham, Daniel McGorrey, Karen Burke, Rosalind Burks, Holly Hickman, Amber Portugal, Michael Sanchez, Adam Dyer, Arteal Jordan, Vivien Nagy, Tera Castillo, and Katlyn Wills ("Plaintiffs") bring this action on behalf of themselves and all those similarly situated who purchased or leased any vehicle equipped with a 2.4L Tigershark MultiAir II Engine (the "Defective Vehicles") manufactured and sold by FCA US LLC, formerly known as Chrysler Group LLC ("FCA" or "Defendant"). All allegations made in this Complaint are based on investigation of counsel, except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## I. INTRODUCTION

1. Car manufacturers have a responsibility to ensure that the vehicles they sell to consumers are safe and that they disclose material facts related to safety when they advertise. A car manufacturer violates this duty when it sells vehicles that, unbeknownst to drivers: (a) consume excessive engine oil so that oil pressure drops

too low before recommended oil changes; (b) to avoid engine damage when oil pressure drops too low, shut off during operation without warning; and (c) release excessive oil into the exhaust system causing vehicles to emit higher levels of toxic emissions that exceed relevant emissions standards. This is incredibly dangerous both to the individual driver and to public health as a whole. But this is exactly what happens with the Defective Vehicles. And when FCA was selling these vehicles it knew of these safety and emissions issues, knew they were material to a reasonable consumer, and failed to disclose these facts.

2.      The Defective Vehicles contain several defects. One is a significant design and/or manufacturing defect in their engines that causes them to improperly burn off and/or consume abnormally high amounts of oil. As a result of this "Oil Consumption" defect, Defective Vehicles can shut down during the course of their normal operation—placing the occupants and surrounding vehicles at an increased risk of serious injury and death. Indeed, FCA has expressly acknowledged in other unrelated safety recalls that "an engine stall could cause a crash without prior warning."[1]

3.      The second defect arises because the sudden shutoffs caused by the Oil Consumption defect could be avoided if FCA's oil indicator system alerted drivers

---

[1] Exhibit 1, Important Safety Recall T65/NHTSA 17V-670, available at https://static.nhtsa.gov/odi/rcl/2017/RCONL-17V670-2523.pdf (last visited Oct. 14, 2020).

of the Defective Vehicles that their engine oil was running low. But it does not. And this "Oil Indicator" defect means that drivers of the Defective Vehicles only become aware of a dangerously low engine-oil level after it causes an engine stall or shut-down, putting their lives at risk. Indeed, the Defective Vehicles shut down without warning when FCA's oil change indicator does not yet recommend an oil change.

4.     The third defect arises as follows. The Oil Consumption defect causes excess oil to enter into the Defective Vehicles' exhaust systems. Oil in the exhaust systems will compromise the oxygen (O2) sensors and the catalytic converter which converts the harmful emissions produced during the combustion process into less harmful gases. As a result of this "Excess Emissions" defect, Defective Vehicles have been emitting harmful emissions at levels that, unknown to the consumer, are in excess of state and federal regulations. Consumers were completely unaware as there was no indication of the Excess Excess Emissions defect until FCA has recently disclosed in an SEC filing that "[i]n connection with internal testing, we determined that approximately 1 million vehicles equipped with the 2.4L Tigershark engine may have excess tailpipe emissions." At no time has FCA informed class members of this issue.

5.     FCA has long known about the Oil Consumption and Oil Indicator defects, as hundreds of Defective Vehicle owners and lessees have reported instances of their vehicles shutting down without warning due to low oil levels

and/or pressure. FCA has long known about the Excess Emissions defect through its own pre-release testing of the Defective Vehicles Yet rather than being honest about these problems, FCA has not disclosed the three defects or engaged in efforts to conceal some of them by describing the excess oil consumption as "normal" in a technical service bulletin.

6.     By characterizing the excessive oil consumption rate as "normal," FCA has avoided the economic fallout that would inevitably result from recalling the millions of Defective Vehicles. As a result, Defective Vehicle owners must fend for themselves, attempting to have the defects diagnosed and repaired on their own or otherwise drive unsafe vehicles that could suffer from mechanical breakdown at any time, even while the car is travelling at full speed. And by not disclosing the Oil Consumption Defect at the point of sale, FCA was able to induce Plaintiffs and Class members to pay more for their vehicle than they would have if FCA had disclosed the defect.

7.     The Oil Consumption and Oil Indicator defects pose a material safety risk to the operators and passengers of all Defective Vehicles. The dangers of excessive and/or abnormal oil consumption include increased mechanical breakdown and a resulting increase in the risk of injury or death. The Excess Emissions defect poses a grave risk to public health. Harmful emissions from internal combustion engines irritate the lungs causing cardiovascular problems and respiratory illnesses

such as asthma either of which can result in premature death. These emissions can react to form smog and acid rain as well as being central to the formation of fine particles (PM) and ground level ozone. Plaintiffs and many other class members have experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, and FCA continues to put owners and lessees of the Defective Vehicles and the public as a whole at risk by refusing to replace the Defective Vehicles.

8.      The alleged defects not only threaten every passenger in a Defective Vehicle, but also, Consumers who purchased Defective Vehicles have been harmed by purchases they would not have made or paid as much for had they known the truth. FCA should be required to compensate consumers for its deceptive conduct and remedy these defects. Plaintiffs bring claims on behalf of themselves and all those similarly situated for FCA's violation of the consumer protection laws of each of the fifty states.

## II.      JURISDICTION

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiffs and Defendant reside in different states. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

10.      This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005,

- 5 -

because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States 28 U.S.C. § 1332(d)(1), (2). The citizenship of each party is described further below in the "Parties" section.

11.    This Court has personal jurisdiction over FCA pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over FCA because it has its principal place of business here, minimum contacts with the United States, this judicial district, and this State, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of FCA vehicles in this State and District. At least in part because of FCA's misconduct as alleged in this lawsuit, the Defective Vehicles ended up on this state's roads and in dozens of franchise dealerships.

### III.    VENUE

12.    Venue is proper in this Court under 28 U.S.C. § 1391 because FCA maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including, *inter alia*, FCA's decision-making, design, promotion, marketing, and distribution of the Defective Vehicles occurred in this District, and because

Defendant conducts a substantial amount of business in this District. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.  Venue is also proper under 18 U.S.C. § 1965(a) because FCA is subject to personal jurisdiction in this District, as alleged in the preceding paragraph, and FCA has agents located in this District. Thus, venue is proper in this District for all pre-trial or trial proceedings.

## IV.   PARTIES

**A.    Plaintiffs**

    **1.    Arizona Plaintiff**

        **a.  Guy West**

13.    Plaintiff Guy West (for purposes of this Plaintiff's allegations, "Plaintiff") is an Arizona citizen and resident of Goodyear, Arizona. On or about July 10, 2019, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Chapman Jeep, an authorized FCA dealership located in Scottsdale, Arizona.

14.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with

the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

15.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

16.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

17.   Approximately two weeks after Plaintiff purchased the Defective Vehicle, he checked the oil, noticed it was low, and added just under a quart. The same thing happened two weeks later. Since purchasing the Defective Vehicle, Plaintiff has had to add about ¾ quart of oil every two weeks.

18.   Plaintiff told the FCA dealership he purchased the Defective Vehicle from that his vehicle consumes oil at an abnormally high pace. The dealership told

him this was "normal." Plaintiff also asked the FCA dealership near his home about it and they told him it was "normal." Plaintiff has owned a lot of vehicles over the years and has never had to add oil like this.

19.    Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff continues to endure the expense and inconvenience of having to constantly add oil.

20.    FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 2.   California Plaintiffs

#### a.  Nick Gizzarelli

21.    Plaintiff Nick Gizzarelli (for purposes of this Plaintiff's allegations, "Plaintiff") is a California citizen and resident of Brentwood, California. On or about November 1, 2018, he purchased a new 2019 Jeep Compass (for purposes of this section, his "Defective Vehicle") from Stoneridge Chrysler Jeep Dodge RAM, an authorized FCA dealership located in Dublin, California.

22.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

23.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in

correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

24.    Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

25.    Plaintiff has delivered his vehicle to an authorized FCA dealership four times for diagnosis and repair. The FCA technician diagnosed the vehicle with low oil. When Plaintiff asked the dealership personnel about the oil consumption problem, the dealership said they were aware of the issue. The FCA technician added oil to the vehicle and directed Plaintiff to add oil at least every 1,000 miles.

26.    Plaintiff's vehicle continues to consume oil at an abnormally high pace. Plaintiff contacted FCA directly and was told that he needed documentation to prove the problem. Plaintiff took his vehicle to the dealer the same day and they topped off the oil but would not give him any sort of documentation. The dealer also told Plaintiff that cars get towed in all the time due to the oil consumption problem.

27.    Plaintiff submitted a complaint to NHTSA on January 16, 2020. Plaintiff's complaint stated the following:

> 2.4L MULTIAIR MOTOR BURNS OIL AT EXCESSIVE RATE. NEW CAR
> BURNS 1QT OF OIL PER 850 MILES. NO "LOW OIL" INDICATOR LIGHT.

WHEN LOW ON OIL, CAR STALLS, JOLTS, OR SHUTS OFF. STALL
GENERALLY OCCURS WHEN TURNING AT LOW SPEEDS (LESS THAN 30
MPH). SIGNIFICANT SAFETY HAZARD IF TURNING IN FRONT OF
ONCOMING TRAFFIC. CAR WILL STALL IF DOWN 2 QUARTS.
THEREFORE, IF YOU DO NOT REFILL OIL EVERY 1500 MILES, YOU RISK
STALLING ON ROADWAYS. CURRENT VEHICLE HAS 26,000 MILES.
NORMALLY ADD 5 QUARTS OF OIL BETWEEN SCHEDULED OIL
CHANGES. STALLING HAS OCCURRED APPROXIMATELY 10 TIMES.
TWO TIMES STALL OCCURRED IN INTERSECTION, ALMOST
RESULTING IN HIGH SPEED COLLISION FROM OPPOSING TRAFFIC.

28.     FCA never told Plaintiff about the Oil Consumption defect, Oil

Indicator defect, or the Excess Emissions defect so Plaintiff purchased his Defective

Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be

reliable and safe and would retain all of its operating characteristics throughout its

useful life. Plaintiff specifically shopped for an FCA vehicle because he believed

FCA's broad advertising messaging that its vehicles were safe and reliable. None of

the advertisements reviewed or representations received by Plaintiff contained any

disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil

Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and

the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair

costs, Excess Emissions defect and that the Defective Vehicles violated state and

federal emissions standards and/or had defective emissions systems, Plaintiff would

not have purchased the Defective Vehicle or would have paid less for it.

### b.  Michelle Schmid

29.     Plaintiff Michelle Schmid (for purposes of this Plaintiff's allegations, "Plaintiff") is a California citizen and resident of California. On or about January 26, 2018, she purchased a new 2017 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Moss Bros. Chrysler Dodge Jeep RAM, an authorized FCA dealership located in San Bernardino, California.

30.     Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

31.     Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or

- 13 -

on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

32.    Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

33.    In or around May 2018, Plaintiff's vehicle stalled while traveling approximately 55 mph on a highway, presenting a serious risk of crashing. Plaintiff took the Defective Vehicle to Victorville Motors, an authorized FCA dealership, which discovered that the oil pan was completely empty.

34.    A few months later, the Defective Vehicle stalled again while Plaintiff was driving, one again presenting a serious safety risk. The dealership had Plaintiff return after 1,000 miles in order to perform an oil consumption test. When Plaintiff returned, the dealer said that some oil consumption was normal. Nevertheless, they told Plaintiff that she would need to change her oil every 4,000 miles and check her dipstick whenever refilling her gas tank.

35.    Plaintiff's vehicle continues to consume oil at an abnormally high pace. Plaintiff has continued to complain about the oil consumption issue during her subsequent oil changes but has received no additional repair or assistance. Plaintiff fears the Defective Vehicle will stall again and continues to endure the expense and inconvenience of more frequent than expected oil changes.

36. FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### c. Robert and Deborah Johnston

37. Plaintiffs Robert and Deborah Johnston (for purposes of this Plaintiff's allegations, "Plaintiffs") are California citizens and residents of Hughson, California. On or about May 5, 2018, Plaintiffs purchased a new 2018 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Central Valley Automotive, an authorized FCA dealership located in Modesto, California.

38.     Unknown to Plaintiffs at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

39.     Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

40.     Since purchasing the Defective Vehicle, Plaintiffs have experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

41.    For example, commencing at or around 10,000 miles, the Defective Vehicle began intermittently stalling. Further, in or around August 2019, only a few months after their most recent oil change, the Defective Vehicle lost power several times. Finally, while Ms. Johnston was driving, the engine completely died in the middle of traffic. She was able to restart the Defective Vehicle and drive to work. However, the Defective Vehicle died again the following day.

42.    On or around August 31, 2019, when the engine in Plaintiffs' vehicle failed to start entirely. Plaintiffs had to have the Defective Vehicle towed to Central Valley Automotive dealership for diagnosis and repair. The FCA technician diagnosed the Defective Vehicle with low oil and performed an oil change ahead of schedule, even though the engine oil in Plaintiffs' vehicle had just been "topped off" by the dealership just a month earlier. Both this "topping off" of oil and the oil change that the dealership performed on this visit were entirely ineffective at resolving the problem. During this visit, the dealership personnel conducted an oil change ahead of schedule. The FCA US dealership personnel informed Plaintiffs that the vehicle has abnormally high oil consumption and that Plaintiffs would need to add oil supplements frequently, even between their regularly scheduled oil changes, to prevent the Defective Vehicle from continuing to spontaneously stall.

43.     Plaintiffs' vehicle continues to consume oil at an abnormally high pace. Plaintiffs fear the Defective Vehicle will stall again and continue to endure the expense and inconvenience of more frequent than expected oil changes.

44.     FCA never told Plaintiffs about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiffs purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiffs chose an FCA vehicle because Plaintiffs believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiffs contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiffs to pay out-of-pocket costs, including repair costs, Plaintiffs would not have purchased the Defective Vehicle or would have paid less for it.

### 3.     Florida Plaintiffs

#### a.  Nicolette Watson

45.     Plaintiff Nicolette Watson (for purposes of this Plaintiff's allegations, "Plaintiff") is a Florida citizen and resident of Pinellas County, Florida. On or about June 17, 2018, she purchased a 2018 Jeep Compass (for purposes of this section,

"Defective Vehicle") from Airport Chrysler Dodge Jeep Ram, an authorized FCA dealership located in Orlando, Florida.

46.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

47.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

48.     Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

49.     On at least five occasions, Plaintiff's Defective Vehicle has stalled while Plaintiff has been driving it. Plaintiff has called Airport Chrysler Dodge Jeep three times to obtain information about how to address the stalling. However, each time Plaintiff has called the dealership, Plaintiff is advised that there is nothing they can do about the issue and that it is not a known problem, so she should simply add more oil.

50.     On or about February 18, 2020, Plaintiff took the Defective Vehicle to Airport CDJR for a routine oil change. At the time, the Defective Vehicle's mileage was approximately 16,400 miles. At this oil change, Plaintiff again asked the dealer about the frequent need for oil, and she was again advised to "keep adding more oil."

51.     Thereafter, on or about April 20, 2020, Plaintiff's Defective Vehicle stalled again and required a quart-and-a-half of oil.

52.     Plaintiff's vehicle continues to consume oil at an abnormally high pace. Plaintiff fears the Defective Vehicle will stall again and continues to endure the expense and inconvenience of more frequent than expected oil changes.

53.     FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective

Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b.  Kyle Davis

54.    Plaintiff Kyle Davis (for purposes of this Plaintiff's allegations, "Plaintiff") is a Florida citizen and resident of Fort Walton Beach, Florida. On or about April 10, 2018, Plaintiff purchased a 2015 Dodge Dart (for purposes of this section, "Defective Vehicle") from Carvana in Fort Walton Beach, Florida.

55.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a

defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

56.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

57.    Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

58.    Plaintiff replaced the spark plugs for the Defective Vehicle after less than 800 miles because the Defective Vehicle kept shutting down on him. When Plaintiff checked the oil, he noticed the dipstick was completely dry and had to use three quarts of oil to refill it. In November 2019, Plaintiff was driving 60 miles per

hour on the freeway when the Defective Vehicle shut down on him without warning. This was particularly dangerous because the other vehicles on the freeway also had no warning that the Defective Vehicle would suddenly slow down.

59.   Plaintiff delivered the Defective Vehicle to an authorized FCA dealership in Fort Walton Beach, Florida, for engine repairs and the vehicle was there for four weeks. The FCA dealership refused to provide Plaintiff with a loaner vehicle while his vehicle was being repaired. Plaintiff paid more than $4,000 to repair the Defective Vehicle's engine.

60.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

61.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and

the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### c. Nathaneal Romanchuk

62.     Plaintiff Nathaneal Romanchuk (for purposes of this Plaintiff's allegations, "Plaintiff") is a Florida citizen and resident of Florida. On or about December 15, 2018, Plaintiff purchased a new 2019 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Phillips Chrysler Jeep Dodge Ram, which is an authorized FCA dealership in Ocala, Florida.

63.     Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

64. Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

65. Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

66. On or about February 1, 2019, Plaintiff's vehicle stalled out while his wife was driving it. Shortly thereafter, Plaintiff presented his vehicle to the dealership and they discovered that the oil pan was completely empty. The Defective Vehicle had 3,000 miles on it at this time and no dashboard notification had alerted him that the oil was low.

67. The dealership had him return after 1,500 miles in order to perform an oil consumption test. When he returned, the dealership personnel said that some oil consumption was normal. Nevertheless, they told Plaintiff that he would need to

change his oil every 4,000 miles and check his dipstick whenever refilling his gas tank.

68.     Plaintiff continued to complain about the oil consumption issue during his subsequent oil changes but did not receive any additional repair or assistance for his vehicle. During this time, his car stalled again when the vehicle's odometer was around 12,000 miles.

69.     Out of fear that his vehicle would stall again, Plaintiff traded his vehicle in for a 2020 Jeep Renegade, which he believed would not suffer from the same defects. However, since purchasing his new vehicle, it has begun apparent the new vehicle also suffers from these defects.

70.     FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair

costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 4.   Idaho Plaintiff

#### a.  Desiree Tarro

71.     Plaintiff Desiree Tarro (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Idaho and resident of Kooskia, Idaho. In or around August 2019, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Wysup Chrysler Jeep Dodge Ram, an authorized FCA dealership in Pullman, Washington.

72.     Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

73.     Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

74.     Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

75.     Plaintiff first began to experience issues with the Defective Vehicle several months after purchasing it from Wysup Chrysler. She first noticed that, when coming to a stop, the engine began to make unusual noises that sounded like it was turning off, rather than idling. The Defective Vehicle would return to functioning normally when Plaintiff began to accelerate.

76.     After Plaintiff had driven the Defective Vehicle about 10,000 miles, the vehicle began to shut down completely or fail to start. On a number of occasions, Plaintiff was forced to borrow a vehicle or be driven to work because the Defective Vehicle's engine would not start.

77.     On four separate occasions, the Defective Vehicle shut off completely while either Plaintiff or her fiancée were driving. On three of those occasions, her children were in the vehicle. Each time, while driving the Defective Vehicle around a corner, the low oil pressure light turned on, the power steering suddenly locked up, and the vehicle shut itself off.

78.     On the fourth occasion that the Defective Vehicle shut itself off, Plaintiff was forced to leave the vehicle in the middle of the road on a blind corner and return to her home on foot to get assistance.

79.     The day after the Defective Vehicle stalled in the middle of the road, Plaintiff was driving around a corner when the low oil pressure light became illuminated. Plaintiff immediately stopped to check the oil level and found that it was almost completely empty, despite the fact that she added a quart of oil less than 500 miles prior.

80.     When the issues with the Defective Vehicle first developed, Plaintiff began to regularly check her oil level and take the Defective Vehicle to have its oil filled. However, Plaintiff did not realize that the oil consumption of the vehicle was irregular. Nor did she connect the oil consumption of the Defective Vehicle to the issues with the Defective Vehicle failing to start or shutting down until after the fourth incident. After the fourth shutdown, when her low oil pressure light again illuminated while she was driving around a corner, Plaintiff returned to Napa

Automotive to have her oil filled and found that the oil was almost completely gone, despite having only driven 500 miles since last filling the Defective Vehicle with oil. At that time, the mechanic refilling the Defective Vehicle's oil commented to Plaintiff that the oil consumption the Class Vehicle was experiencing was abnormal. Plaintiff estimates that she filled the Defective Vehicle with over ten quarts of oil over a period of several months.

81.     Soon thereafter, Plaintiff presented the Vehicle to Wysup Chrysler to diagnose the cause of the shutdowns and excessive oil consumption. According to the maintenance technicians, the engine's seals were not lined up correctly and the engine needed to be completely replaced.

82.     Since replacing the engine, Plaintiff has driven approximately 5,000 miles and had to fill the Defective Vehicle with three quarts of oil. Plaintiff has had to add over thirteen quarts of oil to the Defective Vehicle outside of normal service intervals since purchasing it in August 2019. This was all in order to prevent it from stalling and shutting down without warning, despite never being alerted by the Defective Vehicle's oil indicator system that the Defective Vehicle was low on oil outside of the alerts immediately preceding a shutdown.

83.     Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again. Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

84.    FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**5.    Illinois Plaintiffs**

**a. Amber Wood**

85.    Plaintiff Amber Wood (for purposes of this Plaintiff's allegations, "Plaintiff") is an Illinois citizen and resident of Aurora, Illinois. On or about November 18, 2018, Plaintiff purchased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Bettenhausen Chrysler Dodge Jeep RAM, an authorized FCA dealership in Tinley Park, Illinois.

86.     Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

87.     Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

88.     Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

89.     In fact, only a few weeks after purchasing the Defective Vehicle, Plaintiff was driving the vehicle to work and while she was making a left turn, it shut off and would not move. Plaintiff called her father because he is a mechanic and he told her to keep trying to turn it back on. Plaintiff was finally able to get the Defective Vehicle to start and drove it to her nearby home. Once she was home, Plaintiff called the dealership. The dealership told her if she did not feel safe enough to drive it to the dealership, which was 35 minutes away, to have it towed for diagnosis and repair. The FCA technician said he was not sure what happened. FCA kept the Defective Vehicle for a couple of days then told Plaintiff that the vehicle was sucking down oil and needed a new motor. The engine was replaced. Recently, the oil change indicator light came on even though it had only been 2,000 miles since the last oil change.

90.     Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

91.     FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad

advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b. Thomas Weiner

92.    Plaintiff Thomas Weiner (for purposes of this Plaintiff's allegations, "Plaintiff") is an Illinois citizen and resident of Illinois. In or around February 2018, Plaintiff purchased a new 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Jack Phelan Chrysler Dodge Jeep Ram, an authorized FCA dealership in Countryside, Illinois.

93.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with

the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

94.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

95.    Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

96.    In early September 2019, while Plaintiff was driving to work in the morning, Plaintiff attempted a right turn at an intersection at a speed of less than 25 mph. Suddenly, Plaintiff's emergency brake engaged, his engine stalled, and Plaintiff lost the ability to accelerate his vehicle. Plaintiff was forced to drift his Defective Vehicle to the side of the road in order to avoid a collision.

97.    Only after his vehicle's engine stalled did the Defective Vehicle's instrument panel indicate that his engine oil was critically low. While Plaintiff was able to restore his engine's power, unlock his emergency brake, and resume driving, his engine stall caused him to narrowly avoid crashing the vehicle.  Later that same day, Plaintiff's vehicle stalled again without warning.

98.    Plaintiff brought the Defective Vehicle to the Jack Phelan dealership on September 9, 2019, where he informed the repair technician that his vehicle had stalled without warning, requested a repair under warranty, and was informed by the technician that his engine cutoff was caused by his vehicle being 2 ½ quarts low on engine oil. The technician refilled the engine oil and directed Plaintiff to return his vehicle in 1,000 miles for further testing. At that point, Plaintiff's vehicle had accumulated just 23,574 miles and he had owned his Defective Vehicle for less than two years. Plaintiff was charged $48.00 to replenish the Defective Vehicle's oil in order to begin the "oil consumption test."

99.    Plaintiff returned the Defective Vehicle to the dealership on October 3, 2019, when the vehicle had registered 24,568 miles. Although the Defective Vehicle had accumulated less than 1,000 miles since his last engine oil refill, he was informed that the vehicle had burned through another 2 quarts of oil, and he was directed to return in another 1,000 miles. His Defective Vehicle was burning through a quart of oil approximately every 500 miles.

100.   Within a mere 994 miles, Plaintiff's engine oil had descended below the threshold Defendant designates as safe, rendering his vehicle at risk of sudden engine stalling without warning. Exacerbating the danger is the fact that Plaintiff's Oil Indicator Light and other engine oil monitors fail to engage prior to engine stalling and vehicle inoperability.

101.   Plaintiff returned his Defective Vehicle to the dealership a third time, on November 21, 2019, after his vehicle had registered 26,535 miles. The dealership determined that his engine oil levels were low, but again failed to provide any long-term repair and merely directed Plaintiff to return again in another 1,000 miles.

102.   Plaintiff returned his Defective Vehicle to the dealership a fourth time, on December 12, 2019, after the vehicle had registered 27,541 miles. The dealership again determined his vehicle's oil engine levels were problematic, but failed, for the fourth time, to provide any actual repair for the Oil Consumption Defect.

103.   Plaintiff returned his Defective Vehicle to the dealership for a fifth time, on January 7, 2020, after the vehicle had registered 28,556 miles, for yet another test. The dealership again confirmed Plaintiff's engine had burned nearly a quart of oil in 1,000 miles but failed to provide a repair.

104.   Only upon Plaintiff's *sixth* attempt to obtain a repair did Defendant authorize an engine replacement. On February 4, 2020, six months after Plaintiff's first complaint about the Oil Consumption Defect, Defendant's authorized

dealership acknowledged that Plaintiff's 2.4L Tigershark engine had suffered damage from the Oil Consumption Defect and may require replacement. On February 13, 2020, Plaintiff had his engine replaced. B

105.   Because of reports that replacement engines have continued to exhibit the Oil Consumption Defect, Plaintiff has been forced to expend time, money, and effort in monitoring his engine's oil levels with increased frequency and accounting for the risks of engine stalling.

106.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 6.   Kansas Plaintiff

#### a.   Rebekah Aaren Wright

107.   Plaintiff Rebekah Aaren Wright (for purposes of this Plaintiff's allegations, "Plaintiff") is a Missouri citizen and resident of Kansas City, Missouri. On or about March 26, 2016, Plaintiff purchased a 2016 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Reed Jeep Overland Park, an authorized FCA dealership located in Overland Park, Kansas.

108.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

109.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in

correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

110.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

111.   Plaintiff has had to have the Defective Vehicle towed multiple times to an FCA dealership because it shut off while stopped at a stop light. Each time they told Plaintiff the Defective Vehicle needed oil. The FCA mechanic told Plaintiff this was normal and it was her fault for not checking her oil at home. On October 29, 2019, Plaintiff's vehicle stalled while she was driving, presenting a serious safety risk. The Defective Vehicle was towed to Gladstone Jeep in Gladstone, Missouri , discovered that the oil was 3.5 quarts low despite the fact that the Defective Vehicle's oil had been changed not long ago. Gladstone Jeep kept Plaintiff's Defective Vehicle for three days, did not provide her with a replacement vehicle, and charged Plaintiff $200 for service. On May 11, 2020, Plaintiff's vehicle stalled again while Plaintiff was driving, once again presenting a serious safety risk. The Defective Vehicle was towed to Reed Jeep in Overland Park, Kansas, an authorized FCA dealership, discovered the oil pan was completely empty.

112.    Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of having to have the vehicle towed to the dealership.

113.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

7.    **Louisiana Plaintiff**

a.  **Cheryl Miller**

114.   Plaintiff Cheryl Miller (for purposes of this Plaintiff's allegations, "Plaintiff") is a Louisiana citizen and resident of Houma, Louisiana. On or about April 30, 2018, Plaintiff purchased a 2016 Chrysler 200 (for purposes of this section, "Defective Vehicle") from N & N Auto Sales located in Houma, Louisiana.

115.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

116.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or

on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

117.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

118.   Soon after Plaintiff purchased the Defective Vehicle, she noticed the oil kept getting low but the Oil Indicator Light never came on. She brought the Defective Vehicle to the local FCA dealership because it was still under warranty. The FCA dealership told Plaintiff they could not find anything wrong and recommended they do an oil change. Plaintiff informed the FCA dealership that she just had an oil change two weeks ago, but the FCA dealership insisted that she have it done again. When Plaintiff picked up the Defective Vehicle, the FCA dealership told Plaintiff she would need to bring the Defective Vehicle in every month for an oil change so they could monitor the situation.

119.   In July 2020, the Defective Vehicle shut down on Plaintiff without warning while she was driving. Plaintiff was able to get the vehicle restarted and drove home. Two days later, Plaintiff's 17-year-old daughter was driving the Defective Vehicle when it shut down on her without warning on the highway. Plaintiff's daughter was stopped on the highway and was unable to restart the Defective Vehicle until another driver stopped to help her.

120.   Plaintiff brought the Defective Vehicle to an FCA dealership for diagnosis and repair. The dealership initially called Plaintiff and told her the head gasket needed to be replaced and that this would be covered by the warranty. The dealership called Plaintiff again a few days later and told her the Defective Vehicle's engine needed to be replaced and that it should be covered under the warranty. Two days later, the dealership called Plaintiff and told her that FCA would not cover the cost of the new engine because she is not the original owner of the Defective Vehicle.

121.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of having to have the vehicle towed to the dealership.

122.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and

the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 8.   Maryland Plaintiff

#### a.  Pamela Anderson

123.   Plaintiff Pamela Anderson (for purposes of this Plaintiff's allegations, "Plaintiff") is a Maryland citizen and resident of Maryland. On or about May 18, 2018, Plaintiff purchased a 2019 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Fitzgerald Auto Mall, an authorized FCA dealership in Lexington Park, Maryland.

124.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

125.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

126.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

127.   To the best of her recollection, Plaintiff's Defective Vehicle has stalled five times. In or around late summer 2018, when her Defective Vehicle had just over 3,000 miles on the odometer, the dash lights flashed and the vehicle stalled while Ms. Anderson was turning right at an intersection, presenting a serious risk of a collision. She reported this incident to Fitzgerald Auto Mall as well as FCA's hotline.

128.   After performing an oil consumption test on her Defective Vehicle, during which it was found that her vehicle was consuming between 3 to 4 quarts of oil in 3,000 miles of driving, Fitzgerald Auto Mall replaced the engine block on

April 11, 2019. At the time, her Defective Vehicle had approximately 11,644 on the odometer.

129. On September 4, 2019, when her Defective Vehicle had approximately 14,172 on the odometer, Plaintiff took her vehicle to the dealership for an oil change. Before the oil change began, the technician noted that the oil level in her vehicle was below the minimum mark on the dipstick. The dealership asked Plaintiff to bring in her vehicle every 1,000 miles so they could continue to monitor the oil level.

130. On September 20, 2019, Plaintiff returned her Defective Vehicle to the dealership, which performed another oil consumption test and changed the oil in her vehicle. The dealership asked that Plaintiff continue to bring in her vehicle every 1,000 miles so they could continue to monitor the oil level.

131. On November 18, 2019, Plaintiff returned her Defective Vehicle to the dealership, which performed another oil consumption test and changed the oil in her vehicle. The technician noted that the engine oil level in her vehicle was half a quart low and "within spec currently."

132. Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

133. FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective

Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 9.   Massachusetts Plaintiff

#### a.  Catherine Coppinger

134.   Plaintiff Catherine Coppinger (for purposes of this Plaintiff's allegations, "Plaintiff") is a Massachusetts citizen and resident of Dedham, Massachusetts. On or about May 4, 2018, Plaintiff purchased a 2019 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from McGovern Chrysler Dodge Jeep Ram, an authorized FCA dealership in Newton, Massachusetts.

135.   Unknown to Plaintiff at the time his Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and

did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

136.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

137.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

138.   Plaintiff's Defective Vehicle has shut off on her multiple times without warning while driving. The first time this happened was in July 2018, when the

Defective Vehicle had less than 5,000 miles on it. Plaintiff brought the Defective Vehicle back to the dealership she purchased it from and was told that the oil was low and that she needed an oil change at 3,500 miles. In one instance, Plaintiff's vehicle stalled when she was making a left turn and cars were coming. Thankfully, Plaintiff was able to get the vehicle restarted and moved out of the way before she was hit.

139.   In April 2020, Plaintiff's vehicle stalled while she was taking a right turn. She brought the vehicle to the FCA dealership for diagnosis and repair and the FCA technician told her there was a crack in the engine and it needed to be replaced. Plaintiff emailed FCA and provided them with a timeline of everything that has happened with her vehicle.

140.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

141.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising  messaging  that  its  vehicles  were  safe  and  reliable.  None  of  the

advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 10.   Michigan Plaintiffs

#### a.  Caren Christman

142.   Plaintiff Caren Christman (for purposes of this Plaintiff's allegations, "Plaintiff") is a Michigan citizen and resident of Michigan. In or around August 2018, Plaintiff leased a new 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from McInerney's Chrysler Dodge Jeep Ram, an authorized FCA dealership in Woodhaven, Michigan.

143.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with

the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

144.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

145.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

146.   In or around November 2018, after less than 5,000 miles, Plaintiff's engine stalled while she was driving due to low oil, creating a serious risk of a crash. Plaintiff brought the car into her dealership, which added additional engine oil.

147.   In January 2019, Plaintiff's engine stalled again while she was driving. She visited the dealership on January 16, 2019. The service representative noted that the oil was low and instructed Plaintiff to return every 1,000 miles for three

consecutive times in order to conduct an oil consumption test. On March 7, 2019, when she returned for an oil level check, the dealership informed her that "normal" oil consumption for her vehicle is 1 quart for every 1,000 miles up to 50,000 miles, and 1 quart for every 750 miles above 50,000 miles.

148.   On April 3, when she returned for another oil level check, the dealership noted that the oil was low and that the vehicle had burned off one quart of oil per 1,000 miles. Once again, the dealership told her that "normal" oil consumption for her vehicle is 1 quart for every1,000 miles up to 50,000 miles, and 1 quart for every 750 miles above 50,000 miles.

149.   To the best of her recollection, Plaintiff returned to the dealership twice in or around May and June 2019 for additional oil consumption tests.

150.   In or around late June of 2019, Plaintiff's engine stalled again while she was driving due to low oil. She brought her vehicle back to the dealership, which performed an oil change on July 2.

151.   In or around late November or early December of 2019, Plaintiff's engine stalled again while she was driving due to low oil. The dealer performed an oil change on December 6.

152.   To the best of her recollection, Plaintiff returned to the dealership two more times in or around January and February of 2020 for additional oil

consumption tests. The dealer again found her vehicle burns approximately one quart of oil every 1,000 miles.

153.   The service center has told Plaintiff that this problem is common in these vehicles and that the only fix would be an engine replacement that FCA would have to approve. To date, FCA has not done so.

154.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

155.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and

federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b.  Kelly Johnson

156.  Plaintiff Kelly Johnson (for purposes of this Plaintiff's allegations, "Plaintiff") is a Michigan citizen and resident of Boyne City, Michigan. On or around June 28, 2018, Plaintiff purchased a used 2015 Jeep Cherokee with approximately 45,000 miles (for purposes of this section, "Defective Vehicle") from Fletch's GMC Buick Audi in Petoskey, Michigan.

157.  Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

158.  Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the

opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

159.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

160.   Plaintiff's Defective Vehicle has shut off 8 times while she or her daughter have been driving it, including on July 31, 2020 when the vehicle stalled in the middle of the road while Plaintiff's daughter was driving it to work. Plaintiff and her daughter were forced to push the vehicle over to the side of the road.

161.   Plaintiff took the vehicle to Nick's Auto Repair and had the battery replaced at a cost of approximately $341. Neither Plaintiff nor Nick's Auto Repair knew that the defects were present in the Defective Vehicle and that they caused the stalling of the vehicle.

162.   On August 10, 2020, Plaintiff contacted Brown Motors, an authorized FCA dealership in Petoskey, Michigan. Brown Motors was unable to look at the vehicle until August 24, 2020. Brown Motors advised Plaintiff to participate in an

oil consumption test, which she did. On October 8, 2020, the dealership instructed Plaintiff to undergo a second oil consumption test.

163.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

164.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

## 11.   Minnesota Plaintiff

### a.  Holly Kundel

165.   Plaintiff Holly Kundel (for purposes of this Plaintiff's allegations, "Plaintiff") is a Minnesota citizen and resident of Forest Lake, Minnesota. On or about August 17, 2019, Plaintiff purchased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Forest Lake Chrysler Dodge Jeep Ram, an authorized FCA dealership located in Forest Lake, Minnesota.

166.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

167.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or

on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

168.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

169.   The Defective Vehicle had 3,086 miles on it when Plaintiff purchased it. Plaintiff first noticed low oil in December 2019 when the Defective Vehicle had approximately 5,100 miles. Plaintiff's father checked the oil and it was really low even though the Oil Indicator light never came on. Plaintiff and her father checked the Owner's Manual to make sure they were checking the oil right. Plaintiff's father went out and bought her oil that day and put 2.5 quarts in. Plaintiff took the Defective Vehicle to Valvoline the following week for a professional oil change.

170.   In early August 2020, Plaintiff checked the oil level in the Defective Vehicle and it was really low again. She added a quart and called the dealership. The dealership instructed her to bring the Defective Vehicle in. When she arrived, the dealership checked the oil and told her she needed an oil change even though she had just added oil.  Plaintiff paid for the oil change. The dealership also instructed Plaintiff to begin oil consumption testing. The Defective Vehicle had 7,641 miles on it at that time.

171.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff continues to endure the expense and inconvenience of having to bring the Defective Vehicle to the dealership for oil consumption testing. On September 19, 2020, Plainitff brought the Defective Vehicle to the dealership for oil consumption testing. The Defective Vehicle had approximately 8,200 miles on it at that time. The dealership initially refused to add oil because "it wasn't low" and told Plaintiff, "it is typical for this engine to use one quart every 1,000 miles." Plaintiff persisted and the dealership topped off the oil as they are supposed to for the oil consumption test.

172.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and

federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 12.   Missouri Plaintiffs

#### a.  Ryan Hall

173.   Plaintiff Ryan Hall (for purposes of this Plaintiff's allegations, "Plaintiff") is a Missouri citizen and resident of St. Charles, Missouri. On or about July 27, 2018, Plaintiff purchased a 2019 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Lou Fusz Chrysler Dodge Jeep Ram Fiat, an authorized FCA dealership located in O'Fallon, Missouri.

174.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

175.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's

advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

176.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

177.   A few months after purchasing the Defective Vehicle, Plaintiff's wife called him and told him the vehicle shut off on her without warning. After ten minutes of trying to restart the vehicle, she was finally able to get it started and drove home. The next day, Plaintiff's wife was driving the Defective Vehicle to school when it shut down on her without warning and she was almost hit by another vehicle.

178.   Plaintiff called the dealership and was told that he needed an oil change. But the Defective Vehicle has continued to shut down on them with no warning even after the oil change. On March 1, 2019, Plaintiff brought the Defective Vehicle to Northwest Jeep in Beaverton, Oregon. They were able to verify that this was happening and noted that the engine oil was low.

179.   Plaintiff fears the Defective Vehicle will stall again and continues to endure the expense and inconvenience of more frequent than expected oil changes.

180.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 13.   Nevada Plaintiffs

#### a.  Roberto Hernandez

181.   Plaintiff Roberto Hernandez (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Nevada and resident of Las Vegas, Nevada. On or about April 2, 2015, Plaintiff purchased a 2015 Dodge Dart (for purposes of this section,

"Defective Vehicle") from Chapman Las Vegas Dodge Chrysler Jeep Ram, an authorized FCA dealership in Las Vegas, Nevada.

182.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

183.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

184.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

185.   Plaintiff checks his oil once or twice a week and noticed that he was adding oil within the first 100 miles so he brought it to the dealership.

186.   In September 2017, Plaintiff was driving the Defective Vehicle on the highway with his family inside and the vehicle shut down without warning. This was particularly dangerous because Plaintiff was driving fast at the time and the steering wheel locked up. Plaintiff was able to get the vehicle to the side of the road and called a friend to come and tow the Defective Vehicle back to his house. Additionally, in December 2018, Plaintiff was driving the Defective Vehicle home after Christmas and the vehicle shut down multiple times without warning.

187.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

188.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad

advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 14.    New Jersey Plaintiffs

#### a.  Luis Munoz

189.   Plaintiff Luis Munoz (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of New Jersey and resident of New Jersey. On or about June 15, 2017, Plaintiff purchased a 2017 Jeep Compass (for purposes of this section, "Defective Vehicle") from City Auto Park, an authorized FCA dealership in Burlington, New Jersey.

190.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in

designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

191.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

192.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

193.   In or around July 2018, Plaintiff observed that his Defective Vehicle had burned nearly 1 quart of oil after driving approximately 1,000 miles. Shortly thereafter, he presented his vehicle to the dealership and was told by the dealership personnel that it is normal for these vehicle models to burn 1 quart of oil every 1,000 miles of driving. No dashboard notification had alerted him that his oil was low.

194.   The dealership had him return after another 1,000 miles in order to perform an oil consumption test. When he returned, the dealer told him that the consumption was normal. Plaintiff has continued to complain about the oil consumption issue during his subsequent oil changes but has received no additional repairs or assistance.

195.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

196.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and

federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b. Kimberly Eager

197.   Plaintiff Kimberly Eager (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of New Jersey and resident of Waterford Works, New Jersey. On or about February 28, 2018, Plaintiff purchased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Cherry Hill Triplex: Chrysler Dodge Jeep Kia Mitsubishi and Ram, an authorized FCA dealership in Cherry Hill, New Jersey.

198.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

199.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's

- 69 -

advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

200.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

201.   For example, about six months after Plaintiff purchased the Defective Vehicle, the Defective Vehicle shut down without warning while her 18-year-old daughter was driving it. Plaintiff's daughter took the vehicle to a nearby friend's house after she was able to restart it and the friend's parents checked the oil and it was four quarts low. When Plaintiff purchased the Defective Vehicle, she expected that she would change the oil every 5,000 miles, but the Defective Vehicle shut down well before 5,000 miles. Since then, Plaintiff has been checking the oil every 500 miles, which was not what she expected when she purchased the Defective Vehicle.

202.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

203.  FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**15.   New York Plaintiff**

### a. Sherri McCall

204.  Plaintiff Sherri McCall (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of New York and resident of New York. On or about October 31, 2019, Plaintiff purchased a 2019 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from RS Motors, an authorized FCA dealership in Falconer, New York.

205.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

206.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

207.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

208.   After owning the vehicle for approximately a month, Plaintiff and her husband noticed that the oil was low. She took it into the dealership which had her return after 1,000 miles in order to perform an oil consumption test. When Plaintiff returned, the dealer said that some oil consumption was normal.

209.   On a subsequent visit to the dealership for the problem, the dealer changed her PCV valve. This repair did not improve the oil consumption problem.

210.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

211.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and

- 73 -

federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**16.    North Carolina Plaintiffs**

    **a.  Joshua Caples**

212.   Plaintiff Joshua Caples (for purposes of this Plaintiff's allegations, "Plaintiff") is a North Carolina and resident of North Carolina. In or around September 2018, Plaintiff purchased a 2019 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Nichols Dodge Chrysler Jeep, now known as Cox Chrysler Dodge Jeep Ram, an authorized FCA dealership in Burlington, North Carolina.

213.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

214. Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

215. Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

216. On or around February 17, 2020, Plaintiff's Defective Vehicle stalled out while he was driving and was nearly hit by another vehicle. There was no dashboard notification of any issue, or to alert him that his oil was low. After managing to restart his vehicle, Plaintiff called Cox Chrysler Dodge Jeep Ram to report the stall and ask for a repair under warranty. A service technician asked him if his vehicle had the 2.4L engine. When Plaintiff confirmed that his vehicle did have this engine, the technician informed him that he should check the oil because the Tigershark engines, if even the least bit low on oil, have a tendency to shut off. The

technician did not advise Plaintiff to bring his vehicle in for an oil consumption test, or other inspection or repair.

217.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

218.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 17.   Ohio Plaintiff

#### a.  Danielle Coates

219.    Plaintiff Danielle Coates (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Ohio and resident of Cincinnati, Ohio. On or about February 23, 2019, Plaintiff purchased a 2016 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Jeff Wyler Ft. Thomas Chrysler Ram Jeep, an authorized FCA dealership in Ft. Thomas, Kentucky.

220.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

221.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or

- 77 -

on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

222.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

223.   For example, in August 2019, while driving her Defective Vehicle down a busy street, it sputtered and stalled while turning left into a mall parking lot. This was a very dangerous situation because the vehicle stalled as Plaintiff was turning left and crossing lanes of traffic flowing in the opposite direction. Because the vehicle stalled, Plaintiff was unable to accelerate the vehicle through the turn, and was forced to coast, barely making it into the parking lot. Plaintiff, with the assistance of a woman who worked at a nearby restaurant, pushed the Defective Vehicle into a safer location. Plaintiff called her family members for assistance. After her family members arrived, they checked the vehicle's oil level and determined that the oil level was bone dry. Prior to and even after stalling, there was no check oil level warning from the vehicle. Plaintiff's family then drove her to a nearby Advanced Auto store where Plaintiff purchased a 5-qt container of oil and funnel, spending $32.22. After adding approximately 4 quarts of oil to the vehicle, the vehicle started and was operational.

224.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

225.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b.  Krishawn Durham

226.   Plaintiff Krishawn Durham (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Ohio and resident of Cleveland, Ohio. In or around July 2017, Plaintiff purchased a 2017 Jeep Compass (for purposes of this section,

"Defective Vehicle") from Fred Martin Superstore, an authorized FCA dealership in Barberton, Ohio.

227.  Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

228.  Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

229.  Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

230.  In or around August 2017, Plaintiff was driving the Defective Vehicle when the engine shut down without warning. Plaintiff made several attempts to restart the Defective Vehicle, but it was entirely inoperable. At the time this occurred, Plaintiff had owned the Defective Vehicle for approximately a month and was within the coverage period of the warranty.

231.  Soon thereafter, Plaintiff presented the Defective Vehicle to Fred Martin Superstore's service department to diagnose the cause of the shutdown. According to the maintenance technicians, the engine shut down because the Defective Vehicle was low on oil.

232.  The Defective Vehicle's oil indicator system never alerted her to the fact that the Defective Vehicle was running low on oil. Not only had she only owned the Defective Vehicle for approximately a month when the shutdown occurred, she drives it no more than approximately 600 miles a month on average. Plaintiff conveyed this information to the dealer, complaining that there was an obvious problem with the vehicle oil consumption and oil system indicator. But according to the dealership technicians, the rapid rate of oil consumption she experienced was "normal" for the type of vehicle she was driving.

233.   Since August 2017, Plaintiff has needed to replenish the Defective Vehicle's engine oil with a quart once a month to prevent it from stalling and shutting down without warning.

234.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

235.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### c.  Mikaelyn McDowell

236. Plaintiff Mikaelyn McDowell (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Ohio and resident of Columbus, Ohio. On or about January 13, 2018, Plaintiff leased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Crown Chrysler Jeep, an authorized FCA dealership in Dublin, Ohio.

237. Unknown to Plaintiff at the time his Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

238. Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or

on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

239.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

240.   Plaintiff's Defective Vehicle has shut down on her twice while she was driving. Both times, when Plaintiff checked the dipstick in her vehicle, the oil was completely empty. Both time when Plaintiff brought her Defective Vehicle to Jeep Chrysler, they told her the vehicle is designed to shut off when the oil is low and that the Defective Vehicle needed an oil change. Yet both times this happened, it was well before the maintenance schedule for oil changes. The most recent time the Defective Vehicle shut down, it was 2,000 miles early for an oil change.

241.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

242.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad

advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### d. Katie Kuczkowski

243.   Plaintiff Katie Kuczkowski (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Ohio and resident of Ohio. On or about February 25, 2018, Plaintiff leased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Medina Auto Mall, an authorized FCA dealership in Medina, Ohio.

244.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect

has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

245.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

246.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

247.   On or around February 6, 2020, Plaintiff's vehicle stalled out while driving in the middle of a busy intersection. Shortly thereafter, she presented her vehicle to the dealership and they discovered her oil was two quarts low. Plaintiff's Defective Vehicle had approximately 25,000 miles at the time and no dashboard notification had alerted her that her oil was low.

248.   The dealership had her return after 1,000 miles in order to perform an oil consumption test. When she returned, the dealership personnel said that some oil

consumption was normal. Nevertheless, they told Plaintiff that she would need to change her oil every 4,000 miles and check her dipstick whenever refilling her gas tank.

249.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

250.  FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 18.    Oklahoma Plaintiff

#### a.  Kelsey Williams

251.    Plaintiff Kelsey Williams (for purposes of this Plaintiff's allegations, "Plaintiff") is an Oklahoma citizen and resident of Oklahoma City, Oklahoma. On or about March 17, 2017, Plaintiff purchased a 2016 Fiat 500X (for purposes of this section, "Defective Vehicle") from Edmund Hyundai located in Edmond, Oklahoma.

252.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

253.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in

correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

254.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

255.   Plaintiff has had to have the Defective Vehicle towed multiple times to an FCA dealership eight times because it shut off while Plaintiff was driving. The first time the Defective Vehicle shut down was in June 2017 after Plaintiff has just had the oil changed. Plaintiff was driving 75 mph on the freeway when the Defective Vehicle shut down, the power steering went out, and Plaintiff had to frantically pull over to the shoulder. Once Plaintiff was able to restart the Defective Vehicle, she brought it to the dealership and they had it for over a month. Since then, the Defective Vehicle has continued to shut down on Plaintiff with no warning every 3-4 months.  In November 2017, the Defective Vehicle was at the dealership for almost two months.

256.   The first time the dealership said anything about the oil was last year after the Defective Vehicle shut off while Plaintiff was driving and she brought it to

the dealership. The dealership told Plaintiff that these vehicles burn a lot of oil and are designed to shut down.

257. Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

258. FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 19. Oregon Plaintiffs

#### a. Daniel Scott

259. Plaintiff Daniel Scott (for purposes of this Plaintiff's allegations, "Plaintiff") is an Oregon citizen and resident of Portland, Oregon. On or about March 20, 2018, Plaintiff purchased a 2018 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Lithia Chrysler Dodge Jeep Ram of Portland, an authorized FCA dealership located in Portland, Oregon.

260. Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

261. Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or

on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

262.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

263.   About a month or two after Plaintiff purchased the Defective Vehicle, it shut down on him without warning when he was turning left. This scared him. Plaintiff called the dealership and described what happened. The dealership asked if he was able to get it started again and instructed Plaintiff to let them know if the Defective Vehicle shuts down again. Plaintiff contacted the dealership again after the Defective Vehicle shut down again while Plaintiff was driving two weeks later. The dealership told Plaintiff the oil is low and to bring it in. Since then, the Defective Vehicle has continued to shut down on Plaintiff.

264.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

265.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its

useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b. Ryan Graham

266. Plaintiff Ryan Graham (for purposes of this Plaintiff's allegations, "Plaintiff") is an Oregon citizen and resident of Canby, Oregon. On or about September 27, 2017, Plaintiff purchased a 2014 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Canby Ford located in Canby, Oregon.

267. Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with

the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

268.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

269.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

270.   The Defective Vehicle has shut down on Plaintiff approximately 12 times while he was driving it. Plaintiff brought the Defective Vehicle to NW Jeep in Beaverton, Oregon twice to obtain information about how to address the stalling. However, each time, Plaintiff was advised to change the oil. Plaintiff carries spare oil with him at all times.

271.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

272.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**20.    Pennsylvania Plaintiff**

**a.  Karen Burke**

273.   Plaintiff Karen Burke (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Pennsylvania and resident of Johnstown, Pennsylvania.

On or about June 13, 2018, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Laurel Chrysler Dodge Jeep Ram, an authorized FCA dealership in Johnstown, Pennsylvania.

274.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

275.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

276.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

277.   In October 2019, the Defective Vehicle completely shut down when Plaintiff was merging onto a highway. There was a huge truck behind Plaintiff at the time who almost hit the Defective Vehicle and had to swerve around to miss hitting her.   Plaintiff brought the Defective Vehicle to her FCA dealership and the technician said, "You could use a little oil. Just make sure you check your oil more often."  However, the low oil indicator light had not come on to alert her.

278.   Plaintiff delivered her vehicle to an authorized FCA dealership for diagnosis and repair.  The FCA technician diagnosed the vehicle with low oil. When Plaintiff asked the dealership personnel about the cause of the oil consumption problem, the dealership told her to check the oil every few days herself.

279.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

280.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its

useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### b. Daniel McGorrey

281.   Plaintiff Daniel McGorrey (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Pennsylvania and resident of Pennsylvania. On or about November 21, 2018, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Chapman Chrysler Jeep Dodge Ram, an authorized FCA dealership in Horsham, Pennsylvania.

282.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in

designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

283.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

284.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

285.   On or around January 25, 2019, Plaintiff's Defective Vehicle stalled out while making a left turn on a four-lane road. Shortly thereafter, he presented his vehicle to the dealership and they discovered his oil pan was completely empty. His vehicle had 3,020 miles at this time and no dashboard notification had alerted him that his oil was low.

286.   The dealership had Plaintiff return the Defective Vehicle after 1,000 miles in order to perform an oil consumption test. When he returned, the dealership personnel said that some oil consumption was normal. Nevertheless, they told Plaintiff that he would need to change his oil every 4,000 miles and check his dipstick whenever refilling his gas tank.

287.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

288.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and

federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 21.    South Carolina Plaintiff

#### a.  Rosalind Burks

289.   Plaintiff Rosalind Burks (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of South Carolina and resident of Columbia, South Carolina. On or about October 28, 2019, Plaintiff purchased a 2019 Jeep Cherokee (for purposes of this section, "Defective Vehicle") from Galeana Chrysler Jeep, an authorized FCA dealership in Columbia, South Carolina.

290.   Unknown to Plaintiff at the time his Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

291.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's

advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

292.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

293.   For example, in December 2019, Plaintiff was driving the Defective Vehicle and the vehicle shut down without warning. Plaintiff delivered her vehicle to an authorized FCA dealership for diagnosis and repair. The FCA technician diagnosed the vehicle with low oil. The FCA technician added oil to the vehicle and directed Plaintiff to return after 2,000 miles of driving so that the dealership could conduct an oil consumption test. After only roughly 2,000 miles, Plaintiffs' vehicle was already a quart of oil low, and it continued to consume oil at an abnormally high pace.

294.   On May 15, 2020, Plaintiff's vehicle shut off again without warning while Plaintiff was driving with her grandchildren in the vehicle. The vehicle's oil had recently been changed on March 3, 2020. Plaintiff brought the vehicle back to

an authorized FCA dealership for diagnosis and repair. The FCA technician showed Plaintiff the oil stick and there was no oil on it. When Plaintiff asked the dealership personnel about the cause of the oil consumption problem, the dealership said that the vehicle shut off due to a safety mechanism. The FCA technician added oil to the vehicle and directed Plaintiff to return after 1,000 miles of driving so that the dealership could conduct an oil consumption test.

295.   On May 29, 2020, Plaintiff brought her vehicle to an authorized FCA dealership for oil consumption testing and the vehicle was two quarts low in oil. The service department instructed Plaintiff to return on June 3, 2020, because Plaintiff's vehicle possibly needed a new motor. Plaintiff brought the vehicle to the dealership and provided them with the receipts for the oil changes that had been performed. The dealership topped off the oil and instructed her to check the oil after 1,000 miles and return to the dealership if the oil was low.

296.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

297.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its

useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**22.   Tennessee Plaintiff**

**a.  Holly Hickman**

298.   Plaintiff Holly Hickman (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Tennessee and resident of Kodak, Tennessee. On or about September 5, 2018, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Jim Cogdill Dodge Chrysler Jeep Ram, an authorized FCA dealership in Knoxville, Tennessee.

299.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a

defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

300.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

301.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

302.   Plaintiff's grandfather checked the oil only a couple of months after Plaintiff purchased the Defective Vehicle, and he added a quart of oil because the oil was low. About a month later, Plaintiff checked the oil and it was low again so

she added half a quart. When the oil indicator light came on, Plaintiff brought the Defective Vehicle to an FCA dealership and they added oil.

303.   After approximately 5,000 miles, Plaintiff brought the Defective Vehicle to an FCA dealership for an oil change. She mentioned to the FCA technician that she was concerned about the vehicle's oil consumption and asked them to begin oil consumption testing. The FCA dealership instructed Plaintiff to bring her vehicle in for testing every 1,000 miles. During oil consumption testing at 3,000 miles, the Defective Vehicle's oil level was low and the FCA dealership added a quart of oil. At 5,000 miles, the Defective Vehicle's oil level was showing that it was on the add oil mark but the FCA dealership did not add more oil.

304.   Plaintiff was concerned about the Defective Vehicle's oil consumption and contacted FCA directly. Plaintiff was told that she would need to restart oil consumption testing because the FCA dealership had been doing the testing wrong. Plaintiff was then told that she would need to bring the vehicle in for testing every 500 miles. Plaintiff has contacted FCA repeatedly to discuss her concerns about the Defective Vehicle's excessive oil consumption. FCA continually tells Plaintiff that there is nothing that can be done and that she needs to keep working with the dealership.

305.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

306.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**23.    Texas Plaintiffs**

### a.  Amber Portugal and Michael Sanchez

307.   Plaintiffs Amber Portugal and Michael Sanchez (for purposes of these Plaintiffs' allegations, "Plaintiffs") are citizens of Texas and residents of Irving,

Texas. On or about May 30, 2018, Plaintiffs purchased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Covert Chrysler Jeep Dodge Ram, an authorized FCA dealership in Austin, Texas.

308.   Unknown to Plaintiffs at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

309.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

310.   Since purchasing the Defective Vehicle, Plaintiffs have experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

311.   Plaintiffs' Defective Vehicle has shut down on them multiple times without warning while driving. When this happens, every light on the dashboard comes on and the Defective Vehicle slows down and then stops. Plaintiffs contacted FCA and they were assigned a case manager who told them the Defective Vehicle needed a new battery and that FCA would cover the costs. Plaintiffs delivered their vehicle to an authorized FCA dealership for diagnosis and repair. The FCA technician diagnosed the vehicle with low oil and told Plaintiffs they would need to bring the Defective Vehicle back to have the oil checked at 500 miles. Additionally, Plaintiffs were told they were responsible for paying for the new battery and the dealership refused to provide Plaintiffs with a loaner vehicle for the four days the Defective Vehicle was being repaired.

312.   Even though the FCA technician added oil to the Defective Vehicle and replaced the battery, Plaintiffs' vehicle continues to consume oil at an abnormally high pace and Plaintiffs fear the Defective Vehicle will stall again and Plaintiffs continue to endure the expense and inconvenience of more frequent than expected oil changes.

313.   FCA never told Plaintiffs about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiffs purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiffs chose an FCA vehicle because Plaintiffs believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiffs contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiffs to pay out-of-pocket costs, including repair costs, Plaintiffs would not have purchased the Defective Vehicle or would have paid less for it.

### b.  Adam Dyer

314.   Plaintiff Adam Dyer (for purposes of this Plaintiff's allegations, "Plaintiff") is a New Mexico citizen and resident of Las Cruces, New Mexico. On or about March 16, 2019, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Dick Poe Chrysler Jeep, an authorized FCA dealership located in El Paso, Texas.

315.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and

did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

316.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

317.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

318.   On at least 20 occasions, Plaintiff's Defective Vehicle has stalled while Plaintiff has been driving it. Plaintiff took the Defective Vehicle to an authorized

FCA dealership for diagnosis and repair and was told they were unable to duplicate the problem and to always check his oil because these vehicles consume a lot of it.

319.   The Defective Vehicle has continued to shut down on Plaintiff with no warning. Plaintiffs' vehicle continues to consume oil at an abnormally high pace and Plaintiffs fear the Defective Vehicle will stall again and Plaintiffs continue to endure the expense and inconvenience of more frequent than expected oil changes.

320.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 24.    Virginia Plaintiff

#### a.  Arteal Jordan

321.    Plaintiff Arteal Jordan (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Virginia and resident of Chesapeake, Virginia. In March 2018, Plaintiff purchased a 2014 Dodge Dart (for purposes of this section, "Defective Vehicle") from Priority Chevrolet, an authorized FCA dealership in Chesapeake, Virginia.

322.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

323.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in

correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

324.    Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

325.    Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects. Plaintiff changes the oil in his 2014 Dodge Dart every 2,000–3,000 miles. Despite this relatively quick oil change rate, Plaintiff has experienced four instances where the engine stalled due to low oil levels. Plaintiff believes that this engine consumption defect results in a dangerous safety issue for himself and other drivers. After experiencing multiple engine-stalling events related to low oil levels, Plaintiff had his engine evaluated by Greenbriar Dodge in Chesapeake, Virginia. Greenbriar Dodge determined that the vehicle needed a replacement engine due to the Oil Consumption defect. In January 2020, Greenbriar installed a used 2.4 Liter Tiger Shark replacement engine with approximately 40,000 miles in Plaintiff's vehicle. Except for the $100 deductible that Plaintiff paid, the cost of the replacement engine was covered by an extended warranty that Plaintiff previously purchased. Within a couple of months following

the installation of the replacement engine, Plaintiff's vehicle again began to stall. Plaintiff returned to Greenbriar Dodge. Greenbriar Dodge told Plaintiff that his engine oil was low and recommended a 1,000-mile oil consumption test and Plaintiff agreed to the test. Greenbriar replaced the Defective Vehicle's oil and instructed Plaintiff to return the Defective Vehicle after he had driven it for an additional 1,000 miles. When Plaintiff returned his vehicle to Greenbriar in May 2020 after driving it for 1,000 miles, the technician checked the oil level and determined that the vehicle consumed 1 ¼ quarts of oil during that time period. At this rate of oil consumption, Plaintiff's vehicle would have essentially no oil remaining after driving only 4,800 miles. Greenbriar recommended that Plaintiff return again after driving the vehicle for another 1,000 miles to see how much oil has been consumed. Plaintiff then contacted FCA Chrysler customer care to file a formal complaint about the oil consumption defect on May 12, 2020.

326.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

327.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its

useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 25.   Washington Plaintiff

#### a.   Vivien Nagy

328.   Plaintiff Vivien Nagy (for purposes of this Plaintiff's allegations, "Plaintiff") is a Washington citizen and resident of Kenmore, Washington. On or about February 11, 2017, Plaintiff purchased a 2015 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Rairdon Dodge Jeep of Kirkland, an authorized FCA dealership located in Kirkland, Washington.

329.   Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a

defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

330.   Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

331.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

332.   In June 2020, Plaintiff was driving the Defective Vehicle when it shut off without warning. Plaintiff was able to restart the Defective Vehicle and drove home. The Defective Vehicle shut off without warning again on Plaintiff again ten days later when she was driving on the freeway. This was particularly dangerous

because the other vehicles on the freeway also had no warning that the Defective Vehicle would suddenly slow down. Once Plaintiff was able to get the Defective Vehicle started again, she drove to work and called the dealership and was instructed to bring the Defective Vehicle in the next day. The next day on the way to the dealership the Defective Vehicle shut off on Plaintiff. When she brought the Defective Vehicle to the dealership they told her the vehicle shut off on her because it was out of oil. The dealership told Plaintiff that these cars consume a lot of oil and that she should top off her oil every time she gets gas. She was also instructed to bring her vehicle to the dealership for an oil change every 3000 miles.

333.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

334.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil

Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

### 26. West Virginia Plaintiff

#### a. Katlyn Wills

335. Plaintiff Katlyn Wills (for purposes of this Plaintiff's allegations, "Plaintiff") is a West Virginia citizen and resident of Shady Spring, West Virginia. On or about August 1, 2018, Plaintiff purchased a 2018 Jeep Renegade (for purposes of this section, "Defective Vehicle") from Lake Norman Chrysler Dodge Jeep Ram, an authorized FCA dealership located in Lake Norman, North Carolina.

336. Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect

has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

337. Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

338. Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

339. Within the first six months of owning the vehicle, Plaintiff noticed the Defective Vehicle was burning a lot of oil. Nearly every 1,000 miles Plaintiff would add oil to the Defective Vehicle. In approximately May 2020, the Defective Vehicle's check engine light came on and within seconds the vehicle completely shutdown on the road. Plaintiff checked the oil level and found the reservoir to be dry. About two months later, the Defective Vehicle stalled. Plaintiff checked the oil level and found the level to be slightly below the minimum level.

340.   Plaintiff has talked with service advisors at Sheets Chrysler Dodge Jeep Ram about the Defective Vehicle's oil consumption issue when the Defective Vehicle was being serviced for other issues. The service advisors told her the consumption was normal. Plaintiff was told "these motors were made to burn oil."

341.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

342.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

27.    **Wisconsin Plaintiff**

    a.  **Tera Castillo**

343.    Plaintiff Tera Castillo (for purposes of this Plaintiff's allegations, "Plaintiff") is a citizen of Wisconsin and resident of Wisconsin. On or about August 12, 2019, Plaintiff purchased a 2018 Jeep Compass (for purposes of this section, "Defective Vehicle") from Sheboygan Jeep Chrysler, an authorized FCA dealership in Sheboygan, Wisconsin.

344.    Unknown to Plaintiff at the time the Defective Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was (1) defective and did not function safely, as advertised, or as intended by its design and (2) released excess levels of harmful emissions such as NOx into the environment and/or had a defective emissions system. FCA's unfair, unlawful and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Defective Vehicle with the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect has caused Plaintiff to pay more at the time of purchase than Plaintiff would have paid had the truth been disclosed and deprived Plaintiff of the benefit of the bargain.

345.    Plaintiff uses the Defective Vehicle for personal, family, and/or household uses. Prior to purchasing the Defective Vehicle, Plaintiff relied on FCA's advertising regarding the safety and reliability of the vehicle. FCA had the opportunity to disclose the defects through its advertising, in owner's manuals, in

correspondence sent to Plaintiffs and Class members, through representations by FCA dealerships, through vehicle brochures and other informational documents, or on FCA's website. However, FCA failed to disclose that the Defective Vehicle possessed any defects.

346.   Since purchasing the Defective Vehicle, Plaintiff has experienced the Oil Consumption, Oil Indicator, and Excess Emissions defects, despite adhering to FCA's suggested maintenance schedule for oil changes.

347.   On or around April 10, 2020, Plaintiff's vehicle stalled out while driving around a corner. Then on April 14, 2020, her vehicle stalled out again, but this time while driving 35 mph on a roadway.  Shortly thereafter, she contacted the dealership and she stated her vehicle still had 2,500 miles before her next oil change and there was no low oil warning light on her dashboard when stalling incident occurred. She set up an appointment to have the car checked the next day at the dealership. In the meantime, she had someone check her oil and discovered that the oil pan was completely empty.

348.   At the appointment, the dealership inspected her vehicle and then advised that she would need to bring in her vehicle every 500 miles for at least the next 2,500 miles as part of an oil consumption test. The results of the test would determine if her engine needed to be replaced.

349.   Plaintiff's vehicle continues to consume oil at an abnormally high pace and Plaintiff fears the Defective Vehicle will stall again and Plaintiff continues to endure the expense and inconvenience of more frequent than expected oil changes.

350.   FCA never told Plaintiff about the Oil Consumption defect, Oil Indicator defect, or the Excess Emissions defect so Plaintiff purchased the Defective Vehicle on the reasonable, but mistaken, belief that his Defective Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff chose an FCA vehicle because Plaintiff believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Defective Vehicle had the Oil Consumption defect, the Oil Indicator defect, or Excess Emissions defect. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Excess Emissions defect and that the Defective Vehicles violated state and federal emissions standards and/or had defective emissions systems, Plaintiff would not have purchased the Defective Vehicle or would have paid less for it.

**B.    Defendant**

    **1.    Defendant**

351.   Defendant FCA US LLC is a limited liability corporation organized and in existence under the laws of the State of Delaware. FCA's corporate headquarters

are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components throughout the United States.

352.   FCA sells the Defective Vehicles through FCA franchise dealerships. FCA distributes information about the vehicles to its dealers for the purpose of passing that information to consumers. FCA also understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of its vehicles to consumers. The dealers act as FCA's agents in selling the Defective Vehicles and disseminating information about the Defective Vehicles to customers and potential customers. FCA also disseminates information about its vehicles on its website. At the point of sale, as well as in written materials and on its website, FCA could have told the truth.

## V.    FACTUAL ALLEGATIONS

### A.    FCA's 2.4L Tigershark MultiAir II Engine

353.   Prior to 2013, consumers had complained that some of the Defective Vehicles were underpowered, so the larger 2.4L Tigershark MultiAir II Engine 2.4L supplanted the World Gas Engine used previously by Chrysler and was a near top-down overhaul.

354.   This advertisement depicts the new engine:



355.   The Defective Vehicles equipped with this engine include the following:

- 2014 – 2020 Jeep Cherokee;

- 2017 – 2020 Jeep Compass;

- 2015 – 2020 Jeep Renegade;

- 2015 – 2016 Chrysler 200;

- 2013 – 2016 Dodge Dart; and

- 2016 – 2020 Fiat 500X.

356.   The 2.4L Tigershark engine employs an electro-hydraulic "MultiAir" technology proprietary to FCA. MultiAir is supposed to offer more controllable flow of air during the engine combustion cycle when compared to mechanical variable valve timing systems. According to FCA, the MultiAir technology is supposed to increase engine power and torque, reduce fuel consumption, and reduce emissions.

Based on information and belief, FCA's MultiAir hydraulic system requires strict maintenance of oil volume to function properly.

**B.   The Defects in the Defective Vehicles**

**1.   The Oil Consumption defect creates a safety hazard for class members.**

357.   Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing within the combustion chamber, and to cool the engine by carrying heat away from the moving parts. If there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts, inadequate performance, and catastrophic engine failure.

358.   As explained by FCA in a July 31, 2015 Technical Service Bulletin, "Engines require oil to lubricate and protect the load bearing and internal moving parts from wear including cylinder walls, pistons and piston rings."

359.   But according to FCA dealerships, there is a problem with the pistons and/or rings causing the Oil Consumption defect.

- A March 29, 2019 National Highway Traffic Safety Administration ("NHTSA") complaint regarding a 2015 Jeep Cherokee indicates that the "dealership says this is an oil consumption issue" having "to do with the pistons."

- An April 2, 2019 NHTSA complaint regarding a 2018 Jeep Compass says that the "consumer stated dealer told him [it was the] rings and

- 127 -

pistons in the engine" and the "engine was burning a tremendous amount of oil."

- A November 22, 2019 NHTSA complaint regarding a 2016 Jeep Cherokee says that an "engine piston [was] blown" due to a "faulty engine with excessive oil consumption."

360.   Likewise, a January 26, 2019 NHTSA complaint regarding a 2015 Chrysler 200 says that the driver took the car to a mechanic "to figure out why the oil was running out so fast," and it "turn[ed] out the piston rings in the car are bad, [and] to fix this he said the engine would have to be taken [a]part fully and fixed."

361.   In a Technical Service Bulletin dated July 31, 2015, FCA addresses oil consumption in its vehicles but hides the precise cause of the defect. Instead of describing the cause and the fix in the bulletin, FCA instead directs the dealership "to the detailed diagnostic procedures available in DealerCONNECT> TechCONNECT."

362.   On information and belief, and based on the description of the defect in another case involving similar allegations, the top sidewall of each engine piston contains piston rings that prevent engine oil from entering the combustion chamber, as well as optimizing compression. But the oil control strategy in the Defective Vehicles does not work as intended, allowing engine oil to escape past the oil control piston ring and into the combustion area. This is the result of oil control piston rings

that do not integrate properly with the cylinders in which they operate. Although piston rings do not require maintenance, and are purportedly lifetime parts, the rings in Defective Vehicles wear down, whereby the oil control piston ring is worn flush with the piston wall, allowing engine oil to be consumed during the compression cycle.

363.   And if there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts and catastrophic engine failure.

364.   To avoid such catastrophic engine failure, FCA employs what it calls a "safety feature"—the Defective Vehicles upon detecting low oil pressure simply shut down. As repeatedly remarked upon in NHTSA complaints regarding the Jeep Cherokee, the "dealership says it is a safety feature to shut engine off in the middle of the freeway" and "the car shutting off while in motion was referred to as a safety feature by the dealership." But consumers say it is "an unsafe safety feature and downright dangerous" and "a safety feature to save [the] engine but apparently not human lives." And one consumer called it not a "safety feature" but a "danger switch."

365.   The Oil Consumption defect unreasonably threatens the safety of drivers and passengers using the Defective Vehicles. Because of the Oil Consumption defect, the Defective Vehicles are prone to sudden and unexpected

shut down, creating unsafe driving conditions when the vehicle stalls or shuts off without warning, as indicated in these NHTSA complaints:

- I PURCHASED A 2019 JEEP CHEROKEE AND IN LESS THAN 3,000 MILES THE CAR BROKE DOWN. *IT GAVE NO INDICATION, JUST COMPLETELY SHUT OFF WHILE I WAS DRIVING IN THE MIDDLE LANE OF A FAST-PACED HIGHWAY AND ALMOST KILLED ME*. THE DEALERSHIP TOLD ME IT WAS LOW ON OIL. June 12, 2019, complaint regarding 2019 Jeep Cherokee.

- VEHICLE, WHILE IN MOTION, STALLS AND ENGINE SHUTS OFF AT ANY SPEED. BEING TOLD OIL BURNS TOO QUICKLY IN THESE VEHICLES AND THIS IS A SAFETY FEATURE THE CAR HAS ALTHOUGH IT *HAS ALMOST COST ME MULTIPLE SERIOUS/POTENTILLY FATAL COLLISIONS WITH MY INFANT CHILDREN IN THE VEHICLE. NO OIL INDICATOR HAS EVER TURNED ON INDICATING OIL LEVEL IS LOW*. HAD SAME ISSUE WITH THIS CAR AT 15,000 MILES IN WHICH ENGINE WAS COMPLETELY REPLACED BUT NOW IS DOING THE SAME THING AS BEFORE. THIS IS A WELL DOCUMENTED ISSUE AMONGST JEEPS - WHY HAS THERE NOT BEEN A RECALL? *THIS IS A MAJOR SAFETY CONCERN AND OUR LIVES AND THE LIVES OF OUR CHILDREN ARE AT RISK AS I ALMOST WAS T-BONED TODAY AS MY ENGINE STALLED IN A BUSY INTERSECTION*. I WAS ATTEMPTING TO TURN BUT HAD NOT YET MANEUVERED AND WAS LEFT STALLED IN THE MIDDLE BLOCKING ONCOMING TRAFFIC ON A BUSY CITY STREET BUT HAD HAD THIS SAME PROBLEM HAPPEN ON A HIGHWAY. August 6, 2019, complaint regarding a 2016 Jeep Cherokee.

- *CAR JUST RANDOMLY SHUT OFF IN MIDDLE OF A 50 MPH HIGHWAY, ALMOST CAUSED ACCIDENT*. IT DID IT A COUPLE MORE TIMES BEFORE I GOT IT LOOKED AT. DEALER SAID IT WAS SO LOW ON OIL IT SHUT OFF. January 5, 2017, complaint regarding a 2015 Jeep Cherokee.

- THE DEALER EXPLAINED WHEN THE DIPSTICK DOES NOT "FEEL" OIL THE ENTIRE CAR ESSENTIALLY SHUTS DOWN AND LOCKS UP IN ORDER TO "PROTECT THE ENGINE" CAUSING THE DRIVER TO LOSE ALL ABILITY TO CONTROL IT. ***THEY MIGHT BE PROTECTING THE ENGINE FROM BURNING OIL, BUT TO LOSE FUNCTIONALITY PUTS MY LIFE AND FAMILY IN DANGER***. JEEP/CHRYSLER HAVE HAD THIS REPORTED BEFORE AS I FOUND NUMEROUS CASES OF THE SAME STORY. HOWEVER NO RECALL HAVE BEEN ISSUED. ***I COULD HAVE BEEN IN A VERY SERIOUS ACCIDENT. I WAS NOT TOLD ANY OF THIS INFORMATION WHEN I PURCHASED THE CAR***. May 21, 2019, complaint regarding 2016 Jeep Cherokee.

- WHEN CAR STALLS OUT IT IS WHILE YOU ARE DRIVING AND HAPPENS WITHOUT WARNING, I WAS IN THE MIDDLE OF AN INTERSECTION THE FIRST TIME IT HAPPENED TO ME. ***I COULD HAVE BEEN KILLED TO "SAVE THEIR ENGINE***." January 8, 2019, complaint regarding 2016 Jeep Cherokee.

- WHILE DRIVING THE ENGINE CUT OUT. I DRIFTED TO THE SIDE OF THE ROAD, PUT IT IN PARK AND RESTARTED IT. THERE WASN'T ANY MESSAGE THERE WAS A PROBLEM. IT WAS FINE FOR A COUPLE OF DAYS AND THEN WHILE DRIVING TO WORK THE SAME THING HAPPEN AGAIN. I WAS ABLE TO GET TO THE SIDE WITHOUT BEING HIT. ON CHECKING THE INTERNET IT SHOWED OTHERS HAD THE SAME PROBLEM AND WAS RELATED TO OIL. . CHECKED OIL AND IT WAS LOW. ***I TOOK IT TO THE DEALERSHIP AND THEY CONFIRMED THE 2.4 CUTS OFF EVEN IF THE VEHICLE IS IN MOTION WITH NO WARNING WHEN OIL IS LOW. NO ONE EVER TOLD ME THIS. HAD I BEEN ON A BUSIER MULTI LANE ROAD I MAY HAVE BEEN INVOLVED IN AN ACCIDENT***. I HAVE NEVER NEEDED TO CHECK MY OIL BETWEEN SERVICE ON A NEWER CAR BEFORE THIS IS AN UNSAFE DEFAULT TO LOW OIL. ***IT PUTS THE DRIVER AND PUBLIC IN DANGER. HAD I BEEN TOLD THE VEHICLE MAY SHUT OFF WHILE I WAS DRIVING I WOULD NEVER HAVE BOUGHT THE CAR***. I CANT BELIEVE THAT THEY ARE

ALLOWED TO HAVE THIS AS A FEATURE WITH NO WARNING. April 28, 2018, complaint regarding 2016 Jeep Cherokee.

- WHILE DRIVING MY CAR, THE ENGINE SHUT OFF IN MID DRIVE, IN MOTION, IN A PARKING STRUCTURE GETTING READY TO GET ON THE FREEWAY. I COMPLAINED TO THE DEALER AND THEY SAID IT WAS BECAUSE I NEEDED AN OIL CHANGE AND I WASN'T OVER MILEAGE BY THAT MUCH, HE SAID HE HAS HEARD THIS HAPPEN BEFORE TO A CUSTOMER. *I WAS SO TERRIFIED BECAUSE I COULD HAVE BEEN ON THE FREEWAY AND COULD HAVE GOTTEN INTO AN ACCIDENT AND INJURED AND UNTIL THIS DAY I AM VERY DISTURBED AND WORRY IF IT WILL TURN OFF WHILE DRIVING AND EVEN MORE TERRIFIED IF I AM ON THE FREEWAY!* I JUST WANT TO REPORT THIS BECAUSE THE DEALERSHIP'S RESPONSE DIDN'T SIT WELL WITH ME AND *I THINK IT IS VERY VERY DANGEROUS FOR THE CAR TO TURN OFF JUST BECAUSE YOU NEED AN OIL CHANGE*, IS THERE A DEFECT IN MY CAR? August 20, 2018, complaint regarding 2018 Jeep Cherokee.

- *CAR IS BURNING OIL AND SHUTTING OFF ON THE ROAD, WHICH I OR MY CHILDREN, CAN EASILY GET HURT OR KILLED*. HAVE TRIED TO HAVE RESOLVED NUMEROUS TIMES WITH UNSATISFACTORY RESULTS FROM THE CAR LOT. AS ADVISED FROM THE SERVICE MANAGER THIS IS NORMAL UNDER CHRYSLER STANDARDS. February 23, 2018, complaint regarding 2015 Jeep Cherokee.

366. The Oil Consumption Defect also increases the expected cost of ownership and maintenance of the Defective Vehicles. In order to prevent their vehicles from stalling, Plaintiffs and class members have needed to replenish the oil of their vehicles at excessive abnormal rates. Additionally, the Oil Consumption defect has the consequential effect of shortening the expected lifespan of other mechanical components of the Defective Vehicles. Because of this, Plaintiffs and

class members have and will be forced to replace these components at a much higher rate than they reasonably expected when purchasing the vehicles, thereby increasing their overall cost of ownership.

      **2.**    **The Oil Indicator defect creates a safety hazard for class members.**

367.   The dangers of the Oil Consumption defect are worsened by the Defective Vehicles' inability and/or failure to alert drivers to dangerously low oil levels and/or oil pressure.

368.   FCA has equipped the Defective Vehicles with an oil change indicator system. This is a software based, algorithm-driven device that purportedly takes into account various engine operating conditions to determine when the oil needs changing, such as ambient temperature and typical trip length. It then alerts the driver of the need for an oil change. As FCA states in the Owner's Manual:

> Your vehicle is equipped with an automatic oil change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance.
>
> Based on engine operation conditions, the oil change indicator message will illuminate. This means that service is required for your vehicle. Operating conditions such as frequent short-trips, trailer tow, extremely hot or cold ambient temperatures will influence when the "Change Oil" or "Oil Change Required" message is displayed.

369.   FCA also explains in its Owner's Manuals that "Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles

(5,600 km) since last reset. Have your vehicle serviced as soon as possible, within the next 500 miles (805 km)."

370.    And it further explains that oil should be changed "at 4,000 miles (6,500 km) or 350 hours of engine run time if the vehicle is operated in a dusty and off road environment or is operated predominately at idle or only very low engine RPM's," as that "type of vehicle use is considered Severe Duty."

371.    Otherwise, the oil change intervals should not exceed "10,000 miles (16,000 km), twelve months or 350 hours of engine run time, whichever comes first. The 350 hours of engine run or idle time is generally only a concern for fleet customers."

372.    So a reasonable consumer driving under normal—as opposed to severe—driving conditions is instructed to change their oil either when prompted to do so by the oil change indicator or by 10,000 miles or twelve months.

373.    Remarkably, FCA's oil change indicator does *not* take into account actual, as opposed to predicted, oil levels. So it does not alert drivers of the Defective Vehicles to low oil levels or oil loss, even when oil levels are critically, dangerously low. Indeed, consumers routinely report not having yet received a change oil message at the time their vehicles stalled or shut off. Put another way, the Defective Vehicles regularly experience such severe shortages of oil that they automatically shut down to protect the engine *before FCA's indicator system tells them they are*

*due for an oil change*. This represents a complete failure of the oil change indicator system to monitor and provide meaningful information regarding the real world status of the Defective Vehicle's oil levels.

374.   FCA also misrepresents that the Defective Vehicles are equipped with a separate Oil Pressure Warning Light designed to illuminate when "low engine oil pressure" is detected. This messaging appears in the Owner's Manual as follows:

Oil Pressure Warning Light

| Red Telltale Light | What It Means |
|---|---|
| 🛢️ | **Oil Pressure Warning Light**<br>This light indicates low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on.<br>Do not operate the vehicle until the cause is corrected. This light does not indicate how much oil is in the engine. The engine oil level must be checked under the hood. |

375.   According to FCA, a "Red Telltale Light" will illuminate and a chime will sound to alert the driver to "stop the vehicle and shut off the engine as soon as possible." FCA further instructs owners not to operate the vehicle until the cause is corrected. But this system also fails to alert drivers of the Defective Vehicles *in advance* of the vehicle spontaneously shutting off as a result of low levels.

376.   As a result of the Oil Indicator defect, consumers are not warned in time to avert sudden shut off of their vehicles, creating unsafe driving conditions, as indicated in these NHTSA complaints:

- THE VEHICLE IS BURNING OIL BETWEEN CHANGES, IT SHUTS OFF IN THE MIDDLE OF DRIVING ON A ROAD BECAUSE IT HAS NO OIL. *NO WARNING MESSAGES OR LIGHTS POP UP. I HAVE ALMOST BEEN HIT BY OTHER CARS*

*TWICE (WITH A CHILD IN THE BACKSEAT) BECAUSE THE CAR SHUTS DOWN AND THERE IS NO OIL IN THE CAR. MY SCREEN SAYS I HAVE OVER 50% REMAINING UNTIL THE NEXT OIL CHANGE!* I WAS DRIVING DOWN THE ROAD, AND THE VEHICLE SHUT OFF AND I WAS ALMOST HIT BY OTHER CARS! January 29, 2019, complaint regarding 2016 Jeep Cherokee.

- *THE CAR WILL SHUT DOWN WITH ABSOLUTELY NO WARNING, DOESN'T MATTER HOW FAST YOU ARE GOING. THIS HAS HAPPENED ON BOTH HIGHWAY AND BACK STREETS.* I'M TOLD BY DEALER THAT THE ISSUE IS THE OIL WAS TOO LOW AND THAT SOME SENSOR SHUTS DOWN THE ENGINE. NO WARNING LIGHT, NOTHING. JUST HAPPENS. CAN'T BELIEVE THIS FLAW HAS NOT BEEN RECALLED OR CAUSED FATALITIES. November 1, 2017, complaint regarding 2014 Jeep Cherokee.

- WHILE DRIVING, THE JEEP WILL TURN OFF AUTOMATICALLY DUE TO THE ENGINE BURING TOO MUCH OIL. IT CAUSES A SAFETY CONCERN WHEN THE CAR AUTOMATICALLY STOPS AND CAUSES OTHER CARS TO SWIRVE OR TO HIT THE CAR. *I HAVE ALMOST BEEN HIT MULTIPLE TIMES BECAUSE OF THIS. THERE IS NO WARNING TO IT AND NO OIL LIGHT TO TELL ME THE ENGINE IS LOW OF OIL*. December 31, 2019, complaint regarding 2015 Jeep Cherokee.

- MY 2015 JEEP CHEROKEE LATITUDE HAS STALL OUT 3 TIMES ON ME WHILE DRIVING ON BUSY HIGHWAYS. I TOOK THE VEHICLE IN FOR REPAIR AND WAS TOLD THIS PARTICULAR ENGINE CONSUMES OIL AT A FAST RATE AND WITHOUT ANY WARNING, WHEN LOW, WILL STALL UNEXPECTEDLY. *NO WARNING, NO OIL PRESSURE GAUGE ALERTS, CAR SIMPLE STALLS. I AM AFRAID THE VEHICLE WILL STALL AND ME AND ANY OCCUPANT WILL BE KILLED OR SERIOUSLY INJURED*. November 7, 2019, complaint regarding 2015 Jeep Cherokee.

- *WHILE DRIVING ON SUNDAY MY JEEP SUDDENLY WITHOUT NOTICE OR WARNING SHUT OFF AND WOULD NOT RESTART, I WAS STRANDED IN MIDDLE OF THE ROAD*

SINCE THERE WAS NO WARNING I HAD NO TIME TO PULL TO SIDE. AAA TOWED TO CLARK CHRYSLER/JEEP WHERE IT WAS BOUGHT AND UNDER EXTENDED WARRANTY. ALL PM'S HAVE BEEN DONE THERE AND DONE TIMELY. WHAT THEY FOUND WAS JEEP WAS DOWN 3 QTS OF OIL, I ASKED HOW THAT COULD BE AND WHY WOULD ENGINE SHUT OFF SO ABRUPTLY THEY CLAIM THE 2.4 ENGINES USE 1QT PER 1,000 MILES, THAT NO INDICATOR OR WARNING COMES ON AND ENGINE WILL SHUT OFF TO PROTECT IT. NO WHERE IS IT LISTED IN OWNERS MANUAL. November 15, 2017, complaint regarding 2015 Jeep Cherokee.

- THE ENGINE BURNS THROUGH ALL OF THE OIL IN ABOUT 1500 MILES OF DRIVING. OIL HAS TO BE FILLED IN BETWEEN OIL CHANGES OR *ENGINE WILL STOP WITH NO WARNING OR OIL LIGHT*... ENGINE STOPS WHILE MOVING. February 24, 2020, complaint regarding 2018 Jeep Cherokee.

- FIAT 500X 2016 *TURNS OFF. NO WARNING, WHILE IN MOTION ON A CITY STREET*. MULTIPLE TIMES, LOW SPEED (20 MPH) AND HIGHER SPEED (45 MPH). DEALERSHIP TOLD ME IT WAS BECAUSE I NEEDED TO CHANGE MY OIL. January 12, 2019, NHTSA complaint regarding 2016 Fiat 500X.

- THE 2018 JEEP CHEROKEE LATITUDE CONSUMES OIL AND HAS A MECHANISM WHERE IF THE CAR IS LOW ON OIL IT WILL JUST SHUT OFF WHEN DRIVING. *THIS IS A SERIOUS SAFETY HAZARD AS THE CAR GIVES NO WARNING IT IS LOW ON OIL. SOMEONE IS GOING TO GET KILLED ONE DAY WHEN THESE CARS JUST SHUT OFF IN THE MIDDLE OF DRIVING*. December 9, 2019, complaint regarding 2018 Jeep Cherokee.

377. Consumers reasonably relied on FCA's representations in the Owner's Manuals regarding the oil indicator system and its ability to give notice of the need for an oil change. Those material misrepresentations are false and have unreasonably placed Plaintiffs and class members at an increased risk of injury or death.

### 3.    The Oil Consumption defect causes higher emissions.

378.   As discussed in Section IV.B.1. above, on information and belief, the oil control strategy in the Defective Vehicles does not work as intended, allowing oil to escape past the oil control piston ring and enter into the combustion chamber which is the area circled in magenta in the diagram below. Not all of the oil that enters the combustion chamber is burned. As the piston rises into the combustion chamber, pressure forces the excess oil passed the exhaust valve along with the hot exhaust gases resulting from the combustion.



379.   Once past the exhaust valve, the excess oil and exhaust gases enter into the exhaust manifold travelling down a pipe toward an oxygen (O2) sensor and the catalytic converter.

380.   The catalytic converter is the central component to a vehicle's emissions system. Since 1975, all cars and light-duty trucks have come equipped

with when the Clean Air Act standards on harmful emissions came into effect.[2] The catalytic converter converts dangerous compounds produced in the combustion process such as carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) into less harmful carbon dioxide ($CO_2$), nitrogen ($N_2$), and water ($H_2O$).

381.   A catalytic converter has no moving parts and is designed to last the normal useful life of a vehicle. Pressure pushes exhaust gases through two ceramic honeycomb structures made of heat resistant clay contained within a stainless steel case. Each of the channels within the honeycomb structure are lined with precious metals such as platinum, rhodium and palladium that act as catalysts to the conversion process. When carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) molecules come into contact with the platinum, rhodium and palladium, the molecules are stripped apart and then recombined into less harmful carbon dioxide ($CO_2$), nitrogen ($N_2$), and water ($H_2O$). The honeycomb structure increases surface area for these precious metals to come into contact with the harmful carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (NOx). The photograph below shows a catalytic converter with part of its stainless steel case

---

[2] Exhibit 2, *Automobile Emissions Reduction Efforts in the U.S. – Chronology,* EPA Air and Radiation Office of Mobile Services (1999), http://www.ehso.com/ehshome/auto-emissions_chronol.htm (last visited Oct. 15, 2020)

removed revealing one of the two ceramic honeycomb structures which is circled in yellow.



382.   If excess oil enters into the catalytic converter, the conversion process is disrupted. Excess oil will coat the working surfaces of the ceramic honeycombs so that the platinum, rhodium and palladium cannot react with the toxic exhaust gases. This is called "catalyst poisoning" and the result is that the vehicle will release higher levels of harmful emissions.

383.   Excess oil in the exhaust system can cause other problems that lead to higher emissions. On both sides of the catalytic converter, O2 sensors monitor the concentration of oxygen in the exhaust gases circled in green in the diagram below. The O2 sensors transmit that data to the Engine Control Unit ("ECU") circled in red in the diagram below.



384.   The phosphorus in the excess oil will foul the O2 sensor, causing the O2 sensor to degrade or fail. When the O2 sensor is fouled, it will tell the vehicle's ECU that the fuel/air mixture circulating through the engine is too lean - meaning that there is too little fuel and too much air in the mixture.

385.   The ECU will respond by adding fuel to the fuel/air mixture creating a "rich" fuel mixture ("rich" because there is too much gasoline and too little air). When engines run using a "rich" fuel mixture, fuel economy declines because the engine is receiving more fuel than it can consume during the combustion process.

386.   If the issue is not repaired, the excess fuel will burn when it mixes with oxygen inside the catalytic converter and melt the ceramic honeycomb structures. As a result, the catalytic converter's ability to reduce harmful emissions will be compromised.

387.   When the catalytic converter or O2 sensors are compromised, the Check Engine light should illuminate on the display panel informing the driver of a problem. Upon information and belief, the Defective Vehicles fail to provide notice of an issue to the driver. The result is that drivers are left completely unaware that the dangerous Oil Consumption defect is also causing the Defective Vehicles to have an emissions system that is defective, pollutes at levels that exceed the intended levels, and violate state and federal emissions standards.

388.   Excess oil entering into the exhaust system is widely known to cause increases in harmful emissions. And even if it weren't, FCA's testing would have revealed the Emissions issue.

389.   On January 17, 2006, the EPA issued two final rules related to exhaust emission durability for passenger trucks and other vehicles.   Under these rules, truck and engine manufacturers can use one of two methods for testing the - 83 - emissions' durability—using a chassis dynamometer to test the vehicles after they have run for a given period of time, or using a "bench aging" procedure which involves using extreme heat to test certain components, including the catalytic converters.

390.   In either case, certificate holders must test and certify that the vehicles will comply with EPA emissions standards throughout their "useful life," which is currently defined as 120,000 miles.   As the Clean Air Act Handbook describes it,

"[t]he demonstration of light-duty vehicle emission durability for purposes of certification consists of two elements: (1) emission deterioration (the extent emissions will increase during the vehicle's useful life); and (2) component durability (whether emission-related components will operate properly for the useful life of the vehicle)."

391.   As a result, FCA knew about the Excess Emissions defect from the beginning, because they are required to test the Defective Vehicles for their useful life, and the Excess Emissions defect would have manifested itself during those tests. But they pushed forward with the development of the Defective Vehicles with the 2.4L Tigershark engine anyway.

392.   And as discussed in greater detail in Section V.D.1 below, FCA was well aware of the Excess Emissions defect long before the Defective Vehicles first came to market. FCA successfully hid the Excess Emissions defect from the public for years. The Defective Vehicles fail to inform drivers that the emissions' system is compromised. However, on July 31, 2020, FCA finally admitted that "approximately 1 million vehicles equipped with the 2.4L Tigershark engine may have excess tailpipe emissions."[3] With 1.6 million vehicles equipped with the 2.4L Tigershark engines, FCA's representation that only 1 million vehicles "may have

---

[3] Exhibit 3, Securities and Exchange Commission, Form 6-K, Fiat Chrysler Automobiles, N.V. (Jul. 31, 2020) at 71.

excess tailpipe emissions" is conservative at best and misleading at worst.[4] "As this population [of Defective Vehicles] ages some vehicles exceed in-use emission requirements, depending on drive cycle and mileage."[5]

## C.    FCA's national advertising campaign misrepresents the safety and reliability of the Defective Vehicles.

393.    FCA knows that the safety of their vehicles is material to consumers. A car is more than just transportation: it is the primary means that consumers will use to ensure that their family and friends are safe and secure when travelling on America's roads and highways. FCA spends millions of dollars every year on advertising that is specifically designed to persuade consumers that their vehicles are safe and reliable. However, FCA's advertising entirely omits any mention of the safety risks posed by the Oil Consumption and Oil Indicator defects. Given that FCA knew about all of these defects and the safety risks they posed to consumers and the general public and knew that these issues were material to a reasonable consumer, FCA was obligated to disclose this information.

---

[4] *See id.*

[5] Exhibit 4, Eric D. Lawrence, *Fiat Chrysler planning for big recall of engine used in Jeeps*, Detroit Free Press, Aug. 5, 2020, available at https://www.freep.com/story/money/cars/chrysler/2020/08/05/fiat-chrysler-tigershark-engine-recall-oil-consumption/3288932001/ (last visited Oct. 15, 2020).

394. The following are examples of Jeep Cherokee advertisements concerning the Defective Vehicles that touted their safety and reliability while failing to disclose the Oil Consumption, Oil Indicator, and Excess Emissions defects:







395.   These advertisements state: "Whatever the destination, the 2020 Jeep®

Cherokee can help keep you and your passengers safe and secure on all your

journeys. Over 80 standard and available safety and security features work together

to help you stay protected on all your travels." They also state: "The 2020 Jeep Grand

Cherokee is always ready. Even when you're not. With over 70 Standard and

available safety and security features, plus new standard and available ProTech

Packages, the Grand Cherokee may help keep you and your loved ones out of harm's

way." And they state: "Courageous by nature. The 2020 Jeep® Cherokee offers over

80 standard and available safety and security features designed to step in and help

protect you from the unexpected." But these representations are not in fact true due

to the undisclosed Oil Consumption and Oil Indication defects.

396.   The following are examples of Jeep Compass advertisements

concerning the Defective Vehicles that touted their safety while failing to disclose

the Oil Consumption and Oil Indicator defects:

- 146 -



**ALWAYS ON ALERT**

The 2020 Jeep® Compass has your back thanks to the intuitive technology
included in the available Safety and Security Group.



2020 JEEP® COMPASS SAFETY & SECURITY

**DRIVE WITH COMPLETE CONFIDENCE**

Equipped with over 70 standard and available safety and security features, the 2020 Jeep® Compass
is engineered to inspire confidence with its every innovation.



397.    These advertisements state: "Equipped with over 70 standard and available safety and security features, the 2020 Jeep® Compass is engineered to inspire confidence with its every innovation." And they also state: "Intuitive and always thinking ahead. The 2020 Jeep® Compass offers innovative standard and available safety and security technology designed to help protect you from the unexpected and anticipate the things you don't." But these representations are not in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

398.    The following are examples of Jeep Renegade advertisements concerning the Defective Vehicles that touted their safety while failing to disclose the Oil Consumption and Oil Indicator defects:





399.   These advertisements state: "Wherever you go, over 70 standard and available safety and security technologies can go with you in the 2020 Jeep® Renegade—an ideal balance of excitement and peace of mind." And these

advertisements state: While you're on the lookout for thrills and adventure, the 2020 Renegade offers over 70 standard and available safety and security features looking out for you and your crew." But these representations are not in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

400.  FCA had ample opportunity to disclose the truth about the Oil Consumption, Oil Indication, and Excess Emissions defects to consumers. FCA could have disclosed these material facts: a) in any one of their advertisements for the Defective Vehicles; or b) in the User Guide that comes with every Defective Vehicle; or c) in the Owner's Manual that comes with every Defective Vehicle; or d) at FCA dealerships where FCA instructs dealers what to say about the Defective Vehicles; or e) in the written materials dealers give to consumers when they are considering whether to purchase a Defective Vehicle; or f) on the FCA website where FCA marketed the Defective Vehicles to consumers across the country.

**D.    FCA has known of the dangerous defects present in the Defective Vehicles for years.**

401.  Upon information and belief, FCA has known about the dangerous defects present in the Defective Vehicles since at least 2013 and acquired such knowledge through pre-release testing; post-release monitoring; dealership repair records; warranty and post-warranty claims; complaints made to NHTSA; complaints made on internet forums; and complaints made to FCA itself. Moreover, the defects themselves are pervasive, increasing the likelihood of FCA's early knowledge.

### 1. Pre-release design, manufacturing, and testing data—as well as post-release monitoring—alerted FCA to the defects.

402.    It is standard practice for automobile manufacturers to engage in extensive pre-launch testing of its vehicles. FCA did so here and it would have been particularly robust given the switch to the new Tigershark MultiAir II Engine. This design, engineering, and testing data is unavailable to Plaintiffs without discovery, but upon information and belief, analysis of this data would have revealed the defects. Moreover, vehicle manufacturers such as FCA have significant and dedicated departments that monitor many public and subscription sites to ensure awareness of emerging safety-related issues, among others. Emerging problems such as the Oil Consumption and Oil Indicator defects would be tracked by FCA. Relevant information would be condensed and pushed to design, development, testing, service and quality departments for follow up.

403.    FCA routinely monitors the internet for consumer complaints. Its customer relations department routinely monitors the internet for customer complaints, and it retains the services of third parties to do the same. FCA's customer relations division regularly receives and responds to customer calls concerning product defects. FCA's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

404. FCA knew about the defects because its customer relations department, which interacts with FCA-authorized service technicians in order to identify potentially widespread vehicle problems and assist in diagnosing vehicle issues, has received numerous reports that the Oil Consumption and Oil Indicator defects can cause mechanical breakdown and stall a moving vehicle without any warnings from the oil indicator system.

### 2. Dealership repair records and warranty claims data also support FCA's knowledge of the defects.

405. Upon information and belief, FCA regularly compiles and analyzes detailed warranty service information regarding repairs performed under warranty at its network of dealerships. Indeed, FCA requires dealers to maintain detailed and meticulous records for any warranty repairs performed and routinely refuses to pay for warranty repairs made where the nature and cause of the malfunction is insufficiently described.

406. Moreover, owners of Defective Vehicles have indicated that they made complaints directly to the dealerships as well as to FCA in 2015 and early in 2016. For example:

- I WAS DRIVING AND ALL OF A SUDDEN THE VEHICLE ENGINE TURNED OFF. THANK GOODNESS THERE WAS NO TRAFFIC AS I WAS ONLY BLOCKS FROM THE JEEP DEALER. I WAITED APPROXIMATELY 30 SECONDS AND PUSHED THE START BUTTON AND LUCKILY THE VEHICLE STARTED BUT WOULD ONLY PUTT TO THE DEALER. THE DEALER HAD DIFFICULTY GETTING THE VEHICLE TO THE WORK

STATION. WHEN THEY CALLED ME TO TELL ME THEY FIXED IT THEY TOLD ME THE REASON IT STOP WAS BECAUSE IT WAS 2 QUARTS LOW OF OIL AND THAT WAS THE CAUSE. THIS WAS VERY STRANGE AS I REMINDED THEM TO LOOK AT MY SERVICE RECORD AT WHICH I HAD THE OIL SERVICE RECENTLY DONE AT THEIR FACILITY. THEY DID NOT KNOW HOW TO RESPOND.

*SUBSEQUENT I CONTACTED JEEP HEADQUARTERS* (RESOLUTION DEPT.) AND EXPLAINED WHAT HAPPENED. May 11, 2015, NHTSA complaint for Jeep Cherokee.

- WHILE DRIVING MY 2014 DODGE DART 2.4 TIGERSHARK ENGINE, THE VEHICLE SHUT OFF. THE BATTERY INDICATOR LIGHT CAME ON ALL ELECTRONICS INSIDE THE CAR WERE STILL OPERATIVE. I HAD A WRECKER TAKE THE CAR TO THE DEALERSHIP. DIAGNOSTIC TEST SHOWED LOST COMMUNICATION WITH THE BODY CONTROL MODULE. LOOKED AT OIL AND IT WAS LOW. I WAS TOLD BY AUTO TECHNICAN THAT THE AUTO SHUTS IT'S SELF OFF WHEN IT IS LOW ON OIL. THIS IS A VERY ALARMING SITUATION IF IT WOULD SHUT OFF WHILE DRIVING ON THE FREEWAY IN TRAFFIC *I CALLED CHRYSLER AND REPORTED THIS. THE CALL CENTER STATED THAT SHE HAD 2 PEOPLE CALL THE DAY BEFORE AND 3 ON THE DAY I CALLED WITH THE EXACT PROBLEM*. SHE SAID ALL THE CARS HAD OVER 20,000 MILES ON THEM. March 19, 2016, NHTSA complaint for 2014 Dodge Dart.

**3.     By issuing its 2015 TSB, FCA implicitly acknowledged reports of abnormal oil consumption by 2015.**

407. Technical Service Bulletins ("TSBs") document recommended procedures for repairing vehicles and are issued by a vehicle manufacturer when there are repeat occurrences of a reported problem.

408.   On July 31, 2015, FCA issued an "Engine Oil Consumption Guideline," TSB No. 09-007-15, to dealerships, providing guidance on what was an "acceptable rate of oil consumption" for all 2013-2016 vehicles equipped with gasoline engines, stating in relevant part:

> The accepted rate of oil consumption for engines used in the vehicles listed above is 1 quart (0.946 liter) in 2,000 miles (3,200 km) for the 1st 50,000 miles (80,467 km). For vehicles with more then [sic] 50,000 miles the acceptable oil consumption for engines is 1 quart (0.946 liter) in 750 miles (1,207 km).

409.   Of course, these guidelines are inconsistent with its oil change indicator and Owner's Manual, as discussed above, and represent FCA's attempt to "normalize" the excessive oil consumption of the Defective Vehicles. But more to the point here: they demonstrate that FCA was aware in 2015 that consumers were contacting FCA and dealers with oil consumptions issues necessitating the issuance of the TSB to address them. They also demonstrate that at minimum, FCA was on notice that problems arising from excessive oil consumption, such as the Excess Emissions defect, would be occurring in Defective Vehicles. And the Excess Emissions defect would become apparent if there were frequent warranty repairs or replacements to the oxygen (O2) sensors or catalytic converters—especially since the catalytic converters should last the normal useful life of the vehicle.

**4.   Complaints made to NHTSA and on internet forums also support FCA's knowledge of the defects.**

410.   In addition to the sampling of NHTSA complaints included throughout this complaint, there are hundreds of additional NHTSA complaints regarding the Oil Consumption and/or Oil Indication defects as to Jeep Cherokee alone, including dozens as to each of the 2014, 2015, 2016, 2017, 2018, and 2019 model years. The following is a sampling of NHTSA complaints from 2015 and early 2016 for Jeep Cherokee:

- ON 12/19/14 WHILE DRIVING, MY VEH *STALLED WITHOUT WARNING*. THERE WAS NO WARNING LIGHTS ILLUMINATED BEFORE, DURING/AFTER ITS FAILURE. I HAD TO HAVE THE CAR TOWED. AFTER INSPECTION, I WAS *TOLD THAT THE ENGINE OF MY NEW JEEP WAS BURNING OIL*. THE JEEP RECENTLY HAD BEEN IN FOR AN OIL CHANGE & RTD WITH THE MULTI POINT INSPECTION PAPERWORK INDICATING EVERYTHING WAS OK. HERB CHAMBERS, ALTHOUGH DIAGNOSISING THE JEEP TO BE "BURNING OIL" INSISTED, AT THE DIRECTION OF CHRYSLER PROTOCOL, THAT I DRIVE IT 5,000 MILES AND RETURN IT FOR FURTHER INSPECT. ONLY AFTER MY HUSBAND GOT INVOLVED DID THEY KEEP THE CAR, DRIVE IT, AND EVENTUALLY INSTALL A NEW ENGINE. June 15, 2015, NHTSA complaint.

- NEXT MORNING DROVE 1/4 MILE DOWN ROAD AND IT HAD *LOST ALL POWER AGAIN*. CALLED DEALERSHIP TO LET THEM KNOW I WAS BRINGING IT BACK, JEEP WOULD NOT GO PAST 3RD GEAR, ALMOST HIT MULTIPLE TIMES TRYING TO GET OFF THE ROAD. GOT TO DEALERSHIP, THEY TOLD ME IT IS UN-DRIVEABLE AFTER DRIVING OVER AN HOUR TO GET THERE, THEY HAD JEEP ALMOST 3 WEEKS. MILEAGE WAS AROUND 18,000. WOULD NEED TO REPLACE TRANSMISSION, WHEN THEY FINALLY CALLED TO SAY IT WAS READY, *I WAS TOLD IT WAS BC IT NEEDED AN OIL*

*CHANGE...WITH ONLY 3500 MILES ON THIS CHANGE*(FEB2015-MARCH2015). October 13, 2015, NHTSA complaint.

- 2 TIMES ALREADY I HAVE HAD TO TAKE MY CAR INTO THE DEALERSHIP BECAUSE IT WOULD *SHUT OFF RANDOMLY WHILE DRIVING. THIS HAS HAPPENED WHILE ON THE HIGHWAY AND ALSO WHILE ON BUSY STREETS*. SO FAR I HAVE BEEN ABLE TO DRIFT TO THE SIDE OF THE ROAD, PUT THE CAR IN PARK AND THEN TURN THE CAR OFF AND BACK ON. THE CAR SPUTTERS WHEN RESTARTING AND ON MULTIPLE OCCASIONS WILL STALL AGAIN. BOTH TIMES THEY TRIED TO BLAME IT ON THE OIL CHANGE BEING OVERDUE. THE 2ND TIME I HAD TO HAVE THE *CAR TOWED TO THE DEALERSHIP AND THEY STATED THERE WAS NO OIL IN THE CAR*. HOW A CAR LOSES OIL IF THERE ISN'T A LEAK, I'M NOT SURE. THIS IS NOW THE THIRD TIME IT IS HAPPENING AND *BASED ON THE CAR'S COMPUTER I STILL HAVE 30% TO GO BEFORE NEEDING AN OIL CHANGE* AND THE CAR IS SHUTTING OFF ON ME AGAIN RANDOMLY. I WAS AT THE DEALERSHIP FOR THE 2ND TIME LESS THAN 3 MONTHS AGO. I DRIVE IN MIAMI AND HAVE BEEN LUCKY THAT MY SON WAS NOT IN THE CAR WITH ME. November 17, 2015, NHTSA complaint.

- @3:30PM 12 /5 /15 *CHEROKEE STOP IN THE MIDDLE OF THE INTERSECTION* OF 13 MILE & UTICA. I HAD MY 7YR OLD IN THE CAR AND AVOIDED TRAFFIC ACCIDENT PULLED OVER AND IT SUDDENLY STOPPED AGAIN. FORTUNATELY WAS ABLE TO GET HOME WAS ONLY FIVE MINUTES AWAY. PLACED COMPLAINT TO CHRYSLER THEY TOWED THE VEHICLE 12/7/15. HOWEVER YESTERDAY 12/7/15 @6PM ROSEVILLE CHRYSLER JEEP DEALERSHIP SERVICE:(888)409-5930 CALLED TO TELL ME IT WAS MY ERROR THAT JEEP CHEROKEE STOP WORKING BECAUSE IT WAS "DUE AN OIL CHANGE IN OCTOBER". I TOLD REPAIR SHOP MY HUSBAND AND I NEED TO SPEAK TO A MANAGER BECAUSE 1ST I *RECEIVED NO LIGHT SIGNAL OR NOTIFICATION FROM THIS DIGITAL DISPLAY STATING I NEEDED AN OIL CHANGE* WHICH IS PROVIDED BY 2014 JEEP CHEROKEE SECOND

THERE IS NO WAY THE VEHICLE SHOULD HAVE BEEN DRY OUT OF OIL UNLESS THERE IS LEAK OR SOMETHING CAUSED OIL TO DRY UP. December 8, 2015, NHTSA complaint.

- ***NEW 2015 JEEP CHEROKEE LATITUDE WITH 4K MILES ON IT SUDDENLY TURNED ITSELF OFF WHILE DRIVING DOWN THE ROAD***. NO WARNING OTHER THAN A MESSAGE ON THE DASH TO PUT THE CAR IN PARK TO CHANGE GEARS. ***VERY DANGEROUS***, LOST CONTROL OF POWER STEERING, GAS AND BRAKES. WAS ABLE TO PUT CAR IN PARK ON SIDE OF ROAD, RESTART IT AND GET HOME. IT HAPPENED AGAIN THE NEXT MORNING AND WAS TOWED TO DEALERSHIP. SERVICE DEPT. RAN ALL UPDATES AND THE CAR SHUT OFF ON THEM WHILE TESTING IT TOO. HAS BEEN IN THE SHOP FOR 2 WEEKS AND ***THEY SAY IT WAS DUE TO EXCESSIVE OIL CONSUMPTION*** AND AR REPLACING THE ENGINE. I DON'T BELIEVE THIS TO THE CAUSE; NEVER GOT A WARNING LIGHT AT ALL AND CAR DOES RESTART AND RUN AFTER IT SHUTS ITSELF OFF. SCARED TO DRIVE IT ONCE I GET IT BACK AGAIN, IT IS REALLY ***LIKE A DEATH TRAP WHEN IT SHUTS OFF***. YOU ARE THE MERCY OF ALL THE DRIVERS AROUND YOU TO GET OUT OF YOUR WAY. SOMEONE IS GOING TO GET HURT OR GET KILLED IF THEY DON'T FIGURE THIS OUT SOON. January 18, 2016.

411.  The following are some NHTSA complaints from 2015 and early 2016

for Dodge Dart and Chrysler 200:

- ***CAR CONSUMES 1QT OF OIL EVERY 1000 MILES***. THE VALVETRAIN IS HYDRAULIC AND WHEN LOW THE CAR STUTTERS AND STALLS. June 26, 2015, NHTSA complaint for 2013 Dodge Dart.

- TL* THE CONTACT OWNS A 2014 DODGE DART. THE CONTACT STATED THAT ***THE ENGINE OIL WAS DEPLETING PREMATURELY. THE DEALER STATED THAT THE ENGINE MOTOR FAILED***. THE DEALER STATED THAT THE MOTOR MAY NEED TO BE REBUILT. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE

APPROXIMATE FAILURE MILEAGE WAS 7,000. July 10, 2015, NHTSA complaint for 2014 Dodge Dart.

- TL* THE CONTACT OWNS A 2014 DODGE DART. THE CONTACT STATED THAT *WHILE DRIVING AT APPROXIMATELY 55 MPH, THE VEHICLE STALLED*. THE CONTACT WAS ABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TAKEN INTO THE DEALER WHERE IT WAS INFORMED THAT THE *VEHICLE WAS LOW ON OIL*. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 31,000. THE VIN WAS NOT AVAILABLE. October 30, 2015, NHTSA complaint for 2014 Dodge Dart.

- *CAR STALLED WHILE OPERATING UNDER FULL POWER ON THE INTERSTATE*. IT TOOK APPROX. 3 MINUTES AND IT FINALLY RESTARTED. TOOK CAR TO DEALERSHIP. THEY STATE CAR IS NOT PART OF ANY RECALL BASED ON VIN #. THEY STATE STALLING WAS *RESULT OF EXTREMELY LOW OIL*…. November 13, 2015, NHTSA complaint for 2013 Dodge Dart.

- MY 2014 DODGE DART LOSES OIL. *THE OIL INDICATOR LIGHT DOES NOT WORK*. HOWEVER THE OIL IS NOT LEAKING ON THE GROUND AND ONCE THERE IS NO OIL AT ALL IN THE VEHICLE, IT *SHUTS OFF WHILE DRIVING*. THIS HAPPENS UPON TAKING OFF. THE CAR HAS TO PUT IN NEUTRAL IN ORDER TO START. January 18, 2016, NHTSA complaint for 2014 Dodge Dart.

- TIGER SHARK MULTI-AIR 2 ENGINE CONSUMES 1QT OIL PER 1000 MILES. I WAS UNAWARE OF THIS CONSUMPTION ISSUE AND THE OIL WENT TO LOW AND ENGINE IS DESIGNED TO SHUT OFF. THIS STALLING HAS HAPPEN 3 TIMES TO AND 1 TO THE DEALERSHIP. *NONE OF THE CARS WARNING INDICATORS COME ON WHEN PRESSURE IS LOW THE CAR JUST STALLS*. DEALERSHIP RESOLUTION WATCH OIL LEVEL AND THERE IS FIX FOR THE CONSUMPTION OR ANY WAY FOR THE WARNING LIGHTS TO BE TRIGGERED. SO IF I FORGET TO CHECK THE OIL *I AM GAMBLING WITH MY LIFE AND OTHERS ON THE ROAD IF*

*THE CAR STALLS WHILE ON THE HIGHWAY*. January 21, 2016, NHTSA complaint for 2014 Dodge Dart.

- *I WAS DRIVING MY BRAND NEW CHRYSLER 200 THAT I BOUGHT 4 MONTHS PRIOR AND IT WAS COMPLETELY SHUTTING OFF IN THE MIDDLE OF THE ROAD*... I LOST CONTROL OF STEERING UNTIL IT SHUT COMPLETELY OFF SO I COULD RESTART IT. *VERY SCARY* WHEN YOU HAVE YOUR NEWBORN BABY AND 10 YEAR OLD IN THAT BACK SEAT. *NOT ONCE DID A CHECK ENGINE LIGHT COME ON OR ANY SENSOR COME ON TO TELL ME THAT MY VEHICLE HAD NO OIL IN IT*. SO I BELIEVE THE ENGINE, ELECTRICAL, AND SENSORS ARE ALL MESSED ON THIS VEHICLE. I DO NOT FEEL LIKE I SHOULD BE STUCK WITH IT BECAUSE IN THE BACK OF MY HEAD I NO LONGER FEEL SAFE IN THIS VEHICLE. I AM REACHING OUT FOR HELP BECAUSE CHRYSLER WON'T AND I HAVE OWNED THIS CARE SINCE AUGUST AND IT WAS IN SHOP FOR 17 DAYS IN JANUARY, I HAVE IT BACK BUT I STILL DON'T THINK IT'S RUNNING CORRECTLY. February 7, 2016, NHTSA complaint for 2015 Chrysler 200.

- *ON 3 SEPARATE OCCASIONS, MY 2013 DODGE DART GT WITH A 2.4 TIGER SHARK ENGINE WITH MULTIAIR HAS SHUT DOWN WHILE THE CAR WAS MOVING ON THE ROAD*. *THE REASON FOR THIS THE DEALERSHIP TOLD ME WAS DUE TO LOW OIL*, WHICH WE RECENTLY REALIZED USES AT LEAST 1/2 QUART PER 1,000 MILES. THE DEALER SAYS THIS IS WITHIN NORMAL LIMITS. THEY SAID THAT BEFORE 50,000 MILES IT IS WITHIN NORMAL LIMITS TO BURN 1 QUART FOR EVERY 1000 MILES AND AFTER 50,000 MILES IT IS NORMAL TO BURN 1 QUART FOR EVERY 750 MILES. THIS WAS NEVER DIVULGED TO ME WHEN I PURCHASED THE VEHICLE. IT FIRST DID THIS STARTING AT 35,000 MILES. THE VEHICLE NOW HAS 42,000 MILES. *THERE HAS NEVER BEEN ANY OIL LIGHT OR ANY OTHER ENGINE LIGHT THAT GOES ON BEFORE THE VEHICLE DIES*. IT HAS LEFT ME STRANDED IN THE MIDDLE OF THE ROAD IN SOME VERY DANGEROUS SITUATIONS. I NO LONGER FEEL SAFE DRIVING THIS CAR AND WHO WOULD WANT TO BUY IT FROM ME? *TWO*

- 159 -

***DEALERSHIPS HAVE TOLD ME THAT IT IS NORMAL FOR THE ENGINE ON THIS CAR TO BURN LOTS OF OIL***, TO DIE WHILE THE CAR IS MOVING IF THE OIL IS LOW, AND FOR THE OIL LIGHT NOT TO GO ON BECAUSE THE CAR WILL STOP RUNNING BEFORE THE SENSOR IS ACTIVATED. THEY TELL ME THEY HAVE SEEN THIS BEFORE. THE MAJOR PROBLEM IS THE OIL SENSOR NEVER ACTIVATES TO TELL ME THE OIL IS LOW. ***THEY TELL ME TO CHECK THE OIL LEVEL EVERY TIME I PUT GAS IN THE CAR. I FIND THAT TO BE AN UNACCEPTABLE SOLUTION***. THE OIL HAS ALWAYS BEEN CHANGED AT NORMAL INTERVALS. February 10, 2016, NHTSA complaint for 2013 Dodge Dart.

- ***I HAVE A 2014 DODGE DART THAT IS BURNING OIL AT WHAT SEEMS TO ME TO BE AN ALARMING RATE***. I HAVE HAD MY VEHICLE IN THE SHOP OVER 4 TIMES. I AM BEING TOLD I HAVE NO LEAKS AND MY CAR IS FINE, AND THAT IT IS CHARACTERISTIC THAT MY CAR NEEDS TO HAVE OIL ADDED EVERY 2K MILES. I DRIVE MY CAR TO AND FROM WORK AND I RARELY TRAVEL OUT OF STATE. I AM NOT OVER DRIVING OR ROUGH DRIVING MY CAR BY ANY MEANS. I HAVE SPENT OVER 1K DOLLARS IN RENTALS AND REPAIRS. I HAVE A 3 YEAR OLD SON THAT I DRIVE TO DAYCARE 4 DAYS A WEEK ***AND I CANNOT MENTALLY BE COMFORTABLE DRIVING MY SON IN A CAR THAT STOPS IN THE MIDDLE OF THE ROAD BECAUSE ITS OUT OF OIL***. DODGE HAS DONE NOTHING TO HELP ME AND I AM SEEKING LEGAL ACTION. April 5, 2016, NHTSA complaint for 2014 Dodge Dart.

- AFTER LENGTHY OIL CONSUMPTION TESTS ON CAR BY THE DEALER, I WAS TOLD IT BURNS 1 QUART OF OIL EVERY 1000 MILES AND I WOULD HAVE TO ADD OIL AT THAT RATE. ALSO TOLD THIS WAS "ACCEPTABLE" BY CHRYSLER. ***NO LOW OIL LIGHT COMES ON, EVEN WHEN THE ENGINE TOTALLY FAILED AND I HAD TO HAVE IT TOWED TO THE DEALERSHIP***. CURRENTLY HAVE 25000 MILES AFTER 2.5 YEARS OWNED. April 25, 2016, NHTSA complaint for 2013 Dodge Dart.

- THIS VEHICLE HAVE HAD TWO OCCASIONS OF MASTER CYLINDER BRAKE FLUID LOSS AND *UNEXPLAINED TOTALL ENGINE OIL EVAPORATION WITHOUT WARNING THAT CAUSED THE LOSS OF POWER WHILE DRIVING*. LUCKILY IT HAPPENED IN CITY, NOT HIGHWAY. June 17, 2016, NHTSA complaint for 2014 Dodge Dart.

412.   And there are over a hundred NHTSA complaints each for the Jeep Compass, Jeep Renegade, and Dodge Dart, as well as dozens for the Chrysler 200, including this sampling:

Dodge Dart

- BURNED OIL AND NEED TO PUT OIL IN AFTER 750 MILES. NEW ENGINE WAS PUT IN, BUT IT STILL HAVE PROBLEMS. THE PROBLEM FIRST STARTED 12/4/17. *I WAS DRIVING MY CAR AND IT COMPLETELY STOP WITHOUT WARNING*. I TOOK IT TO THE DEALER AND IT WAS DETERMINED THAT IT WAS AN ENGINE ISSUE. AFTER 6 MONTHS, THE ENGINE WAS REPLACED. IT WAS BURNING OIL. August 11, 2018, NHTSA complaint for 2013 Dodge Dart.

- THIS IS THE SECOND TIME THIS HAS HAPPENED. *THE ENGINE WILL STALL RANDOMLY WHILE DRIVING*. THE FIRST TIME IT HAPPENED, WE HAD TO HAVE IT TOWED TO THE DEALERSHIP. THEY SAID IT WAS A SENSOR COVERED UNDER WARRANTY. OK GOOD. WELL A FEW DAYS AFTER, THE PROBLEM HAPPENED AGAIN. THIS TIME *THEY SAY IT'S BECAUSE THE OIL NEEDED TO BE CHANGED. THE HUD SHOWED OVER 50% OIL LIFE LEFT*. THE SAME ISSUE HAPPENED AGAIN A FEW DAYS AGO. THE PROBLEM SEEMS TO RESOLVE AFTER AN OIL CHANGE. I'VE NOTICED THIS HAS HAPPENED TO A LOT OF PEOPLE, BUT STILL NO RECALLS. *THIS IS EXTREMELY DANGEROUS*. WHEN THE ENGINE STALLS, YOU LOOSE POWER STEERING AND BRAKES. THIS CAN CAUSE A MAJOR ACCIDENT. LUCKILY, IT'S ONLY HAPPENED ON SURFACE STREETS. THIS ISSUE

NEEDS TO BE LOOKED INTO AND FIXED. July 7, 2017, NHTSA complaint for 2014 Dodge Dart.

- I DON'T KNOW WHAT TO DO WITH THE VEHICLE. IT'S GIVEN ME PROBLEMS SINCE I FIRST BOUGHT IT. THE FIRST TIME I HAD A PROBLEM WITH THIS VEHICLE WAS A MONTH AFTER I PURCHASED IT FROM THE DEALERSHIP. *I WAS DRIVING IT, AND IT SUDDENLY TURNED OFF* AND ALL OF THE LIGHTS ON THE DASHBOARD TURNED ON. NOW IT DOES IT FREQUENTLY. THE LAST TIME WAS LITERALLY THIS 3RD OF OCTOBER. *THE DEALERSHIP MECHANICS SUPPOSEDLY SAID IT HAPPENS BECAUSE THE OIL IS LOW ON THE CAR*, THAT THE CAR'S SYSTEM SHUTS OFF TO PROTECT THE VEHICLE FROM DAMAGE TO THE MOTOR, DUE TO LOW OIL. *IT SEEMS RIDICULOUS THAT CHRYSLER IS WILLING TO RISK THEIR BUYERS WITH SUCH A FAULT SYSTEMS*. ALL THE DEALER SAID WAS THAT IT WAS NORMAL AND NOTHING TO WORRY ABOUT. HOWEVER, WHEN *THIS HAS HAPPENED TO ME IT HAS BEEN WHEN THE OIL LIFE IS AT NO LESS THAN 58%*. IT IS VERY UNSAFE TO DRIVE THIS VEHICLE. I CAN CRASH AT ANY MOMENT. AND THE MOTOR JUST BURNS THROUGH OIL LIKE CRAZY. MY MECHANIC CHECKED IT AFTER MAYBE THREE WEEKS OF AN OIL CHANGE AND IT WAS COMPLETELY OUT OF OIL ALREADY. IT SEEMS LIKE. October 11, 2017, NHTSA complaint for 2014 Dodge Dart.

- *CAR STALLS WITHOUT WARNING* IN ALL SORTS OF SCENARIOS, JUST STARTED, TURNING, STOPPING, UP HILL OR DOWN HILL. *MULTIPLE INQUIRIES WITH CHRYSLER CORPORATE AND DEALERSHIPS* RESULTED IN THEM TELLING ME THE CAR IS ENGINEERED TO ALLOW 1QT OF OIL BURNED EVERY 750 MILES, PER SPEC SHEET I HAD TO FIRMLY DEMAND TO BE ABLE TO SEE IT. WAS *BASICALLY TOLD THERE IS NO PROBLEM THAT MY CAR DIES IN THE MIDDLE OF AN INTERSECTION WITH MY FAMILY IN IT*, THEREBY THE POTENTIAL FOR A MAJOR CATASTROPHIC DEADLY SITUATION IS THERE. CHYRSLER CORPORATE CASES WERE CLOSED WITH NO RESOLUTION

AND THEY NEARLY MADE ME PAY FOR THE INQUIRY. November 6, 2019, NHTSA complaint for 2014 Dodge Dart.

- I PURCHASED A 2015 DODGE DART 3/19/18 FROM A DEALERSHIP. I JUST HAD THE OIL CHANGE DONE WHICH WAS RECOMMENDED. THE CAR JUST RECENTLY STARTED TO STALL WHILE DRIVING. NO WARNING LIGHTS WENT ON. WE CHECKED THE BATTERY (WHICH WAS A YEAR OLD) AND THE ALTERNATOR AND THEY WERE FINE. I WENT TO AUTO ZONE TO CHECK IT OUT. I CALLED THE DEALERSHIP I BOUGHT IT AT AND THEY SAID IT COULD BE A NUMBER OF THINGS. NEVER DID THEY MENTION THE OIL BEING THE ISSUE. *I GET A CALL FROM THE DEALERSHIP THAT THE BECAUSE THE OIL WAS LOW THE CAR WILL STALE TO PROTECT THE ENGINE. FIRST OF ALL, IT'S A SAFETY HAZARD IF THIS CAN RANDOMLY STALL, AND SECOND NO LIGHTS CAME ON FOR THE WARNING.* THE CARS METERS SHOWED THAT THE OIL QUALITY WAS AT 85% AND GOOD. THIS IS VERY DANGEROUS. I CHECKED THE OWNERS MANUAL AND THERE IS NOTHING THAT PERTAINS TO THIS CAR STALLING. July 11, 2018, NHTSA complaint for 2015 Dodge Dart.

- TL* THE CONTACT OWNS A 2016 DODGE DART. IN OCTOBER OF 2016, WHILE DRIVING 25 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO A LOCAL DEALER (NAPLETON CHRYSLER JEEP DODGE RAM, 1460 E OSCEOLA PKWY, KISSIMMEE, FL 34744) WHERE IT WAS DIAGNOSED THAT THERE WAS INADEQUATE OIL IN THE VEHICLE DURING PRODUCTION, WHICH CAUSED THE SENSOR TO SHUT THE VEHICLE DOWN. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED. WHILE DRIVING 40 MPH, THE OIL INDICATOR WAS FLASHING. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHERE A COMPRESSION TEST WAS COMPLETED. *THE DEALER DIAGNOSED THAT THE OIL WAS EVAPORATING AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND DENIED THE CLAIM.* THE MANUFACTURER ADVISED THE CONTACT TO ADD OIL AND

REFER TO THE OWNER'S MANUAL. THE FAILURE MILEAGE WAS 15,638. December 12, 2017, NHTSA complaint for 2016 Dodge Dart.

<u>Chrysler 200</u>

- CAR WILL STALL WHILE COMING TO A STOP OR SLOWING TO MAKE A TURN. TOOK IT IN TO THE DEALERSHIP AND WAS TOLD THAT THE OIL NEEDED TO BE CHANGED AND THAT THE ENGINE WOULD AUTOMATICALLY "SHUT OFF" IF AN OIL CHANGE IS NEEDED. ***PROBLEM HAS OCCURRED NUMEROUS TIMES EVEN AFTER HAVING THE OIL CHANGED REGULARLY***. November 1, 2016, NHTSA complaint for 2015 Chrysler 200.

- CAR BURNS ENTIRE SUPPLY OF OIL IN LESS THAN 1500 MILES. ENGINE OIL DEPLETES WITHOUT WARNING THEN THE ***CAR CUTS OFF IN THE MIDDLE OF THE ROAD. OIL LIFE READS IMPROPERLY ON THE DASH***. November 29, 2016, NHTSA complaint for 2015 Chrysler 200.

- HAD THE CAR SINCE APRIL OF THIS YEAR. CUT OFF OVER 20 TIMES AND CONSUMES OIL A LOT. I MEAN I'M ADDING OIL EVERY 700 MILES ALMOST. ***CAR HAS LEFT ME IN THE MIDDLE OF INTERSECTIONS WITH MY FAMILY IN DANGER***. November 27, 2017, NHTSA complaint for 2015 Chrysler 200.

- MY CAR HAS SHUT OFF 3 TIMES JUST THIS WEEK WHILE DRIVING. EACH TIME I WAS IDLING AT A STREET LIGHT. THE DASH SAYS TO PUT CAR BACK IN PARK AND THEN IT TAKES A COUPLE OF TRIES TO RESTART IT. TOOK IT TO THE DEALER THEY SAID I HAVE NO OIL. BUT I JUST HAD AN OIL CHANGE NOT TOO LONG AGO AND I HAVE NO LEAKS. THIS CAR IS CONSUMING WAY TOO MUCH OIL. ***NO WARNING LIGHT CAME ON THAT I WAS LOW ON OIL. I WAS IN A YIELDING LEFT HAND TURNING LANE WHEN THE CAR SHUT OFF 2 OF THE 3 TIMES. IF IT HAD HAPPENED A FEW SECONDS LATER I COULD HAVE BEEN T-BONED WITH MY SON IN THE CAR ON THAT SIDE. VERY DANGEROUS!!!!!*** THIS SHOULD BE RECALLED. December 1, 2017, NHTSA complaint for 2015 Chrysler 200.

- MY 2016 CHRYSLER 200 WAS PURCHASED BRAND NEW, HAS ONLY 15000 MILES. WHEN PULLING INTO TRAFFIC THE ENGINE SHUTS OFF. DASHBOARD PROMPT SAYS PUT IN PARK TO START.CAR WON'T START UNTIL AFTER 3 ATTEMPTS AND IN THE MIDDLE OF TRAFFIC AND SEVERAL NEAR MISSED REAR ENDERS CAR STARTED BUT STUTTERING AND NO POWER. FINALLY AFTER SITTING IN THE MIDDLE OF TRAFFIC FOR 5 OR 10 MINUTES ENGINE SMOOTHED OUT. ***NO WARNING AT ALL. EXTREMELY SCARY AND DANGEROUS, BOTH TIMES CAR WAS IN MOTION TURNING ONTO A BUSY STREET IN HEAVY TRAFFIC, ENGINE JUST SHUT OFF FOR NO REASON. DEALERSHIP SAID OIL CHANGE WAS NEEDED BUT OIL LIFE GAUGE SAID 51%*** AND OIL CHANGE WASN'T DUE FOR ANOTHER 500 MILES.TECH.AT THE DEALERSHIP SAID IT WAS A SAFETY FEATURE. I DON'T SEE ANYTHING SAFE ABOUT THE ENGINE SHUTTING OFF IN THE MIDDLE OF TRAFFIC. VERY UNSAFE AND DANGEROUS. SHOULD BE A RECALL FOR THIS BEFORE SOMEONE HURT OR KILLED. February 3, 2018, NHTSA complaint for 2016 Chrysler 200.

- I HAVE NOTICED THAT MY 2016 CHRYSLER 200 IS BURNING OIL AT AN ALARMING RATE. I DIDN'T EVEN KNOW IT WAS LOW BECAUSE THERE IS NO SENSOR THAT SHOWS UP ON THE DASH LETTING ME KNOW THE OIL WAS LOW. ***THE "OIL CHANGE LIFE" IS STILL AT 20% LIFE BUT MY CAR HAS BURNED THRU OVER 4 QUARTS OF OIL IN 4,000 MILES!! I FIND THIS EXTREMELY CONCERNING NOT TO MENTION THE POSSIBLE ENGINE DAMAGE THAT CAN BE DONE WITH A CAR BURNING THIS MUCH OIL.*** THERE SHOULD BE AN ALERT TO DRIVERS LETTING THEM KNOW THE OIL LEVELS ARE LOW. I HAVE NEVER HAD A CAR THAT BURNED OIL LIKE THIS! September 17, 2018, NHTSA complaint for 2016 Chrysler 200.

Jeep Compass

- ENGINE OIL AND STALLING. I WENT FOR MY 2ND OIL CHANGE 8/27/2018. THE SERVICE TECH AND A MECHANIC LISTENED WHEN I SAID THE OIL WAS BASICALLY GONE

AND MY HUSBAND HAD TO ADD 2 QUARTS. I EVEN CHECKED ALL THE SYSTEM WARNINGS AND THERE IS NONE FOR LOW OIL. WHEN PULLING OUT INTO AN INTERSECTION *THE CAR TOTALLY SHUT OFF AT 4 DIFFERENT TIMES. SO THE MECHANIC SAID YES THOSE 2.4 ENGINES BURN 1 QUART EACH 1000 MILES AND WHEN THE OIL IS LOW THE ENGINE WILL JUST STOP. I ASKED ABOUT WHY THERE ARE NO WARNING LIGHTS, THE MECHANIC AGAIN SAID YES THERE IS NOT ONE. HAVING A CAR JUST SHUT OFF IS SO DANGEROUS.* IT COULD HAVE BEEN A TERRIBLE ACCIDENT IF ANOTHER CAR WAS COMING ANY OF THOSE 4 SHUT OFFS…. September 4, 2018, NHTSA complaint for 2017 Jeep Compass.

- VEHICLE SHUTS DOWN WHILE OPERATING. TOOK IT TO THE DEALER AND THE *DEALER SAID IT USES A QUART OF OIL EVERY 500 MILES THEREBY BY CAUSING ENGINE TO SHUT DOWN DURING OPERATION*. DEALER STATED CHRYSLER IS AWARE OF PROBLEM AND NO SOLUTIONS HAVE BEEN PROVIDED YET. DEALER ALSO STATED TO GET AN OIL CHANGE EVERY 3000 MILES. THIS VEHICLE HAS 33,720 MILES AND WAS PURCHASED JUN 2017. November 5, 2019, NHTSA complaint for 2017 Jeep Compass.

- WHEN PULLING OUT OF THE DRIVEWAY AND GOING FROM REVERSE TO DRIVE *THE CAR STALLED IN THE MIDDLE OF THE STREE*T. THIS HAPPENED A FEW WEEKS AGO ALSO. I CALLED THE DEALERSIP AND THEY SAID IF THE OIL IS LOW THERE IS A SAFETY FEATURE THAT SHUTS DOWN THE ENGINE. *THIS CAR ONLY HAS 3000 MILES ON IT AND IS 3 MONTHS OLD. NO ENGINE LIGHT OR WARNING EVER CAME ON*. I CHECKED THE OIL AND IT WAS A LITTLE LOW SO I ADDED A 1/2 A QUART. IN READING UP ON THIS VEHICLE IT SAYS IT BURNS QUITE A BIT OF OIL. THIS IS UNACCEPTABLE THAT THE CAR BURNS THIS MUCH OIL AND THAT THE CAR WILL SHUT DOWN IF THE OIL IS A LITTLE BIT LOW. THIS IS MORE OF A SAFETY HAZARD IF THE CAR SHUTS DOWN WHILE DRIVING? September 21, 2018, NHTSA complaint for 2018 Jeep Compass.

- ***I HAVE ABOUT 5500 MILES ON MY NEW COMPASS***. WHILE IN DRIVE THE VEHICLE DISPLAY FLASHED "OIL PRESSURE LOW" FOR LESS THAN A SECOND. THEN ANY INDICATION OF THAT WARNING LIGHT IS GONE. THE ENGINE THEN SHUTS DOWN WITH NO WARNING. NO BRAKE LIGHTS WHICH MAKES THIS EXTREMELY UNSAFE FOR THE POTENTIAL OF A REAR END CRASH. I TOOK THE CAR TO THE DEALERSHIP WHO SAID THAT THE ENGINE CONSUMED 3 QUARTS OF OIL. ***THERE WAS NO INDICATION THAT THE CAR WAS LOW ON OIL UNTIL A SECOND BEFORE THE ENGINE STALLED AND TURNED OFF***. December 4, 2018, NHTSA complaint for 2018 Jeep Compass.

- WAS DRIVING AND WENT TO TURN AND ***THE JEEP TURNED OFF WITH NO WARNING***. IT TOOK ME A MINUTE FOR IT TO START AGAIN. THE NEXT DAY I WAS TURNING ONTO THE HIGHWAY AND THE JEEP DID THE SAME THING. I'M LUCKY THAT THERE WAS AN AREA FOR ME TO BE ABLE TO COAST INTO ON THE SIDE OFF THE ROAD OR I COULD HAVE BEEN IN A SERIOUS ACCIDENT. ***HAD THE JEEP TOWED TO THE CLOSET DEALERSHIP AND THEY INFORMED ME THERE WAS NO OIL IN THE JEEP. I HAD 1K MILES LEFT TO MY NEXT OIL CHANGE*** AND GET MY OIL CHANGED ALWAYS BEFORE 5K MILES. ***THE DEALERSHIP TOLD ME THESE JEEPS BURN OIL FASTER THAN THEY SHOULD*** AND I SHOULD BUY SYNTHETIC OIL TO CARRY IN THE JEEP AND CHECK MY OIL EVERY COUPLE OF HUNDRED MILES. THIS SHOULD NOT BE THE SOLUTION, AS ***I WOULDN'T HAVE PURCHASED THE JEEP IF THEY TOLD ME I HAD TO CARRY OIL AROUND WITH ME & CHECK MY OIL EVERY COUPLE OF HUNDRED MILES.*** THIS ISSUE IS DANGEROUS, AS THERE IS NO WARNING THAT YOUR OIL IS LOW BEFORE THE JEEP TURNS OFF. I TRAVEL AT LEAST 100 MILES A DAY FOR WORK AND I DON'T FEEL SAFE IN THIS VEHICLE AND SHOULDN'T HAVE TO CHECK MY OIL EVERY OTHER DAY. April 2, 2019, NHTSA complaint for 2018 Jeep Compass.

- ***JEEP COMPASS IS A SAFETY HAZARD DEATH TRAP; I CANNOT BELIEVE THERE IS NOT A RECALL ON IT! IT LITERALLY BURNS OIL DOWN TO NOTHING & WITH NO***

- 167 -

*WARNING WHATSOEVER THE PARKING BRAKE ENGAGES, THE DASHBOARD LIGHTS UP AND IT JUST STOPS, WHILE DRIVING, ON THE ROAD, IN TRAFFIC!* THIS HAS HAPPENED TO ME TWICE! I HAVE CHANGED THE OIL REGULARLY (ACTUALLY EARLY) AND AFTER 3,000 MILES IT IS EMPTY?? ARE YOU SERIOUS? FIRST TIME IT HAPPENED THE DEALER CONDUCTED AN "OIL CONSUMPTION" TEST, WHAT A JOKE. OBVIOUSLY IT IS OVER-CONSUMING OIL BECAUSE IT JUST SEIZED UP ON ME WHILE DRIVING & MAKING A TURN IN FRONT OF OTHER CARS AND THE DIPSTICK WAS CLEAR, NOT ONE DROP OF OIL LEFT! MADE SPECIAL TRIPS TO THE DEALER SO THEY COULD TOP OFF THE OIL AFTER 1,500 MILES (THEIR SOLUTION TO THIS KNOWN PROBLEM) AND IT HAPPENED A SECOND TIME AFTER LESS THAN 3,000 MILES, AND ONCE AGAIN WHILE MAKING A TURN I WAS ALMOST REAR ENDED BECAUSE THE JEEP STOPPED IN THE MIDDLE OF THE ROAD!!! THE JEEP IS CURRENTLY AT THE DEALER WHILE THEY "FIGURE OUT WHAT IS WRONG" AND HOW TO HANDLE IT. I WILL TELL YOU HOW TO HANDLE IT, RECALL THEM BEFORE SOMEONE DIES!!! IF I COULD DITCH JEEP/CHRYSLER RIGHT NOW I WOULD, AND AS SOON AS MY LEASE IS UP, I WILL BE GOING BACK TO GM CARS! August 15, 2019, NHTSA complaint for 2018 Jeep Compass.

- WHILE DRIVING IN A PARKING LOT, *MY CAR SHUT OFF* INSTANTLY, NO WARNING. THANK GOD I WAS NOT ON THE HIGHWAY OR THAT A CAR WAS NOT DRIVING BEHIND ME! MY HUSBAND CHECKED THE OIL AND IT WAS EXTREMELY LOW. CAR *ONLY HAS, 2,840 MILES ON IT*. BOUGHT THE CAR NEW ON, 6/30/2018, WITH ONLY, 28 MILES ON IT. *WE TOOK THE CAR TO THE JEEP DEALERSHIP AND WAS TOLD THE OIL WAS EMPTY AND THE ENGINE IS BURNING OIL. HE SAID THIS IS HAPPENING WITH THIS MODEL AND OTHER JEEP/DODGE VEHICLES WITH THIS MOTOR.* THE MECHANIC DID AN OIL CHANGE AND STATED TO BRING THE CAR BACK AFTER 500 MILES TO CHECK THE OIL AGAIN. *HE STATED IF THE OIL LOST HAPPENS AGAIN, THEY WOULD HAVE TO REPLACE THE ENGINE, WITH THE SAME TYPE OF ENGINE AND HOPE FOR THE BEST.* I THINK THIS IS ABSURD FOR A NEW VEHICLE WITH SO LITTLE MILES ON

IT! FIAT/CHRYSLER IS NO HELP AND WILL NOT GIVE ANY OPTIONS OTHER THAN REPLACING THE ENGINE. SHAMEFUL AND SHOWS THEY DO NOT VALUE THEIR CUSTOMERS TIME NOR FEELINGS. THEY CONTINUE TO MAKE THESE CARS WITH THESE SAME DEFECTED ENGINES. IF YOU SEARCH, JEEP BURNING OIL, YOU WILL FIND A TON OF COMPLAINTS. February 6, 2019, NHTSA complaint for 2018 Jeep Compass.

- ***BURNING EXCESSIVE OIL. HAD TO GET NEW MOTOR. SECOND MOTOR IS BURNING OIL.*** GOING THROUGH SECOND OIL CONSUMPTION TEST. 2018 JEEP COMPASS WITH 11,500 MILES. STILL UNDER WARRANTY. VEHICLE CAN STOP WITHOUT WARNING, ANYWHERE AT ANY TIME. December 12, 2019, NHTSA complaint for 2018 Jeep Compass.

- THIS IS MY THIRD COMPLAINT ON THIS 2019 JEEP COMPASS. ***WHILE DRIVING THE VEHICLE STALLS*** AND THE EMERGENCY BRAKE AND OTHER LIGHTS COME ON. THE VEHICLE IS UNABLE TO BE RESTARTED AND HAS TO BE TOWED. THE DEALERSHIP HAS UPDATED SOFTWARE, AND NOW HAS SAID THAT THE CAR IS LOW ON OIL EVERY THREE WEEKS AND THAT'S WHY IT STALLS IN THE MIDDLE OF TRAFFIC EXTREMELY DANGEROUS AND I HAVE A BABY ON THE WAY!. ***THE OIL CHANGE INDICATOR DOESN'T EVER SHOW UP AND THE MANUFACTURER JUST GIVES THE RUN AROUND***. August 23, 2019, NHTSA complaint for 2019 Jeep Compass.

Jeep Renegade

- MULTIPLE TIMES SINCE OWNING THIS VEHICLE THE PAST 7 MONTHS, I HAVE HAD TO GET 3 OIL CHANGES AND TOP OFF THE OIL MANY TIMES IN BETWEEN, WHICH IS MUCH MORE THAN THE MANUAL STATES IS NECESSARY. ***THIS VEHICLE BURNS THROUGH OR LOSES OIL TOO QUICKLY, WHICH CAUSES THE VEHICLE TO TURN OFF WHILE DRIVING (IN MOTION) WHICH IS A HUGE SAFETY CONCERN***. IT OFTEN TURNS OFF GOING UP OR DOWN HILL, AND AFTER OR MID TURN (WHAT LITTLE OIL IS REMAINING SHIFTS) ON CITY

STREETS. MY CAR HAS TURNED OFF ITSELF IN THE MIDDLE OF TRAFFIC MORE THAN A DOZEN TIMES. SOMETIMES IT TAKES A COUPLE MINUTES BEFORE IT WILL TURN ITSELF BACK ON. LIKE MENTIONED, THIS HAS OCCURRED MORE THAN A DOZEN TIMES SINCE MAY 2018 (PURCHASED VEHICLE IN MARCH 2018). BETWEEN 10/29 AND 10/31, IT OCCURRED 9 TIMES. November 1, 2018, NHTSA complaint for 2015 Jeep Renegade.

- EXCESSIVE OIL CONSUMPTION . 30000 MILES IN THE ENGINE AND IT *GOES THROUGH OIL MORE OFTEN THAN THE RECOMMENDED OIL CHANGES*. MAJOR ACCIDENT ISSUE, CAUSED BY ENGINE STALLINGS DUE TO UNEXPECTEDLY LOW OIL. *ENGINE STALLED WHILE DRIVING 65MPH ON THE FREEWAY*. August 29, 2019, NHTSA complaint for 2015 Jeep Renegade.

- *THE CAR STALLS FREQUENTLY WITH NO WARNING AT SPEED AND ALSO WHEN EXECUTING A STOP*. IT USES A HUGE AMOUNT OF OIL, 5 QTS BETWEEN CHANGES. I TOOK IT TO THE *DEALER AND THEY TOLD ME THAT THIS CAR STALLS IF THE OIL LEVEL IS LOW*. THIS MEANS THEY RECOGNIZE AN ISSUE AND HAVE DONE NOTHING ABOUT IT. HOW WOULD I KNOW THIS, AND HOW LOW DOES THE OIL HAVE TO BE TO STALL? *THIS IS NOT NORMAL AND IF IT IS 'NORMAL' WHY HAVE THEY NOT TOLD ALL RENEGADE OWNERS?* I WILL NEVER FEEL SAFE IN THIS CAR BECAUSE IF IT STALLS ON THE FREEWAY AT 60 MPH I WILL MOST CERTAINLY HAVE A CRASH. May 17, 2019, NHTSA complaint for 2016 Jeep Renegade.

- I HAVE A 2017 JEEP RENEGADE, THE CAR IS RUNNING OUT OF OIL , I'VE TAKEN THE CAR TO THE DEALER MULTIPLE TIMES AND IT SEEMS THAT *THE ENGINE KEEPS BURNING THE OIL WITHOUT ANY AND THE CAR HAS SHUT DOWN ON ME WHILE DRIVING WITHOUT ANY ALERTS REPORTING ME THAT THE CAR DOES NOT HAVE OIL*, I HAVE TO KEEP CHECKING THE OIL TO MAKE SURE IS RIGHT TO AVOID THE CAR SHUTTING DOWN ON ME WHILE I'M DRIVING, IS REALLY DANGEROUS THAT THE CAR IS BURNING THE

WHOLE MOTOR OIL EVERY 500 MILES WHIOUT HAVING ANY LEAKING OR SHOWING LOW OIL ALERT SIGNS AND THE DEALER CAN'T FIX IT , THE DEALER SHOULD BE ABLE TO REPLACE THE DAMAGE TO AVOID ANY ACCIDENT THIS CAR IS WORSE THAN HAVING AN OLD 1987 CAR. March 18, 2019, NHTSA complaint for 2017 Jeep Renegade.

- ***OIL CONSUMPTION ISSUES. CAR SHUTS OFF WHILE DRIVING WITHOUT ANY WARNING. THIS ALMOST CAUSED ME TO BE INVOLVED IN A CAR CRASH***. THIS OCCURRED THREE TIMES WITHIN 24 HOURS WITH MY CAR. TOOK THE CAR TO JEEP SERVICE AND THE ATTENDANT STATED THAT THIS CAR "CONSUMES 1 QUART OF OIL EVERY 1,000 MILES" AND THAT I SHOULD CALL CORPORATE. WHEN I BROUGHT THE CAR TO JEEP IT WAS OUT OF OIL WITH NO WARNING OF A NEED FOR AN OIL CHANGE OR THAT I WAS LOW ON OIL.

  ***WHEN I BOUGHT THIS CAR FROM THE DEALERSHIP I WAS NOT MADE AWARE*** THAT I WOULD NEED TO CHANGE THE OIL THIS OFTEN AND THAT THIS CAR "CONSUMES" THIS MUCH OIL REQUIRING CONSTANT SERVICE. ***IT IS ALSO NOT STATED IN THE OWNERS MANUAL***.

  ***THE ISSUE WITH THIS CAR COULD CAUSE A HORRIBLE COLLISION***, AS WHILE THE CAR IS IN MOTION IT COMPLETELY TURNS OFF THE ENGINE. WHEN THIS HAPPENED TO ME I WAS IN THE MIDDLE OF A TURN AND WHEN I PRESSED THE GAS TO ACCELERATE THE CAR JUST ROLLED BECAUSE THE ENGINE WAS SHUT OFF AND I HAD NO POWER STEERING. AS THIS OCCURRED ANOTHER CAR WAS COMING, LUCKILY THEY HAD A STOP SIGN. March 25, 2019, NHTSA complaint for 2017 Jeep Renegade.

- ***CAR WOULD NOT GIVE GAS AND COMPLETELY STALLED OUT ON ME***, AND CUT OFF!! IT WOULD NOT TURN BACK ON FOR SEVERAL MINUTES. I ALMOST GOT REAMED BY A LARGE DUMP TRUCK BECAUSE THIS HAPPENED IN THE MIDDLE OF A BACK WINDY ROAD!! ALSO, MY CAR IS SLIPPING OUT OF GEAR FROM 1ST, 2ND, AND 3RD! ***DEALERSHIP TELLS ME I WAS ALMOST OUT OF OIL????***

*HOW CAN THIS BE? I GET REGULAR OIL CHANGES, AND FUNNY THING IS, THEY ALWAYS TELL ME I'M LOW!!??* I'M FIRST OWNER, PURCHASED IN NOVEMBER 2017! ONLY HAVE 36,000 MILES! *NOW DEALERSHIP TELLING ME THIS IS "NORMAL" FOR RENEGADE? WHY WASNT I INFORMED BEFORE PURCHASING!!!* THIS IS A MAJOR SADETY HAZARD! I WAS ALMOST SERIOUSLY INJURED, THE DUMP TRUCK SCREACHED TO A HALT BY A MATTER OF INCHES!!!! September 24, 2019, NHTSA complaint for 2017 Jeep Renegade.

- *THE 2018 JEEP RENEGADE STALLED AS I WAS TURNING IN MY DRIVEWAY. CHECKED THE OIL AND THERE WAS NO OIL ON THE DIPSTICK. NO LIGHTS CAME ON. IT HAD ONLY 4000 MILES ON IT*. NOT EVEN TIME FOR ITS FIRST OIL CHANGE. NEVER HAD A NEW VEHICLE THAT HAD USED OIL. THIS IS NOT SAFE. IT COULD HAVE STALLED ON ME ON THE HIGHWAY. September 26, 2018, NHTSA complaint for 2018 Jeep Renegade.

- *I BOUGHT A BRAND NEW 2018 JEEP RENEGADE. AT APPROXIMATELY 2,500 MILES THE CAR WOULD SHUT OFF ON ME WHILE DRIVING. NO WARNING LIGHTS CAME ON*. IT SHUT OFF TWICE WHILE DRIVING STRAIGHT AND TWICE WHILE MAKING LEFT HAND TURNS. AFTER THE FIRST TIME IT SHUT OFF, IT DIDN'T HAVE THE PICKUP IT HAD BEFORE AND SEEMED TO SPUTTER. *I TOOK IT TO A JEEP DEALERSHIP AND THEY SAID THAT I WAS OUT OF OIL*. THEY TOPPED IT OFF AND SENT ME ON MY WAY.

  *AT 5,500 MILES MY CAR SHUT OFF ON ME AGAIN WHILE DRIVING. THIS WAS VERY SCARY*. IT OCCURRED WHILE MAKING A LEFT HAND TURN AT A LARGE INTERSECTION. I THOUGHT I WAS GOING TO GET HIT. LOST ALL POWER STEERING AND CAR TOOK TIME TO RESTART. AGAIN, THE CAR SPUTTERED AFTER THAT AND TURNED OFF A COUPLE OF MORE TIMES BEFORE I COULD GET BACK TO DEALERSHIP.

  MY CAR IS NOW IN FOR AN OIL CONSUMPTION TEST. I HAVE RESEARCHED THIS ISSUE AND SEE THAT THERE ARE MANY

OTHER COMPLAINTS OF THE SAME ISSUE. A BRAND NEW CAR SHOULD NOT BE SHUTTING OFF WHILE DRIVING. THIS IS A SAFETY ISSUE. SOME WARNING LIGHT NEEDS TO IDENTIFY THERE IS A PROBLEM. CHECKING THE OIL EVERY 1,000 MILES IS UNACCEPTABLE FOR A NEW CAR.

***THIS IS VERY DANGEROUS. WILL IT TAKE LIVES LOST FOR ACTION TO BE TAKEN?*** May 6, 2019, NHTSA complaint for 2018 Jeep Renegade.

- I PURCHASED AND HAVE DRIVEN A NEW 2018 JEEP RENEGADE 2.4 AUTO SINCE DECEMBER 2018. I WAS DRIVING THE OTHER DAY AND TURNED INTO TRAFFIC WHEN ***UNEXPECTEDLY THE LOW OIL LIGHT CAME ON IN MY VEHICLE AND IT COMPLETELY SHUT DOWN! TOTAL POWER LOSS. I WAS ALMOST DEMOLISHED BY A FULLY LOADED LOG TRUCK.*** I PARKED THE CAR AND CHECKED THE OIL PER THE INSTRUCTION MANUAL PROCEDURE. IT WAS ***OVER 2 QTS. LOW IN 5,000 MILES OF DRIVING***.

  I HAVE TRIED MULTIPLE TIMES AND THE ***JEEP DEALERSHIP*** REFUSED TO PROVIDE ME WITH ANY REPAIR DOCUMENTS AFTER INSPECTION. THEY ***TOLD ME THE PROBLEM IS WELL KNOWN BUT FCA IS DOING NOTHING TO REMEDY IT AND THEIR SERVICE DEPARTMENT WAS NOT GOING TO DO ANY FURTHER EVALUATION*** INTO THE PROBLEM.THIS WAS NOT DISCLOSED TO ME IN ANY WAY BEFORE I PURCHASED THE VEHICLE NOR IS IT MENTIONED OR INCLUDED AT ALL IN THE OWNERS/ MAINTENANCE MANUAL. IN ADDITION I HAD TO PAY $85.00 FOR AN OIL CHANGE THAT SHOULD NOT HAVE EVEN BEEN NECESSARY. THESE VEHICLES ARE NOT SAFE TO DRIVE. ***I NOW HAVE TO PARK MY NEARLY NEW VEHICLE BECAUSE I AM TERRIFIED TO DRIVE THIS CAR IN TRAFFIC.*** THEY ARE STILL SELLING THESE THINGS! PLEASE MAKE THEM STOP, THEY ARE DANGEROUS VEHICLES TO DRIVE.*DT*JB July 18, 2019, NHTSA complaint for 2018 Jeep Renegade.

- ….THIS SUMMER, I HAD TO COMPLETE AN OIL CONSUMPTION TEST ON MY VEHICLE. THIS

CONSISTED OF ME DRIVING TO THE DEALERSHIP EVERY 1,000 MILES FOR THEM TO CHECK MY OIL, CHART HOW MUCH IT USED, AND FILL IT BACK UP WITH OIL. THE DISTANCE FROM MY HOUSE TO THE DEALERSHIP IS 35 MILES; QUICKEST ROUTE BEING A 46 MINUTE DRIVE. I HAD TO REPEAT THIS PROCESS 5 TOTAL TIMES. *AT THE END OF THE 5,000 MILES I WAS TOLD BY MY SERVICE TECHNICIAN (ALLAN) THAT I MISSED THE CUT OFF FOR RECEIVING A NEW ENGINE BY ABOUT ½ QUART OF OIL. HE ALSO EXPRESSED THAT HIS PERSONAL OPINION MAY BE DIFFERENT, BUT THAT THE STANDARD/GUIDELINES WAS WHAT HE HAD TO GO BY FOR DIAGNOSING THE RESULTS*. October 1, 2019, NHTSA complaint for 2018 Jeep Renegade.

- THIS IS THE FOURTH TIME IN THREE MONTH MY VEHICLE HAS LOCKED UP, TOLD ME TO SWITCH GEARS AND *COMPLETELY SHUT OFF. I WAS ON THE INTERSTATE AND WAS ALMOST REAR ENDED BECAUSE OF THIS! THE CAR CONTINUES TO DO THIS DESPITE GETTING THE RECOMMENDED OIL CHANGES. MY OIL WAS JUST CHANGED 2,000 MILES AGO.* SOMEONE IS GOING TO DIE AND THIS NEEDS TO BE RECALLED! HUNDREDS OF RENEGADE OWNERS ARE HAVING THIS ISSUE. DANGEROUS! I HAVE CHILDREN AND THIS CAR IS LESS THAN TWO YEARS OLD AND SHUTTING OFF? March 28, 2020, NHTSA complaint for 2018 Jeep Renegade.

413. And there are also scores of complaints posted on various consumer forums, such as www.cargurus.com, www.carcomplaints.com, www.myjeepcompass.com, and www.carproblemzoo.com, as well as on Facebook and Twitter. All of these complaints support FCA's knowledge of the defects.

5.   **Acknowledgements of the pervasiveness of the defects by dealerships also supports that FCA would have known early on about them.**

414.   FCA's knowledge of the defects is also shown by the fact that FCA dealers and technicians have admitted to Defective Vehicle owners that the Oil Consumption and Oil Indicator defects are common problems with the Vehicles. For example:

- AFTER WORK I GO TO START MY CAR AND THERE WAS A HARD START AND THEN MY CAR DIED. THE ENGINE FELT LIKE IT WAS GOING TO POP OUT OF THE HOOD. WELL, CHRYSLER WAS INFORMED AND MY CAR WAS TOWED NEXT DAY TO THE DEALERSHIP. MY SERVICE MAN CALLED APPROXIMATELY 45 MIN AFTER MY CAR WAS DELIVERED TO THEM EXPLAINING TO ME I WAS ABOUT 2 QUARTS LOW ON OIL. THIS IS IMPOSSIBLE I EXPLAINED TO HIM. ON THE DRIVER SIDE THERE IS A STICKER SHOWING I JUST GOT MY OIL CHANGE NOT TO LONG AGO. *MY SERVICE MAN SAID THIS IS A KNOWN PROBLEM WITH THIS ENGINE*. THIS TYPE OF ENGINE BURNS OIL AND I RECOMMEND WHEN YOU FILL UP YOUR TANK TO CHECK YOUR OIL EVERY TIME. I FILL UP ONCE A WEEK SO I HAVE TO CHECK MY OIL ONCE A WEEK!? THIS IS RIDICULOUS MY NEW CAR BURNS OIL!? GOOD THING THIS HAPPENED AFTER WORK. WHAT IF MY CAR WOULD HAVE STALLED WHILE DRIVING WITH MY KIDS. I DRIVE ACROSS TOWN TO TAKE AND PICK UP MY KIDS FROM SCHOOL. NOW I HAVE TO CARRY A QUART OF OIL SO MY CAR DOESN'T STALL AND DIE ON ME. May 10, 2017, NHTSA complaint.

- TL* THE CONTACT OWNS A 2015 DODGE DART. WHILE DRIVING AT AN UNKNOWN SPEED, THE ENGINE STALLED. THE VEHICLE WAS ABLE TO BE RESTARTED. THE VEHICLE WAS TAKEN TO LARRY ROESCH CHRYSLER, DODGE, JEEP, RAM (200 WEST GRAND AVENUE, ELMHURST, IL 60126, 630-834-8000) WHERE IT WAS DIAGNOSED THAT THE

ENGINE OIL WAS LOW. **THE DEALER STATED THAT** THE ENGINE OIL MIGHT BE RELEASING THROUGH THE EXHAUST SYSTEM AND THAT **THE 2.4 LITER ENGINE WAS KNOWN TO BE FAULTY**. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE CONTACT WAS CONCERNED THAT THE ENGINE MAY STALL IN TRAFFIC ON THE HIGHWAY. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 43,600. May 15, 2018, NHTSA complaint.

- THE VEHICLE SHUT OFF ON MY WIFE AND CHILD WHILE SHE WAS DRIVING IT ON THE HIGHWAY, AND **WE TOOK IT TO THE DEALERSHIP AND THEY SAID** IT WAS LOW ON OIL AND THEY DID AN OIL CONSUMPTION TEST AND CLEARED THE VEHICLE AND SAID **IT WAS A COMMON PROBLEM** AND THEY HAVE TO DO OIL CONSUMPTION TEST BEFORE CHRYSLER WILL ISSUE A REPLACEMENT MOTOR, AFTER 2 MONTHS OF THE TEST THEY CONCLUDED THAT IT WAS OK AND SAFE TO DRIVE. THE ISSUE HAPPEND AGAIN WITH MY WIFE AND CHILD IN THE CAR AND DRIVING DOWN THE ROAD, SHE MADE IT BACK HOME AND THE MOTOR WAS OUT OF OIL 3,000 MILES BEFORE HER NEXT OIL CHANGE. I GOT IT TO THE DEALER AND THEY SAID THEY HAVE TO DO THE OIL CONSUMPTION TEST PROCESS AGAIN. May 16, 2018, NHTSA complaint.

- AROUND 8:50AM OCTOBER 4TH, 2018 MY WIFE AND BABY WERE AT A CITY STREET RED LIGHT STOPPED AND UPON ACCELERATING THE CAR COMPLETELY SHUT OFF AND THE STEERING-WHEEL LOCKED UP. AFTER ABOUT 5 MINUTES SHE WAS ABLE TO START IT UP AGAIN. WE LIVE IN THE CITY SO THIS COULD HAVE BEEN MUCH WORSE AT ANY DIFFERENT LIGHT AT ANY TIME OF DAY. I BROUGHT IT IN FIRST THING THE NEXT MORNING TO THE DEALERSHIP AND WAS TOLD THAT LOW OIL CAN CAUSE AIRPOCKETS IN THE ENGINE SHUTTING THE WHOLE VEHICLE OFF. **THE JEEP TECH SAID "THIS HAS BEEN SEEN A LOT ON NEWER JEEPS IN THESE MULTI-AIR ENGINES. PEOPLE COME IN FOR THE SAME REASON AND HAVE NO INDICATION OF WHAT**

*CAUSED IT. WHEN THEY FIRST CAME OUT WE HAD TO DIAGNOSE A LOT AND 99.9% OF THE TIME THAT IS THE CAUSE."* MY CAR WAS AT ~11,200 MILES, AND MY OIL CHANGE STICKER SUGGESTED ~11,600 TO GET IT CHANGED AGAIN. I HAD NO OIL LIGHT, LET ALONE WASN'T EVEN CLOSE TO THE CERTIFIED TECH'S OIL CHANGE STICKER THAT IS PLACED ON THE CAR. THIS IS COMPLETELY UNSAFE AND NOT ACCEPTABLE. THE TECH SUGGESTED KEEPING A QUART OF OIL IN MY CAR AND CHECKING THE OIL EVERY 1-2K MILES (IN A BRAND NEW VEHICLE!).... October 15, 2018, NHTSA complaint for 2017 Jeep Compass.

- STARTING AT 25K MILES, THE VEHICLE STARTED TO BURN THROUGH OIL EVEN BEFORE THE NEXT OIL CHANGE. THE MANUAL STATES TO GO OFF THE OIL SYSTEM LIGHT, DEALERS SAY DIFFERENT. OIL HAD 14% LEFT, BUT THE CAR KEPT SHUTTING OFF WHILE DRIVING ON THE HIGHWAY. WENT TO DEALER, CAR BURNED THROUGH ALL THE OIL. THEY REFUSED TO CHECK FOR ENGINE DAMAGE AND FORCE ME TO PAY FOR A FULL OIL CHANGE. *STATED BY THE DEALER, ITS A KNOWN ISSUE WITH JEEP.* October 9, 2019, NHTSA complaint.

- THE VEHICLE SHUTS OFF WHEN APPROACHING 3500 MILES. THIS HAPPENS WHEN THE VEHICLE IS IN MOTION REGARDLESS OF SPEED RENDERING THE VEHICLE EXTREMELY DIFFICULT TO MANEUVER. *THE JEEP WAS TAKEN TO DEALER AND THE MECHANIC ADVISED THAT THIS IS A KNOWN ISSUE* WITH SOME OF THE NEW JEEP CHEROKEES CONTAINING CERTAIN FIAT MOTORS. THE VEHICLES NOW HAVE A FIAT MOTOR THAT APPARENTLY BURNS THE ENGINES OIL EVERY 3500 MILES & THE SHUT OFF IS A BUILT IN "SAFETY MECHANISM" TO PREVENT THE MOTOR FROM BURNING OUT DUE TO THE LACK OF OIL. THIS INFORMATION WAS NOT DISCLOSED WHEN THE VEHICLE WAS PURCHASED. December 29, 2018, NHTSA complaint.

- MY NEW CAR HAS 2,800 MILES DUE FOR AN OIL CHANGE AT 5 MONTHS/5,000 MILES. THE ENGINE FAILED ONCE FOR NO

KNOWN CAUSE AFTER 2 WEEKS IN THE REPAIR SHOP. NOW MY CAR DIED WHILE IN MOTION ON BUSY ROADS AND A HIGHWAY RAMP AT SPEEDS BETWEEN 15-40 MPH WITHOUT WARNING OR LIGHTS. THIS IS SLA SAFETY HAZARD AS THE STEERING GOES AND CAR JUST COMES TO A STOP WITHOUT ANY WARNING. I HAD IT TOWED AFTER IT'S 5TH TIME IN 4 DAYS STOPPING WHILE IN MOTION AND SHUTTING DOWN. JEEP TOLD ME IT'S EMPTY ON OIL BUT YET THE OIL LIGHT INDICATOR DOESN'T COME ON. ***THEY SAID IT IS A KNOWN ISSUE WITHOUT A FIX FOR ALL 2014-2019 JEEP CHEROKEES***. September 26, 2018, NHTSA complaint.

- WHILE DRIVING A VEHICLE WITH ONLY 4200 MILES ON IT, THE JEEP STALED WITHOUT WARNING. JEEP RESTARTED AND WAS DRIVEN. WHEN I CALLED THE LOCAL DEALERSHIP, I WAS INFORMED TO CHECK MY OIL LEVEL - THAT IT WOULD BE LOW AND TO REFILL. I ASKED HOW THEY KNOW THIS AND ***THE DEALERSHIP'S SERVICE CENTER INFORMED ME THAT THIS IS A "KNOWN ISSUE" WITH THE 2.4 LITER ENGINE AND IS "COMMON"***. I CHECKED MY OIL, SURE ENOUGH, IT WAS LOW - I WOULD SAY TWO (2) QUARTS LOW (IN A 5 QUART SYSTEM). NO "CHECK ENGINE LIGHT", NO "SERVICE ISSUE ANNOUNCEMENT" FROM JEEP - NO WARNING AT ALL FOR A "KNOWN ISSUE". THIS IS INEXCUSABLE! August 9, 2018, NHTSA complaint.

- WHILE DRIVING THE JEEP COMPASSM WITH LESS THAN 5K MILES, THE CAR SHUT OFF WHILE I WAS GOING ABOUT 35 MPH WITHOUT WARNING AND LOCKED THE STEERING AND EVERYTHING. I TOOK IT TO THE JEEP DEALER AND WITHOUT HESITATION, THEY KNEW THAT IT NEEDED A BRAND NEW ENGINE BECAUSE THE CAR "SHOULD NOT BE BURNING OIL THIS QUICKLY." THEY MADE IT SEEM AS THOUGH THIS OCCURS EXTREMELY FREQUENTLY AND I HAVE READ SEVERAL FORUMS ABOUT PEOPLE HAVING THE SAME ISSUE JUST BY LOOKING UP "JEEP COMPASS BURNING OIL." THIS IS AN EXTREMELY HAZARDOUS SITUATION AND SHOULD BE ADDRESSED IMMEDIATELY. *DT

CONSUMER STATED DEALER TOLD HIM RINGS AND PISTONS IN THE ENGINE AND THAT THE OLD ENGINE WAS BURNING A CRAZY AMOUNT OF OIL ENGINE WAS BURNING A TREMENDOUS AMOUNT OF OIL, ***DEALER HINTED THAT A RECALL MAY HAPPEN BECAUSE HOW COMMON THE PROBLEM WAS***.*JB April 2, 2019.

415.    Before dealers would have been referring to the Oil Consumption and Oil Indicator defects as "common" and "known" problems, FCA certainly would have been aware of them. And the pervasiveness of the defects increases the likelihood of FCA's early knowledge. For example, a November 30, 2019 NHTSA complaint states that one dealer said it "had 50 customers" with the same problem. And a consumer forum posting on carproblemzoo.com states that the dealer "said its normal to burn oil and FCA knows about the issue but will not repair. They say about 70% of the 2. 4 are affected across all models."

**E.    FCA has exclusive knowledge of the defects.**

416.    FCA had superior and exclusive knowledge of the defects and knew or should have known that the defects were not known or reasonably discoverable by Plaintiffs and class members before they purchased or leased the Defective Vehicles.

417.    Before Plaintiffs purchased their Defective Vehicle, and since at least 2013, FCA knew about the defects through its exclusive knowledge of non-public, internal data including pre-and post-release internal durability testing and analysis; early consumer complaints about the defects, including complaints to Defendant's

dealers who are its agents for vehicle repairs; records from NHTSA, including early customer complaints made to NHTSA and elsewhere; dealership repair orders; testing conducted in response to those complaints; and other various sources.

418.   The Oil Consumption, Oil Indicator, and Excess Emissions defects were inherent in each Defective Vehicle and present at the time of sale.

419.   The existence of the defects is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle. Had Plaintiffs and other class members known that the Defective Vehicles were equipped with an engine that causes excessive oil consumption, shuts off without warning, and releases harmful emissions at illegally high levels, they would not have purchased or leased the Defective Vehicles or would have paid less for them.

420.   Reasonable consumers, like Plaintiffs, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety hazard, will operate in a manner that is consistent with state and federal laws, and is free from defects. Plaintiffs and class members further reasonably expect that FCA will not sell or lease vehicles with known safety defects, such as the Oil Consumption and Oil Indicator defects, or are known to needlessly and illegally harm the environment, such as the Excess Emissions defect, and will disclose any such defects to its consumers when it learns of them. Plaintiffs and class members did not expect FCA to fail to disclose

the Oil Consumption, Oil Indicator, and Excess Emissions defects to them and to continually deny the defects by refusing to issue a recall.

**F.   FCA has actively concealed the defects.**

421.   While FCA has been fully aware of the defects in the Defective Vehicles, it actively concealed the existence and nature of them from Plaintiffs and class members at the time of purchase, lease, or repair and thereafter.

422.   FCA—by and through the statements it made in the Owner's Manuals prepared for distribution with the Defective Vehicles—has misrepresented the Oil Consumption defect by recommending oil changes at much higher mileage than warranted by the true oil life cycle of the Defective Vehicles, and has misrepresented the Oil Indicator defect by saying that an oil change indicator will let the driver know the appropriate time to change the oil, when Defective Vehicles may actually require an oil change much sooner than indicated and receive no warning prior to the Defective Vehicle shutting off to avoid engine damage.

423.   According to FCA's representations in the Owner's Manual: "Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles since last reset." But FCA made far different representations in the TSB Oil Consumption Guidelines issued to its dealers in 2015.

424.   In the 2015 TSB, FCA told dealer service departments that the accepted rate of oil consumption for engines used in its vehicles is one quart/per 2,000 miles

driven for the first 50,000 miles. And for vehicles with more than 50,000 miles, the acceptable oil consumption is one quart for every 750 miles.

425.   FCA entirely omits the information contained in its 2015 TSB Oil Consumption Guidelines from the Owner's Manual it distributes with the Defective Vehicles. Moreover, FCA fails to disclose to consumers the information in its 2015 Oil Consumption Guidelines when they purchase the Defective Vehicles. Plaintiffs and class members thus only learn that FCA considers the excessive oil consumption of the 2.4L Tigershark engine "normal" when they are told that is the case by FCA's service departments. Conveniently for FCA, this occurs far after the sale of the Defective Vehicles and after experiencing the consequences of the defects.

426.   To the extent that FCA believed that the Oil Consumption defect is "normal," it had a duty to disclose that information to consumers because of the partial representations made in the Owner's Manuals of the Defective Vehicles.

427.   Moreover, despite notice of the defect from numerous consumer complaints and dealership repair orders, FCA has not recalled the Defective Vehicles to repair the defects, has not offered their customers a suitable repair or replacement free of charge, and has not offered to reimburse the Defective Vehicles' owners and leaseholders in full for the costs they incurred in attempting to diagnose and repair the defects.

428.   When consumers present the Defective Vehicles to an authorized FCA dealer for stalling, consumers are typically told the excessive oil consumption and frequent "top-offs" of engine oil are a known issue and there is no fix. On information and belief, whether or not consumers are forced to pay for repairs relating to excessive oil consumption and subsequent engine damage, the same defective part or parts are used to replace the prior defective part or parts.

429.   To this day, FCA still has not notified Plaintiffs and class members that the Defective Vehicles suffer from systemic defects that cause excessive oil consumption, premature engine damage and wear, and excess emissions.

430.   On information and belief, FCA has caused Plaintiffs and class members to expend money at its dealerships to diagnose, repair, and/or replace the Defective Vehicles' engine or related components, despite FCA's knowledge of the defects.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery rule tolling

431.   Class members had no way of knowing about FCA's deception with respect to Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. To be sure, FCA continues to market the Defective Vehicle, with false representations of its safety.

432.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that FCA was concealing the conduct complained of herein and misrepresenting the company's true position with respect to the performance of the Defective Vehicles.

433.   Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the true safety and emissions of the Defective Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that FCA valued profits over truthful marketing and compliance with the law.

434.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Defective Vehicles.

**B.     Fraudulent concealment tolling**

435.   All applicable statutes of limitation have also been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

436.   Instead of disclosing the Defective Vehicle's true oil consumption and emissions, FCA continues to falsely represent that the Defective Vehicles are safe and emit the proper level of emissions.

## C.   Estoppel

437.   FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Defective Vehicles' safety, oil consumption, and emissions.

438.   FCA knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the safety, oil consumption, and emissions in the Defective Vehicles and continues to do so in its advertising and brochures for continued sale of these vehicles.

439.   Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS DEFINITIONS

440.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> **Nationwide Class**
> All persons who purchased or leased a FCA vehicle equipped with the 2.4L Tigershark MultiAir II engine. ("Defective Vehicle")

**Alabama Subclass**

All members of the Nationwide Class who are residents of Alabama or purchased or leased their Defective Vehicle in Alabama.

**Alaska Subclass**

All members of the Nationwide Class who are residents of Alaska or purchased or leased their Defective Vehicle in Alaska.

**Arizona Subclass**

All members of the Nationwide Class who are residents of Arizona or purchased or leased their Defective Vehicle in Arizona.

**Arkansas Subclass**

All members of the Nationwide Class who are residents of Arkansas or purchased or leased their Defective Vehicle in Arkansas.

**California Subclass**

All members of the Nationwide Class who are residents of California or purchased or leased their Defective Vehicle in California

**Colorado Subclass**

All members of the Nationwide Class who are residents of Colorado or purchased or leased their Defective Vehicle in Colorado.

**Connecticut Subclass**

All members of the Nationwide Class who are residents of Connecticut or purchased or leased their Defective Vehicle in Connecticut.

**Delaware Subclass**

All members of the Nationwide Class who are residents of Delaware or purchased or leased their Defective Vehicle in Delaware.

**Florida Subclass**

All members of the Nationwide Class who are residents of Florida or purchased or leased their Defective Vehicle in Florida.

**Georgia Subclass**

All members of the Nationwide Class who are residents of Georgia or purchased or leased their Defective Vehicle in Georgia.

**Hawaii Subclass**

All members of the Nationwide Class who are residents of Hawaii or purchased or leased their Defective Vehicle in Hawaii.

**Idaho Subclass**

All members of the Nationwide Class who are residents of Idaho or purchased or leased their Defective Vehicle in Idaho.

**Illinois Subclass**

All members of the Nationwide Class who are residents of Illinois or purchased or leased their Defective Vehicle in Illinois.

**Indiana Subclass**

All members of the Nationwide Class who are residents of Indiana or purchased or leased their Defective Vehicle in Indiana.

**Iowa Subclass**

All members of the Nationwide Class who are residents of Iowa or purchased or leased their Defective Vehicle in Iowa.

**Kansas Subclass**

All members of the Nationwide Class who are residents of Kansas or purchased or leased their Defective Vehicle in Kansas.

**Kentucky Subclass**

All members of the Nationwide Class who are residents of Kentucky or purchased or leased their Defective Vehicle in Kentucky.

**Louisiana Subclass**

All members of the Nationwide Class who are residents of Louisiana or purchased or leased their Defective Vehicle in Louisiana.

**Maine Subclass**

All members of the Nationwide Class who are residents of Maine or purchased or leased their Defective Vehicle in Maine.

**Maryland Subclass**

All members of the Nationwide Class who are residents of Maryland or purchased or leased their Defective Vehicle in Maryland.

**Massachusetts Subclass**

All members of the Nationwide Class who are residents of Massachusetts or purchased or leased their Defective Vehicle in Massachusetts.

**Michigan Subclass**

All members of the Nationwide Class who are residents of Michigan or purchased or leased their Defective Vehicle in Michigan.

**Minnesota Subclass**

All members of the Nationwide Class who are residents of Minnesota or purchased or leased their Defective Vehicle in Minnesota.

**Mississippi Subclass**

All members of the Nationwide Class who are residents of Mississippi or purchased or leased their Defective Vehicle in Mississippi.

**Missouri Subclass**

All members of the Nationwide Class who are residents of Missouri or purchased or leased their Defective Vehicle in Missouri.

**Montana Subclass**

All members of the Nationwide Class who are residents of Montana or purchased or leased their Defective Vehicle in Montana.

**Nebraska Subclass**

All members of the Nationwide Class who are residents of Nebraska or purchased or leased their Defective Vehicle in Nebraska.

**Nevada Subclass**

All members of the Nationwide Class who are residents of Nevada or purchased or leased their Defective Vehicle in Nevada.

**New Hampshire Subclass**

All members of the Nationwide Class who are residents of New Hampshire or purchased or leased their Defective Vehicle in New Hampshire.

**New Jersey Subclass**

All members of the Nationwide Class who are residents of New Jersey or purchased or leased their Defective Vehicle in New Jersey.

**New Mexico Subclass**

All members of the Nationwide Class who are residents of New Mexico or purchased or leased their Defective Vehicle in New Mexico.

**New York Subclass**

All members of the Nationwide Class who are residents of New York or purchased or leased their Defective Vehicle in New York.

**North Carolina Subclass**

All members of the Nationwide Class who are residents of North Carolina or purchased or leased their Defective Vehicle in North Carolina.

**North Dakota Subclass**

All members of the Nationwide Class who are residents of North Dakota or purchased or leased their Defective Vehicle in North Dakota.

**Ohio Subclass**

All members of the Nationwide Class who are residents of Ohio or purchased or leased their Defective Vehicle in Ohio.

**Oklahoma Subclass**

All members of the Nationwide Class who are residents of Oklahoma or purchased or leased their Defective Vehicle in Oklahoma.

**Oregon Subclass**

All members of the Nationwide Class who are residents of Oregon or purchased or leased their Defective Vehicle in Oregon.

**Pennsylvania Subclass**

All members of the Nationwide Class who are residents of Pennsylvania or purchased or leased their Defective Vehicle in Pennsylvania.

### Rhode Island Subclass

All members of the Nationwide Class who are residents of Rhode Island or purchased or leased their Defective Vehicle in Rhode Island.

### South Carolina Subclass

All members of the Nationwide Class who are residents of South Carolina or purchased or leased their Defective Vehicle in South Carolina.

### South Dakota Subclass

All members of the Nationwide Class who are residents of South Dakota or purchased or leased their Defective Vehicle in South Dakota.

### Tennessee Subclass

All members of the Nationwide Class who are residents of Tennessee or purchased or leased their Defective Vehicle in Tennessee.

### Texas Subclass

All members of the Nationwide Class who are residents of Texas or purchased or leased their Defective Vehicle in Texas.

### Utah Subclass

All members of the Nationwide Class who are residents of Utah or purchased or leased their Defective Vehicle in Utah.

### Vermont Subclass

All members of the Nationwide Class who are residents of Vermont or purchased or leased their Defective Vehicle in Vermont.

### Virginia Subclass

All members of the Nationwide Class who are residents of Virginia or purchased or leased their Defective Vehicle in Virginia.

### Washington Subclass

All members of the Nationwide Class who are residents of Washington or purchased or leased their Defective Vehicle in Washington.

**West Virginia Subclass**
All members of the Nationwide Class who are residents of West Virginia or purchased or leased their Defective Vehicle in West Virginia.

**Wisconsin Subclass**
All members of the Nationwide Class who are residents of Wisconsin or purchased or leased their Defective Vehicle in Wisconsin.

**Wyoming Subclass**
All members of the Nationwide Class who are residents of Wyoming or purchased or leased their Defective Vehicle in Wyoming.

441.   The class may also include other vehicles, as well as other model year vehicles. Plaintiffs reserve the right to amend the proposed class after additional information is received from FCA in discovery.

442.   Excluded from the Class are individuals who have personal injury claims resulting from the Oil Consumption Defect, Oil Indicator Defect, or the high emissions in the Defective Vehicles. Also excluded from the Class are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' counsel.

443.   Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

444.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide

basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

445.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

446.   <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are in excess of an estimated 1,000,000 or more vehicles in the Class. The precise number of Class members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

447.   <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a)     Whether FCA engaged in the conduct alleged herein;

      b)     Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed Defective Vehicles into the stream of commerce in the United States;

      c)     Whether FCA provided false information to consumers regarding the safety and emissions of the Defective Vehicles;

d)   Whether FCA provided false information to the EPA regarding the emissions of the Defective Vehicles;

e)   Whether Defective Vehicles contain engine defects causing excessive oil consumption and sudden shut off without warning;

f)   Whether FCA knew about the defects relating to the Defective Vehicles;

g)   Whether FCA knew about the excess emissions being produced by the Defective Vehicles;

h)   Whether FCA had a duty to disclose the defects to Plaintiffs and Class members.

i)   Whether FCA failed to disclose the defects;

j)   Whether FCA's omission of the defects was material;

k)   Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale;

l)   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

448.   Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

449.   Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and

Plaintiffs intend to prosecute this action vigorously. Plaintiffs' counsel have extensive experience in emissions cases. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

450. <u>Declaratory and Injunctive Relief:</u> Federal Rule of Civil Procedure 23(b)(2): FCA has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

451. <u>Superiority:</u> Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Classes to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VIII. CLASS ALLEGATIONS

## A. Claims brought on behalf of the Arizona Subclass

### COUNT 1

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-1521 *et seq.*)

452. Plaintiff Guy West ("Plaintiffs" for purposes of all Arizona Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

453. This claim is brought on behalf of the Arizona Subclass.

454. FCA, Plaintiffs, and Arizona Class members are "persons" within the meaning of the Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

455. Each Defective Vehicle at issue is "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

456. The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

457.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

- 196 -

458. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

459. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

460. FCA's actions as set forth above occurred in the conduct of trade or commerce.

461.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

462.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

463.   FCA knew or should have known that its conduct violated this statute.

464.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

465.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to

warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

466. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

467. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

468. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

469. Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.

470. Plaintiffs and the Class also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT 2

## BREACH OF CONTRACT
## (BASED ON ARIZONA LAW)

471.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

472.   This claim is brought on behalf of the Arizona Subclass.

473.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

474.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

475.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 3

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON ARIZONA LAW)

476.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

477.   This claim is brought on behalf of the Arizona Subclass.

478.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

479.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

480.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

481.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

482.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

483.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 4

## FRAUDULENT CONCEALMENT
## (BASED ON ARIZONA LAW)

484.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

485.   This claim is brought on behalf of the Arizona Subclass.

486.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

487.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

488.   FCA knew these representations were false when made.

489.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

490.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

491.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

492.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

493.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

494.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle

emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

495.  FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excess harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable

vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

496.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

497.  FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

498.  Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

499.  Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for

their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

500.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

501.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 5

### NEGLIGENT MISREPRESENTATION
### (BASED ON ARIZONA LAW)

502.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

503.   This claim is brought on behalf of the Arizona Subclass.

504.   FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

505.   FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

506.   Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 6

### UNJUST ENRICHMENT
### (BASED ON ARIZONA LAW)

507.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

508.   This claim is brought on behalf of the Arizona Subclass.

509.   Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

510.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

511.   Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**B.   Claims Brought on Behalf of the California Subclass**

## COUNT 7

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

512.   Plaintiffs Nick Gizzarelli, Robert & Deborah Johnston, and Michelle Schmid ("Plaintiffs" for purposes of all California Subclass claims) incorporate by reference all paragraphs as though fully set forth herein.

513.   This claim is brought on behalf of the California Subclass.

514.   California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

515.   FCA's conduct, as described herein, was and is in violation of the UCL. FCA's conduct violates the UCL in at least the following ways:

    i.     By failing to disclose that the Defective Vehicles consume oil at a higher rate than advertised or is industry standard;

    ii.    By knowingly and intentionally concealing from Plaintiffs and the other California Subclass members that the Defective Vehicles contain the Oil Consumption defect, Oil Indicator defect, Excess Emissions defect;

      iii.   By marketing the Defective Vehicles as safe and reliable vehicles; and

      iv.   By violating federal laws, including the Automobile Disclosure Act (15 U.S.C. §§ 1231-33) and 49 U.S.C. § 32908, and EPA CAFE standards by failing to disclose the true emission levels of the Defective Vehicles

      v.   By violating other California laws, including California consumer protection laws.

      vi.   By refusing or otherwise failing to repair and/or replace the Defective Vehicles.

516.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead Plaintiffs and the Class.

517.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the Class were deceived by FCA's failure to disclose that the Defective Vehicles contain defects.

518.    Plaintiffs and the Class reasonably relied upon FCA's false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own.

519.    FCA knew or should have known that its conduct violated the UCL.

520.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption, Oil Indicator, and Excess Emissions defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

521.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

522.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

523.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

524.   Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

525.   Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief as may be appropriate.

526.   Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 8

## VIOLATIONS OF THE CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### (CAL. BUS. & PROF. CODE § 1750 *ET SEQ.*)

527.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

528.   This claim is brought on behalf of California Subclass.

529.   California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, et seq., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

530.   The Defective Vehicles are "goods" as defined in CAL. CIV. CODE §§ 1751(a).

531.   Plaintiffs and the Class are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiffs, the other Class members, and FCA are "person[s]" as defined in CAL. CIV. CODE § 1761(c).

532.   FCA's conduct, as described herein, was and is in violation of the CLRA. FCA's conduct violates at least the following enumerated CLRA provisions:

> i.    CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or certification of goods;
>
> ii.   CAL. CIV. CODE § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

iii.   CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

iv.   CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

v.   CAL. CIV. CODE § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

533.   California Plaintiffs and the California Subclass have suffered injury in fact and actual damages resulting from FCA's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Defective Vehicles.

534.   Because FCA fraudulently concealed that the Defective Vehicles maintain the defects, their value has diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

535.   FCA knew, should have known, or was reckless in not knowing that the Defective Vehicles contain the defects and release harmful excess emissions at levels higher than a reasonable consumer would expect or state and federal laws allow.

536.   Plaintiffs and the Class were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that

Plaintiffs and Class members overpaid for the Defective Vehicles, and/or the Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

537.   FCA's misrepresentations and omissions alleged herein caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased these vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these alleged defects.

538.   In accordance with Civil Code § 1780 (a), Plaintiffs and the Class seek injunctive and equitable relief for FCA's violations of the CLRA, including an injunction to enjoin FCA from continuing its deceptive advertising and sales practices.

539.   Plaintiffs have provided FCA with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).  The notice was transmitted to FCA on April 29, 2020 and October 14, 2020.

540.   Plaintiffs and the Class's injuries were proximately caused by FCA's fraudulent and deceptive business practices.

541.   Therefore, Plaintiffs and the Class are entitled to equitable and monetary relief under the CLRA.

## COUNT 9

## VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)

542.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

543.   This claim is brought on behalf of the California Subclass.

544.   CAL. BUS. & PROF. CODE § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." FCA failed to disclose that the Defective Vehicles contain the defects described herein and release excess emissions.

545.   FCA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and the Class.

546. FCA has violated § 17500 because the misrepresentations and omissions regarding the functionality and reliability of the Defective Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

547. Plaintiffs and the Class have suffered an injury in fact, including the loss of money or property, as a result of FCA's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Defective Vehicles, Plaintiffs and the Class relied on the misrepresentations and/or omissions of FCA with respect to the functionality and reliability of the Defective Vehicles. Had Plaintiffs and the Class known this, they would not have purchased or leased the Defective Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class members overpaid for the Defective Vehicles.

548. All wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business. FCA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

549. The facts concealed and omitted by FCA to Plaintiffs and the Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Defective Vehicles or pay a lower price. Had Plaintiffs and the Class known of the defects and release of harmful excess emissions at the time they purchased or leased the Defective Vehicles, they would

not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

550.   Plaintiffs, individually and on behalf of the Class, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the Class any money FCA acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as may be appropriate.

## COUNT 10

## BREACH OF CONTRACT
## (BASED ON CALIFORNIA LAW)

551.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

552.   This claim is brought on behalf of the California Subclass.

553.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

554.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

555.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 11

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON CALIFORNIA LAW)

556.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

557.   This claim is brought on behalf of the California Subclass.

558.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

559. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

560. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

561. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

562. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

563. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 12

### FRAUDULENT CONCEALMENT
### (BASED ON CALIFORNIA LAW)

564.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

565.   This claim is brought on behalf of the California Subclass.

566.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

567.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

568.   FCA knew these representations were false when made.

569.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

570.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

571.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

572.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

573.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

574.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

575.   FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

576.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

577.   FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

578.   Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

579.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

580.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

581. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 13

## NEGLIGENT MISREPRESENTATION
## (BASED ON CALIFORNIA LAW)

582.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

583.   This claim is brought on behalf of the California Subclass.

584.   FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

585.   FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

586.   Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 14

### UNJUST ENRICHMENT
### (BASED ON CALIFORNIA LAW)

587.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

588.   This claim is brought on behalf of the California Subclass.

589.   Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

- 226 -

590.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

591.   Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**C.     Claims Brought on Behalf of the Florida Subclass**

**COUNT 15**

**VIOLATIONS OF THE FLORIDA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT
(FLA. STAT. § 501.201 *ET SEQ.*)**

592.   Plaintiffs Kyle Davis, Nathaneal Romanchuk, and Nicolette Watson ("Plaintiffs" for purposes of all Florida Subclass claims) incorporate by reference all preceding allegations as though fully set forth herein.

593.   This claim is brought on behalf of the Florida Subclass.

594.   Florida Plaintiffs and the Florida Subclass members are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), FLA. STAT. § 501.203(7).

595.   Defendant engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

596.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). Defendant participated in unfair and deceptive trade practices that violated the Florida UDTPA as described herein.   Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1).  FCA's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is likely to mislead consumers.

597.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American

consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

598.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

599. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false

and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

600.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

601.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

602.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

603.   FCA knew or should have known that its conduct violated this statute.

604.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

   b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material

facts from Plaintiffs and the Class that contradicted these representations; and/or

c.     Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

605.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

606.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

607.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

608.   Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

609.   Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because FCA acted wantonly in causing Plaintiffs and Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

## COUNT 16

## BREACH OF CONTRACT
## (BASED ON FLORIDA LAW)

610.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

611.   This claim is brought on behalf of the Florida Subclass.

612.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

613.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

614.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 17

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON FLORIDA LAW)

615.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

616.   This claim is brought on behalf of the Florida Subclass.

617.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

618.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

619.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

620.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

621.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

622.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 18

## FRAUDULENT CONCEALMENT
## (BASED ON FLORIDA LAW)

623.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

624.   This claim is brought on behalf of the Florida Subclass.

625.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

626.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

627.   FCA knew these representations were false when made.

628.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

629.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

630.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

631.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

632.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

633.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

634.   FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

635.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

636.   FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

637.   Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

638.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

639.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

640.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 19

## NEGLIGENT MISREPRESENTATION
## (BASED ON FLORIDA LAW)

641.  Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

642.  This claim is brought on behalf of the Florida Subclass.

643.  FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

644.  FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

645.  Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 20

### UNJUST ENRICHMENT
### (BASED ON FLORIDA LAW)

646.  Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

647.  This claim is brought on behalf of the Florida Subclass.

648.  Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

649.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

650.   Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**D.**     **Claims Brought on Behalf of the Idaho Subclass**

## COUNT 21

### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CODE ANN. § 48-601 *et seq.*)

651.    Plaintiff Desiree Tarro ("Plaintiffs" for purposes of all Idaho Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

652.   This claim is brought on behalf of the Idaho Subclass.

653.   The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including but not limited to (1) representing that the Defective Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised and certified; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any

unconscionable method, act or practice in the conduct of trade or commerce. *See* IDAHO CODE ANN. § 48-603.

654.   Idaho Plaintiff, the Idaho Subclass, and FCA are each "persons" under IDAHO CODE ANN. § 48-602(1).

655.   FCA's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CODE ANN. § 48-602(2).

656.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

657. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

658. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to

describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

659.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

660.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

661.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

662.   FCA knew or should have known that its conduct violated this statute.

663.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

664.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

665.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

666.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

667.   Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

668.   Pursuant to IDAHO CODE ANN. § 48-608, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

669.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

670.   Plaintiffs also seek punitive damages against FCA because its conduct evidences an extreme deviation from reasonable standards. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 22

## BREACH OF CONTRACT
## (BASED ON IDAHO LAW)

671.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

672.   This claim is brought on behalf of the Idaho Subclass.

673.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

674.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

675.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 23

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON IDAHO LAW)

676.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

677.   This claim is brought on behalf of the Idaho Subclass.

678.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

679.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

680.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

681.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

682.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

683.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 24

### FRAUDULENT CONCEALMENT
### (BASED ON IDAHO LAW)

684.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

685.   This claim is brought on behalf of the Idaho Subclass.

686.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

687.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

688.   FCA knew these representations were false when made.

689.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

690.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

691.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

692.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

693.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

694.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

695.   FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not

just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

696. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

697. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

698. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the

Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

699. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

700. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

701. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 25

## NEGLIGENT MISREPRESENTATION
### (BASED ON IDAHO LAW)

702.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

703.   This claim is brought on behalf of the Idaho Subclass.

704.   FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

705.   FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

706.   Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 26

## UNJUST ENRICHMENT
### (BASED ON IDAHO LAW)

707.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

708.    This claim is brought on behalf of the Idaho Subclass.

709.    Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

710.    FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

711.    Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**E.    Claims Brought on Behalf of the Illinois Subclass**

**COUNT 27**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A)**

712.    Plaintiffs Amber Wood and Thomas Weiner ("Plaintiffs" for purposes of all Illinois Subclass claims) incorporate by reference all paragraphs as though fully set forth herein.

713.    This claim is brought on behalf of the Illinois Subclass.

714.    FCA is a "person" as that term is defined in 815 ILCS 505/1(c).

715.  Plaintiffs and Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

716.  The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

717.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American

consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

718.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

719.  Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false

and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

720.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

721.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

722.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

723.   FCA knew or should have known that its conduct violated this statute.

724.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material

facts from Plaintiffs and the Class that contradicted these representations; and/or

c.     Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

725.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

726.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

727.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

728.    Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

729.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Class seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

730.    Plaintiffs also seeks punitive damages, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq*.

731.    On May 22, 2020, a copy of the *Davis, et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney General of the State of Illinois in accordance with 815 ILCS 505/10a(d).

## COUNT 28

## BREACH OF CONTRACT
## (BASED ON ILLINOIS LAW)

732.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

733.    This claim is brought on behalf of Illinois Subclass.

734.    FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those

misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

735.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

736.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 29

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON ILLINOIS LAW)

737.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

738.   This claim is brought on behalf of the Illinois Subclass.

739.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

740.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

741.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

742.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

743.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

744.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 30

## FRAUDULENT CONCEALMENT
## (BASED ON ILLINOIS LAW)

745.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

746.   This claim is brought on behalf of Illinois Subclass.

747.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

748.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

749.   FCA knew these representations were false when made.

750.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

751.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

752.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

753.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not

know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

754.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

755.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

756.   FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil

consumption or emission levels of the vehicles. Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

757.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

758.   FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

759.   Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

760.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

761.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

762.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the

Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 31

## NEGLIGENT MISREPRESENTATION
## (BASED ON ILLINOIS LAW)

763. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

764. This claim is brought on behalf of the Illinois Subclass.

765. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

766. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

767. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 32

## UNJUST ENRICHMENT
## (BASED ON ILLINOIS LAW)

768.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

769.   This claim is brought on behalf of the Illinois Subclass.

770.   Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

771.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

772.   Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**F.     Claims brought on behalf of the Kansas Subclass**

## COUNT 33

### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### (KAN. STAT. ANN. § 50-623 *et seq.*)

773.   Plaintiff Rebekah Aaren Wright ("Plaintiffs" for purposes of all Kansas Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

774.   This claim is brought on behalf of the Kansas Subclass.

775.   Plaintiffs and Kansas Class members are "consumers" within the meaning of KAN. STAT. ANN. § 50-624(b) who purchased or leased one or more Defective Vehicles.

776.   Each sale or lease of a Defective Vehicle to Plaintiffs was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

777.   The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-626(a). Deceptive acts or practices include but are not limited to "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact" and "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." KAN. STAT. ANN. § 50-626.

778.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing

the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

779.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

780.   Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

781.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

782.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

783.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

784.   FCA knew or should have known that its conduct violated this statute.

785.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

  a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

  b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

  c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

786.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

787.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

788.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

789.   Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

790.   Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

791.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN. § 50-623 *et seq.*

792.  Plaintiffs and the Class also seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 34

## BREACH OF CONTRACT
## (BASED ON KANSAS LAW)

793.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

794.   This claim is brought on behalf of the Kansas Subclass.

795.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

796.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

797.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 35

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON KANSAS LAW)

798.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

799.   This claim is brought on behalf of the Kansas Subclass.

800.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

801.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

802.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

- 276 -

803.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

804.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

805.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 36

## FRAUDULENT CONCEALMENT
### (BASED ON KANSAS LAW)

806.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

807.   This claim is brought on behalf of the Kansas Subclass.

808.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

809.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

810.   FCA knew these representations were false when made.

811.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

812.  FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

813.  As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

814.  The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

815.  Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

816.  FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle

emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

817.  FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing

safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

818.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

819.   FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

820.   Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

821.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for

their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

822.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

823.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 37

## NEGLIGENT MISREPRESENTATION
## (BASED ON KANSAS LAW)

824.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

825.   This claim is brought on behalf of the Kansas Subclass.

826.   FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

827.   FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

828.   Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

**COUNT 38**

**UNJUST ENRICHMENT
(BASED ON KANSAS LAW)**

829.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

830.   This claim is brought on behalf of the Kansas Subclass.

831.   Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

832.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

833.   Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**G.   Claims Brought on Behalf of the Louisiana Subclass**

**COUNT 39**

**VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(LA. REV. STAT. § 51:1401 *et seq.*)**

834.   Plaintiff Cheryl Miller ("Plaintiffs" for purposes of all Louisiana Subclass claims) reallege and incorporate by reference all paragraphs as though fully set forth herein.

835.   This claim is brought on behalf of Louisiana purchasers or lessees who are members of the Class.

836.   FCA, Plaintiffs, and the Class are "persons" within the meaning of LA. REV. STAT. § 51:1402(8).

837.   Plaintiffs and the Class are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

838.   FCA engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

839.   The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "deceptive acts or practices in the conduct of any

trade or commerce." LA. REV. STAT. § 51:1405(A). FCA participated in misleading, false, or deceptive acts that violated the Louisiana CPL including failing to disclose the actual fuel economy of the Defective Vehicles.

840.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

841.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

842.   Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

843.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

844.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

845.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

846.   FCA knew or should have known that its conduct violated this statute.

847.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

   b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

   c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

848.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

849.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

850.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

851.   Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

852.   Pursuant to LA. REV. STAT. § 51:1409, Plaintiffs and the Class seek to recover actual damages in an amount to be determined at trial; treble damages for

FCA's knowing violations of the Louisiana CPL; an order enjoining FCA's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

853.   Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

854.   On May 22, 2020, a copy of the *Davis, et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney General of the State of Louisiana in accordance with LA. REV. STAT. § 51:1409.

## COUNT 40

## BREACH OF CONTRACT
## (BASED ON LOUISIANA LAW)

855.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

856.   This claim is brought on behalf of the Louisiana Subclass.

857.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less

expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

858.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

859.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 41

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON LOUISIANA LAW)

860.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

861.   This claim is brought on behalf of the Louisiana Subclass.

862.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

863.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

864.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

865.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

866.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

867.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 42

### FRAUDULENT CONCEALMENT
### (BASED ON LOUISIANA LAW)

868.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

869.   This claim is brought on behalf of the Louisiana Subclass.

870.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

871.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

872.   FCA knew these representations were false when made.

873.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

874.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

875.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

876.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

877.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

878.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

879.   FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

880.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

881.   FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

882.   Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

883.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

884.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

885.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 43

## NEGLIGENT MISREPRESENTATION
## (BASED ON LOUISIANA LAW)

886.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

887.   This claim is brought on behalf of the Louisiana Subclass.

888.   FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

889.   FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

890.   Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 44

## UNJUST ENRICHMENT
## (BASED ON LOUISIANA LAW)

891.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

892.   This claim is brought on behalf of the Louisiana Subclass.

893.   Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

894.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

895.   Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## H.   Claims Brought on Behalf of the Maryland Subclass

### COUNT 45

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101 *et seq.*)

896.   Plaintiff Pamela Anderson ("Plaintiffs" for purposes of all Maryland Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

897.   This claim is brought on behalf of the Maryland Subclass.

898.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302.

899.  FCA, Plaintiffs, and Class members are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

900.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

901.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

902.   Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to

describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

903.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

904.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

905.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

906.   FCA knew or should have known that its conduct violated this statute.

907.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

908.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

909.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

910.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

911.   Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

912.   Pursuant to MD. CODE ANN., COM. LAW § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

913.   Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 46

### BREACH OF CONTRACT
### (BASED ON MARYLAND LAW)

914.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

915.   This claim is brought on behalf of the Maryland Subclass.

916.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

917.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

918.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 47

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON MARYLAND LAW)

919.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

920.   This claim is brought on behalf of the Maryland Subclass.

921.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

922.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

923.  As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

924.  Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

925.  Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

926.  Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 48

## FRAUDULENT CONCEALMENT
## (BASED ON MARYLAND LAW)

927.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

928.   This claim is brought on behalf of the Maryland Subclass.

929.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

930.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

931.   FCA knew these representations were false when made.

932.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

933.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

934.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

935.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

936.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

937.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

938.   FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

939.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

940.   FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

941.   Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

942.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

943.   Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

944.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 49

## NEGLIGENT MISREPRESENTATION
## (BASED ON MARYLAND LAW)

945.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

946.   This claim is brought on behalf of the Maryland Subclass.

947.   FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

948.   FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

949.   Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 50

## UNJUST ENRICHMENT
## (BASED ON MARYLAND LAW)

950.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

951.   This claim is brought on behalf of the Maryland Subclass.

952.   Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

953.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

954.  Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## I.   Claims brought on behalf of the Massachusetts Subclass

### COUNT 51

### VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)

955.  Plaintiff Catherine Coppinger ("Plaintiffs" for purposes of all Massachusetts Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

956.   This claim is brought on behalf of the Massachusetts Subclass.

957.   Defendant is a "person" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

958.. Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. FCA participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

959. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

960.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

961.   Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

962.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

963.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

964.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

965.   FCA knew or should have known that its conduct violated this statute.

966.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

967.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

968.  Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

969.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

970.  Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

971.  Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Class seek monetary relief against FCA measured as the greater of (a) actual damages in an

amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Class member. Because FCA's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Class member, up to three times actual damages, but no less than two times actual damages.

972.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees costs, and any other just and proper relief available under the Massachusetts Act.

973.   Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct

974.   On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with MASS. GEN. LAWS CH. 93A, § 9(3) to FCA.

## COUNT 52

## BREACH OF CONTRACT
## (BASED ON MASSACHUSETTS LAW)

975.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

976.   This claim is brought on behalf of the Massachusetts Subclass.

977.   FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to

make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

978.   Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

979.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 53

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON MASSACHUSETTS LAW)

980.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

981.   This claim is brought on behalf of the Massachusetts Subclass.

982.   FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

983.   FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

984.   As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

985.   Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

986.   Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and

Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

987.   Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 54

### FRAUDULENT CONCEALMENT
### (BASED ON MASSACHUSETTS LAW)

988.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

989.   This claim is brought on behalf of the Massachusetts Subclass.

990.   FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

991.   The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

992.   FCA knew these representations were false when made.

993.   FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

994.   FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

995.   As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

996.   The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

997.   Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

998.   FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

999.  FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty

to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.   Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1000. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1001. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1002. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1003. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1004. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1005. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 55

## NEGLIGENT MISREPRESENTATION
## (BASED ON MASSACHUSETTS LAW)

1006. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1007. This claim is brought on behalf of the Massachusetts Subclass.

1008. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1009. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1010. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 56

## UNJUST ENRICHMENT
## (BASED ON MASSACHUSETTS LAW)

1011. Plaintiff reallege and incorporate by reference all paragraphs alleged herein.

1012. This claim is brought on behalf of the Massachusetts Subclass.

1013. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1014. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1015. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**J.      Claims Brought on Behalf of the Michigan Subclass**

## COUNT 57

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MICH. COMP. LAWS § 445.903 *et seq.*)

1016. Plaintiffs Caren Christman and Kelly Johnson ("Plaintiffs" for purposes of all Michigan Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1017. This claim is brought on behalf of the Michigan Subclass.

1018. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

1019. Plaintiffs and Class members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

1020. FCA is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

1021. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1022. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1023. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1024. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1025. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1026. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1027. FCA knew or should have known that its conduct violated this statute.

1028. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1029. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to

warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1030. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1031. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1032. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1033. Plaintiffs and the Class seek injunctive relief to enjoin FCA from continuing their unfair and deceptive acts; monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

1034. Plaintiffs also seek punitive damages because FCA carried out despicable conduct with willful and conscious disregard of the rights of others. FCA's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 58

### BREACH OF CONTRACT
### (BASED ON MICHIGAN LAW)

1035. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1036. This claim is brought on behalf of the Michigan Subclass.

1037. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1038. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1039. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 59

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON MICHIGAN LAW)

1040. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1041. This claim is brought on behalf of the Michigan Subclass.

1042. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1043. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1044. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1045. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1046. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1047. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 60

## FRAUDULENT CONCEALMENT
## (BASED ON MICHIGAN LAW)

1048. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1049. This claim is brought on behalf of the Michigan Subclass.

1050. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1051. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1052. FCA knew these representations were false when made.

1053. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1054. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1055. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1056. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1057. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1058. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1059. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1060. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1061. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1062. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1063. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1064. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1065. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 61

### NEGLIGENT MISREPRESENTATION
### (BASED ON MICHIGAN LAW)

1066. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1067. This claim is brought on behalf of the Michigan Subclass.

1068. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1069. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1070. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 62

### UNJUST ENRICHMENT
### (BASED ON MICHIGAN LAW)

1071. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1072. This claim is brought on behalf of the Michigan Subclass.

1073. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1074. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1075. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**K.    Claims Brought on Behalf of the Minnesota Subclass**

**COUNT 63**

**VIOLATION OF THE MINNESOTA
PREVENTION OF CONSUMER FRAUD ACT
(MINN. STAT. § 325F.68 *et seq.*)**

1076. Plaintiff Holly Kundel ("Plaintiffs" for purposes of all Minnesota Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1077. This claim is brought on behalf of the Minnesota Subclass.

1078. The Defective Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

1079. The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

1080. FCA's actions as set forth herein occurred in the conduct of trade or commerce.

1081. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety

hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1082. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1083. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods

of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1084. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1085. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1086. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1087. FCA knew or should have known that its conduct violated this statute.

1088. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

      c.     Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1089. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1090. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1091. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1092. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1093. Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1094. Plaintiffs and the Class also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights of others.

## COUNT 64

### VIOLATION OF THE MINNESOTA
### DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48 *ET SEQ.*)

1095. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1096. This claim is brought on behalf of the Minnesota Subclass.

1097. The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which include "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection

with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

1098. FCA's actions as set forth herein occurred in the conduct of trade or commerce.

1099. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1100. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1101. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1102. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1103. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1104. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1105. FCA knew or should have known that its conduct violated this statute.

1106. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1107. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1108. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1109. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1110. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1111. Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

1112. Plaintiffs and the Class also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights of others.

**COUNT 65**

**BREACH OF CONTRACT**
**(BASED ON MINNESOTA LAW)**

1113. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1114. This claim is brought on behalf of the Minnesota Subclass.

1115. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1116. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1117. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 66

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON MINNESOTA LAW)

1118. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1119. This claim is brought on behalf of the Minnesota Subclass.

1120. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1121. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1122. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1123. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1124. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1125. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

**COUNT 67**

**FRAUDULENT CONCEALMENT**
**(BASED ON MINNESOTA LAW)**

1126. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1127. This claim is brought on behalf of the Minnesota Subclass.

1128. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1129. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1130. FCA knew these representations were false when made.

1131. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1132. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1133. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1134. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1135. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1136. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1137. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles. Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1138. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1139. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1140. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1141. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1142. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1143. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 68

## NEGLIGENT MISREPRESENTATION
## (BASED ON MINNESOTA LAW)

1144. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1145. This claim is brought on behalf of the Minnesota Subclass.

1146. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1147. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1148. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 69

## UNJUST ENRICHMENT
## (BASED ON MINNESOTA LAW)

1149. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1150. This claim is brought on behalf of the Minnesota Subclass.

1151. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1152. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1153. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**L.      Claims Brought on Behalf of the Missouri Subclass**

**COUNT 70**

**VIOLATION OF THE MISSOURI
MERCHANDISING PRACTICES ACT
(MO. REV. STAT. § 407.010, *ET SEQ.*)**

1154. Plaintiff Ryan Hall ("Plaintiffs" for purposes of all Missouri Subclass claims) incorporate by reference all paragraphs as though fully set forth herein.

1155. This claim is brought on behalf of the Missouri Subclass.

1156. FCA, Missouri Plaintiffs and the Missouri Subclass are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

1157. FCA engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

1158. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

1159. In the course of FCA's business, it willfully failed to disclose and actively concealed the true mileage of the Defective Vehicles, which is less than a reasonable consumer would expect in light of FCA's advertising campaign. Accordingly, FCA used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA. FCA's conduct offends public policy; is unethical, oppressive, or unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

1160. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil

Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1161. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels

and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1162. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1163. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1164. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1165. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1166. FCA knew or should have known that its conduct violated this statute.

1167. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.      Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.      Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.      Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1168. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1169. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1170. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1171. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1172. As a direct and proximate result of FCA's violations of the Missouri MPA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

1173. FCA is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining FCA's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

1174. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

1175. On May 22, 2020, a copy of the *Davis, et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney

General of the State of Missouri in accordance with Mo. Ann. Stat. § 407.010, *et seq.*

## COUNT 71

### BREACH OF CONTRACT
### (BASED ON MISSOURI LAW)

1176. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1177. This claim is brought on behalf of the Missouri Subclass.

1178. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1179. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by

misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1180. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 72

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON MISOURI LAW)

1181. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1182. This claim is brought on behalf of the Missouri Subclass.

1183. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1184. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1185. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective

Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1186. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1187. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1188. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 73

## FRAUDULENT CONCEALMENT
## (BASED ON MISSOURI LAW)

1189. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1190. This claim is brought on behalf of the Missouri Subclass.

1191. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1192. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1193. FCA knew these representations were false when made.

1194. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1195. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1196. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1197. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1198. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1199. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels

of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1200. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA

represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1201. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1202. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1203. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1204. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1205. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1206. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 74

## NEGLIGENT MISREPRESENTATION
## (BASED ON MISSOURI LAW)

1207. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1208. This claim is brought on behalf of the Missouri Subclass.

1209. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1210. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1211. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

**COUNT 75**

**UNJUST ENRICHMENT**
**(BASED ON MISSOURI LAW)**

1212. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1213. This claim is brought on behalf of the Missouri Subclass.

1214. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1215. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1216. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**M.   Claims Brought on Behalf of the Nevada Subclass**

**COUNT 76**

**VIOLATION OF THE NEVADA**
**DECEPTIVE TRADE PRACTICES ACT**
**(NEV. REV. STAT. § 598.0903 *et seq.*)**

1217. Plaintiff Roberto Hernandez ("Plaintiffs" for purposes of all Nevada Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1218. This claim is brought on behalf of the Nevada Subclass.

1219. The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "[r]epresents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they

are of another standard, quality, grade, style or model"; "[a]dvertises goods or services with intent not to sell or lease them as advertised and certified"; or "[k]nowingly makes any other false representation in a transaction." NEV. REV. STAT. §§ 598.0915–598.0925.

1220. FCA engaged in deceptive trade practices that violated the Nevada DTPA when FCA knowingly failed to disclose that the Defective Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1221. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1222. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the

- 376 -

representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1223. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1224. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1225. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1226. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1227. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1228. FCA knew or should have known that its conduct violated this statute.

1229. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

     b.     Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

     c.     Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1230. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1231. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1232. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1233. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1234. Accordingly, Plaintiffs and the Class seek their actual damages, punitive damages, an order enjoining FCA's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

## COUNT 77

## BREACH OF CONTRACT
## (BASED ON NEVADA LAW)

1235. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1236. This claim is brought on behalf of the Nevada Subclass.

1237. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1238. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1239. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 78

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON NEVADA LAW)

1240. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1241. This claim is brought on behalf of the Nevada Subclass.

1242. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1243. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1244. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1245. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1246. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1247. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 79

## FRAUDULENT CONCEALMENT
## (BASED ON NEVADA LAW)

1248. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1249. This claim is brought on behalf of the Nevada Subclass.

1250. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1251. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1252. FCA knew these representations were false when made.

1253. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1254. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1255. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1256. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1257. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1258. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1259. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1260. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1261. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1262. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1263. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1264. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1265. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 80

### NEGLIGENT MISREPRESENTATION
### (BASED ON NEVADA LAW)

1266. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1267. This claim is brought on behalf of the Nevada Subclass.

1268. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1269. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1270. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 81

### UNJUST ENRICHMENT
### (BASED ON NEVADA LAW)

1271. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1272. This claim is brought on behalf of the Nevada Subclass.

1273. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1274. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1275. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**N.     Claims Brought on Behalf of the New Jersey Subclass**

**COUNT 82**

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
(N.J. STAT. ANN. § 56:8-1 *ET SEQ.*)**

1276. Plaintiffs Kimberly Eager and Luis Munoz ("Plaintiffs" for purposes of all New Jersey Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1277. This claim is brought on behalf of the New Jersey Subclass.

1278. The New Jersey Consumer Fraud Act (New Jersey CFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial    practice,    deception,    fraud,    false    pretense,    false    promise,

misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

1279. FCA, Plaintiffs, and Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

1280. FCA engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (e). FCA's actions as set forth herein occurred in the conduct of trade or commerce.

1281. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the

representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1282. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1283. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1284. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1285. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1286. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1287. FCA knew or should have known that its conduct violated this statute.

1288. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

  a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

     b.     Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

     c.     Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1289. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1290. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1291. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1292. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1293. Plaintiffs and Class members are entitled to recover legal and/or equitable relief, including an order enjoining FCA's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

1294. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

1295. On May 22, 2020, a copy of the *Davis, et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney General of the State of New Jersey in accordance with N.J.S.A. § 56:8-20.

## COUNT 83

## BREACH OF CONTRACT
## (BASED ON NEW JERSEY LAW)

1296. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1297. This claim is brought on behalf of the New Jersey Subclass.

1298. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1299. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1300. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 84

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON NEW JERSEY LAW)

1301. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1302. This claim is brought on behalf of the New Jersey Subclass.

1303. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1304. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1305. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1306. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1307. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The

Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1308. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 85

### FRAUDULENT CONCEALMENT
### (BASED ON NEW JERSEY LAW)

1309. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1310. This claim is brought on behalf of the New Jersey Subclass.

1311. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1312. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1313. FCA knew these representations were false when made.

1314. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1315. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1316. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1317. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1318. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1319. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1320. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty

to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1321. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1322. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1323. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1324. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1325. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1326. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 86

## NEGLIGENT MISREPRESENTATION
## (BASED ON NEW JERSEY LAW)

1327. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1328. This claim is brought on behalf of the New Jersey Subclass.

1329. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1330. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1331. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 87

### UNJUST ENRICHMENT
### (BASED ON NEW JERSEY LAW)

1332. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1333. This claim is brought on behalf of the New Jersey Subclass.

1334. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1335. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1336. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**O.      Claims Brought on Behalf of the New York Subclass**

**COUNT 88**

**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW**
**(N.Y. GEN. BUS. LAW § 349)**

1337. Plaintiff Sherri McCall ("Plaintiffs" for purposes of all New York Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1338. This claim is brought on behalf of the New York Subclass.

1339. The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349.

1340. New York Plaintiff and the New York Subclass members are "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

1341. FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

1342. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil

- 404 -

Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1343. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1344. Because FCA's deception takes place in the context of public health, its deception affects the public interest. Further, FCA's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

1345. FCA's conduct proximately caused injuries to Plaintiffs and the Class.

1346. Because FCA's willful and knowing conduct caused injury to Plaintiffs and the Class, Plaintiffs and the Class seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining FCA's deceptive conduct; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

1347. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 89

## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
(N.Y. GEN. BUS. LAW § 350)

1348. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1349. This claim is brought on behalf of the New York Subclass.

1350. The New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

1351. FCA caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and Class members.

1352. FCA has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the oil consumption, emission levels, and safety and reliability of the Defective Vehicles as described above, were material and likely to deceive a reasonable consumer.

1353. Plaintiffs and Class members have suffered injury, including the loss of money or property, as a result of FCA's false advertising. In purchasing or leasing their Defective Vehicles, Plaintiffs and Class members relied on the representations and/or omissions of FCA with respect to the oil consumption, emission levels, and safety and reliability of the Defective Vehicles. FCA's representations turned out to be untrue as described herein. Had Plaintiffs and Class members known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

1354. Accordingly, Plaintiffs and the Class overpaid for their Defective Vehicles and did not receive the benefit of the bargain for their Defective Vehicles, which have also suffered diminution in value.

1355. Because FCA fraudulently concealed the true oil consumption, emission levels, and safety and reliability of the Defective Vehicle, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth less than they otherwise would be.

1356. Plaintiffs, individually and on behalf of Class members, request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful and/or deceptive practices. Plaintiffs and Class members are also entitled to recover their actual damages or $500, whichever is greater. Because FCA acted willfully or knowingly, Plaintiffs and Class members are entitled to recover three times actual damages, up to $10,000.

## COUNT 90

## BREACH OF CONTRACT
## (BASED ON NEW YORK LAW)

1357. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1358. This claim is brought on behalf of the New York Subclass.

1359. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those

misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1360. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1361. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 91

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON NEW YORK LAW)

1362. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1363. This claim is brought on behalf of the New York Subclass.

1364. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1365. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1366. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1367. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1368. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1369. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 92

### FRAUDULENT CONCEALMENT
### (BASED ON NEW YORK LAW)

1370. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1371. This claim is brought on behalf of the New York Subclass.

1372. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1373. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1374. FCA knew these representations were false when made.

1375. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1376. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1377. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1378. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not

know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1379. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1380. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1381. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete

without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1382. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1383. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1384. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1385. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1386. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1387. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the

Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 93

### NEGLIGENT MISREPRESENTATION
### (BASED ON NEW YORK LAW)

1388. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1389. This claim is brought on behalf of the New York Subclass.

1390. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1391. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1392. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 94

### UNJUST ENRICHMENT
### (BASED ON NEW YORK LAW)

1393. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1394. This claim is brought on behalf of the New York Subclass.

1395. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1396. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1397. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**P.    Claims Brought on Behalf of the North Carolina Subclass**

### COUNT 95

### VIOLATION OF THE NORTH CAROLINA UNFAIR
### AND DECEPTIVE ACTS AND PRACTICES ACT
### (N.C. GEN. STAT. § 75-1.1 *et seq.*)

1398. Plaintiff Joshua Caples ("Plaintiffs" for purposes of all North Carolina Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1399. This claim is brought on behalf of North Carolina Subclass.

1400. North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" N.C. GEN. STAT. § 75-1.1(a). The North Carolina Act provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the North Carolina Act. N.C. GEN. STAT. § 75-16.

1401. FCA's acts and practices complained of herein were performed in the course of FCA's trade or business and thus occurred in or affected "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

1402. FCA engaged in deceptive trade practices that violated the North Carolina ACT when FCA knowingly failed to disclose that the Defective Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1403. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1404. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between

recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1405. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they

become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1406. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1407. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1408. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

- 420 -

1409. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1410. FCA knew or should have known that its conduct violated this statute.

1411. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1412. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their

vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1413. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1414. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1415. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1416. Plaintiffs seek monetary relief against FCA in an amount to be determined at trial.

1417. FCA acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result, such than an award of punitive damages is appropriate.

1418. Plaintiffs, individually and on behalf of the Class, seek an order for treble his actual damages, an order enjoining FCA's unlawful acts, punitive damages

costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## COUNT 96

## BREACH OF CONTRACT
## (BASED ON NORTH CAROLINA LAW)

1419. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1420. This claim is brought on behalf of the North Carolina Subclass.

1421. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1422. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by

- 423 -

misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1423.  As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 97

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON NORTH CAROLINA LAW)

1424.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1425.  This claim is brought on behalf of the North Carolina Subclass.

1426.  FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1427.  FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1428.  As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective

Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1429. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1430. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1431. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 98

## FRAUDULENT CONCEALMENT
## (BASED ON NORTH CAROLINA LAW)

1432. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1433. This claim is brought on behalf of the North Carolina Subclass.

1434. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1435. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1436. FCA knew these representations were false when made.

1437. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1438. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1439. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1440. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1441. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1442. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels

of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1443. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA

represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1444. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1445. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1446. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1447. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1448. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1449. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 99

### NEGLIGENT MISREPRESENTATION
### (BASED ON NORTH CAROLINA LAW)

1450. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1451. This claim is brought on behalf of the North Carolina Subclass.

1452. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1453. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1454. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 100

## UNJUST ENRICHMENT
## (BASED ON NORTH CAROLINA LAW)

1455. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1456. This claim is brought on behalf of the North Carolina Subclass.

1457. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1458. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1459. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**Q.    Claims Brought on Behalf of the Ohio Subclass**

**COUNT 101**

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
(OHIO REV. CODE ANN. § 1345.01 *ET SEQ.*)**

1460. Plaintiffs Mikaelyn McDowell, Krishawn Durham, Katie Kuczkowski, and Danielle Coates ("Plaintiffs" for purposes of all Ohio Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1461. This claim is brought on behalf of the Ohio Subclass.

1462. Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised and certified, and (4) engaging in acts or practices which are otherwise unfair,

misleading, false, or deceptive to the consumer. OHIO REV. CODE ANN. § 1345.02. FCA participated in misleading, false, or deceptive acts that violated the Ohio CSPA.

1463. FCA is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C).

1464. Ohio Plaintiff and the Ohio Subclass members are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchase or lease of one or more Defective Vehicles is a "consumer transaction" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

1465. FCA engaged in deceptive trade practices that violated the Ohio CSPA when FCA knowingly failed to disclose that the Defective Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1466. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1467. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective

Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1468. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively

concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1469. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1470. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1471. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1472. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1473. FCA knew or should have known that its conduct violated this statute.

1474. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1475. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1476. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of FCA in

this Complaint, including but not limited to the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

a. *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b. *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f. *State ex rel. Jim Petro v. Craftmatic Org., Inc.* (OPIF #10002347);

g. *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h. *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i. *Brinkman v. Mazda Motor of Am., Inc.* (OPIF #10001427);

j. *Khouri v. Don Lewis* (OPIF #100001995);

k. *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l. *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

   m. *Brown v. Spears* (OPIF #10000403).

1477. FCA's omissions and/or misrepresentations about the fuel consumption of the Defective Vehicles were material to Plaintiffs and the Class.

1478. Plaintiffs and the Class suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Class members who purchased the Defective Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Ohio CSPA.

1479. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Ohio CSPA. As a direct and proximate result of FCA's violations of the Ohio CSPA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

1480. FCA's violations present a continuing risk to Plaintiffs and the Class as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1481. Because FCA fraudulently concealed the true oil consumption, emission levels, and safety and reliability of the Defective Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly diminished. In light of the stigma attached to

those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1482. As a result of the foregoing wrongful conduct, Plaintiffs and the Class have been damaged in an amount to be proven at trial and seek all just and proper remedies, including but not limited to actual and statutory damages, an order enjoining FCA's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE ANN. § 1345.09 *et seq.*

1483. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 102

## BREACH OF CONTRACT
## (BASED ON OHIO LAW)

1484. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1485. This claim is brought on behalf of the Ohio Subclass.

1486. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective

Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1487. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1488. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 103

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(BASED ON OHIO LAW)

1489. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1490. This claim is brought on behalf of the Ohio Subclass.

1491. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1492. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1493. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1494. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1495. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1496. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 104

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

1497. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1498. This claim is brought on behalf of the Ohio Subclass.

1499. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1500. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1501. FCA knew these representations were false when made.

1502. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1503. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1504. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1505. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1506. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1507. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1508. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1509. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1510. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1511. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1512. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1513. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1514. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 105

### NEGLIGENT MISREPRESENTATION
### (BASED ON OHIO LAW)

1515. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1516. This claim is brought on behalf of the Ohio Subclass.

1517. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1518. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1519. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 106

### UNJUST ENRICHMENT
### (BASED ON OHIO LAW)

1520. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1521. This claim is brought on behalf of the Ohio Subclass.

1522. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1523. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1524. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

R.    **Claims Brought on Behalf of the Oklahoma Subclass**

### COUNT 107

### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *et seq.*)

1525. Plaintiff Kelsey Williams ("Plaintiffs" for purposes of all Oklahoma Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1526. This claim is brought on behalf of the Oklahoma Subclass.

1527. The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making a "misrepresentation, omission or other practice that has deceived

or could reasonably be expected to deceive or mislead a person to the detriment of that person" and "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." OKLA. STAT. TIT. 15, §§ 752–753.

1528. Oklahoma Plaintiff and the Oklahoma Subclass members are "persons" under OKLA. STAT. TIT. 15, § 752.

1529. FCA is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

1530. The sale or lease of a Defective Vehicle to Plaintiff was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15, § 752 and FCA's actions as set forth herein occurred in the conduct of trade or commerce.

1531. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the

representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1532. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1533. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1534. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1535. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1536. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1537. FCA knew or should have known that its conduct violated this statute.

1538. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.      Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.      Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1539. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1540. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1541. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1542. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1543. Because FCA's unconscionable conduct caused injury to Plaintiffs and the Class, Plaintiff and the Class seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiffs and the Class further seek an order enjoining FCA's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

1544. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 108

## BREACH OF CONTRACT
## (BASED ON OKLAHOMA LAW)

1545. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1546. This claim is brought on behalf of the Oklahoma Subclass.

1547. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1548. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1549. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 109

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON OKLAHOMA LAW)

1550. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1551. This claim is brought on behalf of the Oklahoma Subclass.

1552. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1553. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1554. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1555. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1556. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The

Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1557. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 110

## FRAUDULENT CONCEALMENT
## (BASED ON OKLAHOMA LAW)

1558. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1559. This claim is brought on behalf of the Oklahoma Subclass.

1560. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

- 456 -

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1561.  The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1562.  FCA knew these representations were false when made.

1563.  FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1564. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1565.  As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1566. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1567. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1568. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1569. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty

to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1570. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1571. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1572. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1573. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1574. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1575. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 111

## NEGLIGENT MISREPRESENTATION
## (BASED ON OKLAHOMA LAW)

1576. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1577. This claim is brought on behalf of the Oklahoma Subclass.

1578. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1579. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1580. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 112

## UNJUST ENRICHMENT
## (BASED ON OKLAHOMA LAW)

1581. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1582. This claim is brought on behalf of the Oklahoma Subclass.

1583. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1584. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1585. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

S.      **Claims Brought on Behalf of the Oregon Subclass**

## COUNT 113

### VIOLATION OF THE OREGON
### UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. § 646.605 *et seq.*)

1586. Plaintiffs Daniel Scott and Ryan Graham ("Plaintiffs" for purposes of all Oregon Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1587. This claim is brought on behalf of the Oregon Subclass.

1588. The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: representing that goods have characteristics uses, benefits, or qualities that they do not have; representing that goods are of a particular standard or quality if they are of another; advertising goods or services with intent not to provide them as advertised and certified; and engaging in any other unfair or deceptive conduct in trade or commerce. OR. REV. STAT. § 646.608(1).

1589. FCA is a person within the meaning of OR. REV. STAT. § 646.605(4).

1590. Each Defective Vehicle is a "good" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

1591. FCA engaged in unlawful trade practices that violated the Oregon UTPA when FCA knowingly failed to disclose that the Defective Vehicles did not

have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1592. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1593. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1594. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1595. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1596. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1597. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1598. FCA knew or should have known that its conduct violated this statute.

1599. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1600. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1601. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1602. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1603. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1604. Plaintiffs and the Class are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1). Plaintiffs and the Class

- 467 -

are also entitled to punitive damages because FCA engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

1605. On [insert], a copy of the complaint was mailed to the Attorney General of the State of Oregon in accordance with OR. REV. STAT. § 646.638(2).

## COUNT 114

## BREACH OF CONTRACT
## (BASED ON OREGON LAW)

1606. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1607. This claim is brought on behalf of the Oregon Subclass.

1608. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1609. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1610. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 115

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON OREGON LAW)

1611. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1612. This claim is brought on behalf of the Oregon Subclass.

1613. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1614. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1615. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1616. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1617. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1618. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

- 470 -

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 116

## FRAUDULENT CONCEALMENT
## (BASED ON OREGON LAW)

1619. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1620. This claim is brought on behalf of the Oregon Subclass.

1621. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1622. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1623. FCA knew these representations were false when made.

1624. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1625. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1626. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1627. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1628. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1629. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1630. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1631. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1632. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1633. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1634. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1635. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1636. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 117

## NEGLIGENT MISREPRESENTATION
### (BASED ON OREGON LAW)

1637. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1638. This claim is brought on behalf of the Oregon Subclass.

1639. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1640. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1641. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 118

## UNJUST ENRICHMENT
### (BASED ON OREGON LAW)

1642. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1643. This claim is brought on behalf of the Oregon Subclass.

1644. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1645. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1646. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**T.     Claims Brought on Behalf of the Pennsylvania Subclass**

**COUNT 119**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1 *ET SEQ.*)**

1647. Plaintiffs Daniel McGorrey and Karen Burke ("Plaintiffs" for purposes of all Pennsylvania Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1648. This claim is brought on behalf of the Pennsylvania Subclass.

1649. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they

do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised and certified; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 PA. CONS. STAT. § 201-2(4).

1650. FCA, Plaintiffs, and Class members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

1651. Plaintiffs purchased a Defective Vehicle primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

1652. All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

1653. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the

representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1654. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1655. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1656. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1657. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1658. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1659. FCA knew or should have known that its conduct violated this statute.

1660. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a.   Possessed superior/exclusive knowledge of the design of the
        Defective Vehicles;

b.  Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.  Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1661. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1662. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1663. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1664. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1665. FCA is liable to Plaintiffs and the Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a). Plaintiffs and the Class are also entitled to an award of punitive damages given that FCA's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 120

## BREACH OF CONTRACT
## (BASED ON PENNSYLVANIA LAW)

1666. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1667. This claim is brought on behalf of the Pennsylvania Subclass.

1668. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those

misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1669. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1670. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 121

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON PENNSYLVANIA LAW)

1671. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 483 -

1672. This claim is brought on behalf of the Pennsylvania Subclass.

1673. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1674. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1675. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1676. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1677. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1678. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 122

## FRAUDULENT CONCEALMENT
### (BASED ON PENNSYLVANIA LAW)

1679. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1680. This claim is brought on behalf of the Pennsylvania Subclass.

1681. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1682.  The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1683.  FCA knew these representations were false when made.

1684.  FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1685.  FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1686.  As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1687.  The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not

know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1688. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1689. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1690. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete

without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1691. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1692. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1693. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1694. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1695. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1696. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the

Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 123

### NEGLIGENT MISREPRESENTATION
### (BASED ON PENNSYLVANIA LAW)

1697. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1698. This claim is brought on behalf of the Pennsylvania Subclass.

1699. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1700. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1701. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 124

### UNJUST ENRICHMENT
### (BASED ON PENNSYLVANIA LAW)

1702. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1703. This claim is brought on behalf of the Pennsylvania Subclass.

1704. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1705. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1706. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**U.   Claims Brought on Behalf of the South Carolina Subclass**

**COUNT 125**

**VIOLATION OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT
(S.C. CODE ANN. § 39-5-10 *et seq.*)**

1707. Plaintiff Rosalind Burks ("Plaintiffs" for purposes of all South Carolina Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1708. This claim is brought on behalf of the South Carolina Subclass.

1709. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

1710. FCA is a "person" under S.C. CODE ANN. § 39-5-10.

1711. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1712. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1713. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1714. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1715. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1716. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1717. FCA knew or should have known that its conduct violated this statute.

1718. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.  Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.  Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.  Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1719. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1720. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1721. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1722. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1723. Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs and the Class seek monetary relief to recover their economic losses. Because FCA's actions were willful and knowing, Plaintiffs and the Class' damages should be trebled.

1724. Plaintiffs and the Class further allege that FCA's malicious and deliberate conduct warrants an assessment of punitive damages because it carried out despicable conduct with willful and conscious disregard of the rights of others. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1725. Plaintiffs and the Class further seek an order enjoining each FCA's unfair or deceptive acts or practices.

## COUNT 126

## VIOLATION OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *et seq.*)

1726. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1727. This claim is brought on behalf of the South Carolina Subclass.

1728. FCA is a "manufacturer" under S.C. CODE ANN. § 56-15-10.

1729. FCA participated in unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act

("Dealers Act") by willfully failing to disclose the Defective Vehicles' true oil consumption, emission levels, and safety and reliability.

1730. FCA's bad faith and unconscionable actions include, but are not limited to:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1731. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1732. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1733. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1734. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1735. Pursuant to S.C. CODE ANN. § 56-15-110, Plaintiffs and the Class seek monetary relief to recover their economic losses. Because FCA's actions were willful and knowing, Plaintiffs and Class members' damages should be trebled.

1736. Plaintiffs and the Class further allege that FCA's malicious and deliberate conduct warrants an assessment of punitive damages because it carried out despicable conduct with willful and conscious disregard of the rights of others. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1737. Plaintiffs and the Class further seek an order enjoining each FCA's unfair or deceptive acts or practices.

## COUNT 127

## BREACH OF CONTRACT
## (BASED ON SOUTH CAROLINA LAW)

1738. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1739. This claim is brought on behalf of South Carolina Subclass.

1740. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1741. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by

misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1742. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 128

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON SOUTH CAROLINA LAW)

1743. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1744. This claim is brought on behalf of the South Carolina Subclass.

1745. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1746. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1747. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective

Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1748. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1749. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1750. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 129

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH CAROLINA LAW)

1751. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1752. This claim is brought on behalf of the South Carolina Subclass.

1753. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1754. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1755. FCA knew these representations were false when made.

1756. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1757. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1758. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1759. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1760. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1761. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels

of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1762. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA

represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1763. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1764. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1765. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1766. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1767. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1768. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 130

### NEGLIGENT MISREPRESENTATION
### (BASED ON SOUTH CAROLINA LAW)

1769. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1770. This claim is brought on behalf of the South Carolina Subclass.

1771. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1772. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1773. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 131

### UNJUST ENRICHMENT
### (BASED ON SOUTH CAROLINA LAW)

1774. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1775. This claim is brought on behalf of the South Carolina Subclass.

1776. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1777. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1778. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## V.    Claims Brought on Behalf of the Tennessee Subclass

### COUNT 132

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
(TENN. CODE § 47-18-101, *et seq.*)

1779. Plaintiff Holly Hickman ("Plaintiffs" for purposes of all Tennessee Subclass claims) incorporates by reference all paragraphs alleged herein.

1780. This claim is brought on behalf of the Tennessee Subclass.

1781. Plaintiffs and the Class are "natural persons" and "consumers" within the meaning of TENN. CODE § 47-18-103(2).

1782. FCA is a "person" within the meaning of TENN. CODE § 47-18-103(2).

1783. FCA's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE § 47-18-103(19).

1784. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have . . . ."; "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another"; and "Advertising goods or services with intent not to sell them as

advertised." TENN. CODE § 47-18-104. FCA violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Defective Vehicles have characteristics or benefits that they did not have; representing that Defective Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Defective Vehicles with intent not to sell them as advertised.

1785. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect

of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1786. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1787. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal"

even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1788. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1789. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1790. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1791. FCA knew or should have known that its conduct violated this statute.

1792. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1793. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1794. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1795. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1796. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1797. Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs, individually and on behalf of the Class members, seeks monetary relief against FCA measured as actual damages in an amount to be determined at trial, treble damages as a result of FCA's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

1798. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 133

### BREACH OF CONTRACT
### (BASED ON TENNESSEE LAW)

1799. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1800. This claim is brought on behalf of the Tennessee Subclass.

1801. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

- 513 -

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1802. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1803. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 134

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON TENNESSEE LAW)

1804. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1805. This claim is brought on behalf of the Tennessee Subclass.

1806. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1807. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1808. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1809. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1810. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1811. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

- 515 -

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 135

### FRAUDULENT CONCEALMENT
### (BASED ON TENNESSEE LAW)

1812. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1813. This claim is brought on behalf of the Tennessee Subclass.

1814. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1815. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1816. FCA knew these representations were false when made.

1817. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1818. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1819. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1820. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1821. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1822. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1823. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1824. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1825. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1826. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1827. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1828. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1829. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 136

## NEGLIGENT MISREPRESENTATION
## (BASED ON TENNESSEE LAW)

1830. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1831. This claim is brought on behalf of the Tennessee Subclass.

1832. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1833. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1834. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 137

## UNJUST ENRICHMENT
## (BASED ON TENNESSEE LAW)

1835. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1836. This claim is brought on behalf of the Tennessee Subclass.

1837. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1838. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1839. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**W.**   **Claims Brought on Behalf of the Texas Subclass**

**COUNT 138**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION ACT
(TEX. BUS. & COM. CODE § 17.4 *ET SEQ.*)**

1840. Plaintiffs Amber Portugal, Michael Sanchez, and Adam Dyer ("Plaintiffs" for purposes of all Texas Subclass claims) incorporate by reference all paragraphs alleged herein.

1841. This claim is brought on behalf of the Texas Subclass.

1842. Texas Plaintiffs and the Texas Subclass members are individuals with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

1843. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading, or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); or (ii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3). The Texas DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have"; "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action" means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, FCA has engaged in an unconscionable action or course of action and thereby caused economic damages to the Texas Class.

1844. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between

recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1845. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they

become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1846. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1847. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1848. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1849. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1850. FCA knew or should have known that its conduct violated this statute.

1851. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.  Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.  Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.  Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1852. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their

vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1853. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1854. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1855. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1856. On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with TEX. BUS. & COM. CODE Ann. § 17.505 to FCA.

1857. On May 22, 2020, a copy of the *Davis, et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney General of the State of Texas in accordance with TEX. BUS. & COM. CODE Ann. § 17:501.

1858. Plaintiffs and the Class seek monetary relief against FCA measured as actual damages in an amount to be determined at trial, treble damages for FCA's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1859. Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Plaintiffs and the Class are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from Plaintiffs based on violations of the Texas DTPA or which the Court deems proper. Plaintiffs and Class members also seek an award of punitive damages due to FCA's aggravated and outrageous conduct.

## COUNT 139

## BREACH OF CONTRACT
## (BASED ON TEXAS LAW)

1860. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1861. This claim is brought on behalf of the Texas Subclass.

1862. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1863. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1864. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 140

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON TEXAS LAW)

1865. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1866. This claim is brought on behalf of the Texas Subclass.

- 529 -

1867. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1868. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1869. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1870. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1871. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1872. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 141

### FRAUDULENT CONCEALMENT
### (BASED ON TEXAS LAW)

1873. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1874. This claim is brought on behalf of the Texas Subclass.

1875. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1876. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1877. FCA knew these representations were false when made.

1878. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1879. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1880. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1881. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1882. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1883. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1884. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1885. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1886. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1887. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1888. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1889. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1890. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 142

## NEGLIGENT MISREPRESENTATION
## (BASED ON TEXAS LAW)

1891. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1892. This claim is brought on behalf of the Texas Subclass.

1893. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1894. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1895. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 143

## UNJUST ENRICHMENT
## (BASED ON TEXAS LAW)

1896. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1897. This claim is brought on behalf of the Texas Subclass.

1898. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1899. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1900. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## X.    Claims Brought on Behalf of the Virginia Subclass

### COUNT 144

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### (VA. CODE ANN. § 59.1-196 *et seq.*)

1901. Plaintiff Arteal Jordan ("Plaintiffs" for purposes of all Virginia Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1902. This claim is brought on behalf of the Virginia Subclass.

1903. The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices," which include "[u]sing any other deception, fraud, false

pretense, false promise, or misrepresentation in connection with a consumer transaction." VA. CODE ANN. § 59.1-200.

1904. FCA is a "supplier" under VA. CODE ANN. § 59.1-198.

1905. Each sale and lease of a Defective Vehicle was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

1906. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect

of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1907. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1908. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal"

even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1909. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1910. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1911. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1912. FCA knew or should have known that its conduct violated this statute.

1913. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1914. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1915. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1916. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1917. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1918. Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because FCA's conduct was committed willfully and knowingly, Plaintiffs and the Class are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000. Plaintiffs and the Class also seek an award of punitive damages due to FCA's aggravated and outrageous conduct.

1919. Plaintiff and the Class also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204 *et seq.*

## COUNT 145

### BREACH OF CONTRACT
### (BASED ON VIRGINIA LAW)

1920. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1921. This claim is brought on behalf of the Virginia Subclass.

1922. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

1923. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

1924. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 146

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON VIRGINIA LAW)

1925. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1926. This claim is brought on behalf of the Virginia Subclass.

1927. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

1928. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1929. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1930. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1931. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1932. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 147

## FRAUDULENT CONCEALMENT
## (BASED ON VIRGINIA LAW)

1933. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1934. This claim is brought on behalf of the Virginia Subclass.

1935. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1936. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1937. FCA knew these representations were false when made.

1938. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1939. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1940. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

1941. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

1942. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

1943. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

1944. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

1945. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

1946. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

1947. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

1948. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

1949. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1950. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 148

## NEGLIGENT MISREPRESENTATION
## (BASED ON VIRGINIA LAW)

1951. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1952. This claim is brought on behalf of the Virginia Subclass.

1953. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

1954. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

1955. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 149

## UNJUST ENRICHMENT
## (BASED ON VIRGINIA LAW)

1956. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1957. This claim is brought on behalf of the Virginia Subclass.

1958. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

1959. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

1960. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**Y.    Claims Brought on Behalf of the Washington Subclass**

### COUNT 150

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *et seq.*)

1961. Plaintiff Vivien Nagy ("Plaintiffs" for purposes of all Washington Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1962. This claim is brought on behalf of the Washington Subclass.

1963. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.96.010.

1964. FCA committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

1965. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1966. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

1967. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

1968. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1969. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

1970. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

1971. FCA knew or should have known that its conduct violated this statute.

1972. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

1973. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

1974. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1975. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1976. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

1977. FCA is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any

other remedies the Court may deem appropriate under WASH. REV. CODE ANN. § 19.86.090. Plaintiffs and the Class also seek an award of punitive damages due to FCA's aggravated and outrageous conduct.

1978. On May 22, 2020, a copy of the *Davis et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney General of the State of Washington in accordance with WASH. REV. CODE ANN. § 19.86.095.

## COUNT 151

## BREACH OF CONTRACT
## (BASED ON WASHINGTON LAW)

1979. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1980. This claim is brought on behalf of the Washington Subclass.

1981. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective

Vehicles and did not receive the benefit of their bargain.

1982. Each and every sale or lease of a Defective Vehicle constitutes a

contract between FCA and the purchaser or lessee. FCA breached these contracts by

selling or leasing to Plaintiffs and the Class the Defective Vehicles and by

misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid

for these vehicles and the representations made by FCA.

1983. As a direct and proximate result of FCA's breach of contract, Plaintiffs

and the Class have been damaged in an amount to be proven at trial, which shall

include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT 152

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON WASHINGTON LAW)

1984. Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

1985. This claim is brought on behalf of the Washington Subclass.

1986. FCA manufactured and distributed Defective Vehicles throughout the

United States for sale to Plaintiffs and Class members.

1987. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

1988. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

1989. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

1990. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

1991. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 153

### FRAUDULENT CONCEALMENT
### (BASED ON WASHINGTON LAW)

1992. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1993. This claim is brought on behalf of the Washington Subclass.

1994. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

1995. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

1996. FCA knew these representations were false when made.

1997. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

1998. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

1999. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2000. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2001. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2002. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2003. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles. Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2004. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2005. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2006. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2007. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2008. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2009. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 154

## NEGLIGENT MISREPRESENTATION
## (BASED ON WASHINGTON LAW)

2010. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2011. This claim is brought on behalf of the Washington Subclass.

2012. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2013. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2014. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 155

## UNJUST ENRICHMENT
## (BASED ON WASHINGTON LAW)

2015. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2016. This claim is brought on behalf of the Washington Subclass.

2017.  Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2018.  FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2019.  Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**Z.    Claims brought on behalf of the West Virginia Subclass**

**COUNT 156**

**VIOLATION OF THE WEST VIRGINIA
CONSUMER CREDIT AND PROTECTION ACT
(W. VA. CODE § 46A-1-101 *et seq.*)**

2020.  Plaintiff Katlyn Wills ("Plaintiffs" for purposes of all West Virginia Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2021.  This claim is brought on behalf of the West Virginia Subclass.

2022.  FCA is a "person" under W. VA. CODE § 46A-1-102(31).

2023. Plaintiffs and Class members are "consumers" as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Defective Vehicles.

2024. FCA engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

2025. The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

> (I) Advertising goods or services with intent not to sell them as advertised and certified; . . .
>
> (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;
>
> (M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; [and]
>
> (N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised and certified, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

W. Va. Code § 46A-6-102(7).

2026. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any

material fact with the intent that a consumer rely on the same in connection therewith.

2027. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2028. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2029. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2030. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2031. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2032. FCA knew or should have known that its conduct violated this statute.

2033. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

   b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

   c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2034. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage,

and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2035. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2036. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2037. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2038. Pursuant to W. VA. CODE § 46A-6-106, Plaintiffs and the Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

2039. Plaintiffs and the Class also seek punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.

2040. Plaintiffs and the Class further seek an order enjoining FCA's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

2041. On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with W. VA. CODE § 46A-6-106(b) to FCA.

## COUNT 157

## BREACH OF CONTRACT
## (BASED ON WEST VIRGINIA LAW)

2042. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2043. This claim is brought on behalf of the West Virginia Subclass.

2044. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2045. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2046. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 158

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON WEST VIRGINIA LAW)

2047. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2048. This claim is brought on behalf of the West Virginia Subclass.

2049. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2050. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2051. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2052. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2053. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2054. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 159

## FRAUDULENT CONCEALMENT
## (BASED ON WEST VIRGINIA LAW)

2055. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2056. This claim is brought on behalf of the West Virginia Subclass.

2057. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2058. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2059. FCA knew these representations were false when made.

2060. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2061. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2062. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2063. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2064. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2065. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2066. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2067. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2068. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2069. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2070. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2071. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2072. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 160

### NEGLIGENT MISREPRESENTATION
### (BASED ON WEST VIRGINIA LAW)

2073. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2074. This claim is brought on behalf of the West Virginia Subclass.

2075. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2076. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2077. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 161

### UNJUST ENRICHMENT
### (BASED ON WEST VIRGINIA LAW)

2078. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2079. This claim is brought on behalf of the West Virginia Subclass.

2080. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2081. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2082. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**AA.   Claims Brought on Behalf of the Wisconsin Subclass**

**COUNT 162**

**VIOLATION OF THE WISCONSIN
DECEPTIVE TRADE PRACTICES ACT
(WIS. STAT. § 110.18)**

2083. Plaintiff Tera Castillo ("Plaintiffs" for purposes of all Wisconsin Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2084. This claim is brought on behalf of Wisconsin Subclass.

2085. The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1).

2086. FCA is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

2087. Plaintiffs and Class members are members of "the public" within the meaning of WIS. STAT. § 100.18(1). Plaintiffs purchased or leased one or more Defective Vehicles.

2088. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety

hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2089. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2090. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods

of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2091. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2092. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2093. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2094. FCA knew or should have known that its conduct violated this statute.

2095. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

   b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2096. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2097. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2098. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2099. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2100. Plaintiffs and the Class are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2). Because FCA's conduct was committed knowingly and/or intentionally, Plaintiffs and the Class are entitled to treble damages. Plaintiffs and the Class also seek an award of punitive damages due to FCA's aggravated and outrageous conduct.

2101. Plaintiffs and the Class also seeks court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT 163

## BREACH OF CONTRACT
## (BASED ON WISCONSIN LAW)

2102. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2103. This claim is brought on behalf of Wisconsin Subclass.

2104. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2105. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2106. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 164

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON WISCONSIN LAW)

2107. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2108. This claim is brought on behalf of the Wisconsin Subclass.

2109. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2110. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2111. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2112. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2113. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2114. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 165

## FRAUDULENT CONCEALMENT
## (BASED ON WISCONSIN LAW)

2115. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2116. This claim is brought on behalf of the Wisconsin Subclass.

2117. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2118. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2119. FCA knew these representations were false when made.

2120. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2121. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2122. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2123. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2124. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2125. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2126. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2127. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2128. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2129. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2130. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2131. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2132. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 166

### NEGLIGENT MISREPRESENTATION
### (BASED ON WISCONSIN LAW)

2133. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2134. This claim is brought on behalf of the Wisconsin Subclass.

2135. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2136. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2137. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 167

### UNJUST ENRICHMENT
### (BASED ON WISCONSIN LAW)

2138. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2139. This claim is brought on behalf of the Wisconsin Subclass.

2140. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2141. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2142. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

BB. **Claims Brought on Behalf of the Alabama Subclass**

## COUNT 168

### VIOLATION OF THE ALABAMA
### DECEPTIVE TRADE PRACTICES ACT
### (ALA. CODE § 8-19-1 *et seq.*)

2143. Alabama Plaintiffs ("Plaintiffs" for purposes of all Alabama Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2144. This claim is brought on behalf of the Alabama Subclass.

2145. The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "engaging in any other

unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

2146. Plaintiffs and the Alabama Subclass members are "consumers" within the meaning of ALA. CODE. § 8-19-3(2).

2147. Plaintiffs, the Alabama Subclass members, and FCA are "persons" within the meaning of ALA. CODE § 8-19-3(3).

2148. FCA was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

2149. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety

hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2150. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2151. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods

of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2152. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2153. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2154. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2155. FCA knew or should have known that its conduct violated this statute.

2156. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2157. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2158. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2159. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2160. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2161. Pursuant to ALA. CODE § 8-19-10, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

2162. Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under ALA. CODE. § 8-19-1, *et seq.*

2163. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

2164. On April 29, 2020 and October 14, 2020, Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e) to FCA. FCA failed to remedy its unlawful conduct within the requisite period. Thus, Plaintiffs seek all damages and relief to which they are entitled.

## COUNT 169

## BREACH OF CONTRACT
## (BASED ON ALABAMA LAW)

2165. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2166. This claim is brought on behalf of the Alabama Subclass.

2167. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2168. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2169. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 170

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON ALABAMA LAW)

2170. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2171. This claim is brought on behalf of the Alabama Subclass.

2172. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2173. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2174. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2175. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2176. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The

Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2177. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 171

## FRAUDULENT CONCEALMENT
## (BASED ON ALABAMA LAW)

2178. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2179. This claim is brought on behalf of the Alabama Subclass.

2180. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2181.  The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2182.  FCA knew these representations were false when made.

2183.  FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2184.  FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2185.  As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2186. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2187. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2188. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2189. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and emit excessive pollution, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles

with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive harmful emissions, and whether the manufacturer tells the truth are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2190. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2191. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2192. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2193. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2194. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2195. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 172

## NEGLIGENT MISREPRESENTATION
## (BASED ON ALABAMA LAW)

2196. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2197. This claim is brought on behalf of the Alabama Subclass.

2198. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2199. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2200. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 173

## UNJUST ENRICHMENT
## (BASED ON ALABAMA LAW)

2201. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2202. This claim is brought on behalf of the Alabama Subclass.

2203. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2204. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2205. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**CC.   Claims brought on behalf of the Alaska Subclass**

**COUNT 174**

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT
(ALASKA STAT. ANN. § 45.50.471 *et seq.*)**

2206. Alaska Plaintiffs ("Plaintiffs" for purposes of all Alaska Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2207. This claim is brought on behalf of the Alaska Subclass.

2208. The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

2209. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles

to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2210. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off

of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2211. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2212. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2213. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2214. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2215.   FCA knew or should have known that its conduct violated this statute.

2216.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

   b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

   c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2217.   FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2218. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2219. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2220. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2221. Pursuant to ALASKA STAT ANN. § 45.50.531, Plaintiffs seek monetary relief against FCA measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each plaintiff.

2222. Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices pursuant to ALASKA STAT. ANN. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

2223. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

2224. Plaintiffs sent letters on April 29, 2020 and October 14, 2020 complying with ALASKA STAT. ANN. § 45.50.535(b)(1) to FCA.

## COUNT 175

### BREACH OF CONTRACT
### (BASED ON ALASKA LAW)

2225. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2226. This claim is brought on behalf of the Alaska Subclass.

2227. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2228. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by

misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2229. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 176

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON ALASKA LAW)

2230. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2231. This claim is brought on behalf of the Alaska Subclass.

2232. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2233. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2234. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective

Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2235. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2236. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2237. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 177

## FRAUDULENT CONCEALMENT
## (BASED ON ALASKA LAW)

2238. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2239. This claim is brought by on behalf of the Alaska Subclass.

2240. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2241. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2242. FCA knew these representations were false when made.

2243. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2244. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2245. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2246. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2247. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2248. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excessive vehicle

emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2249. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excess emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable

vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2250. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2251. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2252. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2253. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for

their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2254. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2255. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 178

## NEGLIGENT MISREPRESENTATION
## (BASED ON ALASKA LAW)

2256. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2257. This claim is brought on behalf of the Alaska Subclass.

2258. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2259. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2260. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 179

## UNJUST ENRICHMENT
## (BASED ON ALASKA LAW)

2261. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2262. This claim is brought on behalf of the Alaska Subclass.

2263. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2264. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2265. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**DD.   Claims brought on behalf of the Arkansas Subclass**

**COUNT 180**

**VIOLATION OF THE ARKANSAS**
**DECEPTIVE TRADE PRACTICES ACT**
**(ARK. CODE ANN. § 4-88-101 *et seq.*)**

2266. Arkansas Plaintiffs ("Plaintiffs" for purposes of all Arkansas Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2267. This claim is brought on behalf of the Arkansas Subclass.

2268. FCA, Plaintiffs, and the Arkansas Subclass are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE. ANN. § 4-88-102(5).

2269. Each Defective Vehicle at issue constitutes "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

2270. The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade." ARK. CODE. ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits, in

connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." ARK CODE. ANN. § 4-88-108.

2271. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2272.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2273. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2274. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2275. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2276. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2277. FCA knew or should have known that its conduct violated this statute.

2278. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2279. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2280. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2281. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2282. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2283. Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because FCA

acted wantonly in causing Plaintiffs and Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

2284. Plaintiffs and the Class also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT 181

### BREACH OF CONTRACT
### (BASED ON ARKANSAS LAW)

2285. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2286. This claim is brought on behalf o the Arkansas Subclass.

2287. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2288. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2289. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 182

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON ARKANSAS LAW)

2290. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2291. This claim is brought on behalf of the Arkansas Subclass.

2292. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2293. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2294. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2295. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2296. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2297. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 183

## FRAUDULENT CONCEALMENT
## (BASED ON ARKANSAS LAW)

2298. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2299. This claim is brought on behalf of the Arkansas Subclass.

2300. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2301. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2302. FCA knew these representations were false when made.

2303.  FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2304.  FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2305.  As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2306.  The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2307.  Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2308. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles,  excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2309. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excess harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2310. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2311. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2312. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2313. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2314. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2315. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 184

## NEGLIGENT MISREPRESENTATION
### (BASED ON ARKANSAS LAW)

2316. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2317. This claim is brought on behalf of the Arkansas Subclass.

2318. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2319. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2320. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 185

### UNJUST ENRICHMENT
### (BASED ON ARKANSAS LAW)

2321. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2322. This claim is brought on behalf of the Arkansas Subclass.

2323. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2324. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2325. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**EE.   Claims Brought on Behalf of the Colorado Subclass**

## COUNT 186

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *et seq.*)

2326. Colorado Plaintiffs ("Plaintiffs" for purposes of all Colorado Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2327. This claim is brought on behalf of the Colorado Subclass.

2328. The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

2329. FCA is a "person" under COLO. REV. STAT. § 6-1-102(6).

2330. Colorado Plaintiffs and the Colorado Subclass members are "consumers" for purposes of COLO. REV. STAT § 6-1-113(1)(a).

2331. FCA's conduct, as set forth above, occurred in the conduct of trade or commerce.

2332. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2333. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2334. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2335. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2336. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2337. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2338. FCA knew or should have known that its conduct violated this statute.

2339. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2340. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2341. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2342. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2343. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2344. Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be

determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and Class member.

2345. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

2346. Plaintiffs also seek an order enjoining FCA's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT 187

## BREACH OF CONTRACT
## (BASED ON COLORADO LAW)

2347. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2348. This claim is brought on behalf of the Colorado Subclass.

2349. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective

Vehicles and did not receive the benefit of their bargain.

2350. Each and every sale or lease of a Defective Vehicle constitutes a

contract between FCA and the purchaser or lessee. FCA breached these contracts by

selling or leasing to Plaintiffs and the Class the Defective Vehicles and by

misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid

for these vehicles and the representations made by FCA.

2351. As a direct and proximate result of FCA's breach of contract, Plaintiffs

and the Class have been damaged in an amount to be proven at trial, which shall

include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT 188

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON COLORADO LAW)

2352. Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

2353. This claim is brought on behalf of the Colorado Subclass.

2354. FCA manufactured and distributed Defective Vehicles throughout the

United States for sale to Plaintiffs and Class members.

2355. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2356. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2357. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2358. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2359. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 189

### FRAUDULENT CONCEALMENT
### (BASED ON COLORADO LAW)

2360. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2361. This claim is brought on behalf of the Colorado Subclass.

2362. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2363. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2364. FCA knew these representations were false when made.

2365. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2366. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2367. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2368. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2369. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2370. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2371. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2372. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2373. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2374. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2375. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2376. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2377. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 190

## NEGLIGENT MISREPRESENTATION
## (BASED ON COLORADO LAW)

2378. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2379. This claim is brought on behalf of the Colorado Subclass.

2380. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2381. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2382. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 191

### UNJUST ENRICHMENT
### (BASED ON COLORADO LAW)

2383. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2384. This claim is brought on behalf of the Colorado Subclass.

2385. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2386. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2387. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**FF.   Claims brought on behalf of the Connecticut Subclass**

**COUNT 192**

**VIOLATION OF THE CONNECTICUT
UNFAIR TRADE PRACTICES ACT
(CONN. GEN. STAT. § 42-110A *et seq.*)**

2388. Connecticut Plaintiffs ("Plaintiffs" for purposes of all Connecticut Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2389. This claim is brought on behalf of the Connecticut Subclass.

2390. Connecticut Plaintiffs, Connecticut Subclass members, and FCA are each a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

2391. FCA's challenged conduct occurred in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

2392. The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or

- 651 -

deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

2393. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any

material fact with the intent that a consumer rely on the same in connection therewith.

2394.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2395.  Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2396. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2397. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2398. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2399. FCA knew or should have known that its conduct violated this statute.

2400. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2401. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage,

and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2402. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2403. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2404. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2405. Plaintiffs and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

2406. FCA acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights, and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights of others. Therefore, punitive damages are warranted.

2407. Plaintiffs and the Class also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Connecticut UTPA.

## COUNT 193

### BREACH OF CONTRACT
### (BASED ON CONNECTICUT LAW)

2408. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2409. This claim is brought on behalf of the Connecticut Subclass.

2410. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2411. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2412. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 194

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON CONNECTICUT LAW)

2413. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2414. This claim is brought on behalf of the Connecticut Subclass.

2415. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2416. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2417. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2418. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2419. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2420. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 195

### FRAUDULENT CONCEALMENT
### (BASED ON CONNECTICUT LAW)

2421. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2422. This claim is brought on behalf of the Connecticut Subclass.

2423. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2424. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2425. FCA knew these representations were false when made.

2426. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2427. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2428. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2429. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2430. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2431. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2432. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2433. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2434. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2435. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2436. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2437. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2438. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 196

## NEGLIGENT MISREPRESENTATION
## (BASED ON CONNECTICUT LAW)

2439. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2440. This claim is brought on behalf of the Connecticut Subclass.

2441. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2442. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2443. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 197

### UNJUST ENRICHMENT
### (BASED ON CONNECTICUT LAW)

2444. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2445. This claim is brought on behalf of the Connecticut Subclass.

2446. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2447. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2448. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**GG.   Claims brought on behalf of the Delaware Subclass**

**COUNT 198**

**VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
(DEL. CODE TIT. 6, § 2513 *et seq.*)**

2449. Delaware Plaintiffs ("Plaintiffs" for purposes of all Delaware Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2450. This claim is brought on behalf of the Delaware Subclass.

2451. FCA is a "person" within the meaning of DEL. CODE TIT. 6, § 2511(7).

2452. FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

2453. The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or

- 665 -

omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

2454. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise,

- 666 -

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2455. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2456. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2457. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2458. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2459. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2460. FCA knew or should have known that its conduct violated this statute.

2461. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2462. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2463. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2464. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2465. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2466. Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of FCA's unlawful conduct. *See, e.g.*,

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

2467. FCA engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT 199

## BREACH OF CONTRACT
## (BASED ON DELAWARE LAW)

2468. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2469. This claim is brought on behalf of the Delaware Subclass.

2470. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2471. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2472. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 200

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON DELAWARE LAW)

2473. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2474. This claim is brought on behalf of the Delaware Subclass.

2475. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2476. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2477. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2478. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2479. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2480. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 201

### FRAUDULENT CONCEALMENT
### (BASED ON DELAWARE LAW)

2481. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2482. This claim is brought on behalf of the Delaware Subclass.

2483. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2484. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2485. FCA knew these representations were false when made.

2486. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2487. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2488. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2489. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2490. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2491. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2492. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles. Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2493. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2494. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2495. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2496. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2497. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2498. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 202

### NEGLIGENT MISREPRESENTATION
### (BASED ON DELAWARE LAW)

2499. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2500. This claim is brought on behalf of the Delaware Subclass.

2501. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2502. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2503. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 203

### UNJUST ENRICHMENT
### (BASED ON DELAWARE LAW)

2504. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2505. This claim is brought on behalf of the Delaware Subclass.

2506. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2507. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2508. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**HH.   Claims Brought on Behalf of the Georgia Subclass**

**COUNT 204**

**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390 *et seq.*)**

2509. Georgia Plaintiffs ("Plaintiffs" for purposes of all Georgia Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2510. This claim is brought on behalf of the Georgia Subclass.

2511. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE ANN. § 101-393(b), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services

with intent not to sell them as advertised and certified." GA. CODE ANN. § 10-1-393(b).

2512. Georgia Plaintiffs and Georgia Class members are "consumers" within the meaning of GA. CODE ANN. § 10-1-393(b).

2513. FCA engaged in "trade or commerce" within the meaning of GA. CODE ANN. § 10-1-393(b).

2514. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2515. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2516. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to

describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2517. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2518. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2519. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2520. FCA knew or should have known that its conduct violated this statute.

2521. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2522. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2523. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2524. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2525. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2526. Plaintiffs and Class members are entitled to seek damages and exemplary damages (for intentional violations) per GA. CODE ANN. § 10-1-399(a).

2527. Plaintiffs and Class members will also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE ANN. § 10-1-399.

2528. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

2529. On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with GA. CODE ANN. § 10-1-399(b) to FCA. Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Class are entitled.

## COUNT 205

## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (GA. CODE ANN § 10-1-370 *et seq.*)

2530. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2531. This claim is brought on behalf of the Georgia Subclass.

2532. Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised and certified." GA. CODE ANN. § 10-1-393(b).

2533. FCA, Georgia Plaintiffs, and Georgia Subclass members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

2534. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2535. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2536. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to

describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2537. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2538. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2539. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2540. FCA knew or should have known that its conduct violated this statute.

2541. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2542. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2543. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2544. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2545. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2546. Plaintiffs seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

## COUNT 206

## BREACH OF CONTRACT
## (BASED ON GEORGIA LAW)

2547. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2548. This claim is brought on behalf of the Georgia Subclass.

2549. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2550. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by

selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2551. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT 207**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(BASED ON GEORGIA LAW)**

2552. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2553. This claim is brought on behalf of the Georgia Subclass.

2554. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2555. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2556. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective

Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2557. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2558. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2559. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 208

## FRAUDULENT CONCEALMENT
## (BASED ON GEORGIA LAW)

2560. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2561. This claim is brought on behalf of the Georgia Subclass.

2562. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2563. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2564. FCA knew these representations were false when made.

2565. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2566. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2567. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2568. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2569. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2570. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle

emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2571. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing

safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2572. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2573. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2574. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2575. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for

their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2576. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2577. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 209

## NEGLIGENT MISREPRESENTATION
## (BASED ON GEORGIA LAW)

2578. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2579. This claim is brought on behalf of the Georgia Subclass.

2580. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2581. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2582. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 210

### UNJUST ENRICHMENT
### (BASED ON GEORGIA LAW)

2583. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2584. This claim is brought on behalf of the Georgia Subclass.

2585. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2586. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2587. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## II.   Claims brought on behalf of the Hawaii Subclass

### COUNT 211

### VIOLATION OF THE HAWAII ACT § 480-2(A)
### (HAW. REV. STAT. § 480 *et seq.*)

2588. Hawaii Plaintiffs ("Plaintiffs" for purposes of all Hawaii Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2589. This claim is brought on behalf of the Hawaii Subclass.

2590. HAWAII REV. STAT. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

2591. FCA is a "person" under HAW. REV. STAT. § 480-1.

2592. Hawaii Plaintiff and Hawaii Class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased the Defective Vehicles at issue.

2593. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between

recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2594. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they

become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2595. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2596. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2597. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2598. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2599. FCA knew or should have known that its conduct violated this statute.

2600. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

 a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

 b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

 c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2601. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their

vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2602. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2603. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2604. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2605. Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs and Class members seek monetary relief against FCA measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

2606. Under HAW. REV. STAT. § 480-13.5, Plaintiffs and Class members seek an additional award against FCA of up to $10,000 for each violation directed at a Hawaii elder. FCA knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. FCA's conduct caused one or more of these elders

to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to FCA's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from FCA's conduct.

2607. Plaintiffs also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 212

## BREACH OF CONTRACT
## (BASED ON HAWAII LAW)

2608. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2609. This claim is brought on behalf of the Hawaii Subclass.

2610. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less

expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2611. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2612. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 213

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON HAWAII LAW)

2613. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2614. This claim is brought on behalf of the Hawaii Subclass.

2615. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2616. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2617. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2618. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2619. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2620. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 214

### FRAUDULENT CONCEALMENT
### (BASED ON HAWAII LAW)

2621. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2622. This claim is brought on behalf of the Hawaii Subclass.

2623. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2624. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2625. FCA knew these representations were false when made.

2626. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2627. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2628. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2629. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2630. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2631. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2632. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and

reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2633. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2634. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2635. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material

facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2636. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2637. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2638. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 215

## NEGLIGENT MISREPRESENTATION
## (BASED ON HAWAII LAW)

2639. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2640. This claim is brought on behalf of the Hawaii Subclass.

2641. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2642. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2643. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 216

### UNJUST ENRICHMENT
### (BASED ON HAWAII LAW)

2644. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2645. This claim is brought on behalf of the Hawaii Subclass.

2646. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2647. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2648. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## JJ.    Claims brought on behalf of the Indiana Subclass

### COUNT 217

### VIOLATION OF THE INDIANA
### DECEPTIVE CONSUMER SALES ACT
### (IND. CODE § 24-5-0.5-3)

2649. Indiana Plaintiffs ("Plaintiffs" for purposes of all Indiana Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2650. This claim is brought on behalf of the Indiana Subclass.

2651. FCA is a "person" within the meaning of IND. CODE § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

2652. Plaintiffs' vehicle purchases are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

2653. Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not

limited to "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; . . . (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; . . . (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

2654. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil

Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2655. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels

and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2656. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2657. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2658. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2659. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2660. FCA knew or should have known that its conduct violated this statute.

2661. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2662. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2663. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2664. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2665. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2666. Pursuant to IND. CODE § 24-5-0.5-4, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1,000 for FCA's willfully deceptive acts.

2667. Plaintiffs seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

2668. On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with IND. CODE § 24-5-0.5-5(a) to FCA.

## COUNT 218

## BREACH OF CONTRACT
## (BASED ON INDIANA LAW)

2669. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2670. This claim is brought on behalf of the Indiana Subclass.

2671. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2672. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2673.  As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 219

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON INDIANA LAW)

2674. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2675. This claim is brought on behalf of the Indiana Subclass.

2676. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2677. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2678. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2679. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2680. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2681. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

**COUNT 220**

**FRAUDULENT CONCEALMENT
(BASED ON INDIANA LAW)**

2682. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2683. This claim is brought on behalf of the Indiana Subclass.

2684. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2685. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2686. FCA knew these representations were false when made.

2687. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2688. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2689. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2690. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2691. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2692. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, excess vehicle

emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2693. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing

safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2694. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2695. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2696. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2697. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for

their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2698. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2699. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 221

## NEGLIGENT MISREPRESENTATION
## (BASED ON INDIANA LAW)

2700. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2701. This claim is brought on behalf of the Indiana Subclass.

2702. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2703. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2704. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 222

## UNJUST ENRICHMENT
## (BASED ON INDIANA LAW)

2705. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2706. This claim is brought on behalf of the Indiana Subclass.

2707. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2708. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2709. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**KK.  Claims brought on behalf of the Iowa Subclass**

**COUNT 223**

**VIOLATION OF THE IOWA PRIVATE RIGHT
OF ACTION FOR CONSUMER FRAUDS ACT
(IOWA CODE § 714h.1 *et seq.*)**

2710. Iowa Plaintiffs ("Plaintiffs" for purposes of all Iowa Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2711. This claim is brought on behalf of the Iowa Subclass.

2712. FCA is a "person" under IOWA CODE § 714H.2(7).

2713. Iowa Plaintiffs and Iowa Class members are "consumers" as defined by IOWA CODE § 714H.2(3) who purchased or leased one or more Defective Vehicles.

2714. The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection

with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

2715. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any

material fact with the intent that a consumer rely on the same in connection therewith.

2716. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2717. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2718. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2719. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2720. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2721. FCA knew or should have known that its conduct violated this statute.

2722. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2723. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage,

and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2724. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2725. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2726. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2727. Pursuant to IOWA CODE § 714H.5, Plaintiffs seek an order enjoining FCA's unfair and/or deceptive acts or practices, actual damages, statutory damages up to three times the amount of actual damages awarded as a result of FCA's willful and wanton disregard for the rights of others, attorneys' fees, and other such

equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

2728. Plaintiffs seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 224

## BREACH OF CONTRACT
## (BASED ON IOWA LAW)

2729. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2730. This claim is brought on behalf of the Iowa Subclass.

2731. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2732. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2733. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 225

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (BASED ON IOWA LAW)

2734. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2735. This claim is brought on behalf of the Iowa Subclass.

2736. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2737. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2738. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2739. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2740. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2741. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 226

## FRAUDULENT CONCEALMENT
## (BASED ON IOWA LAW)

2742. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2743. This claim is brought on behalf of the Iowa Subclass.

2744. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2745. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2746. FCA knew these representations were false when made.

2747. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2748. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2749. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2750. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2751. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2752. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, compliance with applicable federal and state regulations regarding excess vehicle emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2753. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2754. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2755. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2756. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2757. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2758. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2759. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 227

## NEGLIGENT MISREPRESENTATION
## (BASED ON IOWA LAW)

2760. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2761. This claim is brought on behalf of the Iowa Subclass.

2762. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2763. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2764. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 228

## UNJUST ENRICHMENT
## (BASED ON IOWA LAW)

2765. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2766. This claim is brought on behalf of the Iowa Subclass.

2767.  Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2768.  FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2769.  Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**LL.    Claims brought on behalf of the Kentucky Subclass**

**COUNT 229**

**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. § 367.110 *ET SEQ.*).**

2770.  Kentucky Plaintiffs ("Plaintiffs" for purposes of all Kentucky Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2771.  This claim is brought on behalf of the Kentucky Subclass.

2772.  FCA and Kentucky Class members are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

2773.  FCA engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

2774. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." KY. REV. STAT. § 367.170(1).

2775. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2776. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2777. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2778. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2779. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2780. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2781. FCA knew or should have known that its conduct violated this statute.

2782. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2783. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2784. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2785. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2786. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2787. Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs and the Class seek to recover actual damages in an amount to be determined at trial; declaratory

relief; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

2788. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 230

### BREACH OF CONTRACT
### (BASED ON KENTUCKY LAW)

2789. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2790. This claim is brought on behalf of the Kentucky Subclass.

2791. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2792. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2793. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 231

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON KENTUCKY LAW)

2794. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2795. This claim is brought on behalf of the Kentucky Subclass.

2796. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2797. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2798. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2799. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2800. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2801. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

**COUNT 232**

**FRAUDULENT CONCEALMENT**
**(BASED ON KENTUCKY LAW)**

2802. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2803. This claim is brought on behalf of the Kentucky Subclass.

2804. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2805. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2806. FCA knew these representations were false when made.

2807. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2808. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2809. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2810. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2811. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2812. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2813. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2814. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2815. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2816. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2817. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2818. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2819. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 233

## NEGLIGENT MISREPRESENTATION
## (BASED ON KENTUCKY LAW)

2820. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2821. This claim is brought on behalf of the Kentucky Subclass.

2822. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2823. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2824. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 234

## UNJUST ENRICHMENT
## (BASED ON KENTUCKY LAW)

2825. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2826. This claim is brought on behalf of the Kentucky Subclass.

2827. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2828. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2829. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**MM.  Claims brought on behalf of the Maine Subclass**

**COUNT 235**

**VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
(ME. REV. STAT. ANN. TIT. 5, § 205-A *et seq.*)**

2830. Maine Plaintiffs ("Plaintiffs" for purposes of all Maine Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2831. This claim is brought on behalf of the Maine Subclass.

2832. FCA, Plaintiffs, and Maine Class members are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(2).

2833. FCA is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(3).

2834. The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." ME. REV. STAT. ANN. TIT. 5, § 207.

2835. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2836. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2837. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2838. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2839. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2840. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2841. FCA knew or should have known that its conduct violated this statute.

2842. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2843. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2844. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2845. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2846. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2847. Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because FCA

acted wantonly in causing Plaintiffs and Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

2848. Pursuant to ME. REV. STAT. ANN. TIT. 5, § 213, Plaintiffs seek an order enjoining FCA's unfair and/or deceptive acts or practices.

2849. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

2850. On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with ME. REV. STAT. ANN. TIT. 5, § 213(1-A) to FCA. Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they and the Class are entitled.

## COUNT 236

## BREACH OF CONTRACT
## (BASED ON MAINE LAW)

2851. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2852. This claim is brought on behalf of the Maine Subclass.

2853. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2854. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2855. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 237

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON MAINE LAW)

2856. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2857. This claim is brought on behalf of the Maine Subclass.

2858. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2859. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2860. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2861. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2862. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2863. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 238

## FRAUDULENT CONCEALMENT
### (BASED ON MAINE LAW)

2864. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2865. This claim is brought on behalf of the Maine Subclass.

2866. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2867. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2868. FCA knew these representations were false when made.

2869. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2870. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2871. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2872. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2873. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2874. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2875. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles. Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2876. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2877. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2878. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2879. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2880. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2881. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 239

## NEGLIGENT MISREPRESENTATION
### (BASED ON MAINE LAW)

2882. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2883. This claim is brought on behalf of the Maine Subclass.

2884. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2885. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2886. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 240

## UNJUST ENRICHMENT
### (BASED ON MAINE LAW)

2887. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2888. This claim is brought on behalf of the Maine Subclass.

2889. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2890. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2891. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**NN.   Claims brought on behalf of the Mississippi Subclass**

### COUNT 241

### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT (MISS. CODE. ANN. § 75-24-1 *ET SEQ.*)

2892. Mississippi Plaintiffs ("Plaintiffs" for purposes of all Mississippi Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2893. This claim is brought on behalf of the Mississippi Subclass.

2894. The Mississippi Consumer Protection Act (Mississippi CPA) prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE ANN. § 75-24-5(1). Unfair or deceptive practices include but are not limited to

"(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have"; "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(i) Advertising goods or services with intent not to sell them as advertised and certified." MISS. CODE ANN. § 75-24-5(2).

2895. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive

trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2896. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2897. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's

deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2898. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2899. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2900. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2901. FCA knew or should have known that its conduct violated this statute.

2902. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2903. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2904. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2905. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2906. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2907. Plaintiffs seek actual damages in an amount to be determined at trial and any other just and proper relief available under the Mississippi CPA.

2908. Plaintiffs seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

2909. Plaintiffs have provided FCA with pre-suit notice.

## COUNT 242

### BREACH OF CONTRACT
### (BASED ON MISSISSIPPI LAW)

2910. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2911. This claim is brought on behalf of the Mississippi Subclass.

2912. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less

expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2913. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2914. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 243

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON MISSISSIPPI LAW)

2915. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2916. This claim is brought on behalf of the Mississippi Subclass.

2917. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2918. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2919. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2920. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2921. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2922. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 244

### FRAUDULENT CONCEALMENT
### (BASED ON MISSISSIPPI LAW)

2923. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2924. This claim is brought on behalf of the Mississippi Subclass.

2925. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2926. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2927. FCA knew these representations were false when made.

2928. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2929. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2930. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2931. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2932. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2933. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2934. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2935. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2936. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2937. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2938. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

2939. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2940. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 245

## NEGLIGENT MISREPRESENTATION
## (BASED ON MISSISSIPPI LAW)

2941. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2942. This claim is brought on behalf of the Mississippi Subclass.

2943. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

2944. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

2945. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 246

## UNJUST ENRICHMENT
## (BASED ON MISSISSIPPI LAW)

2946. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2947. This claim is brought on behalf of the Mississippi Subclass.

2948. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

2949. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

2950. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**OO.   Claims Brought on Behalf of the Montana Subclass**

**COUNT 247**

**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT OF 1973
(MONT. CODE ANN. § 30-14-101 *et seq.*)**

2951. Montana Plaintiffs ("Plaintiffs" for purposes of all Montana Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2952. This claim is brought on behalf of the Montana Subclass.

2953. The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair

- 783 -

or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103.

2954. FCA, Plaintiffs, and Class members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

2955. Plaintiffs and Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

2956. The sale or lease of each Defective Vehicle at issue occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and FCA committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

2957. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign

touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

2958. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

2959. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

2960. FCA's actions as set forth above occurred in the conduct of trade or commerce.

2961. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

2962. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

2963. FCA knew or should have known that its conduct violated this statute.

2964. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

2965. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

2966. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2967. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2968. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

2969. Plaintiffs and the Class seek monetary relief against FCA in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because FCA acted wantonly in causing Plaintiffs and Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

2970. Plaintiffs and the Class additionally seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

## COUNT 248

### BREACH OF CONTRACT
### (BASED ON MONTANA LAW)

2971. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2972. This claim is brought on behalf of the Montana Subclass.

2973. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil

Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

2974. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

2975. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 249

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON MONTANA LAW)

2976. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2977. This claim is brought on behalf of the Montana Subclass.

2978. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

2979. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

2980. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

2981. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

2982. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and

Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

2983. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 250

## FRAUDULENT CONCEALMENT
## (BASED ON MONTANA LAW)

2984. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2985. This claim is brought on behalf of the Montana Subclass.

2986. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

2987. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

2988. FCA knew these representations were false when made.

2989. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

2990. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

2991. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

2992. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

2993. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

2994. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

2995. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty

to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

2996. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

2997. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

2998. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

2999. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3000. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3001. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 251

### NEGLIGENT MISREPRESENTATION
### (BASED ON MONTANA LAW)

3002. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3003. This claim is brought on behalf of the Montana Subclass.

3004. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3005. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3006. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 252

## UNJUST ENRICHMENT
## (BASED ON MONTANA LAW)

3007. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3008. This claim is brought on behalf of the Montana Subclass.

3009. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3010. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3011. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**PP.    Claims Brought on Behalf of the Nebraska Subclass**

## COUNT 253

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
(NEB. REV. STAT. § 59-1601 *et seq.*)

3012. Nebraska Plaintiffs ("Plaintiffs" for purposes of all Nebraska Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3013. This claim is brought on behalf of the Nebraska Subclass.

3014. The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602.

3015. FCA, Plaintiffs, and Class members are "person[s]" under NEB. REV. STAT. § 59-1601(1).

3016. FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

3017. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil

825 of 960

Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3018. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels

- 799 -

and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3019. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3020. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3021. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3022. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3023. FCA knew or should have known that its conduct violated this statute.

3024. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3025. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3026. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3027. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3028. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3029. Because FCA's conduct caused injury to Plaintiffs and the Class' property through violations of the Nebraska CPA, Plaintiffs and the Class seek recovery of actual damages as well as enhanced damages up to $1,000, an order enjoining FCA's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

3030. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 254

## BREACH OF CONTRACT
## (BASED ON NEBRASKA LAW)

3031. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3032. This claim is brought on behalf of the Nebraska Subclass.

3033. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3034. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3035.  As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 255

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON NEBRASKA LAW)

3036.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3037.  This claim is brought on behalf of the Nebraska Subclass.

3038.  FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3039.  FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3040.  As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3041. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3042. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3043. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 256

## FRAUDULENT CONCEALMENT
## (BASED ON NEBRASKA LAW)

3044. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

3045. This claim is brought on behalf of the Nebraska Subclass.

3046. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3047. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3048. FCA knew these representations were false when made.

3049. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3050. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3051. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3052. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3053. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3054. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels

of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3055. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA

represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3056. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3057. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3058. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3059. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3060. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3061. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 257

## NEGLIGENT MISREPRESENTATION
### (BASED ON NEBRASKA LAW)

3062. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

- 810 -

3063. This claim is brought on behalf of the Nebraska Subclass.

3064. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3065. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3066. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 258

### UNJUST ENRICHMENT
### (BASED ON NEBRASKA LAW)

3067. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3068. This claim is brought on behalf of the Nebraska Subclass.

3069. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3070. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3071. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**QQ.  Claims brought on behalf of the New Hampshire Subclass**

**COUNT 259**

**VIOLATION OF THE NEW HAMPSHIRE
CONSUMER PROTECTION ACT
(N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)**

3072. New Hampshire Plaintiffs ("Plaintiffs" for purposes of all New Hampshire Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3073. This claim is brought on behalf of the New Hampshire Subclass.

3074. FCA, Plaintiffs, and Class members are "persons" under N.H. REV. STAT. ANN. § 358-A:1.

3075. FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. § 358-A:1.

3076. The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including "but . . . not limited to, the following: . . . [r]epresenting that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a

particular standard, quality, or grade, . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised and certified." N.H. REV. STAT. § 358-A:2.

3077. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3078. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3079. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3080. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3081. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3082. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3083. FCA knew or should have known that its conduct violated this statute.

3084. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3085. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not

expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3086. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3087. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3088. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3089. Because FCA's willful conduct caused injury to Plaintiffs and Class members' property through violations of the New Hampshire CPA, Plaintiffs and

the Class seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining FCA's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

3090. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 260

## BREACH OF CONTRACT
## (BASED ON NEW HAMPSHIRE LAW)

3091. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3092. This claim is brought on behalf of the New Hampshire Subclass.

3093. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess

harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3094. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3095. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 261

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON NEW HAMPSHIRE LAW)

3096. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3097. This claim is brought on behalf of the New Hampshire Subclass.

3098. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3099. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3100. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3101. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3102. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3103. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and

Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 262

### FRAUDULENT CONCEALMENT
### (BASED ON NEW HAMPSHIRE LAW)

3104. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3105. This claim is brought on behalf of the New Hampshire Subclass.

3106. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3107. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3108. FCA knew these representations were false when made.

3109. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3110. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3111. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3112. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3113. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3114. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3115. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3116. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3117. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3118. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3119. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3120. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3121. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 263

## NEGLIGENT MISREPRESENTATION
## (BASED ON NEW HAMPSHIRE LAW)

3122. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3123. This claim is brought on behalf of the New Hampshire Subclass.

3124. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3125. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3126. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 264

## UNJUST ENRICHMENT
## (BASED ON NEW HAMPSHIRE LAW)

3127. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3128. This claim is brought on behalf of the New Hampshire Subclass.

3129. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3130. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3131. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**RR.   Claims brought on behalf of the New Mexico Subclass**

**COUNT 265**

**VIOLATION OF THE NEW MEXICO
UNFAIR TRADE PRACTICES ACT
(N.M. STAT. ANN. § 57-12-1 *et seq.*)**

3132. New Mexico Plaintiffs ("Plaintiffs" for purposes of all New Mexico Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3133. This claim is brought on behalf of the New Mexico Subclass.

3134. FCA, Plaintiffs, and Class members are "person[s]" under N.M. STAT. ANN. § 57-12-2.

3135. FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

3136. The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

3137. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American

consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3138. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3139. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false

and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3140. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3141. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3142. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3143. FCA knew or should have known that its conduct violated this statute.

3144. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

   a.  Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

   b.  Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material

facts from Plaintiffs and the Class that contradicted these representations; and/or

c.     Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3145. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3146. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3147. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3148. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3149. Because FCA's unconscionable, willful conduct caused actual harm to Plaintiffs and Class members, Plaintiffs and the Class seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

3150. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 266

## BREACH OF CONTRACT
## (BASED ON NEW MEXICO LAW)

3151. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3152. This claim is brought on behalf of the New Mexico Subclass.

3153. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased

or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3154. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3155. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 267

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON NEW MEXICO LAW)

3156. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3157. This claim is brought on behalf of the New Mexico Subclass.

3158. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3159. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3160. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3161. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3162. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3163. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing

the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 268

## FRAUDULENT CONCEALMENT
## (BASED ON NEW MEXICO LAW)

3164. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3165. This claim is brought on behalf of the New Mexico Subclass.

3166. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3167. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the

vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3168. FCA knew these representations were false when made.

3169. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3170. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3171. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3172. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3173. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3174. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3175. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide

information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3176. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3177. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3178. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3179. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3180. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3181. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient

to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 269

## NEGLIGENT MISREPRESENTATION
### (BASED ON NEW MEXICO LAW)

3182. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3183. This claim is brought on behalf of the New Mexico Subclass.

3184. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3185. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3186. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 270

## UNJUST ENRICHMENT
### (BASED ON NEW MEXICO LAW)

3187. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3188. This claim is brought on behalf of the New Mexico Subclass.

3189. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3190. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3191. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**SS.    Claims brought on behalf of the North Dakota Subclass**

### COUNT 271

### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### (N.D. CENT. CODE § 51-15-02)

3192. North Dakota Plaintiffs ("Plaintiffs" for purposes of all North Dakota Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3193. This claim is brought on behalf of the North Dakota Subclass.

3194. FCA, North Dakota Plaintiffs, and North Dakota Subclass members are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

3195. FCA engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

3196. The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. CENT. CODE § 51-15-02.

3197. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive

trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3198. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3199. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's

deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3200.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

3201.  FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3202.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3203.  FCA knew or should have known that its conduct violated this statute.

3204.  FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.  Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.  Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.  Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3205. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3206. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3207. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3208. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3209. Plaintiffs seek monetary relief against FCA in an amount to be determined at trial.

3210. FCA knowingly committed the conduct described above and therefore, under N.D. CENT. CODE § 51-15-09, FCA is liable to Plaintiffs and the Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs and the Class further seek an order enjoining FCA's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

3211. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 272

### BREACH OF CONTRACT
### (BASED ON NORTH DAKOTA LAW)

3212. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3213. This claim is brought on behalf of the North Dakota Subclass.

3214. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil

Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3215. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3216. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 273

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON NORTH DAKOTA LAW)

3217. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3218. This claim is brought on behalf of the North Dakota Subclass.

3219. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3220. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3221. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3222. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3223. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and

Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3224. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 274

## FRAUDULENT CONCEALMENT
## (BASED ON NORTH DAKOTA LAW)

3225. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3226. This claim is brought on behalf of the North Dakota Subclass.

3227. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3228. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3229. FCA knew these representations were false when made.

3230. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3231. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3232. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3233. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3234. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3235. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3236. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty

to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.   Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3237. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3238. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3239. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3240. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3241. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3242. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 275

## NEGLIGENT MISREPRESENTATION
## (BASED ON NORTH DAKOTA LAW)

3243. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3244. This claim is brought on behalf of the North Dakota Subclass.

3245. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3246. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3247. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 276

### UNJUST ENRICHMENT
### (BASED ON NORTH DAKOTA LAW)

3248. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3249. This claim is brought on behalf of the North Dakota Subclass.

3250. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3251. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3252. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

TT.   **Claims brought on behalf of the Rhode Island Subclass**

## COUNT 277

## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1 *et seq.*)

3253. Rhode Island Plaintiffs ("Plaintiffs" for purposes of all Rhode Island Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3254. This claim is brought on behalf of the Rhode Island Subclass.

3255. FCA, Plaintiffs, and Class members are "persons" within the meaning of R.I. GEN. LAWS § 6-13.1-1(3).

3256. FCA was engaged in "trade" and "commerce" within the meaning of R.I. GEN. LAWS § 6-13.1-1(5).

3257. Plaintiffs purchased or leased Defective Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

3258. Rhode Island's Unfair Trade Practices and Consumer Protection Act (Rhode Island CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," including "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" and "[u]sing any other methods, acts or practices

which mislead or deceive members of the public in a material respect." R.I. GEN.

LAWS § 6-13.1-1(6).

3259. In the course of FCA's business, FCA willfully failed to disclose and

actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles

causes them to consume so much oil that the oil level becomes low in between

recommended oil changes, resulting in the sudden shut off of the Defective Vehicles

to protect the engine at the expense of vehicle occupant safety; (2) the Defective

Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil

Indicator defect—such that they have no opportunity to avert sudden shut off; and

(3) the Oil Consumption defect results in damage to the emissions system causing

the Defective Vehicles to emit harmful excess emissions. Particularly in light of the

representations in FCA's Owner's Manual, and in its national advertising campaign

touting the safety and reliability of the Defective Vehicles, a reasonable American

consumer would expect the Defective Vehicles to operate without known safety

hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive

trade practices, unfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect

of deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any

material fact with the intent that a consumer rely on the same in connection therewith.

3260. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3261. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3262. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3263. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3264. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3265. FCA knew or should have known that its conduct violated this statute.

3266. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3267. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage,

and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3268. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3269. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3270. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3271. Plaintiffs and the Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).

3272. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 278

## BREACH OF CONTRACT
## (BASED ON RHODE ISLAND LAW)

3273. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3274. This claim is brought on behalf of the Rhode Island Subclass.

3275. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3276. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3277.  As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 279

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON RHODE ISLAND LAW)

3278. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3279. This claim is brought on behalf of the Rhode Island Subclass.

3280. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3281. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3282. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3283. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3284. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3285. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 280

## FRAUDULENT CONCEALMENT
## (BASED ON RHODE ISLAND LAW)

3286. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3287. This claim is brought on behalf of the Rhode Island Subclass.

3288. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3289. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3290. FCA knew these representations were false when made.

3291. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3292. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3293. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3294. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3295. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3296. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels

of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3297. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA

represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3298. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3299. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3300. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3301. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3302. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3303. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 281

## NEGLIGENT MISREPRESENTATION
## (BASED ON RHODE ISLAND LAW)

3304. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3305. This claim is brought on behalf of the Rhode Island Subclass.

3306. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3307. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3308. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 282

## UNJUST ENRICHMENT
## (BASED ON RHODE ISLAND LAW)

3309. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3310. This claim is brought on behalf of the Rhode Island Subclass.

3311. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3312. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3313. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**UU.  Claims Brought on Behalf of the South Dakota Subclass**

**COUNT 283**

**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(S.D. CODIFIED LAWS § 37-24-6)**

3314. South Dakota Plaintiffs ("Plaintiffs" for purposes of all South Dakota Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3315. This claim is brought on behalf of the South Dakota Subclass.

3316. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which include "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. CODIFIED LAWS §§ 37-24-6(1), 37-24-31.

3317. All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce.

3318. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3319. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3320. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3321. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3322. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3323. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3324. FCA knew or should have known that its conduct violated this statute.

3325. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3326. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to

warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3327. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3328. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3329. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3330. Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs and the Class are entitled to a recovery of their actual damages suffered as a result of FCA's acts and practices.

3331. Plaintiffs and the Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct.

## COUNT 284

## BREACH OF CONTRACT
## (BASED ON SOUTH DAKOTA LAW)

3332. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3333. This claim is brought on behalf of South Dakota Subclass.

3334. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3335. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects

described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3336.  As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 285

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON SOUTH DAKOTA LAW)

3337. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3338. This claim is brought on behalf of the South Dakota Subclass.

3339. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3340. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3341. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3342. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3343. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3344. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 286

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH DAKOTA LAW)

3345. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3346. This claim is brought on behalf of the South Dakota Subclass.

3347. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3348. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3349. FCA knew these representations were false when made.

3350. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3351. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3352. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3353. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3354. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3355. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels

of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3356. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA

represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3357. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3358. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3359. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3360. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3361. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3362. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 287

## NEGLIGENT MISREPRESENTATION
## (BASED ON SOUTH DAKOTA LAW)

3363. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3364. This claim is brought on behalf of the South Dakota Subclass.

3365. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3366. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3367. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 288

## UNJUST ENRICHMENT
## (BASED ON SOUTH DAKOTA LAW)

3368. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3369. This claim is brought on behalf of the South Dakota Subclass.

3370. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3371. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3372. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## VV.   Claims Brought on Behalf of the Utah Subclass

### COUNT 289

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)

3373. Utah Plaintiffs ("Plaintiffs" for purposes of all Utah Subclass claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3374. This claim is brought on behalf of the Utah Subclass.

3375. The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including but not limited to indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; and "indicat[ing] that a specific price advantage exists, if it does not." UTAH CODE ANN. § 13-11-4.

3376. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between

recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3377. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they

become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3378. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3379. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3380. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3381. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3382. FCA knew or should have known that its conduct violated this statute.

3383. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

    b.    Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3384. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their

vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3385. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3386. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3387. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3388. FCA knew, or had reason to know, that consumers would rely on their failure to disclose the defects in its emissions system. FCA therefore engaged in an unconscionable act within the meaning of UTAH CODE ANN. § 13-11-5.

3389. Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs and the Class seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available

under the Utah CSPA. Plaintiffs and the Class also seek an award of punitive damages due to FCA's aggravated and outrageous conduct.

3390. On May 22, 2020, a copy of the *Davis et al. v. FCA US LLC* complaint, which has since been consolidated with this action, was mailed to the Attorney General of the State of Utah in accordance with UTAH CODE ANN. § 13-11-4, *et seq*.

## COUNT 290

## BREACH OF CONTRACT
## (BASED ON UTAH LAW)

3391. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3392. This claim is brought on behalf of the Utah Subclass.

3393. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3394. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3395. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 291

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON UTAH LAW)

3396. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3397. This claim is brought on behalf of the Utah Subclass.

3398. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3399. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3400. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3401. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3402. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3403. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty

disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

**COUNT 292**

**FRAUDULENT CONCEALMENT**
**(BASED ON UTAH LAW)**

3404. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3405. This claim is brought on behalf of the Utah Subclass.

3406. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3407. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3408. FCA knew these representations were false when made.

3409. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3410. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3411. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3412. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3413. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception

on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3414. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3415. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased

or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3416. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3417. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3418. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the

Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3419. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3420. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3421. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

3422. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Utah Plaintiff's and the Utah Subclass's rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT 293**

**NEGLIGENT MISREPRESENTATION
(BASED ON UTAH LAW)**

3423. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3424. This claim is brought on behalf of the Utah Subclass.

3425. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3426. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3427. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 294

## UNJUST ENRICHMENT
## (BASED ON UTAH LAW)

3428. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3429. This claim is brought on behalf of the Utah Subclass.

3430. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3431. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3432. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

### WW. Claims brought on behalf of the Vermont Subclass

### COUNT 295

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

3433. Vermont Plaintiffs ("Plaintiffs" for purposes of all Vermont Subclass claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3434. This claim is brought on behalf of the Vermont Subclass.

3435. FCA was a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

3436. The Vermont Consumer Fraud Act (Vermont CFA) makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." VT. STAT. ANN. TIT. 9, § 2453(a).

3437. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing

the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3438. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3439. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3440. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3441. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3442. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3443. FCA knew or should have known that its conduct violated this statute.

3444. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

b.   Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3445. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3446. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3447. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3448. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3449. Plaintiffs and the Class are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

3450. Plaintiffs and the Class seek punitive damages based on the outrageousness and recklessness of FCA's conduct.

## COUNT 296

## BREACH OF CONTRACT
## (BASED ON VERMONT LAW)

3451. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3452. This claim is brought on behalf of the Vermont Subclass.

3453. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3454. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3455. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall

include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 297

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (BASED ON VERMONT LAW)

3456. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3457. This claim is brought on behalf of the Vermont Subclass.

3458. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3459. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3460. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3461. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3462. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3463. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 298

## FRAUDULENT CONCEALMENT
## (BASED ON VERMONT LAW)

3464. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3465. This claim is brought on behalf of the Vermont Subclass.

3466. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3467. The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3468. FCA knew these representations were false when made.

3469. FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3470. FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3471. As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts

that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3472. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3473. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3474. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3475. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true

facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.  Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3476. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would

hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3477. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3478. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3479. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3480. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3481. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT 299**

**NEGLIGENT MISREPRESENTATION
(BASED ON VERMONT LAW)**

3482. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3483. This claim is brought on behalf of the Vermont Subclass.

3484. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3485. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3486. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 300

## UNJUST ENRICHMENT
## (BASED ON VERMONT LAW)

3487. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3488. This claim is brought on behalf of the Vermont Subclass.

3489. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3490. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members. It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3491. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## XX.   Claims brought on behalf of the Wyoming Subclass

## COUNT 301

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. § 40-12-105 *et seq.*)

3492. Wyoming Plaintiffs ("Plaintiffs" for purposes of all Wyoming Subclass claims) hereby reallege incorporate by reference all paragraphs as though fully set forth herein.

3493. This claim is brought on behalf of the Wyoming Subclass.

3494. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that: (1) the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that the oil level becomes low in between recommended oil changes, resulting in the sudden shut off of the Defective Vehicles to protect the engine at the expense of vehicle occupant safety; (2) the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off; and (3) the Oil Consumption defect results in damage to the emissions system causing the Defective Vehicles to emit harmful excess emissions. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Defective Vehicles, a reasonable American consumer would expect the Defective Vehicles to operate without known safety hazards or excess emissions. Accordingly, FCA engaged in unfair and deceptive

trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

3495. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Defective Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Defective Vehicles. FCA also willfully failed to disclose and actively concealed that the Defective Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off. Moreover, FCA willfully failed to disclose and actively concealed that the Defective Vehicles release harmful excess emissions.

3496. Plaintiffs and Class members reasonably relied upon FCA's misrepresentations and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's

deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Defective Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

3497. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3498. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

3499. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Class.

3500. FCA knew or should have known that its conduct violated this statute.

3501. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

 a. Possessed superior/exclusive knowledge of the design of the Defective Vehicles;

 b. Made incomplete representations regarding the operation and emissions levels, as well as the safety and durability, of the Defective Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

 c. Intentionally concealed the Oil Consumption, Oil Indicator, and the Excess Emissions defects from Plaintiffs and the Class.

3502. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off or that their vehicles would release excess harmful emissions. This is a reasonable and objective consumer expectation relating to the Defective Vehicles.

3503. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3504. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

3505. Because FCA fraudulently concealed the defects and the true level of emissions of the Defective Vehicles, a raft of negative publicity resulted once the defects finally began to be disclosed.

3506. Pursuant to WYO. STAT. § 40-12-108(a), Plaintiffs and the Class seek monetary relief against FCA measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA. Plaintiffs and the Class also seek an award of punitive damages due to FCA's aggravated and outrageous conduct.

3507. On April 29, 2020 and October 14, 2020, Plaintiffs sent letters complying with WYO. STAT. § 40-12-109 to FCA. Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs and the Class seek all damages and relief to which they are entitled.

## COUNT 302

## BREACH OF CONTRACT
## (BASED ON WYOMING LAW)

3508. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3509. This claim is brought on behalf of the Wyoming Subclass.

3510. FCA's misrepresentations and omissions alleged herein, including FCA's failure to disclose the Defective Vehicles' Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, caused Plaintiffs and the Class to

make their purchases or leases of the Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class would not have purchased or leased the Defective Vehicles, would not have purchased or leased the Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain these defects or release excess harmful emissions. Accordingly, Plaintiffs and the Class overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

3511. Each and every sale or lease of a Defective Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the Class the Defective Vehicles and by misrepresenting or failing to disclose that the Defective Vehicles contain the defects described above and release excess emissions, especially given the premium paid for these vehicles and the representations made by FCA.

3512. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 303

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON WYOMING LAW)

3513. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3514. This claim is brought on behalf of the Wyoming Subclass.

3515. FCA manufactured and distributed Defective Vehicles throughout the United States for sale to Plaintiffs and Class members.

3516. FCA impliedly warranted to Plaintiffs and the Class that their vehicles were free of defects and were merchantable and fit for their ordinary purpose.

3517. As alleged herein, FCA breached the implied warranty of merchantability because the Defective Vehicles suffer from the Oil Consumption defect, Oil Indicator defect, and the Excess Emissions defect. The Defective Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

3518. Plaintiffs and Class members have experienced the defects and have given notice to FCA that the Defective Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

3519. Due to the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, Plaintiffs and Class members are unable to operate their vehicles as intended in a safe condition, legally, and substantially free from defects. The Defective Vehicles do not provide safe and reliable transportation to Plaintiffs and

Class members. As a result, Plaintiffs and Class members are unable to safely drive their Defective Vehicles.

3520. Plaintiffs and Class members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

## COUNT 304

### FRAUDULENT CONCEALMENT
### (BASED ON WYOMING LAW)

3521. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3522. This claim is brought on behalf of the Wyoming Subclass.

3523. FCA intentionally misrepresented and concealed the Oil Consumption defect, Oil Indicator defect, and Excess Emissions defect, and the other above-described safety hazards or acted with reckless disregard for the truth, and denied

Plaintiffs and Class members information that is highly relevant to their purchasing decision.

3524.  The vehicles Plaintiffs and Class members purchased or leased were, in fact, defective, unsafe, unreliable, and would fail to operate properly when driven in normal usage because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds. Further, the Defective Vehicles release harmful excess emissions.

3525.  FCA knew these representations were false when made.

3526.  FCA had a duty to disclose this material safety information to Plaintiffs and Class members because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

3527.  FCA's concealment was material because if it had been disclosed, Plaintiffs and Class members would not have bought or leased the Defective Vehicles or paid as much for them.

3528.  As alleged in this complaint, at all relevant times, FCA has held out that the Defective Vehicles were EPA-compliant and produced an expected amount of emissions. But, nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles have defective emission controls, release a higher level of harmful emissions than expected by a reasonable consumer and state and federal law allows.

3529. The truth about the safety hazards, excess harmful emissions, and the defects described herein was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

3530. Plaintiffs and the Class reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and the Class did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' defects and excess harmful emissions.

3531. FCA's false representations and omissions were material to consumers because they concerned the safety of the Defective Vehicles, release excessive levels of harmful emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and the Class members, highly valued that the Defective Vehicles' safety and reliability.

3532. FCA had a duty to disclose that the Defective Vehicles are unsafe, contain defects and release excessive harmful emissions, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs and the Class members. FCA also had a duty

to disclose because it made general affirmative representations about the qualities of its vehicles with respect to safety, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual oil consumption or emission levels of the vehicles.   Having volunteered to provide information to Plaintiffs and the Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class members. Whether an automobile is safe and reliable and contains defects are material concerns to a consumer. Also, whether a manufacturer's products pollute, release excessive levels of harmful emissions, and whether the manufacturer tells the truth, are material concerns to a consumer. FCA represented to Plaintiffs and Class members that they were purchasing or leasing safe and reliable vehicles, when in fact the Defective Vehicles pose safety hazards and contain defects.

3533. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were unsafe or unreliable or not clean vehicles, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

3534. FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the safety and emission levels of its Defective Vehicles.

3535. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Defective Vehicles manufactured by FCA, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

3536. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have been injured and sustained damage because they overpaid for their vehicles and have suffered and continue to suffer repair/replacement and oil change costs over what was represented by FCA. Had they been aware of the true facts, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would have paid less.

3537. Accordingly, as a direct and proximate result of FCA's actions, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3538. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and the representations that FCA made to them in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 305

## NEGLIGENT MISREPRESENTATION
## (BASED ON WYOMING LAW)

3539. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3540. This claim is brought on behalf of the Wyoming Subclass.

3541. FCA made representations to Plaintiffs and members of the Class concerning the safety and emission levels of the Defective Vehicles that were not true.

3542. FCA had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3543. Plaintiffs reasonably relied on FCA's representations and as a result Plaintiffs and Class members were harmed.

## COUNT 306

## UNJUST ENRICHMENT
## (BASED ON WYOMING LAW)

3544. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3545. This claim is brought on behalf of the Wyoming Subclass.

3546. Because of FCA's wrongful acts and omissions, FCA charged a higher price for the Defective Vehicles than the vehicles' true value and FCA obtained monies which rightfully belong to Plaintiffs and Class members.

3547. FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

3548. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

**YY.  Claims Brought on Behalf of the Nationwide Class**

### COUNT 307

**VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301 *et seq.*)**

3549. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3550. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

3551. This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

3552. Plaintiffs and the other Nationwide Class members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Defective Vehicles for personal, family, or household purposes.

3553. FCA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells FCA vehicles accompanied by written Limited Warranties.

3554. The Defective Vehicles are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

3555. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

3556. The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

3557. FCA provided Plaintiffs and the members of the Nationwide Class with written and implied warranties, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

3558. FCA breached these written and implied warranties as described in detail above. FCA expressly warranted in advertisements and consumer-facing communications, including on the window stickers themselves that were affixed to the Defective Vehicles, that the Defective Vehicles were safe and reliable. FCA impliedly warranted that the Defective Vehicles would conform to the descriptions promised in FCA's advertisements and consumer-facing communications.

3559. FCA breached these express warranties because the Defective Vehicles maintain the Oil Consumption, Oil Indicator, and Excess Emissions defects. Moreover, FCA breached these implied warranties because the Defective Vehicles did not and do not conform to the descriptions advertised.

3560. The terms of the warranties became part of the basis of the bargain between FCA and the Plaintiffs and all other Class members when deciding to purchase a Defective Vehicle.

3561. Plaintiffs and each of the other Nationwide Class members have had sufficient direct dealings with either FCA or its agents (including FCA dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiffs and each of the other Nationwide Class members, on the other hand. Moreover, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between FCA and its dealers. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

3562. Because FCA knew of the defect at the time of the sale, it has waived any opportunity to cure.

3563. As a direct and proximate result of FCA's breach of written warranties and implied warranties of merchantability, Plaintiffs and Nationwide Class members have suffered damages in an amount to be determined at trial.

3564. Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including without limitation compensation for the

additional oil changes required to drive the Defective Vehicles, compensation for the inconvenience associated with the additional oil changes, and the monetary difference between the Defective Vehicles as warranted and as sold, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

3565. Plaintiffs have provided FCA with an opportunity to cure and provided multiple forms of written notice that they will be initiating suit.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.     Determining this action may be maintained as a Class action with respect to the Class and certify it as such under Rule 23(b)(2) and (b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.     Declaring, adjudging, and decreeing the conduct of the Defendant as alleged herein to be unlawful, unfair, and deceptive;

C.      Requiring that all Class members be notified about the Oil Consumption, Oil Indicator, and Excess Emissions defects, as explained herein, at FCA's expense;

D.      Awarding Plaintiffs and Class members restitution of all monies paid to Defendant as a result of unlawful, deceptive, and unfair business practices;

E.      Awarding Plaintiffs and Class members actual, compensatory damages as proven at trial;

F.      Ordering disgorgement of all profits wrongfully received by FCA for the Defective Vehicles.

G.      Awarding Plaintiffs and Class members all statutory penalties and exemplary damages, as allowed by law;

H.      Awarding Plaintiffs and Class members any and all equitable relief;

I.      Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and pre- and post-judgment interest;

J.      Awarding restitution, including at the election of Class members, recovery of the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles; and

K.      Such other or further relief as may be appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

- 930 -

DATED: October 21, 2020          Respectfully Submitted,

**THE MILLER LAW FIRM, P.C.**

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Elaine T. Byszewski
Christopher R. Pitoun
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (888) 381-2889
elaine@hbsslaw.com
christopherp@hbsslaw.com

**MCGUIRE LAW, P.C.**
Myles McGuire

- 931 -

Evan M. Meyers
Paul T. Geske
Timothy P. Kingsbury
55 W. Wacker Dr., 9th Fl.
Chicago, Illinois 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com
tkingsbury@mcgpc.com

*Interim Co-Lead Class Counsel for*
*Plaintiffs and the Putative Class*

**MCCUNE WRIGHT AREVALO, LLP**
Richard D. McCune
David C. Wright
Steven A. Haskins
Mark I. Richards
3281 E. Guasti, Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
rdm@mccunewright.com
dcw@mccunewright.com
sah@mccunewright.com
mir@mccunewright.com

**SAUDER SCHELKOPF**
Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

- 932 -

**BERGER MONTAGUE PC**
Russell D. Paul
Jeffrey L. Osterwise
Amey J. Park
Abigail J. Gertner
1818 Market Street Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
josterwise@bm.net
apark@bm.net
agertner@bm.net

*Interim Plaintiff's Steering Committee for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 21, 2020 I electronically filed the foregoing with the Clerk of the Court using the ECF system which will notify all counsel of record authorized to receive such filings.

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
epm@millerlawpc.com

- 934 -